## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PERKINS & MARIE CALLENDER'S INC.,[1] et al., | Case No. 11-11795 (KG) |
| Debtors. | (Joint Administration Pending) |

**EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (II) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO SECTIONS 105, 361, 362 AND 363 OF THE BANKRUPTCY CODE, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES PURSUANT TO SECTIONS 361, 362, 363 AND 364 OF THE BANKRUPTCY CODE, (IV) GRANTING LIENS AND SUPERPRIORITY CLAIMS, AND (V) SCHEDULING A FINAL HEARING ON THE DEBTORS' MOTION TO INCUR SUCH FINANCING ON A PERMANENT BASIS PURSUANT TO BANKRUPTCY RULES 4001(B) AND 4001(C)**

Perkins & Marie Callender's Inc. (f/k/a The Restaurant Company) ("PMCI") and its above-captioned affiliated debtor entities (collectively, with PMCI, the "Debtors"), by and through their undersigned proposed counsel, hereby respectfully submit this emergency motion (this "Motion") for entry of interim and final orders: (i) authorizing the Debtors to obtain postpetition financing pursuant to section 364 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"); (ii) authorizing the use of Cash Collateral (as hereinafter defined) pursuant to sections 105, 361, 362 and 363 of the Bankruptcy Code; (iii) granting adequate protection to the Prepetition Secured Parties (as hereinafter defined) pursuant to section 361, 362, 363 and 364 of the Bankruptcy Code; (iv) granting liens and superpriority claims; and

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Perkins & Marie Callender's Inc. (4388); Perkins & Marie Callender's Holding Inc. (3999); Perkins & Marie Callender's Realty LLC (N/A); Perkins Finance Corp. (0081); Wilshire Restaurant Group LLC (0938); PMCI Promotions LLC (7308); Marie Callender Pie Shops, Inc. (7414); Marie Callender Wholesalers, Inc. (1978); MACAL Investors, Inc. (4225); MCID, Inc. (2015); Wilshire Beverage, Inc. (5887); and FIV Corp. (3448). The mailing address for the Debtors is 6075 Poplar Avenue, Suite 800, Memphis, TN 38119.

(v) scheduling a final hearing on the Debtors' motion to incurred such financing on a permanent basis pursuant to Rules 4001(b) and (c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  In support of this Motion, the Debtors submit and incorporate by reference herein the "Declaration of Joseph F. Trungale in Support of Debtors' Chapter 11 Petitions and First Day Motions" and the "Declaration of Joseph H. Santarlasci, Jr. in Further Support of the Debtor' Postpetition Debtor-in-Possession Financing" filed contemporaneously with this Motion.  In further support of this Motion, the Debtors respectfully state as follows:

## Jurisdiction and Venue

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2. Venue of the above-captioned chapter 11 cases and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory and legal predicates for the relief requested herein are sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rule 4001(b) and (c).

## Factual Background

4. On June 13, 2011 (the "Petition Date"), each of the Debtors filed a voluntary petition (collectively, the "Petitions") for relief under chapter 11 of the Bankruptcy Code, and each thereby commenced chapter 11 cases (collectively, the "Chapter 11 Cases") in this Bankruptcy Court (the "Court").  No request has been made for the appointment of a trustee or examiner, and the Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no Official Committee of Unsecured Creditors ("Committee") has been appointed in any of the Chapter 11 Cases.

YCST01:11167164.1                                       070242.1001

**A. The Debtors' Businesses**

5.      The Debtors are one of the leading operators of family-dining and casual-dining restaurants, under their two (2) highly-recognized brands: (i) their full-service family dining restaurants located primarily in the Midwest, Florida and Pennsylvania under the name "Perkins Restaurant and Bakery" ("Perkins"), and (ii) their mid-priced, full-service casual-dining restaurants, specializing in the sale of pies and other bakery items, located primarily in the western United States under the name "Marie Callender's Restaurant and Bakery" ("Marie Callender's").

6.      Through the Debtors' Foxtail Foods bakery goods manufacturing operations ("Foxtail"), the Debtors offer pies, muffin batters, cookie doughs, pancake mixes, and other food products for sale to both company-owned and franchised Perkins and Marie Callender's restaurants, and to unaffiliated customers, such as food service distributors and supermarkets, as well as on-line to the public.  Foxtail operates one (1) manufacturing facility located in Corona, California, at which it produces pies and other bakery products primarily for the Marie Callender's restaurants, and two (2) facilities in Cincinnati, Ohio, at which it produces pies, pancake mixes, cookie doughs, muffin batters and other baking products primarily for the Perkins restaurants and various third-party customers.  Prior to that certain asset sale transaction with ConAgra Foods RDM, Inc. ("RDM") described below, the Debtors licensed to ConAgra Foods, Inc. (f/k/a ConAgra, Inc.) and RDM (collectively, "ConAgra") the use of the registered name "Marie Callender's" in connection with the manufacture and distribution of various food products by ConAgra in various domestic and foreign markets pursuant to licensing/distribution agreements. Effective as of June 9, 2011, Marie Callender Pie Shops, Inc.("MCPSI"), one of the within Debtors  sold its ownership of its material "Marie Callender's" trademarks to RDM pursuant to a certain "Asset Purchase Agreement" dated as of June 9, 2011 (the "Trademark Sale

3

Transaction"). Concomitantly, RDM and MCPSI entered into a certain "Trademark License Agreement", dated as of June 9, 2011, pursuant to which the Debtors received a perpetual, royalty-free, worldwide license to use the applicable trademarks in connection with restaurant operations and the sale of fresh bakery products.

7.      Perkins, founded in 1958, offers a full menu of over ninety (90) assorted breakfast, lunch, dinner, snack and dessert items.  Breakfast items, which are available throughout the day, account for approximately half of the entrees sold in the Perkins restaurants.

8.      Marie Callender's, founded in 1948, has one of the longest operating histories within the full-service dining sector.  Marie Callender's is known for serving quality food in a warm and pleasant atmosphere and for its premium pies that are baked fresh daily.

9.      As of April 17, 2011, the Debtors owned and operated one hundred sixty (160) Perkins restaurants located in thirteen (13) states, and franchised three hundred fourteen (314) Perkins restaurants located in thirty-one (31) states and five (5) Canadian provinces.  Similarly, the Debtors owned and operated eighty-five (85) Marie Callender's restaurants located in nine (9) states, and franchised thirty seven (37) Marie Callender's restaurants located in four (4) states and Mexico.[2]  Thus, the Debtors operate or franchise approximately six hundred (600) restaurants throughout the United States, Canada and Mexico.*

10.      As of April 17, 2011, the Debtors employed approximately twelve thousand three hundred fifty (12,350) employees, consisting of approximately five thousand three hundred fifty (5,350) part-time employees and approximately seven thousand (7,000) full-time employees.*

---

[2]      Included therein, MCPSI operates two (2) "Callender's Grill" restaurants in Los Angeles, California and a single "East Side Mario's" restaurant in Lakewood, California.

*      Immediately prior to the Petition Date, the Debtors initiated a store reduction program to discontinue approximately sixty-five (65) corporate-operated restaurant locations, which will have the attendant effect of a reduction in workforce of approximately 2,500 people.

11. The Debtors' revenues for the year ended December 26, 2010 were approximately $507 million.

**B.  Corporate Structure and Pre-Petition Capitalization**

12. Perkins & Marie Callender's Holding Inc. (f/k/a The Restaurant Holding Corporation) ("PMC Holding") is a holding company that wholly owns PMCI. PMCI is the Debtors' principal operating entity and the primary obligor on the Debtors' pre-Petition Date senior secured working capital facility and their secured and unsecured bond debt. PMCI directly or indirectly owns and operates the Debtors' restaurant operations, oversees the Debtors' franchised restaurant operations, and owns and operates its Foxtail business.

13. PMCI owns and controls one hundred (100%) percent of Perkins & Marie Callender's Realty LLC (f/k/a TRC Realty LLC), Perkins Finance Corp., PMCI Promotions LLC ("Promotions"), and Wilshire Restaurant Group LLC ("Wilshire"). Through Wilshire, PMCI owns and controls one hundred (100%) percent of MCPSI which, in turn, owns and controls one hundred (100%) percent of Marie Callender Wholesalers, Inc., MACAL Investors, Inc., MCID, Inc., Wilshire Beverage, Inc., and FIV Corp. MCPSI, together with its wholly-owned subsidiaries, owns and operates the Marie Callender's corporate and franchised restaurant operations. The foregoing direct and indirect wholly-owned subsidiaries of PMCI are hereinafter referred to as the "Subsidiary Debtors"; and the Subsidiary Debtors, exclusive of Promotions, are hereinafter referred to as the "Guarantor Subsidiary Debtors".

14. Pursuant to that certain Indenture, dated as September 21, 2005 (as amended, the "Senior Notes Indenture"), among PMCI, The Bank of New York Mellon Trust Company N.A., as successor trustee thereunder, and certain other parties, PMCI issued $190 million in aggregate principal amount of 10% Senior Notes due 2013 (the "Senior Notes"), with a maturity date of October 1, 2013 and interest payable semi-annually on April 1 and October 1 of each year. The

5

Senior Notes are unsecured obligations of PMCI and are guaranteed on an unsecured basis by the Guarantor Subsidiary Debtors.

15.     Pursuant to that certain Indenture, dated as of September 24, 2008 (as amended, the "Secured Notes Indenture"), among PMCI, The Bank of New York Mellon Trust Company N.A., as successor trustee thereunder (the "Secured Notes Trustee"), The Bank of New York Mellon, as collateral agent (the "Collateral Agent"), and certain other parties, PMCI issued $132 million in aggregate principal amount of 14% Senior Secured Notes due 2013 of which approximately $103 million in aggregate principal amount are currently outstanding (the "Secured Notes"), with a maturity date of May 31, 2013 and interest payable semi-annually on May 31 and November 30 of each year.  The Secured Notes are guaranteed by PMC Holding and the Guarantor Subsidiary Debtors and are secured on a second lien basis by substantially all of the assets of PMCI, PMC Holding and the Guarantor Subsidiary Debtors.

16.     Concurrently with the issuance of the Secured Notes, PMCI and PMC Holding entered into a Credit Agreement dated as of September 24, 2008 (as amended, the "Prepetition Credit Agreement") with Wells Fargo Capital Finance, LLC (f/k/a Wells Fargo Foothill, LLC) ("Wells Fargo") as the lender and administrative agent (the "Prepetition Agent"), consisting of a revolving credit facility in favor of PMCI, as borrower, of up to $26,000,000, with a sub-limit of $15,000,000 for the issuance of letters of credit (collectively, the "Prepetition Credit Facility"). The Prepetition Credit Facility is guaranteed by PMC Holding and the Guarantor Subsidiary Debtors and is secured on a first lien basis by substantially all of the assets of PMCI, PMC Holdings and the Guarantor Subsidiary Debtors.

17.     By virtue of the issuance of the Secured Notes and the establishment of the Prepetition Credit Facility (the indebtedness and other obligations thereunder, collectively the "Prepetition Secured Indebtedness"), each of the Debtors (other than Promotions) is primarily or

6

secondarily liable and obligated for the repayment of all of the aforesaid Prepetition Secured Indebtedness and substantially all of their respective assets constitute collateral therefor (collectively, the "Prepetition Collateral").  The Prepetition Agent, the Prepetition Lenders, the Secured Notes Trustee, the Collateral Agent and the holders of the Secured Notes are referred to collectively as the "Prepetition Secured Parties".  By virtue of the issuance of the Senior Notes, each of the Debtors (other than Promotions and PMC Holding) is primarily or secondarily liable and obligated for the repayment of the Senior Notes.

18.     Pursuant to that certain Intercreditor Agreement dated as of September 24, 2008 (as amended, restated, supplemental or otherwise modified from time to time, the "Intercreditor Agreement") the Prepetition Agent and the Collateral Agent are parties to an intercreditor arrangement that governs the respective rights, obligations and priorities of the Prepetition Agent, the lenders under the Prepetition Credit Agreement (the "Prepetition Lenders"), the Collateral Agent, the Secured Notes Trustee and the holders of the Secured Notes with respect to their respective interests in the Prepetition Collateral.  Pursuant to the Intercreditor Agreement, the liens held by the Prepetition Agent, on behalf of the Prepetition Lenders are senior in priority to the liens and security interests held by the Collateral Agent for the benefit of itself, the Secured Notes Trustee and the Secured Noteholders, on all Prepetition Collateral.

19.     After application of the proceeds from the Trademark Sale Transaction, as of the Petition Date, approximately $103,000,000 in aggregate principal amount of the Secured Notes are outstanding, $190,000,000 in aggregate principal amount of the Senior Notes are outstanding, and approximately $10,060,000 in principal amount is outstanding under the Prepetition Credit Facility (comprised almost entirely of outstanding letters of credit (the "Existing Letters of Credit")).

20.     In addition to the foregoing, as of the Petition Date, the Debtors had outstanding approximately $8,600,000 in unpaid trade debt to their vendors and suppliers.

**C.     Events Leading to the Debtors' Chapter 11 Cases**

21.     Prior to the commencement of these Chapter 11 Cases, the Debtors' operations and financial performance were severely and adversely affected due to excessive leverage and poor sales results.  The poor economic climate has been a primary factor in the decline in restaurant sales, particularly in Florida and California where there are large concentrations of Perkins and Marie Callender's restaurants, and where high foreclosure rates and depressed economies have prevailed.  With overall unemployment rates at record high levels, discretionary income for many historically-loyal customers and other consumers has been severely constrained, directly correlating to depressed restaurant sales and reduced or eliminated customer traffic.  Restaurant sales were also negatively impacted by a lack of restaurant remodeling expenditures due to the Debtors' internal constraints on deploying cash for capital expenditures.  As better resourced competitors continued to build new locations and upgrade their existing facilities (and in some cases, through the vehicle of their own chapter 11 proceedings, restructured their financial affairs), many of the Debtors' restaurants became facially dated and stale, which also negatively impacted the ability of the Debtors to maintain customer traffic at the levels prevailing prior to the economic downturn.

22.     On April 1, 2011, the Debtors obligated thereunder were unable and failed to make a scheduled interest payment of $9,500,000 on the Senior Notes.  After the passage of thirty (30) days from April 1, without payment of such interest, such default became an Event of Default under the Senior Notes Indenture, permitting potential acceleration of the Senior Notes by the holders of at least twenty-five (25%) percent in aggregate principal amount of the Senior Notes.  The occurrence of the interest default and subsequent Event of Default (as defined in the

8

Senior Notes Indenture) resulting therefrom also gave rise to various potential collection and enforcement remedies available to the indenture trustee for, and the holders of, the Senior Notes and to the Prepetition Agent under the Prepetition Credit Agreement. Certain technical defaults also existed under the Prepetition Credit Agreement as to which the Prepetition Agent had similar potential rights and remedies. Effective April 30, 2011, PMCI and various of the other Debtors entered into two (2) forbearance agreements (collectively, the "Forbearance Agreements"). On or about May 4, 2011, PMCI, the Guarantor Subsidiary Debtors and the holders of in excess of eighty (80%) percent in aggregate principal amount of the Senior Notes entered into a forbearance agreement, pursuant to which said holders agreed to forbear from exercising any and all of their rights and remedies with respect to the aforesaid payment default and other existing and anticipated defaults and Events of Default through and including June 30, 2011 (the "Senior Note Forbearance Agreement"). Additionally, on or about May 9, 2011, the Debtors (other than Promotions) entered into a forbearance agreement (the "Wells Forbearance Agreement") with the Prepetition Lender and the Prepetition Agent under the Prepetition Credit Agreement (triggered by certain technical defaults thereunder including the nonpayment of the semi-annual interest payment on the Senior Notes) pursuant to which the Prepetition Lender and Prepetition Agent agreed to forbear from exercising any and all of their rights and remedies to and until June 30, 2011.

23. During the window of opportunity created by the execution and delivery of the Forbearance Agreements, the Debtors entered into negotiations with the holders of the Senior Notes signatory to the Senior Note Forbearance Agreement (and the holders of one hundred (100%) percent of the Secured Notes) (collectively, the "Restructuring Support Parties") which negotiations were designed to restructure and recapitalize the Debtors' businesses and balance sheet. To that end, in the weeks preceding the Petition Date, the Debtors and said noteholders

entered into a "Restructuring Support Agreement" dated as of June 6, 2011, designed to mutually and consensually develop and agree upon the parameters of a reorganization program for the Debtors that will, among other things, delever the Debtors' capital structure, and thereby establish a pre-filing blueprint for an efficient and effective chapter 11 reorganization process. In connection with entering into the Restructuring Support Agreement, the Debtors and Restructuring Support Parties also negotiated the principal terms of the Debtors' plan of reorganization, and such plan of reorganization and the accompanying disclosure statement will be filed with the Court on or before July 14, 2011 in accordance with the milestones contained in the Restructuring Support Agreement.

### Debtors' Urgent Need for Postpetition Financing and Use of Cash Collateral

24.     During the ordinary course of their operations and the sale of their products, the Debtors generate "cash collateral" as such term is defined in section 363 of the Bankruptcy Code (the "Cash Collateral").  The Debtors need to use Cash Collateral in the normal course of their business in order to, among other things, make essential payments on account of, among other things, employee payroll, benefits, taxes, PACA claims and claims pursuant to section 503(b)(9) of the Bankruptcy Code, and to otherwise purchase postpetition goods and services that are necessary to the continued postpetition operation of the Debtors' businesses.

25.     As set forth above, the Prepetition Secured Indebtedness is secured by prepetition liens on substantially all of the Debtors' assets, including the Cash Collateral.  The Debtors do not have any material unencumbered cash with which to operate their businesses.  The Prepetition Secured Creditors are unwilling to permit the Debtors to use the Cash Collateral on terms other than those set forth in this Motion and in the DIP Facility Documents (as hereinafter defined).

26.     Even the use of Cash Collateral, however, would be insufficient to fund the Debtors' ongoing funding requirements for the operation of their businesses in an orderly manner.  The Debtors need to supplement their use of Cash Collateral with the financing proposed to be provided under the secured debtor-in-possession financing facility (hereinafter the "DIP Facility") that would be established pursuant to (i) that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement (as the same may be amended or modified from time to time, the "DIP Facility Agreement")[3] by and among PMC Holding, as parent, PMCI, as borrower, the lenders party thereto (collectively, the "DIP Lenders"), and Wells Fargo, as administrative agent thereunder (the "DIP Agent"), and (ii) the other agreements, documents, notes, and instruments delivered in connection therewith (collectively with the DIP Facility Agreement, the "DIP Facility Documents").  The Debtors' use of Cash Collateral, and the proceeds of the DIP Facility, shall be limited to expenditures permitted under the DIP Facility Documents.

27.     Accordingly, in order to obtain the use of Cash Collateral and the financing available under the DIP Facility, and to avoid immediate and irreparable harm to the Debtors' business operations and their estates, the Debtors seek, among other things, emergency interim approval of this Motion.

### The DIP Facility

28.     As of the Petition Date, the amount outstanding under the Prepetition Credit Facility consisted almost entirely of approximately $10,060,000 of the issued non-cash collateralized Existing Letters of Credit.

---

[3]     Except to the extent defined herein, capitalized terms used in this Motion shall have the definitions set forth in the DIP Facility Agreement.  A copy of the DIP Facility Agreement is attached as "Exhibit A" to this Motion.

29.     Under the DIP Facility, which will perpetuate the aforesaid letters of credit facility and said issued letters of credit, the Prepetition Agent and Prepetition Lenders will additionally provide the requisite and sufficient working capital through a revolving credit facility.

30.     Pursuant to Bankruptcy Rule 4001, the Debtors set forth significant elements of the DIP Facility and the DIP Facility Documents, as follows[4]:

| **Name of Each Entity with An Interest In Cash Collateral** | (i) Prepetition Agent, (ii) Prepetition Lenders; (iii) Secured Notes Trustee, (iv) the Collateral Agent and (v) holders of Secured Notes. |
| --- | --- |
| **Amount of DIP Facility**<br><br>**See DIP Facility Agreement §2.1 and §2.11** | Interim maximum amount is $16.0 million; and final maximum amount is $21.0 million.<br><br>Comprised of a postpetition revolving credit facility in the maximum principal amount of $21.0 million ($16.0 million, until entry of the Final Order (as hereinafter defined). Includes a subfacility thereunder, of $15.0 million, for the issuance of postpetition letters of credit (the "<u>DIP Facility Letters of Credit</u>").<br><br>Availability under the DIP Facility is not tied to a borrowing base, but is basically limited to the amount necessary to fund general corporate needs (including working capital needs) in accordance with the applicable 13-Week Budget.<br><br>Upon entry of the Interim Order,[5] all Existing Letters of Credit (aggregating $10,058,760 in face amount) will be integrated into the DIP Facility and be deemed to have been issued under the DIP Facility, and thereupon will constitute DIP Facility Letters of Credit. On account thereof, and subject to the limits on availability described below, an aggregate principal amount of $5,941,240 will remain available under the DIP Facility for postpetition revolving loans (or issuances of additional letters of credit) thereunder, pending entry of the Final Order.<br><br>Upon entry of the Final Order, the balance of the availability under |

---

[4]     The terms and conditions of the DIP Facility set forth in this Motion are intended solely for informational purposes to provide the Court and interested parties with a brief overview of the significant terms thereof and should only be relied upon as such. For a complete description of the terms and conditions of the DIP Facility, reference should be made to the DIP Facility Documents and the Interim Order (as hereinafter defined). The summary herein is qualified in its entirety by reference to such documents and such order. Interested parties are strongly encouraged to read the operative documents and such order. In the event there is a conflict or inconsistency between this Motion and the operative documents or such order, the operative documents or such order, as applicable, shall control in all respects.

[5]     A copy of the proposed Interim Order is attached as "<u>Exhibit B</u>" to this Motion.

| | |
|---|---|
| | the DIP Facility will become available, subject to the referenced limits on availability, and will be used, among other purposes, to repay any then-remaining outstanding Prepetition Secured Indebtedness (other than the converted Existing Letters of Credit) under the Prepetition Credit Agreement. No portion of the outstanding Prepetition Secured Indebtedness relating to the Secured Notes is to be rolled up into the DIP Facility. |
| **Borrowing Base** | None. |
| **Limits on Availability**<br><br>**See DIP Facility Agreement §2.1 and §2.11** | The aggregate amount otherwise available under the DIP Facility ($16.0 million, until entry of the Final Order; and $21.0 million thereafter) for revolving loans or (subject to the sublimit therefor) issuance of letters of credit shall be limited to an amount equal to the lesser of:<br><br>(i)     various reserves; and<br><br>(ii)    the amount necessary to fund the general corporate needs (including working capital needs) of the Debtors in accordance with the 13-Week Budget. |
| **Use of Proceeds**<br><br>**See DIP Facility Agreement §6.13** | Permitted to be used for the following: (i) upon entry of the Final Order, to repay (if any) in full all Prepetition Secured Indebtedness (if any) then outstanding under the Prepetition Credit Facility (expected to be de minimis) (other than Existing Letters of Credit, which are deemed to be DIP Facility Letters of Credit upon entry of the Interim Order); (ii) to pay transactional costs and expenses of the DIP Facility; (iii) for general corporate purposes (including working capital purposes) of the Debtors as provided in the 13-Week Budget; and (iv) other prepetition expenses of the Debtors that are approved by the Court. |
| **Interest Rate**<br><br>**See DIP Facility Agreement §2.6** | Loans made under the DIP Facility bear interest at a rate per annum, as selected from time to time by PMCI, equal to:<br><br>(a)  the Base Rate plus 3.50% per annum; or<br><br>(b)  the LIBOR Rate plus 4.50% per annum.<br><br>The Base Rate has a floor of 2.00% per annum; and the LIBOR Rate has a floor of 1.00% per annum.<br><br>Interest generally is payable on a monthly basis in arrears. |
| **Default Rate**<br>**See DIP Facility Agreement §2.6(c)** | If an Event of Default has occurred and is continuing, then, at the election of the Required Lenders, amounts due under the DIP Facility shall bear interest at a rate 2.00% per annum above the interest rate otherwise applicable thereto. |
| **Commitment and Other Fees** | Closing Fee: $200,000, payable on the date of entry of the Interim Order. The payment of this $200,000 closing fee also will satisfy, in |

| | |
|---|---|
| **See DIP Facility Agreement §2.6(b), §2.10 and §17.10** | full, the $100,000 forbearance fee that had been payable by the Debtors in accordance with the Wells Forbearance Agreement relating to the Prepetition Credit Facility. |
| | Unused Line Fee: 0.50% per annum on the daily unused portion of the Maximum Revolver Amount. |
| | DIP Letter of Credit Fee: 4.50% per annum on the Daily Balance of the aggregate undrawn amount of DIP Facility Letters of Credit; in addition to customary issuance, etc., fees. |
| | DIP Facility Lenders Group Expenses: Various fees and expenses, including but not limited to those incurred in connection with the negotiation and preparation of the DIP Facility Documents and the establishment of the DIP Facility, and those incurred by the DIP Lenders and the DIP Agent in enforcing their rights and remedies thereunder. |
| | In addition, various audit, appraisal and other miscellaneous fees and expenses also may apply. |
| **Security & Super-Priority Claim**<br><br>**See DIP Facility Agreement §2.14** | (i) Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute an allowed claim (the "DIP Facility Superpriority Claim") against the Debtors, with priority over any and all administrative expenses, diminution claims (including all Adequate Protection Obligations (as defined in the Interim Order) all claims of any kind asserted by the Prepetition Secured Parties arising under the Interim Order or the Final Order and all other claims against the Debtors arising prior to or after the Petition Date, of any kind whatsoever, including all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(6), 506(c), 507, 546(c), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, and which DIP Facility Superpriority Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (other than all claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or other applicable law (collectively, the "Avoidance Actions") or the proceeds thereof) subject only to the payment of the Carve-Out to the extent specifically provided for in the Interim Order, the Final Order and the DIP Facility Agreement; |
| | (ii) The DIP Facility is to be secured by a first priority senior priming security interest in and lien on all prepetition and postpetition assets of the Debtors, which shall include, without limitation, all Collateral, whether now existing or hereafter acquired; and a junior priority |

| | |
|---|---|
| | security interest in and lien on all assets otherwise encumbered by Permitted Prior Liens, and to the extent not otherwise included, all proceeds, tort claims, insurance claims, intercompany claims and other rights to payments not otherwise included in the foregoing and all accessions to, substitutions and replacements for, and rents and profits of each of the foregoing; provided however, such lien shall not include (a) Avoidance Actions and the proceeds thereof until the entry of the Final Order and (b) the Excluded Assets, and at all times such lien and security interest shall be subject only to the payment of the Carve-Out to the extent specifically provided for in the Interim Order, Final Order and DIP Facility Agreement. |
| **Maturity Date (Term of DIP Facility)**<br><br>**See DIP Facility Agreement §3.3** | DIP Facility to terminate on the earliest of: (a) the date on which the Debtors terminate the DIP Facility and repay all outstanding amounts thereunder; (b) December 14, 2011 (subject to acceleration upon certain events of default); (c) five (5) days after the Petition Date, if the Interim Order has not been entered by such date; (d) forty-five (45) days after the Petition Date, if the Final Order has not been entered by such date; (e) the date on which the Interim Order expires, if the Final Order is not yet entered and effective; (f) the sale of substantially all of the Debtors' assets under section 363 of the Bankruptcy Code; (g) the effective date of a confirmed plan of reorganization that does not provide for payment in full of all amounts owed under the DIP Facility Documents; (h) conversion of any of the Chapter 11 Cases to chapter 7 of the Bankruptcy Code; and (i) the date of termination of the DIP Lenders' lending commitments (whether by acceleration or otherwise). |
| **Carve-Out**<br><br>**See DIP Facility Agreement §2.14(c)** | The Carve-Out shall include the following:<br><br>After a Carve-Out Trigger Notice, all accrued and unpaid fees, disbursements, costs and expenses incurred by professionals retained by the Debtors and/or the Committee prior to an Event of Default (the "Professional Fees"), up to the amount included in the most recent 13-Week Budget for such Professional Fees provided that such fees and expenses must be approved by the Court , plus all Professional Fees incurred after  the date of the Carve-Out Trigger Notice up to a maximum amount of $300,000 , plus fees payable pursuant to 28 U.S.C. §1930 and to the Clerk of the Court. Neither the DIP Facility, Carve-Out, Collateral or Cash Collateral shall be available to pay the Professional Fees of the Debtors or the Committee in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against any of the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders under the Prepetition Credit Facility or any of the Prepetition Loan Documents, or the Secured Notes Trustee, the Collateral Agent, or the Secured Noteholders under the Secured Notes Indenture or any Secured Note Documents, provided further that no more than **$50,000** of the proceeds of the DIP Facility or Cash Collateral may be used by the |

| | |
|---|---|
| | Committee to fund an investigation of the liens, claims and interests of the Prepetition Secured Parties (as defined in the Interim Order) and negotiate and/or contest the terms or entry of the Final Order. |
| **Conditions Precedent**<br><br>**See DIP Facility Agreement §3.1 and §3.2** | Customary for debtor-in-possession credit facilities, as more fully set forth in Sections 3.1 and 3.2 of the DIP Facility Agreement.<br><br>Includes, among other things: (i) entry of the Interim Order, in form and substance acceptable to the DIP Lenders, no later than five (5) days after the Petition Date; and (ii) delivery of the initial 13-Week Budget in form and substance acceptable to the DIP Agent. |
| **Covenants**<br><br>**See DIP Facility Agreement §5 and §6** | Sections 5 and 6 of the DIP Facility Agreement contain various affirmative and negative covenants, many or all of which are customary for debtor-in-possession credit facilities of this nature and some of which are customized to this situation.<br><br>These affirmative and negative covenants include, among other things, financial and collateral reporting requirements, maintenance of insurance, limitations on new indebtedness, and limitations on disposal of assets.<br><br>One affirmative covenant requires compliance with a 13-Week Budget based upon certain minimum cumulative cash receipts and certain maximum cumulative disbursements requirements (subject to agreed-upon variances), as set forth in Schedule 6.16 to the DIP Facility Agreement. A copy of the 13-Week Budget is attached as "<u>Exhibit C</u>" to this Motion. |
| **Events of Default**<br><br>**See DIP Facility Agreement §8** | Section 8 of the DIP Facility Agreement contains various "Events of Default", many or all of which are customary for debtor-in-possession credit facilities of this nature. They include, without limitation: |
| | (i) failure of Debtors to pay principal, interest or other amounts under the DIP Facility Documents as and when due, with grace periods applicable in certain cases; |
| | (ii) a default (other than a payment default) under any DIP Facility Document, with grace periods applicable in certain cases; |
| | (iii) false or misleading representations, warranties, or certifications; |
| | (iv) declaration that provision(s) of any DIP Facility Documents are null and void or unenforceable; |
| | (v) certain milestones are not achieved by the respective date indicated; |
| | (vi) any of the Chapter 11 Cases are dismissed or are converted to a case under chapter 7 of the Bankruptcy Code; |
| | (vii) with certain exceptions, the entry of an order granting any other superpriority administrative claim or lien equal or |

| | |
|---|---|
| | superior to that granted to DIP Administrative Agent; |
| | (viii) a trustee, examiner or other responsible person with powers to operate the business is appointed; |
| | (ix) the Final Order shall not have been entered within 45 days after the Petition Date, or prior to or immediately following expiration of the Interim Order; |
| | (x) the exclusivity period terminates; |
| | (xi) after entry of the Final Order, the allowance of any claims under section 506(c) of the Bankruptcy Code against the DIP Agent or DIP Lenders, or the Prepetition Agent or Prepetition Lenders, or any of their respective collateral; and |
| | (xii) the Debtors sell all or substantially all of their assets without the consent of DIP Agent and the Required Lenders. |
| **Surcharge Waivers**<br><br>**See DIP Facility Agreement §8.14(l)**<br><br>Interim Order par. 9 | Upon approval at the Final Hearing, and except for the Carve-Out, so long as the DIP Agent and the DIP Lenders are providing the DIP Facility or otherwise allowing the use of Cash Collateral, no costs of administration shall be imposed against the DIP Agent or the DIP Lenders or any of the Collateral or the Prepetition Secured Parties or the Prepetition Collateral under sections 105, 506(c) or 552 of the Bankruptcy Code or otherwise and the Debtors waive for themselves and on behalf of the estates any and all rights under sections 105, 506(c) or 552 or otherwise. |
| **Modification of Automatic Stay**<br><br>**See DIP Facility Agreement §9.1** | The automatic stay of section 362 shall be modified and vacated to permit the DIP Agent and DIP Lenders to exercise their remedies under the DIP Facility Documents, without further motion to, or order from, the Court; provided, however, that the DIP Agent shall be permitted to exercise any remedy in the nature of a liquidation of, or foreclosure on, any interest of the Debtors in the Collateral, and as otherwise provided in the Interim Order and the Final Order only upon five (5) business days' prior written notice to the Debtors and their counsel, counsel to the Secured Notes Trustee and the Collateral Agent, counsel to the holders of the Secured Notes, counsel to the Committee (if appointed) in these cases, and to the U.S. Trustee. |
| **Adequate Protection for the Benefit of Prepetition Secured Parties in Connection with Use of Cash Collateral**<br><br>**See Interim Order,** | As adequate protection (the "Adequate Protection"), the Prepetition Agent, on its own behalf and on behalf of the Prepetition Lenders, and the Secured Notes Trustee, on its own behalf and on behalf of the Collateral Agent and the holders of the Senior Secured Notes, will receive (i) replacement liens, junior in priority to the liens granted under the DIP Facility, in all Collateral (of the same nature and type as the Prepetition Collateral with respect to all of the Debtors), to secure the amount of any decrease in value of their Prepetition Collateral as a result of the provisions of the DIP Facility and Interim |

| | |
|---|---|
| **par. 13(a) and (b)** | Order and Final Order granting first priority priming liens on such real and personal property to the DIP Agent (for its own benefit and the benefit of the DIP Lenders), granting second priority liens to the Prepetition Agent and the Prepetition Lenders, and third priority liens to the Secured Notes Trustee, the Collateral Agent and the Secured Noteholders in such collateral, (ii) an administrative claim (the "<u>Prepetition Secured Party Administrative Claim</u>") against the Debtors' estates to the extent that the Replacement Liens (as defined in the Interim Order) do not adequately protect the Prepetition Secured Creditors against a decrease in the value of their Prepetition Collateral as a result of the priming DIP Facility and use of Cash Collateral, which Prepetition Secured Party Administrative Claim, if any, shall be junior and subordinate to the DIP Facility Superpriority Claim; and (iii) payment of other fees and expenses (including professional fees and expenses whether incurred prepetition or postpetition) as provided for under the terms of the Prepetition Loan Documents and Secured Notes Documents, as applicable.  The Adequate Protection Liens shall be subject and subordinate only to (i) the DIP Liens (as defined in the Interim Order),  (ii) any Permitted Prior Liens on the Collateral to which the DIP Liens are junior; and (iii) the Carve-Out. |
| | Roll-up: Upon entry of the Interim Order and closing of the DIP Facility, the Existing Letters of Credit shall be rolled up into the DIP Facility and constitute DIP Facility Letters of Credit.  The Debtors shall use loans advanced under the DIP Facility for working capital and other liquidity needs.  Upon approval at the Final Hearing, the remaining outstanding obligations owed under the Prepetition Credit Facility will be paid in full in cash from the proceeds of DIP Facility and the Prepetition Credit Facility will be terminated. |
| | As adequate protection, to the extent there are any remaining contingent or other obligations under the Prepetition Credit Facility, the Prepetition Agent and Prepetition Lenders will receive Adequate Protection pursuant to the Interim Order. |
| **Indemnification Provisions**<br><br>**See DIP Facility Agreement §10.3** | PMCI shall be required to indemnify, defend and hold harmless the DIP Agent and the DIP Lenders, and certain related persons and participants, to the fullest extent permitted by law, from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all other out-of-pocket costs and expenses actually incurred in connection therewith or in connection with the enforcement of the indemnification, at any time asserted against any of them in connection with or as a result of or related to the execution, delivery, enforcement, performance or administration of the DIP Facility Documents or any of the transactions contemplated thereby. |
| **Perfection of Liens Without Compliance** | The DIP Agent and DIP Lenders and the Prepetition Secured Parties (as defined in the Interim Order and Final Order) are not required to |

| | |
|---|---|
| with Applicable Laws<br><br>**See Interim Order at par. 4 and 13(a)** | file financing statements, mortgages, deeds of trust, security deeds, notices of lien, or similar instruments in any jurisdiction or effect any other action to attach or perfect the security interests and liens granted under the DIP Facility Documents and the Interim Order or Final Order; and instead may rely on DIP Facility Documents and Interim Order or Final Order for perfection. |

**Supplemental Bankruptcy Rule 4001 and Local Rule 4001-2 Disclosures**

31.     Cross-Collateralization: Delaware Local Rule 4001-2 requires the disclosure of certain provisions that are contained in post-petition financing motions and proposed orders or in the loan documents underlying those pleadings (collectively, the "Financing Motions").  Local Rule 4001-2(a)(i)(A) requires the disclosure of provisions in Financing Motions that grant cross-collateralization protection.  In connection with the request for an Interim Order or a Final Order, the DIP Facility Documents do contain cross-collateralization protections in that the DIP Facility (a) is secured by the Collateral, which includes virtually all of the assets of the Debtors, including assets that were not included as collateral securing the Prepetition Secured Indebtedness, and (b) will repay the Prepetition Credit Facility upon entry of a Final Order (excluding the Prepetition Letters of Credit, which will be rolled up into the DIP Facility and constitute DIP Facility Letters of Credit pursuant to the proposed Interim Order) .

32.     Investigation of Liens: Bankruptcy Rule 4001(c)(1)(B)(iii) and (viii) and Delaware Local Rule 4001-2(a)(i)(B) require the disclosure of findings of fact in Financing Motions that are intended to bind the estate with respect to the validity, amount, or perfection of liens or a waiver of claims, without first giving certain parties in interest an opportunity to conduct an investigation as to those facts or claims.  The Interim Order contains findings of fact agreed to by the Debtors but provides for an investigation period (ending on the later of: (a) sixty (60) days following the formation of the Committee, on the part of the Committee or (b) if no Committee is formed, for seventy-five (75) days following the entry of the Interim Order (the

"Investigation Termination Date") by any party-in-interest with standing and requisite authority), with respect to the validity, amount, perfection, priority, enforceability of the Prepetition Secured Indebtedness; and, if the Committee or any such party-in-interest, as applicable so determines, it may challenge the validity, amount, perfection, priority and enforceability of the Prepetition Secured Indebtedness and Prepetition Liens securing the Prepetition Secured Indebtedness, or assert any other claims or causes of action held by the Debtors' estates against any Prepetition Secured Party, as applicable, so long at the Committee or party- in-interest files a motion or otherwise initiates an appropriate action by the Investigation Termination Date. The Interim Order further provides that the Committee (if appointed) may use up to $50,000 of the DIP Facility and Cash Collateral to fund the expenses associated with such investigation. See Interim Order ¶¶ 5(c) and 6.

33. §506(c) Surcharge Waiver: Bankruptcy Rule 4001(c)(1)(B)(x) and Delaware Local Rule 4001-2(a)(i)(C) require disclosure of provisions in Financing Motions that seek to waive, without notice, whatever rights the estate may have under section 506(c) of the Bankruptcy Code. Although the DIP Facility Documents and Final Order provide for a waiver of rights under section 506(c) of the Bankruptcy Code, such rights are not waived in the Interim Order. The proposed waiver of the Debtors and estates' rights under section 506(c) of the Bankruptcy Code will be effective only after notice to parties in interest and entry of the Final Order granting such relief. See Interim Order ¶ 9; DIP Facility Agreement §8.14(l) (providing that the allowance of any claim under section 506(c) after the entry of the Final Order will be an event of Default under the DIP Facility Agreement.

34. Lien of Avoidance Actions: Bankruptcy Rule 4001(c)(1)(B)(xi) and Delaware Local Rule 4001-2(a)(i)(D) require disclosure of provisions in Financing Motions that grant the prepetition secured creditor liens on Avoidance Actions. The Prepetition Secured Parties are not

granted liens on Avoidance Actions or the proceeds thereof in connection with the Interim Order or the Final Order.  See Interim Order ¶ 4(b).  In addition, the Interim Order provides that the DIP Facility Superpriority Claim in favor of the DIP Agent and the DIP Lenders as security for the DIP Facility, would not be entitled to be satisfied from the proceeds of Avoidance Actions. See DIP Facility Agreement §2.14; Interim Order ¶ 3.

35.     Roll-up of Certain PrePetition Secured Indebtedness:  Delaware Local Rule 4001-2(a)(i)(E) requires disclosure of provisions in financing motions whereby postpetition loans will be used to repay prepetition debt.  The DIP Facility Documents provide for the rollup of the Prepetition Secured Indebtedness outstanding under the Prepetition Credit Facility (but not the Prepetition Secured Indebtedness outstanding under the Secured Notes) into the DIP Facility (the "Roll-up").  Firstly, upon entry of the Interim Order the Debtors will have availability under the DIP Facility, up to $16.0 million, to operate their businesses, of which $10,058,760 will be used to roll up Existing Letters of Credit which will be rolled into and deemed issued under the DIP Facility as DIP Facility Letters of Credit.  Upon entry of the Final Order (after notice to parties in interest), any remaining Prepetition Secured Indebtedness then outstanding under the Prepetition Credit Facility would be repaid from the proceeds of an advance under the DIP Facility.  See Interim Order ¶ 3 (i); DIP Facility Agreement §[6.13(a)].

36.     Carve-Out: Delaware Local Rule 4001-2(a)(i)(F) requires disclosure of provisions in financing motions that provide disparate treatment to professionals retained by the creditors' committee from professionals retained by the Debtors.  The Carve-Out being provided for in the DIP Facility Agreement and Interim Order is applicable to both the Debtors' and the Committees' professionals and the U.S. Trustee.  Accordingly, all professionals retained by these estates will be treated equally with respect to the Carve-Out. No amounts borrowed under the DIP Facility, or the proceeds of the DIP Facility, Prepetition Collateral, Collateral or Cash

Collateral may be used to pay the fees and expenses incurred by any party, including the Debtors or the Committee (if appointed) in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or litigation against, the DIP Agent, any DIP Lender or any Prepetition Secured Party or asserting any claims or causes of action against the DIP Agent, any DIP Lender or any Prepetition Secured Party or any Avoidance Actions against such entities or challenging the amount, validity, extent, perfection, priority or enforceability of the Prepetition Indebtedness, any Prepetition Secured Financing Document or Adequate Protection; provided, however, that the Committee (if appointed) shall be authorized to use up to an aggregate amount of $50,000 to (i) investigate the liens, claims and interests of the Prepetition Secured Parties and (ii) negotiate and/or contest the terms or entry of the Final Order. If no committee is appointed any other party in-interest with standing and requisite authority may use up to $50,000 for such purpose. See Interim Order ¶ 5(c), 6.

37.     Priming Liens: Finally, Delaware Local Rule 4001-2(a)(i)(G) requires disclosure of provisions in financing motions that prime any secured liens without the consent of the lienholder. As discussed more fully herein, the Prepetition Secured Parties are consenting to the DIP Liens priming their liens, in exchange for the Adequate Protection (as defined in the Interim Order). See Interim Order ¶ 13. All other Permitted Prior Liens are not primed by the DIP Liens. See Interim Order ¶ 4(b). In addition, no liens in favor of the DIP Lenders or the DIP Agent are being given with respect to assets excluded as collateral under, and pursuant to the terms of, the DIP Facility Documents.

38.     The provisions of the DIP Facility Documents as to which disclosure was required pursuant to Delaware Local Rule 4001-2 are justified under the circumstances of these Chapter 11 Cases. First and foremost, without the inclusion of such terms; the DIP Lenders would not agree to make the DIP Facility available to the Debtors and the Prepetition Secured Parties

would not agree to the Debtors use of Cash Collateral or the priming of their liens. In light of the unavailability of adequate financing alternatives and for the reasons set forth more fully below, the Debtors determined in the exercise of their sound business judgment that agreeing to the terms of the post-petition financing described in this Motion, including the roll-up, is appropriate under the circumstances of these Chapter 11 Cases.

39. Accordingly, the facts and circumstances of these Chapter 11 Cases justify the inclusion of the terms that require disclosure under Delaware Local Rule 4001-2.

### Authorization to Use Cash Collateral

40. During the ordinary course of operations and the sale of its products, the Debtors generate Cash Collateral. The Debtors need to use Cash Collateral in the normal course of their business in order to continue to finance their operations, make essential payments, such as funding employee payrolls, and taxes, and to purchase goods. However, Cash Collateral is insufficient to fund the Debtors' ongoing funding requirements for the operation of their businesses in an orderly manner. Thus, the Debtors need to supplement their use of Cash Collateral with the funds being provided by the DIP Facility. As the DIP Facility is contingent upon the Debtors' obtaining approval to use Cash Collateral, it is imperative that the Debtors obtain authority to use Cash Collateral, subject to the terms described in this Motion. Accordingly, in order to obtain the financing under the DIP Facility and to avoid immediate and irreparable harm to the Debtors' business operations and their estates, the Debtors have an immediate need for authority to use Cash Collateral.

### Prepetition Secured Parties' Adequate Protection

41. To the extent that their interests in the Prepetition Collateral constitute valid and perfected security interests and liens as of the Petition Date, the Prepetition Secured Parties are entitled to adequate protection of their interest in the Prepetition Collateral, including the Cash

Collateral pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code. Accordingly, the Debtors have agreed, subject to the Court's approval, to provide the Prepetition Secured Parties with Adequate Protection for the use of Cash Collateral and in return for their agreement to permit the priming of their prepetition liens by the postpetition liens described in this Motion. The Adequate Protection consists among other things, of the following:

A. Adequate Protection Liens: replacement liens, junior in priority to the liens granted under the DIP Facility, in all collateral of the same nature and type as the Prepetition Collateral, to secure the amount of any decrease in value of their Prepetition Collateral as a result of the provisions of the DIP Facility and Interim Order and Final Order granting first priority liens on such property to the DIP Administrative Agent. The Replacement Liens shall be subject and subordinate only to (i) the DIP Liens, (ii) any Permitted Prior Liens to which the DIP Liens are junior, and (iii) the Carve-Out.

B. Prepetition Super Priority Administrative Claim: an administrative claim (the "Prepetition Secured Party Administrative Claim") against the Debtors' estates to the extent that the Replacement Liens do not adequately protect the Prepetition Secured Parties against a decrease in the value of their Prepetition Collateral as a result of the priming DIP Facility and use of Cash Collateral, which Prepetition Secured Party Administrative Claim, if any, shall be junior and subordinate to the claims of the DIP Facility and the Carve-Out.

C. Payment of the reasonable fees and expenses of the professionals retained by the Prepetition Secured Parties in accordance with the Prepetition Credit Facility Documents and the Secured Notes Documents as provided in paragraph 15 of the proposed Interim Order.

D. Upon entry of the Final Order, the Debtors will promptly pay interest due, if any, and certain accrued and unpaid fees, expenses and charges and letter of credit fees and commissions due under the Prepetition Credit Facility Documents at the same rate being paid on the Prepetition Credit Facility as of the Petition Date.

E. The Liens of the Prepetition Secured Parties in the Prepetition Collateral shall remain in place subject to the Permitted Prior Liens, the Carve-Out and the priorities provided in the Intercreditor Agreement (but shall be junior in priority to the DIP Liens).

F. The Prepetition Secured Parties shall be afforded (i) reporting as to Collateral amounts as required pursuant to the DIP Facility Documents, and (ii) reasonable access to the Collateral and the Debtors' business

premises during normal business hours for the purposes of verifying the Debtors' compliance with the terms of the Interim Order as it pertains to the Prepetition Collateral.

## **Relief Requested**

42.     By this Motion, the Debtors request entry of the Interim Order and the Final

Order authorizing:

A.      in the case of the Interim Order, the Debtors to borrow up to an aggregate principal amount of $15.0 million as set forth in the DIP Facility Agreement, or, in the case of the Final Order, the Debtors to borrower the full amount of the DIP Facility up to an aggregate principal amount of $21.0 million;

B.      the Debtors to execute and enter into the DIP Facility Agreement and the other DIP Facility Documents and to perform such other and further acts as may be required by the DIP Facility Documents;

C.      the granting of first priority liens and security interests in substantially all of the Debtors' assets (other than the Excluded Assets, the Avoidance Actions and the proceeds thereof) in favor of the DIP Administrative Agent and the DIP Lenders (including property that currently constitutes Prepetition Collateral) and all proceeds thereof, to secure any and all of the obligations under the DIP Facility, subject to the Carve-Out and the Permitted Prior Liens (provided however, the Collateral that is subject to Permitted Prior Liens shall be encumbered by junior liens of the DIP Agent and DIP Lenders);

D.      the granting of superpriority administrative expense claims to the DIP Agent and the DIP Lenders payable from, and having recourse to, all prepetition and postpetition property of the Debtors' estates (including property that currently constitutes Prepetition Collateral) and all proceeds thereof, subject only to the Carve-Out, to secure any and all of the obligations under the DIP Facility;

E.      the Debtors, pursuant to sections 361 and 363(c) and (e) of the Bankruptcy Code to use Cash Collateral and all Prepetition Collateral of the Prepetition Secured Parties;

F.      the Debtors to provide Adequate Protection as specified herein in favor of the Prepetition Secured Parties in connection with the Debtors use of Cash Collateral in which the Prepetition Secured Parties have an interest, and the diminution in the value of the Prepetition Secured Parties' interest in the Prepetition Collateral;

G.   the rollover of the Prepetition Letters of Credit into the DIP Facility, with such Prepetition Letters of Credit to be deemed to have been issued under the DIP Facility and to constitute DIP Facility Letters of Credit for all purposes;

H.   subject to entry of a Final Order, authorization to repay any and all amounts then outstanding under the Prepetition Credit Facility (excluding Prepetition Letters of Credit, which are being rolled over into the DIP Facility as DIP Facility Letters of Credit).

I.   pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing") on this Motion be held before the Court to consider entry of the Interim Order; and

J.   the scheduling of a final hearing (the "Final Hearing"), to be held within thirty (30) days of the Petition Date, to consider entry of the Final Order.

## Basis For Relief Requested

43.   For the following reasons, the Debtors respectfully submit that they have satisfied the standards applicable for the use of Cash Collateral and for Court approval of the DIP Facility.

## The Debtors Should Be Authorized to Use Cash Collateral

44.   Section 363 of the Bankruptcy Code governs the Debtors' use of property of the estates.[6] Section 363(c)(1) of the Bankruptcy Code provides that:

> If the business of the debtor is authorized to be operated under Section ... 1108 … of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

45.   Section 363(c)(2) of the Bankruptcy Code, however, provides an exception with respect to "cash collateral" to the general grant of authority to use property of the estate in the

---

[6]      Pursuant to Section 1107 of the Bankruptcy Code, a debtor-in-possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363 of the Bankruptcy Code.

ordinary course set forth in section 363 of the Bankruptcy Code. Specifically, a trustee or debtor-in-possession may not use, sell, or lease "cash collateral" under subsection (c)(1) unless:

> (A)     each entity that has an interest in such collateral consents; or
>
> (B)     the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

46.     In this case, the Prepetition Secured Parties have consented to the use of Cash Collateral in exchange for Adequate Protection as described above. Therefore, the Debtors are authorized to use the Cash Collateral pursuant to section 363(c)(2) of the Bankruptcy Code.

47.     Moreover, the Debtors submit that the Adequate Protection to be provided to the Prepetition Secured Parties is appropriate. Section 363(e) of the Bankruptcy Code provides as follows:

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used ... by the [debtor-in-possession], the court, with or without a hearing, shall prohibit or condition such use ... as is necessary to provide adequate protection of such interest.

See 11 U.S.C. § 363(e).

48.     The concept of adequate protection finds its basis in the Fifth Amendment's protection of property interests. H.R. Rep. No. 595, 95th Cong., 1st Sess. 338-40 (1977), reprinted in U.S. Code Cong & Admin. News 1978, pp. 5963. Adequate protection is also grounded in the belief that secured creditors should not be deprived of the benefit of their bargain. Id.

49.     The Bankruptcy Code does not define adequate protection, but section 361 of the Bankruptcy Code does list three non-exclusive examples of adequate protection. First, making a cash payment or periodic cash payments to the extent necessary to compensate for any decrease in value of an entity's interest in property may constitute adequate protection. See 11 U.S.C.

§361(1).  Second, providing additional or replacement liens to the extent necessary to compensate for any decrease in value of an entity's interest in property may suffice.  <u>See</u> 11 U.S.C. §361(2).  Third, "granting such other relief … as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property" may also suffice. <u>See</u> 11 U.S.C. §361(3).

50.     As adequate protection under sections 363(e) and 361(1)-(3) of the Bankruptcy Code, the Debtors have agreed to provide the Prepetition Secured Parties with Adequate Protection, including (a) the Adequate Protection Liens, (b) the Prepetition Secured Party Administrative Claim, (c) payment of the reasonable fees and expenses of the Prepetition Secured Parties' professionals, (d) upon entry of the Final Order, payment to the Prepetition Agent of any Prepetition First Lien Indebtedness then outstanding and unpaid, (e) the Liens of the Prepetition Secured Parties in the Prepetition Collateral shall remain in place, subject to the Permitted Prior Liens, the Carve-Out and the priorities provided in the Intercreditor Agreement (but shall be junior in priority to the DIP Liens), and (f) the Prepetition Secured Parties shall be afforded (i) reporting as required under the DIP Facility Documents and (ii) reasonable access to the Collateral and the Debtors' business premises during normal business hours, for the purposes of verifying the Debtors' Compliance with the terms of the Interim Order and Final Order as it relates to the Prepetition Secured Parties.

51.     Additionally, as noted above, the DIP Lenders' obligation to lend under the DIP Facility is conditioned upon the Debtors receiving authority to use Cash Collateral.  Hence, absent such authority, the Debtors would not have access to any additional liquidity, which would imperil their ability to reorganize.

52.     Therefore, the Debtors request that the Court authorize them to use Cash Collateral on an interim and (after a final hearing) final basis.

**Postpetition Financing**

53.     The Debtors propose to obtain financing under the DIP Facility by providing
security interests and  other liens as set forth above pursuant to sections 364(c) and (d) of the
Bankruptcy Code.  The statutory requirement for obtaining postpetition credit under section
364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtors are
"unable to obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy
Code]."  11 U.S.C. § 364(c).  Indeed, section 364(c) financing is appropriate when the debtor-in-
possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.
See In re YL West 87th Holdings I LLC, 423 BR 421, 441 (Bankr. Court, S.D.N.Y. January 13,
2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364
financing"); In re Ames Dep't Stores. Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor
must show that it has made a reasonable effort to seek other sources of financing under Sections
364(a) and (b) of the Bankruptcy Code); In re Crouse Group, Inc., 71 B.R. 544, 549 (Banks. E.D.
Pa. 1987) (secured credit under Section 364(e)(2) of the Bankruptcy Code is authorized, after
notice and hearing, upon showing that unsecured credit cannot be obtained).

54.     Courts have articulated a three-part test to determine whether a debtor is entitled
to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

    a.     the debtor is unable to obtain unsecured credit under Section 364(b), *i.e.*,
by allowing a lender only an administrative claim;

    b.     the credit transaction is necessary to preserve the assets of the estate; and

    c.     the terms of the transaction are fair, reasonable, and adequate, given the
circumstances of the debtor-borrower and the proposed lender.

In re Ames Dep't Stores, 115 B.R. at 37-39; In re General Growth Properties, Inc., 412 B.R.
122, 125-26 (Bankr. S.D.N.Y. May 14, 2009) (granting motion for postpetition financing upon
finding that (a) "no comparable credit [was] available on more favorable terms"; (b) that the

debtors needed postpetition financing "to preserve [their] assets and continue their operations"; and (c) that the terms and conditions of the DIP Documents had been negotiated in good faith).

55.     During the prepetition period, the Debtors, through their financial advisor, endeavored to identify potential sources of postpetition financing.  Based on those discussions with potential lenders, the Debtors have determined that adequate postpetition financing on an unsecured basis or on a junior priority basis to the Prepetition Secured Parties' Indebtedness is not available.  Without postpetition financing, the Debtors would be unable to operate their businesses as a going concern, which would significantly impair the value of the Debtors' assets to the detriment of all creditor constituencies.  Furthermore, by obtaining postpetition financing, the Debtors will be in a position to preserve the value of their assets for the benefit of all creditors.  Finally, the terms of the DIP Facility are fair, reasonable and adequate given the Debtors' circumstances, all as more fully set forth below.

**Approval of Priming Liens and Adequate Protection under Section 364(d)**

56.     If a debtor is unable to obtain credit under the provisions of Section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien."  11 U.S.C. § 364(d).  Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by senior or "priming" liens, provides that the court may, after notice and a hearing, authorize a debtor to obtain credit or incur debt secured by a senior or equal lien on property of the estate that is subject to a lien, only if:

> (A)     the trustee is unable to obtain credit otherwise; and

> (B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d); In re Levitt & Sons, LLC, 384 B.R. 630, 640-41 (Bankr. S.D.Fla. Feb. 13,

2008) ("In the event the debtor is unable to obtain credit under the provisions of §364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly called a "priming lien.").

57.     A debtor has the burden of establishing that the holder of a lien to be subordinated, or whose cash collateral will be used, has adequate protection.  See In re Swedeland Devel. Co., 16 F.3d 552, 564 (3d Cir. 1994); see also In re Marcys Lee Associates, L.P., Case No. 10-667 (Bankr. E.D. Penn. Jan. 20, 2011) (memo and order, Judge J. William Ditter, Jr.).  The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis.  In re Stoney Creek Technologies, LLC, 364 B.R. 882, 890 (Bankr. E.D. Penn. March 19, 2007) (section 364(d)(3) of the Bankruptcy Code serves as a catch-all that allows the bankruptcy court discretion to fashion adequate protection on a case by case basis); see In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996).  "Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process."  In re Mosello, 195 B.R. at 288 (quoting In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).

58.     In accordance with section 364(d) of the Bankruptcy Code, and consistent with the purposes underlying the provision of adequate protection, the proposed Interim Order provides the Prepetition Secured Creditors with adequate protection, including (a) the Adequate Protection Liens, (b) the Prepetition Secured Party Administrative Claim, (c) payment of the reasonable fees and expenses of the Prepetition Secured Parties' professionals, (d) upon entry of the Final Order, payment to the Prepetition Agent of any Prepetition First Lien Indebtedness then outstanding and unpaid, (e) the Liens of the Prepetition Secured Parties in the Prepetition Collateral shall remain in place, subject to the Permitted Prior Liens, the Carve-Out and the priorities provided in the Intercreditor Agreement (but shall be junior in priority to the DIP

31

Liens) and (f) the Prepetition Secured Parties shall be afforded reporting as required by the DIP Facility Agreement and access to the Collateral and the Debtors' premises during normal business hours for the purpose of verifying the Debtors' compliance as described above. The Prepetition Secured Parties have consented to the priming of their liens provided that the relief requested herein is granted, including the grant of the Prepetition Secured Creditors' Adequate Protection.

59.     Moreover, a "priming" lien may be granted with the consent of the secured creditors whose lien will be primed. <u>See</u> <u>In re Sun Healthcare Group, Inc.</u>, 245 B.R. 779, 782 n.5 (Bankr. D.Del. 2000) ("Their consent (to the use of their cash collateral and priming of their liens) was given in exchange for . . . adequate protection"); <u>In re El Paso Refinery, L P.</u>, 171 F.3d 249, 252 (5th Cir. 1999) (noting that "El Paso gave BBL a priming lien, which by agreement was given a priority over the preexisting first lien of a group of Term Lenders"); <u>In re Outboard Marine Corp.</u>, 2002 WL 571661, at *1 (Bankr. N.D.Ill Jan. 9, 2002) ("the DIP Lenders committed to provide certain financing to the Debtors . . . pursuant to which the Pre-petition Lenders consented to the imposition of priming liens upon the Pre-petition Collateral and in favor of the DIP Lenders"), <u>aff'd</u>, <u>Bank of America, N.A. v. Moglia</u>, 330 F.3d 942 (7th Cir. 2003).

60.     The Prepetition Secured Parties have agreed to the priming of their liens in favor of the DIP Facility. Accordingly, the Court should authorize the Debtors to grant priming liens to the DIP Agent and the DIP Lenders to secure the Debtors' obligations under the DIP Facility.

## <u>No Adequate Alternative to the DIP Facility is Currently Available</u>

61.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by Sections 364(c) and (d) of the Bankruptcy Code. <u>In re YL West 87th Holdings I LLC</u>, 423 BR 421, 441 (Bankr. Court,

S.D.N.Y. Jan. 13, 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing"); In re General Growth Properties, Inc., 412 B.R. at 125 (debtor has an obligation to make "reasonable efforts, under the circumstances . . .to obtain [unsecured financing], in the ordinary course of business or otherwise" ); In re Harborwalk, LP, Case No. 10-80043-G3-11 (LZP) (Bankr. S.D. Texas, Jan. 29, 2010) ("Section 364(d)(1) does not require that a debtor seek credit from every possible source, but a debtor must show that it made a reasonable effort to obtain post-petition financing from other potential lenders on less onerous terms and that such financing was unavailable.").

62.     Substantially all of the Debtors' assets are subject to the liens asserted by the Prepetition Secured Parties.  Because of the substantial amount of the Prepetition Secured Indebtedness, obtaining the financing needed by the Debtors as unsecured debt or debt secured by liens junior to the liens of the Prepetition Secured Parties was not a realistic option.

63.     In the days and weeks prior to the commencement of these Chapter 11 Cases, the Debtors instructed their proposed financial advisor to pursue alternative postpetition financing from a number of potential lenders.  Specifically, the Debtors instructed their proposed financial advisor to explore alternative post petition financing from a number of potential lenders.  The Debtors' proposed financial advisor reached out to the Debtors' existing secured lenders as well as other institutional lenders and various other parties about providing postpetition financing. None of the potential lenders that were contacted were willing to provide an adequate stand-alone debtor-in-possession financing facility on terms more favorable than the DIP Facility.

64.     Most of the parties contacted were not interested in providing financing to the Debtors at the level required to fund the Debtors' operations on an ongoing basis.  None of the parties contacted, offered more favorable terms than those provided under the DIP Facility. Moreover, most potential lenders contacted by the Debtors' financial advisor were not willing to

provide an adequate stand alone debtor in possession facility unless the lenders would be able to prime the liens of the Prepetition Secured Parties.

65.     Because the Prepetition Secured Parties would not consent to being primed by a third party lender and because the Debtors decided that it would be imprudent to attempt to prime the Prepetition Secured Parties on a contested basis in light of the risk involved (and the more favorable terms of the DIP Facility), the Debtors determined that the proposed DIP Facility is the best financing option available to the Debtors under the circumstances.

66.     Accordingly, the Debtors have satisfied the requirement of Sections 364(c) and (d) of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtors.

### The DIP Facility Terms are Fair, Reasonable and Appropriate

67.     The proposed terms of the DIP Facility Agreement and the other DIP Facility Documents are fair, reasonable, and adequate under the circumstances. First and foremost, as discussed more fully above, the Debtors made a concerted, good-faith effort to obtain credit on the most favorable terms available in the market. No other lender was willing to provide the $21,000,000 million in funding necessary to pay the Prepetition Secured Indebtedness under the Prepetition Credit Facility and fund the continued operation of the Debtors' businesses on more favorable terms than those provided in the DIP Facility. Against this backdrop, the Debtors and their proposed bankruptcy counsel and financial advisor carefully evaluated the proposed financing offered by the DIP Facility Lender and engaged in extensive arms' length negotiations with the DIP Facility Lender regarding the proposed terms and conditions of the DIP Facility. Eventually, the Debtors, in their sound business judgment, agreed to the DIP Facility as the proposal best suited to the Debtors' needs. Moreover, the terms and conditions of the DIP Facility were negotiated by the parties in good faith and at arms' length.

68.     To further illustrate that the terms are fair, reasonable and adequate, the proposed DIP Facility and the Interim Order provides that the security interests and administrative expense claims granted to the DIP Lenders are subject to the Carve-Out. In <u>In re Ames Dep't</u> Stores, 115 B.R. 34 (Bankr. S.D.N.Y 1990), the court found that such "carve-outs" are not only reasonable, but are necessary to ensure that official committees and the debtor's estate will be assured of the assistance of counsel. <u>Id.</u> at 40; <u>accord</u> <u>In re General Growth Properties, Inc.</u>, 412 B.R. at 125.

69.     Likewise, the various fees and charges required under the DIP Facility are customary, and approval thereof is appropriate.  For example, after taking into account the relative interest rate margins (fixed, in the case of the DIP Facility; variable, in the case of the Prepetition Credit Facility) and interest rate floors, the minimum possible interest rate for Base Rate Loans would be 5.50% per annum under the DIP Facility (versus 8.25% under the Prepetition Credit Facility, were the highest variable margin then to apply); for LIBOR Rate Loans, 5.50% (versus 7.50% under the Prepetition Credit Facility, were the highest variable margin then to apply).  The letter of credit fee for DIP Facility Letters of Credit (including the Prepetition Letters of Credit proposed to be rolled up into the DIP Facility) would increase by 0.50% per annum, assuming the highest variable margin under the Prepetition Credit Facility.  In contrast to these modest provisions, courts routinely authorize material lender incentives beyond the explicit liens and other rights specified in Section 364 of the Bankruptcy Code. <u>See</u>, <u>e.g.</u>, <u>In re Defender Drug Stores, Inc.</u>, 145 B.R. 312, 316 (9th Cir. BAP 1992) (authorizing credit arrangement under Section 364, including a lender "enhancement fee").

70.     Accordingly, the terms of the DIP Facility are fair, reasonable and adequate, and the DIP Agent and the DIP Lenders under the DIP Facility should be accorded the benefits of section 364(e) of the Bankruptcy Code in respect of such facility.

YCST01:11167164.1                                   070242.1001

**Roll-up of Portion of the Pre-petition Secured Obligations**

71.     The Debtors' agreement to the Roll-up should be approved pursuant to sections 363 and 105(a) of the Bankruptcy Code.  section 363(b)(1) of the Bankruptcy Code provides, in relevant part: "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate …."  11 U.S.C. § 363(b)(1).  In addition, section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

72.     The proposed use, sale, or lease of property of the estate may be approved under section 363(b) of the Bankruptcy Code if it is supported by sound business justification.  See In re Montgomery Ward, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions"); Motorola, Inc. v. Official Comm. of Unsecured Creditors and JPMorgan Chase Bank, N.A. (In re Iridium Operating LLC), 478 F.3d 452, 466 & n. 21 (2d Cir. 2007); In Re Stingfree Techs., Inc., 2009 Bankr. LEXIS 3023 (Bankr. E.D. Pa., Feb. 4. 2009); In re Global Crossing Ltd., 295 BR 726, 742 (Bankr. S.D.N.Y. July 24, 2003); In re Del. & Hudson H.R. Co., 124 B.R. 169, 176 (Bankr. D. Del. 1991) (explaining that the Third Circuit has adopted the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)).  The Debtors believe that entry into the proposed DIP Facility is a sound exercise of their business judgment, See In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D.Del. 1994) (approving interim loan, receivables facility and asset-based facility based upon the debtor's prudent business judgment); ); see also In re General Growth Properties, Inc., 412 B.R. at 125 (finding that the terms of the borrowings and other financial accommodations reflected prudent business judgment consistent with the debtors' fiduciary

duties).  Moreover, pursuant to section 105 of the Bankruptcy Code, the Court has expansive

equitable powers to fashion any order or decree which is in the interest of preserving or

protecting the value of the Debtor's assets.  <u>See</u>, <u>e.g.</u>, <u>See</u> <u>In re Fleurantin</u>, Case No. 09-4376

(unpaginated) (3rd Cir. March, 24 2011); <u>see also</u> <u>In re Padilla</u>, 389 BR 409, 429 (Bankr. E.D.

Penn. June 30, 2008); <u>Chinichian v. Campolongo</u>, 784 F.2d 1440, 1443 (9th Cir. 1986).

73.     As noted above, the Roll-up is supported by sound business judgment as the Roll-

up will satisfy the Debtors' obligations under the DIP Facility.  In addition, it was a condition to

the Prepetition Secured Creditors' consent to use of Cash Collateral and the priming of their by

the DIP Lenders.  Finally, the Roll-up will not affect the rights of the Committee or other

appropriate party in interest to assert any challenges to the liens or claims of the Prepetition

Secured Creditors during the investigation period provided for in the Interim Order and Final

Order.

<b><u>Interim Approval Should Be Granted</u></b>

74.     Bankruptcy Rules 4001(b) and (c)(2) provide that a final hearing on a motion to

obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than

fifteen (15) days after the service of such motion.  Upon request, however, a bankruptcy court is

empowered to conduct a preliminary expedited hearing on the motion and authorize the

obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the

Debtors' estates.  <u>See</u> Fed.R.Bankr.P. 4001(c)(2).

75.     The Debtors request that the Court authorize the Debtors, on an interim basis

pending the Final Hearing, to borrow under the DIP Facility in an amount up to $16.0 million

under the DIP Facility (reduced by the amount of Prepetition Letters of Credit being rolled up

into the DIP Facility as DIP Facility Letters of Credit).  This relief will enable the Debtors to

operate their businesses in a manner that will permit them to preserve and maximize value and

37

thereby avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

76.     Absent interim approval of the use of Cash Collateral and interim borrowing under the DIP Facility, the Debtors' businesses would suffer immediate and irreparable harm. Specifically, the Debtors would have no funds available to purchase goods and services necessary to continue their business operations.  The Debtors would be unable to meet their payroll and other employee-benefit obligations, thereby threatening the livelihood of more than twelve thousand [(12,000)] full-time and part-time employees.  Moreover, the Debtors would be unable to purchase food and essential services necessary to continue their restaurant and pie-making operations.

77.     The Debtors also believe that interim authority to use Cash Collateral and to borrow up to $16.0 million (inclusive of DIP Facility Letters of Credit) is necessary for the Debtors to implement payments to holders of PACA claims or claims under section 503(b)(9) of the Bankruptcy Code or other vendor payments that the Debtors believe are critical to their ability to obtain goods and services from their vendors.

78.     The Debtors' need for interim relief is particularly acute.  In recent months, many of the Debtors' vendors have sharply-reduced their payment terms.  Most of the Debtors' vendors are providing goods and services to the Debtors on payment terms of twenty (20) days or less.

79.     Moreover, as the Debtors are engaged in the food business, they constantly need a supply of fresh ingredients to maintain their operations.  Even a temporary inability to obtain such ingredients will be devastating for the Debtors' businesses.  Absent interim use of Cash Collateral and interim borrowing under the DIP Facility, the Debtors' ability to provide high-

YCST01:11167164.1                                                                                                               070242.1001

quality food and services will be greatly diminished, thereby threatening the confidence and loyalty of their customers.

80.     The failure to obtain interim (and final) approval of the DIP Facility will also imperil the Debtors' going concern value and reorganization efforts.  Therefore, the Debtors seek interim approval of the use of Cash Collateral and interim borrowing under the DIP Facility in the amount of $16 million (net of the DIP Facility Letters of Credit).  For the same reasons, the Debtors request that the Court waive any stay on the effectiveness of an Interim Order.

## Final Hearing

81.     The Debtors further respectfully request that the Court set a date and time for the Final Hearing to consider the entry of a Final Order approving the relief sought in this Motion no later than thirty (30) after the date of entry of the Interim Order since pursuant to the DIP Credit Agreement an Event of Default will occur thereunder if the  Final Order is not entered within forty-five (45) days after the Petition Date, including without limitation final court approval of the Debtor's use of Cash Collateral and borrowings of up to $21.0 million (with a $15.0 million sublimit for the issuance of DIP Facility Letters of Credit, including the Existing Letters of Credit proposed to be rolled up) under the DIP Facility.

## Request For Immediate Relief and Waiver of
## Stay to Avoid Immediate and Irreparable Harm

82.     By this Motion, the Debtors seek a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed.R.Bankr.P. 6004(h).  For the reasons set forth above, the Debtors submit that ample cause exists to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h).

## **Notice**

83.     The Debtors will serve notice of this Motion upon: (i) the Office of the United States Trustee; (ii) the Debtors' consolidated list of creditors holding the forty (40) largest unsecured claims; (iii) counsel to the agent for the Debtors' pre-petition Credit Facility and post-petition debtor-in-possession financing facility; (iv) counsel to the indenture trustee for the Senior Secured Notes; (v) counsel to the indenture trustee for the Senior Notes; and (vi) counsel to the Restructuring Support Parties.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  Additionally, notice of (i) the Court's entry of the Interim Order and (ii) the hearing before the Court on the Final Order will be provided to the Utility Providers in the manner provided for in the Interim Order.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

## **No Prior Request**

84.     The Debtors have not made any prior request for the relief sought in this Motion.

### *Remainder of page intentionally blank*

WHEREFORE, the Debtors respectfully request that the Court (i) enter an Interim Order authorizing the Debtors to borrow up to $16.0 million (inclusive of the Prepetition Letters of Credit rolled up into the DIP Facility as DIP Facility Letters of Credit) on an interim basis pursuant to the terms of the DIP Facility Documents and the proposed Interim Order, (ii) schedule a Final Hearing on this Motion, (iii) after notice and an opportunity for a hearing, enter a Final Order authorizing the Debtors to borrow up to $21.0 million pursuant to the terms of the DIP Facility Documents, inclusive of the issuance of DIP Facility Letters of Credit as provided therein, and (iv) grant such other and further relief as is appropriate.

Dated: June 13, 2011
      Wilmington, Delaware

Respectfully submitted,

YOUNG CONAWAY STARGATT & TAYLOR, LLP

By:  /s/ Robert S. Brady
     Robert S. Brady (No. 2847)
     Robert F. Poppiti, Jr. (No. 5052)
     The Brandywine Building
     1000 West Street, 17th Floor, P.O. Box 391
     Wilmington, DE 19801
     Telephone: (302) 571-6600
     Facsimile:  (302) 571-1253


And

TROUTMAN SANDERS LLP

     Mitchel H. Perkiel
     Hollace T. Cohen
     Brett D. Goodman
     The Chrysler Building, 405 Lexington Avenue
     New York, NY 10174
     Telephone: (212) 704-6000
     Facsimile:  (212) 704-6288

Proposed Counsel for Perkins & Marie Callender's Inc., et al.
Debtors and Debtors-in-Possession