**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| PERKINS & MARIE CALLENDER'S INC.,[1] et al., | Case No. 11-11795 (KG) |
| Debtors. | (Joint Administration Pending) |

**DECLARATION OF JOSEPH F. TRUNGALE IN SUPPORT
OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, JOSEPH F. TRUNGALE, do hereby submit this declaration (the "Declaration") and declare under penalty of perjury that the following information is true to the best of my knowledge, information and belief:

1.     I have held the positions of President and Chief Executive Officer of Perkins & Marie Callender's Inc. ("PMCI") and various of the other debtors (collectively, the "Debtors") since March, 2004.  In my capacity as such, I have detailed knowledge of and experience with the business and financial affairs of the Debtors. Additionally, I have spent my entire professional career (approximately forty-five (45) years) in various management and senior executive positions within the restaurant management industry.

2.     As the President and Chief Executive Officer, I am one of the officers of the Debtors responsible for implementing the Debtors' business plans and strategies, and for generally overseeing the Debtors' business, financial, operational, and legal affairs.  Moreover, in my capacities as the President and Chief Executive Officer of PMCI and as an officer,

---

[1]  The Debtors, together with the last four digits of each  Debtor's federal tax identification number, are: Perkins & Marie Callender's Inc. (4388); Perkins & Marie Callender's Holding Inc. (3999); Perkins & Marie Callender's Realty LLC (N/A); Perkins Finance Corp. (0081); Wilshire Restaurant Group LLC (0938); PMCI Promotions LLC (7308); Marie Callender Pie Shops, Inc. (7414); Marie Callender Wholesalers, Inc. (1978); MACAL Investors, Inc. (4225); MCID, Inc. (2015); Wilshire Beverage, Inc. (5887); and FIV Corp. (3448).  The mailing address for the Debtors is 6075 Poplar Avenue, Suite 800, Memphis, TN 38119.

manager and/or director of the other Debtors, I have been involved in the Debtors' restructuring process (the "Restructuring"), including, inter alia, (a) participating in the development, negotiations and implementation of various strategic alternatives for recasting, reducing or modifying the Debtors' indebtedness; (b) managing the professionals engaged by the Debtors in connection with the Restructuring; (c) supervising the preparation of the documentation necessary to implement a Restructuring; and (d) consulting with the Debtors' other officers and executives, and members of the Debtors' Boards of Directors or their equivalent, with respect to the foregoing.

3.     On June 13, 2011 (the "Petition Date"), each of the Debtors filed a voluntary petition (collectively the "Petitions") for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), and each thereby commenced chapter 11 cases (collectively, the "Chapter 11 Cases") in this Bankruptcy Court (the "Court") in an effort to preserve and maximize the value of their businesses, assets and chapter 11 estates.

4.     The Debtors intend to operate their businesses and manage their assets and properties as "debtors-in-possession" under sections 1107(a) and 1108 of the Bankruptcy Code.

5.     I have been advised by counsel that this Court has jurisdiction over these Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334.  In addition, I have also been advised by counsel that venue of these Chapter 11 Cases is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

(a)     **Overview of the Debtors' Businesses and History**

6.     The Debtors are one of the leading operators of family-dining and casual-dining restaurants, under their two (2) highly-recognized brands: (i) their full-service family dining restaurants located primarily in the Midwest, Florida and Pennsylvania under the name "Perkins

Restaurant and Bakery" ("Perkins"), and (ii) their mid-priced, full-service casual-dining restaurants, specializing in the sale of pies and other bakery items, located primarily in the western United States under the name "Marie Callender's Restaurant and Bakery" ("Marie Callender's").

7.       Through the Debtors' Foxtail Foods bakery goods manufacturing operations ("Foxtail"), the Debtors offer pies, muffin batters, cookie doughs, pancake mixes, and other food products for sale to both company-owned and franchised Perkins and Marie Callender's restaurants, and to unaffiliated customers, such as food service distributors and supermarkets, as well as on-line to the public.  Foxtail operates one (1) manufacturing facility located in Corona, California, at which it produces pies and other bakery products primarily for the Marie Callender's restaurants, and two (2) facilities in Cincinnati, Ohio, at which it produces pies, pancake mixes, cookie doughs, muffin batters and other baking products primarily for the Perkins restaurants and various third-party customers.  Prior to that certain asset sale transaction with ConAgra Foods RDM, Inc. ("RDM") described below, the Debtors licensed to ConAgra Foods, Inc. (f/k/a ConAgra, Inc.) and RDM (collectively, "ConAgra") the use of the registered name "Marie Callender's" in connection with the manufacture and distribution of various food products by ConAgra in various domestic and foreign markets pursuant to licensing/distribution agreements. Effective as of June 9, 2011, Marie Callender Pie Shops, Inc., one of the within Debtors ("MCPSI"), sold its ownership of its material "Marie Callender's" trademarks to RDM pursuant to a certain "Asset Purchase Agreement" dated as of June 9, 2011 (the "Trademark Sale Transaction"). Concomitantly, RDM and MCPSI entered into a certain "Trademark License Agreement", dated as of June 9, 2011, pursuant to which the Debtors received a perpetual,

royalty-free, worldwide license to use the applicable trademarks in connection with restaurant operations and the sale of fresh bakery products.

8.      Perkins, founded in 1958, offers a full menu of over ninety (90) assorted breakfast, lunch, dinner, snack and dessert items. Breakfast items, which are available throughout the day, account for approximately half of the entrees sold in the Perkins restaurants.

9.      Marie Callender's, founded in 1948, has one of the longest operating histories within the full-service dining sector. Marie Callender's is known for serving quality food in a warm and pleasant atmosphere and for its premium pies that are baked fresh daily.

10.     As of April 17, 2011, the Debtors owned and operated one hundred sixty (160) Perkins restaurants located in thirteen (13) states, and franchised three hundred fourteen (314) Perkins restaurants located in thirty-one (31) states and five (5) Canadian provinces. Similarly, the Debtors owned and operated eighty-five (85) Marie Callender's restaurants located in nine (9) states, and franchised thirty seven (37) Marie Callender's restaurants located in four (4) states and Mexico.[2] Thus, the Debtors operate or franchise nearly six hundred (600) restaurants throughout the United States, Canada and Mexico.*

11.     As of April 17, 2011, the Debtors employed approximately twelve thousand three hundred fifty (12,350) employees, consisting of approximately five thousand three hundred fifty (5,350) part-time employees and approximately seven thousand (7,000) full-time employees.*

12.     The Debtors' revenues for the year ended December 26, 2010 were approximately $507 million.

---

[2]  Included therein, MCPSI operates two (2) "Callender's Grill" restaurants in Los Angeles, California and a single "East Side Mario's" restaurant in Lakewood, California.

*  Immediately prior to the Petition Date, the Debtors initiated a store reduction program to discontinue approximately sixty-five (65) corporate-operated restaurant locations, which will have the attendant effect of a reduction in workforce of approximately 2,500 people.

(a)     **Corporate Structure and Pre-Petition Capitalization**

13.     Perkins & Marie Callender's Holding Inc. (f/k/a The Restaurant Holding Corporation) ("PMC Holding") is a holding company that wholly owns PMCI. PMCI is the Debtors' principal operating entity and the primary obligor on the Debtors' pre-Petition Date senior secured working capital facility and their secured and unsecured bond debt. PMCI directly or indirectly owns and operates the Debtors' restaurant operations, oversees the Debtors' franchised restaurant operations, and owns and operates its Foxtail business.

14.     PMCI owns and controls one hundred (100%) percent of Perkins & Marie Callender's Realty LLC (f/k/a TRC Realty LLC), Perkins Finance Corp., PMCI Promotions LLC ("Promotions"), and Wilshire Restaurant Group LLC ("Wilshire"). Through Wilshire, PMCI owns and controls one hundred (100%) percent of MCPSI which, in turn, owns and controls one hundred (100%) percent of Marie Callender Wholesalers, Inc., MACAL Investors, Inc., MCID, Inc., Wilshire Beverage, Inc., and FIV Corp. MCPSI, together with its wholly-owned subsidiaries, owns and operates the Marie Callender's corporate and franchised restaurant operations. The foregoing direct and indirect wholly-owned subsidiaries of PMCI are hereinafter referred to as the "Subsidiary Debtors"; and the Subsidiary Debtors, exclusive of Promotions, are hereinafter referred to as the "Guarantor Subsidiary Debtors". A corporate organizational chart is attached hereto as Exhibit A.

15.     On September 24, 2008, PMCI issued $132 million in aggregate principal amount of 14% Senior Secured Notes (the "Senior Secured Notes"), with a maturity date of May 31, 2013 and interest payable semi-annually on May 31 and November 30 of each year. The Senior Secured Notes are guaranteed by PMC Holding and the Guarantor Subsidiary Debtors and are secured on a second lien basis by substantially all of the assets of PMCI, PMC Holding and the

Guarantor Subsidiary Debtors.  Previously, on September 21, 2005, PMCI issued $190 million of 10% Senior Notes (the "Senior Notes"), with a maturity date of October 1, 2013 and interest payable semi-annually on April 1 and October 1 of each year.  The Senior Notes are unsecured obligations of PMCI and are guaranteed on an unsecured basis by the Guarantor Subsidiary Debtors.

16.    Concurrently with the issuance of the Senior Secured Notes, PMCI and PMC Holding entered into a Credit Agreement dated as of September 24, 2008 (as amended, the "Credit Agreement") with Wells Fargo Capital Finance, LLC (f/k/a Wells Fargo Foothill, LLC) as the lender and administrative agent (the "Credit Facility Agent"), consisting of a revolving credit facility in favor of PMCI, as borrower, of up to $26,000,000, with a sub-limit of $15,000,000 for the issuance of letters of credit (collectively, the "Credit Facility").  The Credit Facility is guaranteed by PMC Holding and the Guarantor Subsidiary Debtors and is secured on a first lien basis by substantially all of the assets of PMCI, PMC Holdings and the Guarantor Subsidiary Debtors.

17.    Accordingly, by virtue of the issuance of the Senior Secured Notes and the establishment of the Credit Facility, each of the Debtors (other than Promotions) is primarily or secondarily liable and obligated for the repayment of all of the aforesaid secured debt obligations, and, by virtue of the issuance of the Senior Notes, each of the Debtors (other than Promotions and PMC Holding) is primarily or secondarily liable and obligated for the repayment of the Senior Notes.

18.    After application of certain of the proceeds from the Trademark Sale Transaction, as of the Petition Date, approximately $103,000,000 in aggregate principal amount of the Senior Secured Notes are outstanding, $190,000,000 in aggregate principal amount of the Senior Notes

are outstanding, and approximately $10,060,000 in principal amount is outstanding under the Credit Facility (comprised solely of outstanding letters of credit).

19.     In addition to the foregoing, as of the Petition Date, the Debtors have outstanding approximately $8,600,000 in unpaid trade debt to their vendors and suppliers.

(a)     **Events Leading to the Debtors' Chapter 11 Cases**

20.     Prior to the commencement of these Chapter 11 Cases, the Debtors' operations and financial performance were severely and adversely affected due to excessive leverage and poor sales results. The poor economic climate has been a primary factor in the decline in restaurant sales, particularly in Florida and California where there are large concentrations of Perkins and Marie Callender's restaurants, and where high foreclosure rates and depressed economies have prevailed. With overall unemployment rates at record high levels, discretionary income for many historically-loyal customers and other consumers has been severely constrained, directly correlating to depressed restaurant sales and reduced or eliminated customer traffic. Restaurant sales were also negatively impacted by a lack of restaurant remodeling expenditures due to the Debtors' internal constraints on deploying cash for capital expenditures. As better resourced competitors continued to build new locations and upgrade their existing facilities (and in some cases, through the vehicle of their own chapter 11 proceedings, restructured their financial affairs), many of the Debtors' restaurants became facially dated and stale, which also negatively impacted the ability of the Debtors to maintain customer traffic at the levels prevailing prior to the economic downturn.

21.     On April 1, 2011, the Debtors obligated thereunder were unable and failed to make a scheduled interest payment of $9,500,000 on the Senior Notes. After the passage of thirty (30) days from April 1, without payment of such interest, such default became an Event of

Default under the indenture governing the Senior Notes (the "Senior Notes Indenture"),

permitting potential acceleration of the Senior Notes by the holders of at least twenty-five (25%)

percent in aggregate principal amount of the Senior Notes. The occurrence of the interest default

and subsequent Event of Default (as defined in the Senior Notes Indenture) resulting therefrom

also gave rise to various potential collection and enforcement remedies available to the indenture

trustee for, and the holders of, the Senior Notes and to the Credit Facility Agent under the Credit

Agreement. Certain technical defaults also existed under the Credit Agreement as to which the

Credit Facility Agent had similar potential rights and remedies. Effective April 30, 2011, PMCI

and various of the other Debtors entered into two (2) forbearance agreements (collectively, the

"Forbearance Agreements"). On or about May 4, 2011, PMCI, the Guarantor Subsidiary

Debtors and the holders of in excess of eighty (80%) percent in aggregate principal amount of

the Senior Notes entered into a forbearance agreement, pursuant to which said holders agreed to

forbear from exercising any and all of their rights and remedies with respect to the aforesaid

payment default and other existing and anticipated defaults and Events of Default through and

including June 30, 2011 (the "Senior Note Forbearance Agreement"). Additionally, on or about

May 9, 2011, the Debtors (other than Promotions) entered into a forbearance agreement with the

lender and the Credit Facility Agent under the Credit Agreement (triggered by certain technical

defaults thereunder including the nonpayment of the semi-annual interest payment on the Senior

Notes) pursuant to which the lender and Credit Facility Agent agreed to forbear from exercising

any and all of their rights and remedies to and until June 30, 2011.

      22.    During the window of opportunity created by the execution and delivery of the

Forbearance Agreements, the Debtors entered into negotiations with the holders of the Senior

Notes signatory to the Senior Note Forbearance Agreement (and the holders of one hundred

(100%) percent of the Senior Secured Notes) (collectively, the "Restructuring Support Parties") which negotiations were designed to restructure and recapitalize the Debtors' businesses and balance sheet. To that end, in the weeks preceding the Petition Date, the Debtors and said noteholders entered into a "Restructuring Support Agreement" dated as of June 6, 2011, designed to mutually and consensually develop and agree upon the parameters of a reorganization program for the Debtors that will, among other things, delever the Debtors' capital structure, and thereby establish a pre-filing blueprint for an efficient and effective chapter 11 reorganization process. In connection with entering into the Restructuring Support Agreement, the Debtors and Restructuring Support Parties also negotiated the principal terms of the Debtors' plan of reorganization, and such plan of reorganization and the accompanying disclosure statement will be filed with the Court on or before July 14, 2011 in accordance with the milestones contained in the Restructuring Support Agreement. A copy of the Restructuring Support Agreement is attached hereto as Exhibit B.

23.     In consultation with their professionals and certain of their constituencies, the Debtors have diligently evaluated a number of options to address their current financial and capital issues. These efforts have included sharing information with and engaging in discussions with a variety of the Debtors' stakeholders with the goal of restructuring the Debtors' balance sheet to bring it into line with the Debtors' current debt servicing capabilities. Based on the Debtors' evaluation of their options for addressing their current financial and capital issues and discussion with their stakeholders, the Debtors concluded that proceeding with a Restructuring on the terms set forth in the Restructuring Support Agreement provided the best available means of achieving their goals.

24.     Accordingly, the Debtors determined that the commencement of these Chapter 11 Cases would provide the best alternative to eliminate underproductive operations and to restructure their businesses, financial affairs and balance sheet.

(a)     **First Day Motions**

25.     I have formed opinions as to (a) the urgency and necessity for obtaining the relief sought by the Debtors in their several "first-day" applications and motions described herein (collectively, the "<u>First Day Pleadings</u>"),[3] (b) the need for the Debtors to continue to effectively operate and, as seamlessly as possible, embark upon their Chapter 11 Cases (and the methodologies to be employed in furtherance thereof), (c) the deleterious effects upon the Debtors' employees, customers, creditors and estates if the Debtors do not obtain the requested relief, and (d) the immediate and irreparable harm that the Debtors and their estates will be exposed to in the event that this Court does not approve the relief requested in the First Day Pleadings. My opinions are based upon my first-hand experience as President and CEO for the Debtors for the past seven (7) years and as the result of my review of various materials and information, discussions with other executives of the Debtors, and discussions with the Debtors' advisors.

26.     This Declaration is submitted in support of the Debtors' Petitions and this Court's entry of orders approving the relief requested in all of the First Day Pleadings.

27.     I have reviewed each of the First Day Pleadings, and participated together with other of the Debtors' personnel in the preparation thereof. I believe, to the best of my knowledge, that the facts and circumstances set forth in the Petitions and the First Day Pleadings are true and correct. This representation is based upon information and belief and through my

---

[3] Capitalized terms not otherwise defined herein shall have the meaning attributed to them in the relevant First Day Pleading.

review of various materials and information, as well as my history and experience with and knowledge of the Debtors' operations and financial condition. Based upon the foregoing, if called to testify before this Court, I could and would, testify competently to the facts set forth in each of the First Day Pleadings.

28.     The relief sought in the First Day Pleadings will minimize the adverse impact of these Chapter 11 Cases on the Debtors, its employees, customers, landlords, franchisees, vendors suppliers, and other creditors, and will maximize value for the Debtors' creditors. I believe that the relief sought in the First Day Pleadings is necessary and essential to enable the Debtors to operate effectively as debtors-in-possession in their Chapter 11 Cases.

29.     As described more fully below, the Debtors carefully designed the relief requested in the First Day Pleadings in consultation with their advisors to ensure that the Debtors' immediate operational needs are met and that the Debtors (and other constituencies) will not suffer any immediate and irreparable harm by dint of the commencement of the Chapter 11 Cases. As indicated, I participated in the analyses that led to the development of each of the First Day Pleadings. The relief requested therein – as briefly articulated below and more fully in the First Day Pleadings – is tailored to address those matters, issues and requirements that need urgent and immediate attention by this Court in order to sustain the values and viability of the Debtors' business operations.

        a.      ***Motion for Joint Administration***

30.     The Debtors believe that many of the motions, applications, hearings and orders that will arise in these Chapter 11 Cases will collectively affect each of the Debtors. For this reason, the Debtors believe that the interests of the Debtors, their creditors, and all other parties in interest would be best served by the joint administration of these Chapter 11 Cases. The

Debtors further believe that in order to optimally and economically administer the Debtors' pending Chapter 11 Cases, said cases should be jointly administered, for procedural purposes only, under the case number assigned to PMCI. The Debtors believe that joint administration will also significantly reduce the volume of paper that otherwise would be filed with the Clerk of this Court, render the completion of various administrative tasks less costly, provide for greater efficiencies and simplify supervision of the administrative aspects of these Chapter 11 Cases by the Office of the United States Trustee.

31.     For these reasons, I believe, and the Debtors submit, that the relief requested in this motion is in the best interests of the Debtors, their creditors, and their estates, and should therefore be approved.

       **b.**     ***Motion to Employ and Retain Claims, Noticing and Balloting Agent***

32.     The Debtors seek authority to retain and employ Omni Management Group, LLC ("Omni") as their claims, noticing and balloting agent (the "Agent"). Upon information and belief, Omni is an experienced Agent and is frequently used in such capacities in chapter 11 cases. I believe that Omni is well qualified to serve as Agent in these Chapter 11 Cases, and its engagement and employment will provide the Debtors with efficient management of the claims, noticing, balloting and related administrative processes in these Chapter 11 Cases, thereby leaving the Debtors' management and advisors to focus on the Debtors' restructuring and reorganization efforts.

       **c.**     ***Cash Management Motion***

33.     The Debtors seek an order of this Court authorizing, but not directing, among other things, (a) the continued use of their existing cash management system (the "Cash Management System"), (b) the continued use of their existing bank accounts and business forms,

and (c) the payment of all pre-petition costs and fees associated with customer credit cards, and (d) a waiver of the requirements of section 345(b) of the Bankruptcy Code in connection therewith on an interim basis.

34.     The Debtors maintain a cash management receipt and disbursement system in the ordinary course of their operations.  In order to lessen the disruption generally caused by the commencement of the Chapter 11 Cases and maximize the value of their businesses, assets and chapter 11 estates, it is vital to the Debtors that they maintain their existing Cash Management System.

35.     The Debtors further request that they be authorized to continue to use all correspondence and business forms existing immediately before the Petition Date without (and which do not contain) reference to the Debtors' status as "debtors-in-possession".  Parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors-in-possession given the size of and publicity surrounding these Chapter 11 Cases.  If the Debtors were required to change their pre-printed correspondence and business forms, they would be forced to choose standard forms rather than the current forms with which the Debtors' employees, customers, vendors and suppliers are familiar.  Such a change in operations would create a sense of, as well as cause, unsettledness and potential confusion within the Debtors' organization and for the Debtors' employees, customers, vendors and suppliers.  I believe, and the Debtors submit, that it would be costly and disruptive to cease using all existing forms, and to purchase and begin using new stationary and business forms.  The Debtors respectfully submit that to do so would be unnecessary, and that appropriate care can be taken to assure the proper use of the existing forms.

36.     The Debtors additionally seek authorization to pay all pre-petition costs and fees associated with customer credit and debit card purchases and processing, including those related to the Debtors' cash register system.  The success of the Debtors' chapter 11 reorganization efforts is dependent upon, among other things, the ability to process customer credit and debit card transactions which accounts for approximately sixty percent (60%) of the Debtors' revenue. The ability to pay processing and cash register system fees, including any related pre-petition amounts, is critical to the Debtors' reorganization.  Any inability on the Debtors' part to continue to satisfy pre-petition obligations with respect to such fees would threaten the Debtors' ability to maximize estate value.

37.     The Debtors also seek a waiver of the U.S. Trustee's requirement that the Debtor's bank accounts be closed and that new post-petition "debtor-in-possession" bank accounts be opened.  If enforced in these Chapter 11 Cases, such requirement would cause enormous disruption to the Debtors' businesses and would seriously impair the Debtors' chapter 11 efforts.  The Debtors' bank accounts are integral to and integrated within a long-established Cash Management System that the Debtors need to preserve and maintain to ensure smooth and effective collections and disbursements in the ordinary course of their businesses.  Therefore, to avoid delays in the Debtors' payment of debts incurred post-petition, and to ensure as smooth a transition as possible into these chapter 11 proceedings, the Debtors should be permitted to preserve and continue to maintain the existing pre-Petition Date bank accounts and, if necessary, to open new accounts and close existing accounts in the normal course of the Debtors' business operations.  Otherwise, resetting the Debtors' numerous central and local bank accounts is certain to be disruptive, time consuming and expensive.

YCST01:11166947.1
070242.1001

38.     If the relief requested in the subject motion is granted, the Debtors will implement appropriate mechanisms to ensure that no payments will be made on any debts which were incurred by them prior to the Petition Date, other than those as may be authorized by order of this Court.  To prevent the possible inadvertent payment of pre-Petition Date claims, the Debtors will work closely with their cash management banks to ensure that appropriate procedures are in place to prevent checks that were issued prior to the Petition Date from being honored subsequent to the Petition Date absent this Court's authorization.

### d.     *Employee Wages/Benefits Motion*

39.     Pursuant to the subject motion, the Debtors are seeking authority (but not direction) to honor and pay all pre-Petition Date wages, salaries, and other accrued compensation, and to continue to honor and implement certain other policies, programs and benefits that the Debtors have provided, and which the Debtors believe must be continued, to and for their employees in the ordinary course of the Debtors' businesses.

40.     Prior to the implementation of the store reduction program, the Debtors had a current work force of approximately 7,000 full-time and approximately 5,350 part-time employees nationwide (collectively, the "Employees").*

41.      Approximately three and one-half percent (3.5%) of the Employees are compensated through fixed salaries, and the remaining Employees are compensated on an hourly basis.  The Debtors have the following four (4) general categories of employees: (1) employees who run the Perkins and Marie Callender's restaurants, including restaurant managers such as general managers, M-Class Managers and support staff such as servers, hosts, bus persons, cooks and dishwashers; (2) corporate field managers who supervise the operations of multiple

---

\* Immediately prior to the Petition Date, the Debtors initiated a store reduction program to discontinue approximately sixty-five (65) corporate-operated restaurant locations, which will have the attendant effect of a reduction in workforce of approximately 2,500 people.

restaurants and related functions, including regional managers, franchise consultants, area vice presidents, senior operations managers and senior area directors; (3) corporate headquarters personnel that primarily work out of the Debtors' Memphis, Tennessee office; and (4) personnel who support the Debtors' bakery goods manufacturing operations at Foxtail. Employees who work in the Marie Callender's restaurants, as well as those Employees that work out of the Mission Viejo, California office and those Employees that work at Foxtail's manufacturing facility located in Corona, California are employees of Wilshire. All of the Debtors other Employees are employed by PMCI.

42.     The Debtors are obligated to pay or honor a variety of pre-petition Employee claims, including, without limitation, (i) accrued salary, wages, bonuses, and other compensation that were earned prior to the Petition Date, but which are scheduled to be paid post-petition; (ii) withholding taxes to federal, state and local authorities related to these payments; (iii) certain amounts withheld from some of the Employees' payments for a variety of reasons including, but not limited to, certain insurance programs, savings plans, child support, and garnishments; (iv) vacation time and/or vacation time compensation; (v) outstanding claims for reimbursement of business expenses that were incurred and paid by the Employees pre-petition, but for which they have not yet been reimbursed; and (vi) obligations under workers' compensation programs.

43.     Based upon the Debtors' ordinary course payroll disbursement schedule, the aggregate amount of current earned, but unpaid, pre-Petition Date wages and salaries, exclusive of withholding for payroll taxes, as of the Petition Date, is approximately $6,700,000.

44.     To the best of my knowledge, information and belief, no pre-petition wages and salaries payable, and proposed to be paid, to any single individual Employee exceed the $11,725 priority limitation contained in section 507(a)(4) of the Bankruptcy Code.

45.     The majority of the Employees are reliant upon the timely payment of their wages and salaries to cover their monthly living costs and expenses.  The Debtors' failure to remit payment on account of pre-petition Employee claims to the Employees would inflict great hardship on the Employees and would seriously damage morale and productivity at a very critical time for the Debtors.  The full commitment of the Employees is required for the Debtors to successfully navigate through the bankruptcy process.

46.     Moreover, the Debtors are obligated to pay federal, state and local withholding taxes (collectively, the "Payroll Taxes").  Such withholding taxes and social security contributions are withheld from payroll by the Debtors.  Federal payroll taxes are paid based on a semi-weekly schedule dictated by the Internal Revenue Service ("IRS") and state withholding payments vary by state. The Debtors pay all Payroll Taxes to the appropriate authorities within two (2) business days of a Payroll date. Therefore, an order confirming the Debtors' authority to pay any and all local, state and federal withholding, Payroll-related and incentive compensation taxes relating to the pre-petition periods, including, but not limited to, all withholding taxes, Social Security taxes and Medicare taxes, is warranted.  The Debtors request authorization to pay all outstanding withholding taxes, tax deposits and processing fees that accrued and were owed to the taxing authorities prior to the Petition Date.  In addition, the Debtors seek authorization to pay all federal, state and local withholding taxes, tax deposits and processing fees in the ordinary course of business on a going forward basis.

47.     Additionally, pursuant to the Debtors' pre-petition policies and procedures, some of the M-Class Managers and general managers for the Perkins and Marie Callender's brands are eligible for incentive bonuses earned according to sales and controllable income achievement and based on each restaurant's actual performance compared with the established budget

assigned to each restaurant (the "Incentive Compensation").  Eligible managers who achieve, or

beat, the restaurant's minimum targets are awarded a bonus at the end of each of the thirteen (13)

accounting periods per year.  General managers are additionally eligible for annual bonuses at

the end of the year based on overall controllable income targets achieved at the end of the year.

48.     Approximately 403 Perkins and 215 Marie Callender's M-Class Managers and

approximately 160 Perkins and 76 Marie Callender's general managers are eligible for the

foregoing restaurant management incentive programs.  Perkins' general managers are

additionally eligible for a compensation differential plan conducted at the end of each quarter to

determine whether actual sales targets were achieved in the previous rolling thirteen (13) periods.

49.     The Debtors seek authority to pay qualifying restaurant management Employees

for incentive compensation earned within the period of May 16, 2011 to June 12, 2011, as well

as any accrued or earned incentive compensation for the quarter ending July 10, 2011, in an

aggregate amount not to exceed $130,000.  Absent further order of this Court, no payments to

Employees which are insiders of the Debtors, as that term is defined in section 101(31) of the

Bankruptcy Code, will be made on account of Incentive Compensation.

50.     Furthermore, certain Employees are eligible for paid vacation.  Pursuant to the

Debtors' procedures and policies, certain Employees are entitled to earn vacation based upon

years of service and number of hours worked per pay period.   Pursuant to the Debtor's policies

and procedures, there are a maximum number of hours of vacation that an Employee can accrue.

The maximum amount of vacation that can be accrued at the corporate or management level is

three (3) weeks per year. Corporate and management Employees of Perkins, Marie Callender's

and Foxtail (as well as hourly plant Employees at Foxtail) are able to accrue, rollover and bank

vacation time up to a certain number of capped hours depending on the brand.

51.     Full-time and hourly Employees at Perkins are entitled to anniversary checks. Beginning on April 18, 2011, hourly Marie Callender's Employees no longer accrued paid vacation time.  Instead, hourly Employees of Marie Callender's that work an average of thirty (30) hours or more per week are now entitled to an anniversary check paid on an anniversary date equivalent to the Employee's average pay per week, for a maximum of two work (2) weeks. Those hourly Marie Callender's Employees that were eligible for paid vacation accrual under the prior policy continue to maintain a bank of their accrued paid vacation time that may be used or applied but may not be added to after April 18, 2011.

52.     Additionally, certain Employees are eligible for (a) holiday pay for designated holidays and (b) sick time, which is based upon number of hours worked per week and full or part-time status.

53.     Accordingly, the Debtors request authority, but not direction, from this Court to allow Employees to use pre-petition accrued vacation, sick and holiday time and to pay Employees for pre-petition unpaid accrued vacation and anniversary checks upon termination in accordance with the Debtors' pre-petition policies and procedures.  Also, the Debtors request authority to continue to accrue vacation obligations and award holidays and sick days to eligible Employees for post-petition periods in accordance with the Debtors' pre-petition policies and procedures.  Further, the Debtors request authority to permit all Employees to take ordinary course vacation time in accordance with the Debtors' pre-petition policies and procedures.

54.     The Debtors have regularly and historically paid certain corporate and administrative Employees severance for a series of weeks after their termination based on an Employee's position within the Debtors' corporate structure and the number of years of their service (the "Severance Package"). The Debtors' severance guidelines set forth a minimum

number of weeks offered as severance pay that any eligible Employee would be entitled to and a maximum capped number of weeks of severance pay based on additional years of service. In addition to the Severance Package, the Debtors have traditionally offered terminated Employees an outplacement package, based on an Employee's position with the Debtors and number of years of service, consisting of outplacement services through an outside agency for period of two (2) days to as many as six (6) months (the "Outplacement Package," and together with the Severance Package, the "Termination Packages").

55.     The Debtors request authority, but not direction, to allow Employees to continue to accrue pre-petition time served towards the Termination Packages and award Termination Packages to eligible Employees for post-petition periods in accordance with the Debtors' pre-petition policies and procedures. Absent further order of this Court, no payments to Employees which are insiders of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code, will be made on account of the Termination Packages.

56.     The Debtors withhold money from the Employee payroll pursuant to instructions from certain Employees or orders by judicial or administrative authorities (collectively, the "Designated Withholdings") to pay for, among other things, supplemental insurance programs, savings plans, child support, and garnishments. Out of an abundance of caution, the Debtors request authority to remit and continue to remit those withholdings from Employees' payroll checks to the appropriate designee or depository.

57.     Prior to the Petition Date, certain of the Employees regularly incurred permitted business-related expenses, which are reimbursable by the Debtors in the ordinary course of business. These reimbursable expenses include, but are not limited to, expenses for travel, auto expenses, telephone charges, and meals. Typically, the Employee incurs and pays the expense

with a personal credit card, and the Debtors' thereupon reimburse the Employee after submission and approval of the Employee's expense reimbursement request. These business expenses are processed on a frequent and regular basis. However, sometimes there is some lag time between the time the expenses were incurred by the Employee and the time an expense reimbursement request is submitted. Therefore, it is difficult to determine with any precision the aggregate outstanding amount of such Employee expense obligations. The Debtors estimate, however, that the pre-Petition Date Employee expense obligations as of the Petition Date entitled to reimbursement are approximately $200,000.

58.     It would be inequitable to require the Employees to personally bear these out-of-pocket expenses, all of which were incurred on behalf and at the direction of the Debtors with the expectation that they would be reimbursed promptly. Therefore, the Debtors request authority to reimburse the Employees for all pre-petition business expenses incurred by its Employees in the ordinary course of the Debtors' business.

59.     The various states in which the Debtors conduct business have laws that require the Debtors to maintain workers' compensation liability insurance and to provide employees with workers' compensation coverage for claims that arise from or are related to their employment with the Debtors. The Debtors provide workers' compensation benefits to their Employees through a self-insured program administered by ACE USA ("ACE"). In addition, the Debtors provide excess loss insurance through policies with ACE and Great American Insurance Company of New York (collectively, the "Workers' Compensation Policies"). ACE holds letters of credit as collateral for its excess coverage. Pre-petition, the claims under the Workers' Compensation Policies were administered by an independent third party claims administrator, ESIS, Inc.

YCST01:11166947.1                                                                                      070242.1001

60.     Historically, the Debtors have paid approximately $4.2 million annually on account of their Workers' Compensation Policies.  The Debtors anticipate that the average monthly expense for their Workers' Compensation Policies will be approximately $450,000.

61.     The Debtors' failure to maintain workers' compensation insurance in the various states in which the Debtors conduct business could result in the commencement of legal or administrative proceedings against the Debtors.  In addition, the failure to maintain workers' compensation insurance could subject the Debtors and their officers and directors to material fines.  Moreover, as required by certain states in which the Debtors conduct business, some of the workers' compensation claims are covered by letters of credit.  If the Debtors fail to maintain workers' compensation insurance, claimants and the various state workers' compensation authorities may have recourse to the letters of credit to satisfy unpaid claims.  In that case, the Debtors may be required to replenish the letters of credit, which would further reduce availability under the Debtors' Credit Facility.

62.     The Debtors contract with TALX Corporation, a third party unemployment administrator to administer the Debtors' unemployment tax, claims, and benefit management functions (collectively, the "Unemployment Obligations").

63.     The Debtors request authority to continue paying all outstanding amounts related to Workers' Compensation Policies and Unemployment Obligations that arose prior to the Petition Date, including, without limitation, any payments for workers compensation claims, premiums and fees owed for administrative costs and other amounts required in connection with the Debtors Workers' Compensation Policies, as such amount become due in the ordinary course of business.

YCST01:11166947.1

070242.1001

64. Prior to the Petition Date, the Debtors offered and provided its Employees certain standard employee benefits funded by either the Debtors, the Employees, or both, including among others: (i) medical, dental, prescription drug, long and short term disability, and life insurance; (ii) 401(k), deferred compensation and supplemental retirement plans for eligible Employees; and (iii) other miscellaneous benefits some (but not all) of which are described below (collectively, the "Employee Benefits").  The failure to continue these Employee Benefits would severely undermine the Employees' morale and productivity, and surely result in significant hardship to the Employees.  To retain the services of the Employees and maintain their morale, productivity and loyalty during these Chapter 11 Cases, the Debtors seek authority, in the ordinary course of the Debtors' business postpetition to pay any amounts related to the Employee Benefits and Benefit Contributions (including prepetition amounts) and to continue to provide the Employee Benefits to the Employees and to make Benefit Contributions in accordance with Debtors' prepetition policies and procedures.

65. Medical coverage is offered for certain eligible Employees of the Debtors through a Preferred Provider Organization (the "PPO Plans") and is administered by UnitedHealthcare (the "PPO Administrator").  Approximately 1,400 Employees, including hourly restaurant Employees that became eligible to participate in this program after two (2) years of full-time employment, participate in the PPO Plans.  Dental, vision and prescription drug coverages are offered for eligible Employees of the Debtors through the PPO Plans.  The PPO Plans are self-funded by the Debtors.  In addition to the PPO Plans, the Debtors offer excess coverage to approximately ten (10) to twelve (12) executives through Exec-U-Care (the "Exec-U-Care Plan" and together with the PPO Plans, the "Health Plans").

66.     Overall the Debtors pay approximately sixty percent (60%) of the total cost of the Health Plans, including, but not limited to, claims, premiums (including stop-loss premiums) and administrative fees for the medical, dental, vision and prescription drug coverages provided under the Health Plans.  Approximately forty percent (40%) of the overall cost of the Health Plans is paid by the Employees.

67.     The Debtors also offer limited benefit health coverage through Starbridge (Cigna) for hourly field Employees working an average of fifteen (15) or more hours per week but which are not otherwise eligible to participate in the PPO Plans (the "Limited Coverage Plans"). Approximately 570 Employees are enrolled in the Limited Coverage Plans.  Premiums for the Limited Coverage Plans are one hundred percent (100%) paid by participating Employees. Dental, vision and prescription drug coverages are offered for an added fee to eligible Employees of the Debtors through the Limited Coverage Plans.

68.     The Debtors offer basic and supplemental life insurance to certain eligible Employees.  Life insurance and accidental, death and dismemberment ("AD&D") coverage is provided to Employees that participate in the PPO Plans through Cigna (the "Life Insurance Policies"). In addition, at no cost, the Debtors provide short and long term disability insurance to eligible Employees in management and administrative positions (the "STD/LTD Coverage"). The Debtors seek authority to continue to offer the Life Insurance Policies and the STD/LTD Coverage in the ordinary course of the Debtors' business.

69.     The Debtors seek authority, in their sole discretion, in the ordinary course of the Debtors' business post-petition to honor any and all obligations owed in connection with the Limited Coverage Plans, Life Insurance Policies, STD/LTD Coverage and Supplemental Limited Coverage, including, without limitations, the (a) payment of all premiums, claims and

24

administrative fees currently in arrears; and (b) payment of any premiums, claims and administrative fees that may have accrued prior to the Petition Date but will not become due until a later date and to continue to offer the Limited Coverage Plans, Life Insurance Policies, STD/LTD Coverage and Supplemental Limited Coverage to their Employees (including the payment of arising claims and administrative fees) in accordance with the Debtors' prepetition policies and procedures.

70.     The Debtors offer a qualified 401(k) plan (the "401(k) Plan") to Employees who have been employed for one (1) year, are at least eighteen (18) years of age, and have completed at least 1,250 hours of service their first year of employment.  Under the 401(k) Plan, participating Employees may make voluntary contributions of between one percent (1%) and fifteen percent (15%) of the gross income per paycheck.  The Debtors request authorization, but not direction, in their sole discretion, to: (a) make any prepetition 401(k) Plan employee contributions; (b) pay any 401(k) Plan administrative fees outstanding as of the Petition Date; and (c) continue the 401(k) Plan in the ordinary course of the Debtors' business.

71.     The Debtors also offer a Non-Qualified Deferred Compensation Plan (the "NQDC Plan") to eligible officers and management-level Employees of the Debtors.  The Debtors request authorization, but not direction, in their sole discretion, to (a) make any prepetition NQDC employee contributions, (b) pay any NQDC Plan administrative fees outstanding as of the Petition Date, and (c) continue the NQDC Plan in the ordinary course of the Debtors' businesses. Approximately sixty-four (64) Employees are "vested" in the NQDC Plan, which contains a dedicated fund of approximately $2.8 million (an average vestment of approximately $40,000 per entitled Employee).

72.     In addition, the Debtors offered two (2) separate Supplemental Executive Retirement Plans ("SERP Plan 1" and "SERP Plan 2", and together the "SERP Plans"), funded entirely by the Debtors, to certain eligible Employees, who were and remain in senior management at the time the SERP Plans were incepted.  Fourteen (14) Employees are entitled to the benefit of the SERP Plans, the aggregate entitlements of which is approximately $650,000 (an average right of approximately $46,000 per Employee). The Debtors request authorization, but not direction, in their sole discretion, to (a) pay any SERP Plans Administrative Fees outstanding as of the Petition Date, and (b) continue the administration of the SERP Plans for those invested Employees in the ordinary course of the Debtors' businesses.

73.     In addition to the aforesaid employees-related programs, the Debtors provide their Employees certain miscellaneous benefits (collectively, the "Miscellaneous Benefits") that are designed to reward employee loyalty, productivity and performance.  For example, certain Employees are entitled to reduced-price meals for each shift worked and discounts on meals for themselves and guests when dining during periods for which the Employee is not scheduled to work.

74.     The Debtors request authority to maintain the Miscellaneous Benefits in the ordinary course of business and in accordance with their pre-Petition Date custom and practices. The Debtors believe that the costs associated with the Miscellaneous Benefits are minimal when compared to the Debtors' financial affairs generally and the benefit derived to the Debtors and their estates.

75.     Lastly, the Debtors from time to time the Debtors supplement their staffing needs by retaining temporary employees (collectively, the "Temporary Employees") pursuant to agreements with temporary placement agencies (collectively, the "Temporary Placement

Agencies"). In connection with the Debtors agreements with the Temporary Placement Agencies, the Debtors are required to pay the Temporary Placement Agencies certain fees for their services as well as pay to the Temporary Placement Agencies those amounts due to the Temporary Employees (collectively, the "Temporary Placement Fees"). The Debtors seek authority, but not direction, to continue to pay the Temporary Placement Fees, including, without limitation, any pre-petition obligations, and contract with the Temporary Placement Agencies in the ordinary course of the Debtors' businesses. The Debtors estimate that, as of the Petition Date, approximately $30,000 of Temporary Placement Fees in the aggregate remain unpaid by the Debtors.

76. Based upon the foregoing, the Debtors believe that there is ample justification for the payment of pre-petition Employee claims and Employee Benefits to or on behalf of the Employees and to the various related providers, servicers and administrators in the ordinary course of the Debtors' businesses.

     **e.**     ***Motion for Authority to Pay Claims Arising Under 11 U.S.C. 503(b)(9) (the "Twenty-Day Claims Motion")***

77. In order to obtain and ensure timely delivery from their suppliers and vendors of food, beverages and goods related to the Debtors' restaurant and manufacturing operations (collectively, the "Goods"), and to help ensure that the Debtors have access to post-petition trade credit from the suppliers of these vital Goods, the Debtors seek entry of an order authorizing, but not directing, payment, in the ordinary course, of pre-Petition Date claims of suppliers and vendors entitled to administrative priority under sections 503(b)(9) and 507(a)(2) of the Bankruptcy Code (such suppliers and vendors collectively, the "Priority Vendors") for those undisputed obligations arising from Goods received by the Debtors from such Vendors in the

YCST01:11166947.1
070242.1001

ordinary course of business within twenty (20) days before the Petition Date (collectively, the "Priority Vendor Claims").

78.     In the ordinary course of the Debtors' businesses, with due regard to the limited prepetition credit and payment terms imposed by vendors and suppliers, numerous Priority Vendors provide the Debtors with Goods that will be essential to the sustained operations of the Debtors both in the short term and during the reorganization period.  If the Priority Vendors are not paid in the ordinary course on account of their Priority Vendor Claims, such Priority Vendors are unlikely to provide the Debtors with post-petition trade credit and may refuse to continue providing the Debtors with Goods after the Petition Date.  Any delay or disruption in the continuous flow of Goods to the Debtors could result in an immediate shut down of the Debtors' restaurants.  As of the Petition Date, the Debtors estimate that the Priority Vendor Claims total approximately $6,000,000 in the aggregate.

79.     Absent obtaining the relief requested in the subject motion, the Debtors would face the very real possibility that Priority Vendors would cease delivery of Goods, causing a significant disruption to, if not cessation of, the Debtors' businesses.  An order of this Court confirming that all obligations of the Debtors arising from Goods delivered in the ordinary course of the Debtors' businesses in the twenty (20) days prior to the Petition Date may be paid by the Debtors, in their sole discretion, in the ordinary course pursuant to sections 503(b)(9) and 507(a)(2) of the Bankruptcy Code will help ensure continuous delivery of Goods to the Debtors. Accordingly, the relief requested should be granted because it is critical to the Debtors' continued operation and, consequently, is in the best interests of the Debtors, their creditors, and their estates.

YCST01:11166947.1                                                                                           070242.1001

80.     Subject to the terms set forth more fully in the Twenty-Day Claims Motion, the Debtors propose to condition the payment of the Priority Vendor Claims on the agreement of individual Priority Vendors to continue supplying Goods to the Debtors on the trade terms that such Priority Vendors provided Goods to the Debtors on a historical basis prior to the Petition Date (the "Customary Trade Terms"), or pursuant to such other favorable trade practices and programs that are agreed to by the Debtors, in their sole discretion. The Debtors reserve the right to negotiate new trade terms with any Priority Vendor as a condition to payment of any Priority Vendor Claim; provided, however, that the Debtors will provide the Restructuring Support Parties with at least five (5) business days notice of any material modifications to any trade terms under which any material Priority Vendor provided Goods to the Debtors as of the Petition Date.

81.     In the event a Priority Vendor refuses to supply Goods to the Debtors on Customary Trade Terms (or such other terms as are agreed to by the parties) following receipt of payment on its Priority Vendor Claim, then the Debtors hereby seek authority, in their discretion and without further order of the Court, (a) to declare that any payments made to such Priority Vendor on account of its Priority Vendor Claims be deemed to have been in payment of any then-outstanding (or subsequently accruing) undisputed post-petition claims of such Priority Vendor without further action by any person or entity, and (b) to recover any payment made to such Priority Vendor on account of its Priority Vendor Claims to the extent that such payments exceeded the undisputed post-petition claims of such Priority Vendor, without giving effect to any rights of setoff or recoupment, claims, provision for payment of reclamation or trust fund claims, or other defenses; provided, however, that upon recovery of any such payments by the Debtors, the applicable portion of the Priority Vendor Claims shall be reinstated as such in the amount recovered.

YCST01:11166947.1                                      070242.1001

**f.** ***Motion to Pay Claims Arising Under PACA (the "PACA Motion")***

82.     The Debtors seek entry of an order authorizing the Debtors, in their sole discretion, to pay certain pre-petition claims (collectively, the "<u>PACA Claims</u>") of the PACA Claimants, to wit, vendors which, prior to the Petition Date, sold goods (collectively, the "<u>PACA Goods</u>") to the Debtors that constitute either (i) "perishable agricultural commodities," as such term is defined under the Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 499(a), *et seq*. ("<u>PACA</u>") or (ii) any other eligible goods under state statutes of similar effect. As previously noted and described herein, the Debtors have also filed the Twenty-Day Claims Motion.[5] The Debtors seek authority to pay those PACA Claims that are not paid under any order entered by this Court on the Twenty-Day Claims Motion.

83.     Due to (a) the Debtors' desire to prevent any interference with their supply of PACA Goods, and (b) the Debtors' recognition of the rights of the trust beneficiaries under their respective statutes, the Debtors seek to have this Court authorize payment of all PACA Claims, which the Debtors determine to be valid in their sole discretion. Any PACA Claimant who accepts payment from the Debtors on account of its valid PACA Claim (whether through the authority granted under the PACA Motion or the Twenty-Day Claims Motion) will be deemed to have waived any and all claims, of whatever type, kind or priority, against (a) the Debtors, (b) their property and estates, and (c) any funds and other property held in trust by the Debtors that do not constitute "property of the estate," but only to the extent that payment has been received on account of the PACA Claim.

84.     Preservation of the Debtors' relationships with the suppliers of fresh produce is particularly critical due to the highly competitive nature of the Debtors' industry and the nature

---

[5]  To be clear, certain parties identified as vendors pursuant to the Twenty-Day Claims Motion may hold PACA Claims. However, if the subject motion is granted, such PACA Claims will be paid as such and not as Priority Vendor Claims.

of the Debtors' restaurant operations and pie making businesses. Any disruption in the supply of fresh produce would prove devastating and would greatly hinder the Debtors' ability to operate and efforts to reorganize.

85.     In addition, the failure to provide the relief requested herein could subject the Debtors to an avalanche of actions from PACA Claimants seeking enforcement of their PACA Claims, which would result in the unnecessary expenditure of funds by the Debtors in responding thereto. Moreover, the Debtors' failure to satisfy the PACA Claims may result in the disruption of an uninterrupted supply of fresh produce from vendors. Any delays in satisfying PACA Claims could adversely affect the Debtors' ability to obtain fresh produce in the future, thereby undercutting the Debtors' competitive posture and their ability to successfully reorganize. The relief requested with respect to the PACA Claims does not involve authorization to make payments on account of pre-petition claims, as PACA Claimants would be paid from non-estate property.

86.     Furthermore, in certain circumstances, pursuant to PACA, officers and directors may be held secondarily liable for amounts owed to a seller of PACA Goods. Thus, to the extent that any PACA obligations remain unsatisfied by the Debtors, the Debtors' officers and directors may be subject to lawsuits during the pendency of these Chapter 11 Cases. Any such lawsuit (and the ensuing potential liability) would distract the Debtors' officers and directors in their attempt to implement a successful reorganization strategy, to the detriment of all parties in interest in these Chapter 11 Cases.

87.     It is the Debtors' business judgment that prompt satisfaction of valid PACA Claims will best promote the Debtors' rehabilitation and is in the best interests of the Debtors and their customers, creditors and estates. And, to the extent the Debtors question whether any

particular PACA Claim is valid, the Debtors reserve the right to contest such claims in accordance with applicable law.

88.    For all of the foregoing reasons, the Debtors request authority to pay, in the Debtors' sole discretion, the undisputed amounts of the PACA Claims.

**g.    *Administrative Expense Status Motion for Post-Petition Delivery of Goods/Services***

89.    The Debtors seek entry of an order confirming that their suppliers and vendors (collectively, the "Vendors") will have administrative expense priority claims under section 503(b) of the Bankruptcy Code for undisputed obligations arising from pre-petition purchase orders outstanding as of the Petition Date for (a) products and goods received and accepted by the Debtors on or subsequent to the Petition Date and (b) services provided to the Debtors on or subsequent to the Petition Date.

90.    In the ordinary course of the Debtors' businesses, numerous Vendors provide the Debtors with merchandise, equipment, supplies, products and related items (collectively, the "Vendor Goods") or provide various types and forms of services (the "Services") to the Debtors. The Vendor Goods include, but are not limited to, food and beverage products, linen and paper products, cooking and cleaning supplies, uniforms, and other products necessary and essential to the day-to-day operation of the Debtors' restaurants and manufacturing operations, as well as equipment, office supplies, furniture, computer supplies and equipment, and other items used in the Debtors' business generally. As of the Petition Date, certain of such Vendor Goods may be in transit to the Debtors' facilities. Services include, without limitation, courier services, moving and transport services, maintenance services, and other services to maintain the Debtors' retail and business operations.

91.	On average, the Debtors' restaurants submit purchase orders to distributors through the internet at least two (2) times per week in the ordinary course of the Debtors' businesses.   These restaurants then enter the invoices received from the distributors and submit them to the Debtors' corporate offices for payment.  All other supplies, equipment and services not otherwise provided to the Debtors from the distributors are ordered through other suppliers directly through the internet or by phone.  The restaurants similarly enter invoices when the product is received and transmit them to the Debtors' corporate office for payment. Likewise, the Foxtail manufacturing facilities issue purchase orders to various suppliers and vendors for product.  Product delivery to the Foxtail facilities can occur anywhere from approximately three (3) to thirty (30) days following the date the purchase order is issued.  As a result of the filing of these Chapter 11 Cases, Vendors may be concerned that delivery or shipment of Vendor Goods or provision of Services on or after the Petition Date pursuant to an outstanding pre-petition purchase order or other requisition will render such Vendors pre-Petition Date unsecured creditors of the Debtors' estates.

92.	Accordingly, Vendors may decline to ship, or may instruct their shippers not to deliver, Vendor Goods destined for the Debtors or refuse to provide Services unless the Debtors issue substitute post-petition purchase orders.  Alternatively, Vendors may require that the Debtors obtain an order of this Court confirming that all obligations of the Debtors arising from outstanding orders, delivery of which occurs post-petition, are to be granted administrative expense status under section 503(b)(1)(A) of the Bankruptcy Code.  Reissuing thousands of purchase orders would require a significant investment of the Debtors' time, energy and resources and would divert the attention of a significant number of critical employees from the Debtors' reorganization efforts.  Additionally, the potential delay in receiving Vendor Goods that

33

would be caused by having to reissue purchase orders could significantly disrupt the Debtors' business operations, which depend on the timely delivery of the Vendor Goods and Services, and hamper the Debtors' reorganization efforts.

93.     Although the Debtors believe that they have the authority to make payment for Vendor Goods and Services received post-petition (irrespective of the time the purchase orders were first placed), confirmation of that authority is, in the Debtors' view, highly desirable. The Debtors' relationships with their Vendors are particularly important and it is therefore important to reassure Vendors that their valid claims will be given administrative expense priority status, and that they will be paid by the Debtors in the ordinary course of business for Vendor Goods delivered and Services provided post-petition.

94.     The Debtors believe that the relief requested herein will ensure the continuous supply of Vendor Goods and provision of Services that are vital to the Debtors' continuous operations and integral to maximizing value in these cases, and therefore respectfully request that such relief be granted.

**h.     *Motion to Pay Warehouses and Shippers***

95.     The Debtors seek authority to pay, in their discretion, (a) certain pre-petition claims of freight forwarders, carriers, warehouse operators and similar claimants in the ordinary course of business (collectively, the "Obligations") up to an aggregate cap of $175,000 to obtain the release of valuable inventory or other goods or materials, (b) maintain the Debtors' distribution system in an efficient and smooth manner, and/or (c) induce critical freight forwarders, carriers and support providers to continue to make timely deliveries of inventory and other goods and materials.

96.     The Debtors' businesses are extremely dependent on the sale and distribution of their own products and those received from vendors. The Debtors rely upon freight forwarders, carriers, warehousemen and similar claimants in the ordinary course of business (each, a "Shipper and Warehouseman," and collectively, the "Shippers and Warehousemen") and their distribution system to maintain necessary inventory and deliver products timely to their customers and their various restaurant locations. Transportation charges are a small portion of the cost of sale of the Debtors' inventory, and if the Debtors are unable to pay such invoices timely, the cost in lost inventory and lost sales may greatly exceed the amount of those invoices. Indeed, even if the Shippers and Warehousemen do not have valid liens under applicable non-bankruptcy law, possession and retention of or control over the Debtors' inventory and supplies and any attendant delay in delivery or shipment may severely disrupt the Debtors' operations.

97.     The Debtors ship their fresh pies and dessert items to each of their restaurant locations through a third party trucking company. The trucking company uses a dedicated specialized fleet of tractors and trailers designed to handle the safe shipping of fresh pies while minimizing damage and assuring the product is available by the start of business each day. The trucking company's drivers have been specially trained and are provided with access to the restaurants to facilitate deliveries. In addition to the fresh pies delivered nightly, the Debtors ship pies daily to various third party retail locations throughout the country. The products are warehoused in third party storage facilities and picked up by designated carriers who target their deliveries to various parts of the country to meet the designated delivery timeline of the customer.

98.     To meet these goals, the Debtors utilize a complex network of Shippers and Warehousemen. In particular, the Debtors primarily depend upon the services of certain carriers

YCST01:11166947.1                                                           070242.1001

to move finished product to warehouses from Foxtail's two (2) Cincinnati, Ohio locations and its Corona, California plant (the "Carriers"). The Carriers are dedicated freight carriers for the delivery of product to the Debtors' warehouses and storage facilities. Additionally, the Debtors often use certain other carriers (collectively, the "Secondary Carriers") for alternative delivery to warehouses and storage facilities. All third party product is warehoused in outside storage facilities. The Debtors utilize the warehouses of certain operators (collectively, the "Warehouses") for finished items forwarded from Foxtail's Cincinnati, Ohio facilities and its Corona, California facility. The Debtors' products are released from the Warehouses to distributors and third parties for the fulfillment of orders.

99.      The Debtors are concerned that the Shippers and Warehousemen will stop providing services if they do not receive the full amount of their pre-petition invoices in a timely manner, and in accordance with past practice. Further, if they are not timely paid by the Debtors, the Shippers and Warehousemen may cease to provide shipping and other services to the Debtors on the same terms that they did pre-petition.

100.      The Debtors are critically in need of the services of the Shippers and Warehousemen and other applicable service providers and cannot easily, economically or quickly replace them with third party providers. Further, the Shippers and Warehousemen with possession or control of the Debtors' goods or supplies may assert a possessory lien, thereby freezing up the shipment and delivery of such property.

101.      Together, the Shippers and Warehousemen that handle the Debtors' goods and supplies ensure that the Debtors' delivery and transport networks run smoothly and efficiently. The Debtors lack the ability to handle certain shipping themselves. Therefore, the Debtors'

YCST01:11166947.1                                                                                            070242.1001

delivery systems would completely stop without the services and support provided by the Shippers and Warehousemen.

102. Accordingly, for the reasons discussed above, the Debtors submit that paying the Obligations is critical and is necessary to avoid immediate and irreparable harm to, and is in the best interests of, the Debtors, the estates and their creditors.

### i. *Motion to Pay Certain Pre-Petition Taxes*

103. In the ordinary course of their businesses, the Debtors are required to collect certain taxes, including sales and use taxes, from third-parties and hold them for a period of time before remitting them to the appropriate taxing authorities (the "Trust Fund Taxes"). In addition, certain taxing authorities are authorized under state law to collect certain unpaid business and occupation taxes directly from individual officers and directors of the Debtors (the "Business Taxes," and together with the Trust Fund Taxes and the penalties, interest or other such charges that may be assessed thereon, the "Taxes"). The Taxes are generally paid quarterly or semi-annually to the respective taxing authorities, depending on the given Tax and the relevant taxing authority to which it is paid.

104. The Debtors seek authority, but not direction, to pay any Taxes that were accrued pre-petition but were not in fact paid or processed pre-petition, or were paid pre-petition in an amount less than is actually owed, or to the extent any such payments made pre-petition were rejected, lost or otherwise not received in full by any taxing authority. Further, there may be Taxes incurred or collected from sales and services provided pre-Petition Date that will come due shortly after the filing, which the Debtors seek authority to pay taxing authorities in an amount not to exceed $3.5 million in the aggregate.

YCST01:11166947.1

070242.1001

105.     Without this relief, some, if not all, of the taxing authorities may initiate an audit of the Debtors if the Taxes are not paid on time.  Such audits will unnecessarily divert the Debtors' attention away from the reorganization process and result in unnecessary expenses.  Moreover, if the Debtors do not pay such amounts in a timely manner, the taxing authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, seek payment from the Debtors' directors and officers and pursue other remedies that will irreparably and immediately harm the estates.  Additionally, absent the relief requested herein, some states hold corporate officers personally liable for unpaid "trust fund" taxes, including sales and use taxes, in certain circumstances.  Further, to the extent that any such "trust fund" taxes remain unpaid by the Debtors, their officers could be subject to lawsuits or criminal prosecution during the pendency of these Chapter 11 Cases.  Even the possibility of any such lawsuit or criminal prosecution would most certainly distract the Debtors and their officers from their efforts in these Chapter 11 Cases.

106.     Moreover, to the extent that the Taxes that the Debtors are required to collect from third parties are held by the Debtors in trust for the benefit of the taxing authorities, including for example, sales, use and other such Taxes, they are "trust fund" Taxes that arguably do not constitute property of the Debtors' estates.  Accordingly, the Debtors should be able to pay any Taxes that constitute trust fund taxes as they come due because payment of such taxes would not prejudice the rights of any of the Debtors' other creditors.

107.     I believe that the Debtors failure to pay the Taxes could have a materially adverse impact on their ability to operate in the ordinary course of business and to reorganize.  Therefore, it is appropriate for the Debtors to pay, in their sole discretion, the Taxes, including any penalties

and interest thereon, if any, and any liability resulting from audits of pre-Petition Date Taxes to the relevant taxing authorities in the ordinary course of the Debtors' businesses.

**j.** _**Insurance Policies and Premium Financing Motion**_

108. In the ordinary course of the Debtors' businesses, the Debtors maintain, in current effect, insurance policies (collectively, the "<u>Policies</u>") which provide primary coverage and in certain instances excess and umbrella coverage for, among other things, liability of the Debtors' directors and officers, property, crime and casualty risks on the Debtors' real and personal property, workers' compensation, liability that may result from the Debtors' products, and liability that may arise out of the Debtors' errors and omissions and employment practices. The Policies are essential to the preservation of the Debtors' businesses, properties and assets, and in many cases the coverage is required by various regulations, laws and contracts that govern the Debtors' business conduct.

109. It is not economically advantageous for the Debtors to pay the premiums on each of their Policies on an annualized basis. Accordingly, from time to time, in the ordinary course of their businesses, the Debtors finance the premiums on certain of these Policies (collectively, the "<u>Financed Policies</u>"). If the Debtors are unable to continue making payments under the financing agreement for the Financed Policies (the "<u>Financing Agreements</u>"), the Debtors' counterparties to such Financing Agreements may be permitted to terminate the Financed Policies. The Debtors would then be required to obtain replacement insurance on an expedited basis and at significant cost to the estates. If the Debtors are required to obtain replacement insurance and to pay a lump sum premium for such insurance in advance, this payment may be the same or greater than what the Debtors currently pay under the agreements for the Financed Policies. Even if the Debtors' counterparties are not permitted to terminate the Financed

Policies, any interruption of payments would severely and adversely affect the Debtors' ability to finance premiums for future policies.

110.    The Debtors seek (i) authority, but not direction, to (a) continue pre-petition insurance coverage and enter into new insurance policies and (b) maintain pre-petition premium financing agreements and continue financing arrangements for insurance premiums, and (ii) authority and direction for the Debtors' banks and other financial institutions to process, honor and pay certain checks and fund transfer requests.  In view of the importance of maintaining the insurance coverage with respect to their business activities and the preservation of the Debtors' cash flow and estates by financing the insurance premiums, I believe and the Debtors submit that it is in the best interest of creditors in these Chapter 11 Cases for the Court to authorize the Debtors to honor these obligations.  Any other alternative would likely require considerable cash expenditures and would be detrimental to the Debtors' chapter 11 efforts.  Finally, if the Debtors fail to make the payments due under the Financing Agreements and the Financed Policies are cancelled as a result, the Debtors' may be exposed to immediate and significant risk.

**k.**      ***Motion to Continue Customer Practices***

111.    The Debtors request entry of an order authorizing (but not directing) the Debtors, in their sole discretion, to continue honoring their marketing, sales and promotional practices, which are targeted to develop and sustain positive reputations in the marketplace for their restaurants and pie production business (collectively, the "Customer Programs").

112.    The Debtors' Customer Programs for the Perkins brand include the following:

(a)     Gift Cards: All one hundred sixty one (161) Perkins restaurants and three hundred nineteen (319) franchised locations utilize a gift card program processed by Banc of America Merchant Services, LLC ("BAMS"), under which customers may purchase a gift card in store or online at perkins.com which can be loaded in $10 and $25 denominated amounts and non-denominated amounts ranging

40

from $5 to $100 per card (the "<u>Perkins Gift Cards</u>").  As of June 6, 2011, approximately $3.66 million in value remained outstanding on customers' Perkins Gift Cards.[6]

(b)    <u>Great Lakes Scrip Program:</u> The Great Lakes Scrip program is a certificate program in which gift cards are sold to Great Lakes Scrip Center LLC, a broker of scrip gift cards, at a fifteen percent (15%) discount and Great Lakes Scrip Center LLC then sells the cards to various charitable organizations as fundraisers.

(c)    <u>Direct Mail and Coupon Offers</u>: In the ordinary course, the Debtors, as Perkins, conduct mass distributions of coupons and offers.   Perkins does not participate in a formal system-wide direct mail program.  Restaurant specific direct mail requests are facilitated by American Clearing House upon request.  Perkins also utilizes free standing inserts and co-op inserts, facilitated through Valassis, to support promotional activity.  In addition, Perkins distributes monthly emails to its email database, Perkins eClub.  Perkins eClub members receive introductory offers upon sign up and subsequent monthly eBlasts with incentive offers.

113.    The Debtors' Customer Programs for the Marie Callender's brand include the following:

(a)    <u>Gift Cards</u>: Approximately eighty-five (85) Marie Callender's restaurants and thirty-six (36) Marie Callender's franchises, utilize a gift card program processed by BAMS under which customers may purchase a gift card in store or online at mariecallenders.com which can be loaded in dollar amounts from $5-$100 per card (the "<u>Marie Callender's Gift Cards</u>", and together with the Perkins Gift Cards, the "<u>Gift Cards</u>").  As of June 6, 2011, approximately $3.57 million in value remained outstanding on customers' Marie Callender's Gift cards.

(b)    <u>Charity Certificate Program:</u> Marie Callender's offers a certificate program that provides non-profit organizations with valid tax identification numbers a fifteen percent (15%) discount on gift cards.  Gift cards are then sold by the non-profit for face value and

---

[6]  Since the gift card program is also utilized at franchised locations, from time-to-time, though infrequently, a gift card will be purchased at a franchised location but redeemed at one of the Debtors' locations, or vice versa. In such circumstances, a customer will purchase a gift card at a franchised location even though no goods are provided by that restaurant. If the gift card is then used at a non-franchised location, that non-franchised restaurant has provided services for which no payment has been made to the Debtors. This process also occurs in the reverse. Thereafter, BAMS settles these transactions for the Debtors by sweeping net redemptions to and from the appropriate franchise accounts and the Debtors' promotional accounts (kept separate from other corporate funds and accounts) once a week.  By this Motion, the Debtors seek authority to continue this policy.

41

   

the organization makes fifteen percent (15%) for every gift card sold.

(c) <u>Direct Mail and Coupon Offers</u>: In the ordinary course, the Debtors, as Marie Callender's, conduct mass distributions of coupons and monthly value offers through direct mail and to Sunday subscribers of certain newspapers. Often these coupons and offers are valid for a fixed period of time, typically four (4) to six (6) weeks.

114.     The Debtors believe that most of the Customer Programs constitute "ordinary course of business" practices, and therefore do not require this Court's approval.  However, out of an abundance of caution, the Debtors seek authority from this Court to honor their pre-Petition Date obligations arising from the Customer Programs in the ordinary course of business.

115.     The Debtors submit that entry of an order approving the Debtors' ability to continue to honor their Customer Programs and satisfy the Gift Card Processing Fees is necessary to avoid immediate and irreparable harm to the Debtors and their estates. Well over ten thousand (10,000) customers frequent the Debtors' restaurants and franchises each week.  The success and viability of the Debtors' businesses are dependent upon the loyalty and confidence of their customers. The continued support of this constituency is absolutely essential to the survival of the Debtors' businesses and the Debtors' ability to reorganize. The Debtors believe that any delay in honoring various Customer Programs, satisfying the Gift Card Processing Fees or the discontinuation of Customer Programs as a result of the commencement of these Chapter 11 Cases will severely and irreparably impair the Debtors' customer relations at a time when the loyalty and support of customers is extremely critical.

116.     Moreover, honoring these pre-petition obligations will require minimal expenditure of estate funds and will assist the Debtors in preserving customer relationships for the benefit of all stakeholders. The Debtors believe that any cost of continuation of the Customer Programs is justified by the greater likelihood of the customers' continued patronage of the

Debtors' restaurants.[7] Accordingly, to preserve the value of their estates, the Debtors must be permitted, in the Debtors' sole discretion, to continue honoring the Customer Programs without interruption or modification. In addition, to provide necessary assurances to the Debtors' customers on a going-forward basis, the Debtors request authority to continue honoring or paying all obligations to customers that arise from and after the Petition Date in the ordinary course of the Debtors' businesses.

117.     The Debtors' creditors also will benefit from the relief sought herein. If the Debtors are prohibited from maintaining policies consistent with past business practice, then customers' lost confidence in the Debtors will damage the Debtors' businesses to an extent that far exceeds any cost associated with continuing such practices. Accordingly, the Debtors' creditors will benefit from an order authorizing the relief sought herein because such an order will protect the Debtors' reputation during this critical time and enhance the Debtors' ability to generate revenue.

118.     Additionally, in connection with the administration of the Customer Programs, the Debtors are a party to that certain gift card processing agreement with BAMS, which provides for, among other things, the establishment and implementation of a stored value card program, card production, maintenance of a database of Gift Card data, the authorization and processing of Gift Card transactions, a call center, and web-based support tools.  Failure to continue to issue and process customer Gift Cards would severely disrupt the Debtors' businesses, adversely affect sales and negatively impact loyal customers.   Without this continued and uninterrupted ability,

---

[7]  With respect to the continuation of the Debtors' gift card and charitable programs, the Debtors submit that any amounts paid by customers and unused as of the Petition Date would arguably be entitled to priority treatment pursuant to Section 507(a)(7) of the Bankruptcy Code as a customer deposit. The Debtors would therefore be required to pay these claims in full in order to confirm a plan of reorganization. Accordingly, granting the relief requested herein would only affect the timing, and not the amount, of the payment of these obligations to the extent that they constitute priority claims.

the Debtors would lose a major avenue for conducting sales transactions in the ordinary course of their businesses.

119. Under the terms of the agreement with BAMS, the Debtors are required to pay BAMS fees for their Gift Card services, certain amounts of which may have accrued, but remained unpaid as of the Petition Date (the "Gift Card Processing Fees"). Accordingly, the Debtors seek authority to continue to pay these Gift Card Processing Fees, including any pre-petition obligations, in the ordinary course of their businesses to avoid any interruption of their ability to issue, process and service Gift Card transactions. The Debtors estimate that, as of the Petition Date, approximately $30,000 in Gift Card Processing Fees remain unpaid to BAMS. Thus, the Debtors submit that it is necessary, prudent and in the best interest of their estates and creditors to allow, but not require, the Debtors to satisfy any such pre-petition amounts.

120. Accordingly, the Debtors respectfully request that they be authorized, in the Debtors' sole discretion, to continue honoring their Customer Programs in the ordinary course of the Debtors' businesses in the same manner and on the same terms and conditions as such programs were administered prior to the Petition Date.

**l.** ***Motion for Entry of Interim and Final Orders Prohibiting Utilities from Altering, Refusing or Discontinuing Utility Services, Finding Utilities Adequately Assured of Payment and Establishing Procedures for Determining Additional Adequate Assurance of Payment***

121. In the ordinary course of business, the Debtors regularly incur expenses for water, gas, electricity, sewer, waste services, phone and internet services, wi-fi services, satellite services and other similar services (collectively, the "Utility Services") provided by approximately five hundred fifty-five (555) service providers (collectively, the "Utility Providers") in the aggregate.

122.     On a weekly basis, the Debtors pay amounts on account of bills received from the Utility Providers. The Utility Providers for electric, gas, phone, water and sewer services have been instructed by the Debtors to send the Debtors' bills to AVISTA, a bill consolidator retained prior to the Petition Date (the "Bill Consolidator"), for the purpose of organizing and paying those Utility Providers on behalf of the Debtors. The Bill Consolidator consolidates the Debtors' utility bills and facilitates payment pursuant to a contractual relationship with the Debtors. Those bills are consolidated and, on a weekly basis, the Debtors make one payment to the Bill Consolidator as directed by the Bill Consolidator. Upon receipt of this weekly payment, disbursements are made by the Bill Consolidator to each of the covered Utility Providers who are due to receive payments during the applicable time period. With regard to charges for waste services, cable, satellite, internet and wi-fi, the Debtors pay bills submitted by those Utility Providers directly.

123.     Through these arrangements, the Debtors have historically paid bills for Utility Services on a timely basis pursuant to the terms contracted for with each Utility Provider. Accordingly, as of the Petition Date, the Debtors believe that they were current on their payments to the Utility Providers.  As of the Petition Date, however, the Debtors may have: (i) pre-petition accounts payable to certain Utility Providers on account of bills which are not yet due; (ii) outstanding checks issued to certain Utility Providers in payment for pre-petition charges for Utility Services that had not cleared the Debtors' bank account prior to the Petition Date; or (iii) liabilities for pre-petition Utility Services for which the Debtors have not been billed.

124.     As of the Petition Date, however, the Debtors may have: (i) pre-Petition Date accounts payable to certain Utility Providers; (ii) outstanding checks issued to certain Utility

Providers in payment for pre-Petition Date charges for utility services that had not cleared the Debtors' bank account prior to the Petition Date; or (iii) liabilities for pre-Petition Date utility services for which the Debtors have not been billed.

125.    Therefore, the Debtors request that the Court enter an interim order and a final order (together, the "Utility Orders"): (i) prohibiting the Utility Providers from altering, refusing, or discontinuing services; (ii) approving the Debtors' establishment of a segregated deposit account in the amount of $750,000 (the "Deposit") to serve as adequate assurance of payment, as the term is defined in section 366(c)(1)(A) of the Bankruptcy Code, for the Utility Providers and deeming the Utility Providers to have received adequate assurance of payment pursuant to section 366(b) of the Bankruptcy Code; (iii) establishing procedures and mechanisms under which the Utility Providers may request additional adequate assurance of future payment; and (iv) authorizing the Debtors to supplement, as necessary, the Utility Service List and providing that any newly added Utility Provider will be subject to the terms of the Utility Orders.

126.    Such relief is necessary to enable the Debtors to continue their business operations uninterrupted by threats of potential termination of, or suspension or interruption in their utility services.  Because the Utility Providers administer essential services to the Debtors' restaurant facilities, any interruption in utility services could be devastating.  In fact, the temporary or permanent discontinuation of utility services at any of the Debtors' facilities could irreparably disrupt the Debtors' business operations and, as a result, fundamentally undermine the Debtors' reorganization efforts.

127.    The Debtors fully intend to pay all post-petition obligations owed to the Utility Providers in a timely manner and expect that they will have sufficient funds with which to satisfy fully all their post-petition utility obligations.  The Debtors' good faith in this regard is evidenced

by their consistent pre-petition payment history with each of the Utility Providers. Other than utility bills not yet payable as of the Petition Date in the ordinary course of the Debtors' regular payment terms with the Utility Providers (which the Debtors are now prohibited from paying as a result of the commencement of their Chapter 11 Cases), the Debtors historically have fully paid their pre-petition utility bills on time. In fact, prior to the Petition Date, the Debtors had not experienced any suspension or termination of Utility Services by virtue of non-payment of a utility bill.

128.    Nevertheless, to provide adequate assurance of payment to the Utility Providers, the Debtors propose to provide the Utility Providers with adequate assurance in the form of the Deposit in a sum equal to fifty percent (50%) of the Debtors' estimated monthly utility costs. The Deposit will be maintained in a segregated, interest bearing account that will be established within twenty (20) days of the Petition Date.

129.    To the extent that any Utility Provider believes that the Deposit does not provide adequate assurance of payment, the Debtors have proposed certain customary procedures for Utility Providers to request additional adequate assurance by serving a written request for such additional assurance upon counsel for the Debtors.  To the extent that the Debtors and such Utility Provider are unable to reach an agreement regarding the additional assurances requested by the Utility Provider, a hearing before this Court will be held to determine whether the Deposit, together with any additional consideration offered by the Debtors, constitutes adequate assurance of payment.

130.    In light of the foregoing, the Debtors respectfully request the Court to grant the relief requested with respect to the Debtors' Utility Providers.

m. ***Debtor-In-Possession Financing and Use Cash Collateral Motion***

131.    By the subject motion, the Debtors request entry of the Interim Order and the Final Order authorizing their obtaining post-petition financing and use of cash collateral. As of the Petition Date, and after application of the proceeds derived from the prepetition Trademark Sale Transaction, the amount outstanding under the Debtors' prepetition credit facility consisted almost entirely of approximately $10,060,000 of issued non-cash collateralized letters of credit.

132.    Under the post-petition debtor-in-possession financing facility (the "DIP Facility"), which will perpetuate the aforesaid letters of credit and said issued letters of credit, the Prepetition Agent and Prepetition Lenders (as defined herein) will additionally provide the requisite and sufficient working capital through a revolving credit facility.

133.    Pursuant to Bankruptcy Rule 4001, the Debtors set forth significant elements of the DIP Facility and the DIP Facility Documents, as follows[8]:

| **Name of Each Entity with An Interest In Cash Collateral** | (i) Prepetition Agent, (ii) Prepetition Lenders; (iii) Secured Notes Trustee, (iv) the Collateral Agent and (v) holders of Secured Notes. |
| --- | --- |

---

[8]  The terms and conditions of the DIP Facility set forth in this Motion are intended solely for informational purposes to provide the Court and interested parties with a brief overview of the significant terms thereof and should only be relied upon as such.  For a complete description of the terms and conditions of the DIP Facility, reference should be made to the DIP Facility Documents and the Interim Order.  The summary herein is qualified in its entirety by reference to such documents and such order.  Interested parties are strongly encouraged to read the operative documents and such order.  In the event there is a conflict or inconsistency between this Motion and the operative documents or such order, the operative documents or such order, as applicable, shall control in all respects.

48

| | |
|---|---|
| **Amount of DIP Facility**<br><br>**See DIP Facility Agreement §2.1 and §2.11** | Interim maximum amount is $16.0 million; and final maximum amount is $21.0 million.<br><br>Comprised of a postpetition revolving credit facility in the maximum principal amount of $21.0 million ($16.0 million, until entry of the Final Order (as hereinafter defined). Includes a subfacility thereunder, of $15.0 million, for the issuance of postpetition letters of credit (the "<u>DIP Facility Letters of Credit</u>").<br><br>Availability under the DIP Facility is not tied to a borrowing base, but is basically limited to the amount necessary to fund general corporate needs (including working capital needs) in accordance with the applicable 13-Week Budget.<br><br>Upon entry of the Interim Order, all Existing Letters of Credit (aggregating $10,058,760 in face amount) will be integrated into the DIP Facility and be deemed to have been issued under the DIP Facility, and thereupon will constitute DIP Facility Letters of Credit. On account thereof, and subject to the limits on availability described below, an aggregate principal amount of $5,941,240 will remain available under the DIP Facility for postpetition revolving loans (or issuances of additional letters of credit) thereunder, pending entry of the Final Order.<br><br>Upon entry of the Final Order, the balance of the availability under the DIP Facility will become available, subject to the referenced limits on availability, and will be used, among other purposes, to repay any then-remaining outstanding Prepetition Secured Indebtedness (other than the converted Existing Letters of Credit) under the Prepetition Credit Agreement. No portion of the outstanding Prepetition Secured Indebtedness relating to the Secured Notes is to be rolled up into the DIP Facility. |
| **Borrowing Base** | None. |
| **Limits on Availability**<br><br>**See DIP Facility Agreement §2.1 and §2.11** | The aggregate amount otherwise available under the DIP Facility ($16.0 million, until entry of the Final Order; and $21.0 million thereafter) for revolving loans or (subject to the sublimit therefor) issuance of letters of credit shall be limited to an amount equal to the lesser of:<br><br>(i)     various reserves; and<br><br>(ii)    the amount necessary to fund the general corporate needs (including working capital needs) of the Debtors in accordance with the 13-Week Budget. |
| **Use of Proceeds**<br><br>**See DIP Facility** | Permitted to be used for the following: (i) upon entry of the Final Order, to repay (if any) in full all Prepetition Secured Indebtedness (if any) then outstanding under the Prepetition Credit Facility (expected to be de minimis) (other than Existing Letters of Credit, which are |

| | |
|---|---|
| **Agreement §6.13** | deemed to be DIP Facility Letters of Credit upon entry of the Interim Order); (ii) to pay transactional costs and expenses of the DIP Facility; (iii) for general corporate purposes (including working capital purposes) of the Debtors as provided in the 13-Week Budget; and (iv) other prepetition expenses of the Debtors that are approved by the Court. |
| **Interest Rate**<br><br>**See DIP Facility Agreement §2.6** | Loans made under the DIP Facility bear interest at a rate per annum, as selected from time to time by PMCI, equal to:<br><br>(a)   the Base Rate plus 3.50% per annum; or<br><br>(b)   the LIBOR Rate plus 4.50% per annum.<br><br>The Base Rate has a floor of 2.00% per annum; and the LIBOR Rate has a floor of 1.00% per annum.<br><br>Interest generally is payable on a monthly basis in arrears. |
| **Default Rate**<br>**See DIP Facility Agreement §2.6(c)** | If an Event of Default has occurred and is continuing, then, at the election of the Required Lenders, amounts due under the DIP Facility shall bear interest at a rate 2.00% per annum above the interest rate otherwise applicable thereto. |
| **Commitment and Other Fees**<br><br>**See DIP Facility Agreement §2.6(b), §2.10 and §17.10** | Closing Fee:  $200,000, payable on the date of entry of the Interim Order.  The payment of this $200,000 closing fee also will satisfy, in full, the $100,000 forbearance fee that had been payable by the Debtors in accordance with the Wells Forbearance Agreement relating to the Prepetition Credit Facility.<br><br>Unused Line Fee: 0.50% per annum on the daily unused portion of the Maximum Revolver Amount.<br><br>DIP Letter of Credit Fee: 4.50% per annum on the Daily Balance of the aggregate undrawn amount of DIP Facility Letters of Credit; in addition to customary issuance, etc., fees.<br><br>DIP Facility Lenders Group Expenses: Various fees and expenses, including but not limited to those incurred in connection with the negotiation and preparation of the DIP Facility Documents and the establishment of the DIP Facility, and those incurred by the DIP Lenders and the DIP Agent in enforcing their rights and remedies thereunder.<br><br>In addition, various audit, appraisal and other miscellaneous fees and expenses also may apply. |
| **Security & Super-Priority Claim** | (i) Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute an allowed claim (the "DIP Facility Superpriority Claim") against the Debtors, with priority over any and all administrative expenses, diminution claims (including all |

| | |
|---|---|
| **See DIP Facility Agreement §2.14** | Adequate Protection Obligations (as defined in the Interim Order) all claims of any kind asserted by the Prepetition Secured Parties arising under the Interim Order or the Final Order and all other claims against the Debtors arising prior to or after the Petition Date, of any kind whatsoever, including all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(6), 506(c), 507, 546(c), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, and which DIP Facility Superpriority Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (other than all claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or other applicable law (collectively, the "<u>Avoidance Actions</u>") or the proceeds thereof) subject only to the payment of the Carve-Out to the extent specifically provided for in the Interim Order, the Final Order and the DIP Facility Agreement; |
| | (ii) The DIP Facility is to be secured by a first priority senior priming security interest in and lien on all prepetition and postpetition assets of the Debtors, which shall include, without limitation, all Collateral, whether now existing or hereafter acquired; and a junior priority security interest in and lien on all assets otherwise encumbered by Permitted Prior Liens, and to the extent not otherwise included, all proceeds, tort claims, insurance claims, intercompany claims and other rights to payments not otherwise included in the foregoing and all accessions to, substitutions and replacements for, and rents and profits of each of the foregoing; provided however, such lien shall not include (a) Avoidance Actions and the proceeds thereof until the entry of the Final Order and (b) the Excluded Assets, and at all times such lien and security interest shall be subject only to the payment of the Carve-Out to the extent specifically provided for in the Interim Order, Final Order and DIP Facility Agreement. |
| **Maturity Date (Term of DIP Facility)** **See DIP Facility Agreement §3.3** | DIP Facility to terminate on the earliest of: (a) the date on which the Debtors terminate the DIP Facility and repay all outstanding amounts thereunder; (b) December 14, 2011 (subject to acceleration upon certain events of default); (c) five (5) days after the Petition Date, if the Interim Order has not been entered by such date; (d) forty-five (45) days after the Petition Date, if the Final Order has not been entered by such date; (e) the date on which the Interim Order expires, if the Final Order is not yet entered and effective; (f) the sale of substantially all of the Debtors' assets under section 363 of the Bankruptcy Code; (g) the effective date of a confirmed plan of |

| | |
|---|---|
| | reorganization that does not provide for payment in full of all amounts owed under the DIP Facility Documents; (h) conversion of any of the Chapter 11 Cases to chapter 7 of the Bankruptcy Code; and (i) the date of termination of the DIP Lenders' lending commitments (whether by acceleration or otherwise). |
| **Carve-Out**<br><br>**See DIP Facility Agreement §2.14(c)** | The Carve-Out shall include the following:<br><br>After a Carve-Out Trigger Notice, all accrued and unpaid fees, disbursements, costs and expenses incurred by professionals retained by the Debtors and/or the Committee prior to an Event of Default (the "<u>Professional Fees</u>"), up to the amount included in the most recent 13-Week Budget for such Professional Fees provided that such fees and expenses must be approved by the Court , plus all Professional Fees incurred after  the date of the Carve-Out Trigger Notice up to a maximum amount of $300,000 , plus fees payable pursuant to 28 U.S.C. §1930 and to the Clerk of the Court. Neither the DIP Facility, Carve-Out, Collateral or Cash Collateral shall be available to pay the Professional Fees of the Debtors or the Committee in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against any of the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders under the Prepetition Credit Facility or any of the Prepetition Loan Documents, or the Secured Notes Trustee, the Collateral Agent, or the Secured Noteholders under the Secured Notes Indenture or any Secured Note Documents, provided further that no more than **$50,000** of the proceeds of the DIP Facility or Cash Collateral may be used by the Committee to fund an investigation of the liens, claims and interests of the Prepetition Secured Parties (as defined in the Interim Order) and negotiate and/or contest the terms or entry of the Final Order. |
| **Conditions Precedent**<br><br>**See DIP Facility Agreement §3.1 and §3.2** | Customary for debtor-in-possession credit facilities, as more fully set forth in Sections 3.1 and 3.2 of the DIP Facility Agreement.<br><br>Includes, among other things: (i) entry of the Interim Order, in form and substance acceptable to the DIP Lenders, no later than five (5) days after the Petition Date; and (ii) delivery of the initial 13-Week Budget in form and substance acceptable to the DIP Agent. |
| **Covenants**<br><br>**See DIP Facility Agreement §5 and §6** | Sections 5 and 6 of the DIP Facility Agreement contain various affirmative and negative covenants, many or all of which are customary for debtor-in-possession credit facilities of this nature and some of which are customized to this situation.<br><br>These affirmative and negative covenants include, among other things, financial and collateral reporting requirements, maintenance of insurance, limitations on new indebtedness, and limitations on disposal of assets.<br><br>One affirmative covenant requires compliance with a 13-Week |

| | |
|---|---|
| | Budget based upon certain minimum cumulative cash receipts and certain maximum cumulative disbursements requirements (subject to agreed-upon variances), as set forth in Schedule 6.16 to the DIP Facility Agreement.  A copy of the 13-Week Budget is attached as "<u>Exhibit C</u>" to this Motion. |
| **Events of Default**<br><br>**See DIP Facility Agreement §8** | Section 8 of the DIP Facility Agreement contains various "Events of Default", many or all of which are customary for debtor-in-possession credit facilities of this nature. They include, without limitation:<br><br>(i) failure of Debtors to pay principal, interest or other amounts under the DIP Facility Documents as and when due, with grace periods applicable in certain cases;<br><br>(ii) a default (other than a payment default) under any DIP Facility Document, with grace periods applicable in certain cases;<br><br>(iii) false or misleading representations, warranties, or certifications;<br><br>(iv) declaration that provision(s) of any DIP Facility Documents are null and void or unenforceable;<br><br>(v) certain milestones are not achieved by the respective date indicated;<br><br>(vi) any of the Chapter 11 Cases are dismissed or are converted to a case under chapter 7 of the Bankruptcy Code;<br><br>(vii) with certain exceptions, the entry of an order granting any other superpriority administrative claim or lien equal or superior to that granted to DIP Administrative Agent;<br><br>(viii) a trustee, examiner or other responsible person with powers to operate the business is appointed;<br><br>(ix) the Final Order shall not have been entered within 45 days after the Petition Date, or prior to or immediately following expiration of the Interim Order;<br><br>(x) the exclusivity period terminates;<br><br>(xi) after entry of the Final Order, the allowance of any claims under section 506(c) of the Bankruptcy Code against the DIP Agent or DIP Lenders, or the Prepetition Agent or Prepetition Lenders, or any of their respective collateral; and<br><br>(xii) the Debtors sell all or substantially all of their assets without the consent of DIP Agent and the Required Lenders. |
| **Surcharge Waivers** | Upon approval at the Final Hearing, and except for the Carve-Out, so |

| | |
|---|---|
| **See DIP Facility Agreement §8.14(l)**<br><br>Interim Order par. 9 | long as the DIP Agent and the DIP Lenders are providing the DIP Facility or otherwise allowing the use of Cash Collateral, no costs of administration shall be imposed against the DIP Agent or the DIP Lenders or any of the Collateral or the Prepetition Secured Parties or the Prepetition Collateral under sections 105, 506(c) or 552 of the Bankruptcy Code or otherwise and the Debtors waive for themselves and on behalf of the estates any and all rights under sections 105, 506(c) or 552 or otherwise. |
| **Modification of Automatic Stay**<br><br>**See DIP Facility Agreement §9.1** | The automatic stay of section 362 shall be modified and vacated to permit the DIP Agent and DIP Lenders to exercise their remedies under the DIP Facility Documents, without further motion to, or order from, the Court; provided, however, that the DIP Agent shall be permitted to exercise any remedy in the nature of a liquidation of, or foreclosure on, any interest of the Debtors in the Collateral, and as otherwise provided in the Interim Order and the Final Order only upon five (5) business days' prior written notice to the Debtors and their counsel, counsel to the Secured Notes Trustee and the Collateral Agent, counsel to the holders of the Secured Notes, counsel to the Committee (if appointed) in these cases, and to the U.S. Trustee. |

       (i)    <u>The Need for The Use Cash Collateral and Post-petition Financing</u>

      134.    During the ordinary course of operations and the sale of its products, the Debtors generate Cash Collateral. The Debtors need to use Cash Collateral in the normal course of their businesses in order to make essential payments on account of, among others, employee payroll and taxes, PACA claims, and claims under section 503(b)(9) of the Bankruptcy Code, and to otherwise purchase post-petition goods and services that are necessary to the continued post-petition operation of the Debtors' businesses.

      135.    Cash Collateral alone, however, is insufficient to fund the Debtors' ongoing funding requirements for the operation of their businesses in an orderly manner. Thus, the Debtors need to supplement their use of Cash Collateral with the financing to be provided under the DIP Facility. In order to avoid immediate and irreparable harm to the Debtors' business operations and their estates, the Debtors need emergency interim approval of the DIP Motion.

(ii)    No Adequate Alternative to the DIP Facility is Currently Available

136.    Most of the Debtors' assets are subject to the Prepetition Liens asserted by the Prepetition Lenders.  Because of the substantial amount of the Prepetition Secured Indebtedness, obtaining the financing needed by the Debtors as unsecured debt or debt secured by liens junior to the liens of the Prepetition Lenders was not a realistic option, other than possibly existing secured creditors who already had a financial interest in the Debtors to protect, such as the holders of the Senior Notes.

137.    In the days and weeks prior to the commencement of these Chapter 11 Cases, the Debtors instructed their financial advisors to pursue alternative post-petition financing from a number of potential lenders.  The Debtors' proposed financial advisor engaged in discussions with the Debtors' prepetition first and second lien lenders about providing post-petition financing.  The Debtors' proposed financial advisor also spoke to many other institutional lenders and various other parties in an effort to obtain other potential post-petition financing proposals.  The Debtors' proposed financial advisor, however, was unable to obtain alternative financing that was both (a) adequate to meet the Debtors' financing and liquidity requirements and (b) on more favorable terms than the DIP Facility.

138.    Most of the parties contacted were not interested in providing financing to the Debtors at the level required to fund the Debtors' operations on an ongoing basis.  None of parties offered move favorable terms than those provided under the DIP Facility.  Moreover, most potential lenders contacted by the Debtors' financial advisor were not interested in providing an adequate stand alone debtor-in-possession financing facility unless the lenders would be able to prime the liens of the Prepetition Lenders.  Because the Prepetition Lenders would not consent to being primed by a third party lender and because the Debtors decided that it

would be imprudent to attempt to prime the Prepetition Lenders on a contested basis in light of the risk involved (and the more favorable terms of the DIP Facility), the Debtors determined that the proposed DIP Facility is the best financing option available to the Debtors under the circumstances.

139.     Accordingly, the Debtors concluded that no alternative credit on more favorable terms was available to the Debtors.

(iii)     <u>The DIP Facility Terms are Fair, Reasonable, and Appropriate</u>

140.     The proposed terms of this DIP Facility and the other DIP Facility Documents are fair, reasonable, and adequate under the circumstances.  First and foremost, as discussed more fully above, the Debtors made a concerted, good-faith effort to obtain credit on the most favorable terms available in the market.  No other lender was willing to provide the $21 million in funding necessary to pay the Prepetition Secured Indebtedness and fund the continued operation of the Debtors' businesses on more favorable terms than those provided in the DIP Facility.  Against this backdrop, the Debtors and their proposed bankruptcy counsel and financial advisor carefully evaluated the proposed financing offered by the DIP Facility Lenders and engaged in extensive arms' length negotiations with the DIP Facility Lenders regarding the proposed terms and conditions of the DIP Facility.  Eventually, the Debtors, in their sound business judgment, agreed to the DIP Facility as the proposal best suited to the Debtors' needs. Moreover, the terms and conditions of the DIP Facility were negotiated by the parties in good faith and at arms' length.

(iv)     <u>The Debtors' Need for Interim Approval of The DIP Facility</u>

141.     The Debtors request that the Court authorize the Debtors, on an interim basis pending a Final Hearing, to borrow under the DIP Facility in an amount up to $16 million under

YCST01:11166947.1                                                                                          070242.1001

the revolver.  This relief will enable the Debtors to operate their businesses in a manner that will permit them to preserve and maximize value and thereby avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

142.    Absent interim approval of the use of Cash Collateral and interim borrowing under the DIP Facility, the Debtors' businesses would suffer immediate and irreparable harm. Specifically, the Debtors would have no funds available to purchase goods and services necessary to continue their business operations.  The Debtors would be unable to meet their payroll and other employee-benefit obligations, thereby imperiling the jobs of the Debtors' employees.

143.    The Debtors also believe that interim authority to use Cash Collateral and to borrow up to $21 million is necessary for the Debtors to implement payments to their holders of PACA rights or claims under section 503(b)(9) of the Bankruptcy Code or other vendor payments that the Debtors believe are critical to their ability to obtain goods and services from their vendors.

144.    The Debtors' need for interim relief is particularly acute.  In recent months, many of the Debtors' vendors have sharply-reduced their payment terms.  Most of the Debtors' vendors are providing goods and services to the Debtors on payment terms of twenty (20) days or less.

145.    Moreover, as the Debtors are engaged in the food business, they constantly need a supply of fresh ingredients to maintain their operations.  Even a temporary inability to obtain such ingredients would be devastating for the Debtors' businesses.  Absent interim use of Cash Collateral and interim borrowing under the DIP Facility, the Debtors ability to provide high-

YCST01:11166947.1                                          070242.1001

quality food and services will be greatly diminished, thereby threatening the confidence and loyalty of their customers.

146.     The failure to obtain interim (and final) approval of the DIP Facility will also imperil the Debtors' going concern value and reorganization efforts.  Therefore, the Debtors seek interim approval of the use of Cash Collateral and interim borrowing under the DIP Facility in the amount of $16 million.  For the same reasons, the Debtors request that the Court waive any stay on the effectiveness of an Interim Order.

**n.**     ***Motions to Reject Non-Residential Real Property Leases and Abandon Property***

147.     The Debtors seek an order authorizing them to (i) reject *nunc pro tunc* to the Petition Date the unexpired non-residential real property leases for those certain closed restaurant locations (collectively, the "Closed Locations") set forth in Exhibit 1 to the proposed order (collectively, the "Leases"), that the Debtors have determined are no longer necessary or useful to their estates, and (ii) abandon any personal property that remains on the premises of the Closed Locations.

148.     Prior to the Petition Date, the Debtors closed each of the Closed Locations. The restaurants previously operating at the Closed Locations were generally unprofitable locations within the Debtors' business portfolios, thus constituting a financial strain on the Debtors. For these reasons, prior to the Petition Date, the Debtors ceased operating at the locations covered by the Leases.

149.     While the Debtors believe they have removed, or are in the process of removing, all personal property of more than *de minimis* value from the locations covered by the Leases, to the extent that the Debtors leave any property, including, but not limited to, personal property, furniture, fixtures and/or equipment (collectively, "Personal Property"), at the Closed Locations,

the Debtors request that such Personal Property be deemed abandoned pursuant to section 554 of the Bankruptcy Code.

150.    The Debtors submit that any Personal Property remaining in the Closed Locations will be of inconsequential value or burdensome to the Debtors' estates to remove. The Debtors believe that the cost of retrieving, marketing and reselling the abandoned Personal Property far outweighs any recovery the Debtors could hope to attain for the Personal Property. Accordingly, the Debtors have determined that the abandonment of any such Personal Property is in the best interests of the Debtors, their estates and creditors.

151.    In light of the importance of the Debtors ability to reject the Leases *nunc pro tunc* to the Petition Date, the Debtors have filed the attendant motion on the Petition Date and I have highlighted the relief requested in this Declaration.  The Debtors acknowledge that the relief requested requires due and proper notice and will not be granted at the "first day" hearing. Accordingly, the Debtors will provide notice of the motion and the corresponding hearing date in accordance with the Bankruptcy Code, Bankruptcy Rules and the Local Rules of this Court.

152.    In conclusion, for all the foregoing reasons and the reasons as more fully set forth in each of the First Day Pleadings, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as the Court may deem appropriate.

I certify under penalty of perjury that the foregoing is true and correct based upon my knowledge, information and belief as set forth in this Declaration.

/s/ Joseph F. Trungale
Joseph F. Trungale
President and Chief Executive Officer of
Perkins & Marie Callender's Inc. et al.

# EXHIBIT A



All ownership percentages are 100%, unless otherwise noted.

Partnership percentages are approximated.

CHP-III, CHP-IV & others

**P&MC's Holding LLC**
(DE LLC)

**P&MC's Real Estate Holding LLC**
(DE LLC)

**P&MC's Holding Corp.**
(DE corp)

These 12 entities are the "Debtors"

**Perkins & Marie Callender's Holding Inc.**
(DE corp)
**("PMC Holding")**

**Perkins & Marie Callender's Inc.**
(DE corp)
**("PMCI")**

**Perkins & Marie Callender's Realty LLC**
(DE LLC)
**("PMC Realty")**

**Perkins Finance Corp.**
(DE corp)
**("Finance")**

**Wilshire Restaurant Group LLC**
(DE LLC)
**("Wilshire")**

**PMCI Promotions LLC**
(CO LLC)
**("Promotions")**

**Marie Callender Pie Shops, Inc.**
(CA corp)
**("MCPSI")**

**Wilshire Beverage, Inc.**
(TX corp)
**("Wilshire Beverage")**

**Marie Callender Wholesalers, Inc.**
(CA corp)
**("Wholesalers")**

**MCID, Inc.**
(ID corp)
**("MCID")**

**FIV Corp.**
(DE corp)
**("FIV")**

**MACAL Investors, Inc.**
(CA corp)
**("MACAL")**

57% — Pie Shop No. 9

40% — Marie Callender Pie Shop No. 48

58% — Marie Callender's No. 50

60% — Marie Callender Pie Shop No. 59

65% — Marie Callender's #61

95% — Marie Callender Pie Shop #62, LP

58% — Marie Callender's #66

30% — Marie Callender's #71

85% — Marie Callender's #73

75% — Marie Callender's #97

63% — Marie Callender of Simi Valley

96.23% — MC Texas Limited Partnership — 3.77%

# EXHIBIT B

## RESTRUCTURING SUPPORT AGREEMENT

RESTRUCTURING SUPPORT AGREEMENT (this "<u>Agreement</u>"), dated as of June 6, 2011, among (i) Perkins & Marie Callender's Holding Inc., on behalf of itself and certain of its subsidiaries[1] (collectively, the "<u>Company</u>"), and (ii) the undersigned funds and accounts managed or advised by Wayzata Investment Partners LLC (collectively, the "<u>Wayzata Entities</u>" and, together with the Company, the "<u>Parties</u>" and each a "<u>Party</u>") who hold (a) the 14% Senior Secured Notes due 2013 (the "<u>Senior Secured Notes</u>") issued by the Company under an indenture dated as of September 24, 2008 and/or (b) the 10% Senior Notes due 2013 (the "<u>Senior Notes</u>" and, together with the Senior Secured Notes, the "<u>Notes</u>") issued by the Company under an indenture dated as of September 21, 2005.

## W H E R E A S:

A.      Prior to the date hereof, representatives of the Company and the Wayzata Entities have discussed the possibility of consummating a financial restructuring of the Company's indebtedness and other obligations on such terms and conditions as the Wayzata Entities and the Company may approve in their respective sole discretion (the "<u>Restructuring</u>") as set forth in this Agreement and the Restructuring Term Sheet (as defined herein).

B.      It is anticipated that the Restructuring will be implemented through a Plan (as defined below) filed by the Company in connection with the commencement of voluntary cases under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>").

C.      This Agreement and the exhibits attached hereto set forth the agreement among the Parties concerning their commitment, subject to the terms and conditions hereof and thereof, to implement the Restructuring.

**NOW, THEREFORE,** in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

1.      <u>Definitions</u>.  The following terms shall have the following definitions:

"<u>Agreement</u>" has the meaning set forth in the preamble hereof.

"<u>Affiliate</u>" means, with respect to any Person, any other Person which directly or indirectly controls, or is under common control with, or is controlled by, such Person.  As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean, with respect to any Person, the possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through

---

[1] The following direct and indirect subsidiaries or Perkins & Marie Callendar's Holding, Inc. are parties to this Agreement: Perkins & Marie Callender's Inc.; Perkins & Marie Callender's Realty LLC; Perkins Finance Corp.; Wilshire Restaurant Group LLC; PMCI Promotions LLC; Marie Callender Pie Shops, Inc.; Marie Callender Wholesalers, Inc.; MACAL Investors, Inc.; MCID, Inc.; Wilshire Beverage, Inc.; and FIV Corp.

ownership of securities or partnership or other ownership interests, by contract or otherwise) of such Person.

"<u>Ballot</u>" means the ballot distributed with the Disclosure Statement for voting on the Plan.

"<u>Bankruptcy Code</u>" has the meaning set forth in the recitals hereto.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals hereto.

"<u>Business Day</u>" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York, New York are authorized by law or other governmental action to close.

"<u>Chapter 11 Cases</u>" means the voluntary chapter 11 cases to be commenced by the Company.

"<u>Claim</u>" has the meaning given to such term in the Bankruptcy Code.

"<u>Company</u>" has the meaning set forth in the preamble hereof.

"<u>Company Termination Event</u>" has the meaning set forth in section 8 hereto.

"<u>Confirmation Hearing</u>" means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

"<u>Confirmation Order</u>" means the order entered by the Bankruptcy Court confirming the Plan, including all exhibits, appendices and related documents, each in form and substance acceptable to the Company and the Wayzata Entities.

"<u>Disclosure Statement</u>" means the disclosure statement in respect of the Plan which shall be in form and substance acceptable to the Company and the Wayzata Entities.

"<u>DIP Credit Facility</u>" means the debtor-in-possession credit facility as substantially described in the term sheet attached as Annex 1 to the Restructuring Term Sheet.

"<u>Effective Date</u>" means the date on which the Plan becomes effective.

"<u>Final Order</u>" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket of such court, the operation or effect of which has not been stayed, reversed, vacated, modified or amended, and as to which order or judgment (or any revision, modification, or amendment thereof) the time to appeal, petition for certiorari, or seek review or rehearing has expired and as to which no appeal, petition for certiorari, or petition for review or rehearing was filed or, if filed, remains pending; <u>provided</u>, <u>however</u>, that the possibility that a motion may be filed pursuant to Rules 9023 or 9024 of the Bankruptcy Rules or Rules 59 or 60(b) of the Federal Rules of Civil Procedure shall not mean that an order or judgment is not a Final Order.

"<u>First Lien Credit Agreement</u>" means that certain Credit Agreement by and among Perkins & Marie Callender's Holding Inc., as parent, Perkins & Marie Callender's Inc., as borrower, the lenders that are signatories thereto, as the lenders, and Wells Fargo Foothill, LLC, as the arranger and administrative agent, dated as of September 24, 2008.

"<u>Marie Callender's IP Transaction</u>" means the sale of the Company's Marie Callender's licensing business to ConAgra Foods RDM, Inc. prior to the Petition Date.

"<u>Notes</u>" has the meaning set forth in the preamble hereof.

"<u>Notes Claims</u>" means the Senior Secured Notes Claims and the Senior Notes Claims.

"<u>Parties</u>" has the meaning set forth in the preamble hereof.

"<u>Person</u>" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group or any legal entity or association.

"<u>Petition Date</u>" means the date the Chapter 11 Cases are commenced, a date which shall be no later than June 13, 2011.

"<u>Plan</u>" means that certain pre-negotiated chapter 11 plan of reorganization in respect of the Chapter 11 Cases, which shall be consistent with the terms of the Restructuring Term Sheet and in form and substance acceptable to the Company and Wayzata Entities.

"<u>Restructuring</u>" has the meaning set forth in the recitals hereto.

"<u>Restructuring Support Party</u>" means each of the Wayzata Entities.

"<u>Restructuring Term Sheet</u>" means the term sheet outlining the principal terms of the Plan and attached hereto as Exhibit A.

"<u>Senior Secured Notes</u>" has the meaning set forth in the preamble hereof.

"<u>Senior Secured Notes Claims</u>" means all outstanding obligations owed to the holders of the Senior Secured Notes, including, without limitation, for payment of principal and accrued and unpaid interest.

"<u>Senior Notes</u>" has the meaning set forth in the preamble hereof.

"<u>Senior Notes Claims</u>" means all outstanding obligations owed to the holders of the Senior Notes.

"<u>Transfer</u>" has the meaning set forth in section 10 hereto.

"<u>Termination Date</u>" has the meaning set forth in section 9 hereto.

"<u>Termination Event</u>" has the meaning set forth in section 7 hereto.

"Wayzata Entities" has the meaning set forth in the preamble hereof.

2.    <u>Restructuring Term Sheet</u>.  The Restructuring Term Sheet is expressly incorporated herein and is made a part of this Agreement.  The general terms and conditions of the Restructuring and the Plan are set forth in the Restructuring Term Sheet; <u>however</u>, the Restructuring Term Sheet is supplemented by the terms and conditions of this Agreement.  In the event of any inconsistencies between the terms of this Agreement and the Restructuring Term Sheet, the Restructuring Term Sheet shall govern.

3.    <u>Timeline</u>.  The Parties agree to pursue their respective obligations on the following timeline (in each case, a "<u>Milestone</u>") subject to the rights of the Wayzata Entities and the Company to mutually agree, in writing, to extend the dates described below:

a) On or prior to June 6, 2011, the Parties shall execute this Agreement;

b) On or prior to June 9, 2011, the Company shall have consummated the Marie Callender's IP Transaction and shall have applied the proceeds from such transaction, net of transaction costs (the "<u>Net Proceeds</u>"), immediately and directly as follows:  (i) <u>first</u>, to repay all outstanding revolving loans advanced under the First Lien Credit Agreement as of such repayment date; (ii) <u>second</u>, to pay all accrued and unpaid interest due and owing as of May 31, 2011 in respect of the Senior Secured Notes in the amount of $9,240,000.00; (iii) <u>third</u>, the Company shall retain $2.2 million; and (iv) <u>fourth</u>, to redeem the maximum principal amount of the Notes that may be redeemed from the remaining Net Proceeds, plus accrued and unpaid interest thereon (the "<u>ConAgra Optional Redemption</u>"), at the redemption price set forth in Section 3.07(c) of the Senior Secured Notes Indenture, <u>provided</u>, <u>however</u>, no amount of the Net Proceeds shall be used in satisfaction of any portion of the redemption price above 100% of the principal amount of the Senior Secured Notes plus accrued and unpaid interest thereon (the "<u>Prepayment Premium</u>"), <u>provided</u>, <u>further</u>, <u>however</u>, the Prepayment Premium due and owing on account of the optional redemption shall be deemed fully earned and accrued as of the closing date of the ConAgra Optional Redemption and the payment of the Prepayment Premium by the Company shall be deferred, shall not bear interest and shall be treated in accordance with the Restructuring Term Sheet.

c) On or prior to June 13, 2011, the Company shall commence the Chapter 11 Cases;

d) On or prior to July 14, 2011, the Company will file the Plan and the Disclosure Statement;

e) On or prior to the earlier of August 23, 2011, or six weeks from the filing of the Disclosure Statement and Plan, the Company shall obtain entry of an order approving the Disclosure Statement;

f) On or prior to the earlier of October 4, 2011, or five weeks from the hearing on the Disclosure Statement, the Company shall obtain entry of the Confirmation Order confirming the Plan;

g) On or prior to the earlier of October 21, 2011, or seventeen days from the entry of the Confirmation Order confirming the Plan, the Effective Date of the Plan shall have occurred.

4.  <u>Commitment of Restructuring Support Parties</u>.  Subject to the terms and conditions hereof and the terms and conditions set forth in the Restructuring Term Sheet, each Restructuring Support Party shall (severally and not jointly):

a) subject to its receipt of a Bankruptcy Court approved Disclosure Statement, vote all Notes Claims, now or hereafter beneficially owned by such Restructuring Support Party or for which it now or hereafter serves as the nominee, investment manager or advisor for beneficial holders thereof to accept the Plan in accordance with the applicable procedures set forth in the Disclosure Statement, and timely return a duly-executed Ballot in connection therewith, <u>provided</u>, <u>however</u>, no Restructuring Support Party shall be obligated to vote to accept the Plan, and may withdraw or revoke its tender, consent or vote with respect to the Plan, upon (i) the termination of this Agreement (<u>provided</u>, that if the Wayzata Entities are the terminating parties, the Wayzata Entities are not then in material breach of their obligations under this Agreement); or (ii) the withdrawal, amendment, modification of, or the filing of a pleading seeking to withdraw, amend or modify, the Plan or the documents included in the Plan Supplement (as such term shall be defined in the Plan), in a manner that is not acceptable to the Wayzata Entities;

b) not withdraw, amend, or revoke (or cause to be withdrawn, amended or revoked) its tender, consent or vote with respect to the Plan except as otherwise expressly permitted pursuant to subsection (a) above;

c) following the commencement of the Chapter 11 Cases, not (i) object, on any grounds, to the terms, conditions, nature or amount of the DIP Credit Facility except to the extent that such terms are materially inconsistent in any respect from those in the DIP Term Sheet; (ii) object to, delay, or take any other action to interfere, directly or indirectly, in any respect with acceptance or implementation of the Restructuring, subject to the rights of the Wayzata Entities under subsections (a) and (b) of this section 4, (iii) encourage any Person to take any of the actions described in the preceding clause (i) and (ii) herein, or (iv) directly or indirectly seek, solicit, support or encourage any plan of reorganization or liquidation other than the Plan; and

d) not take any other action, including, without limitation, initiating or joining in any legal proceeding, that is inconsistent with or that would be reasonably likely to delay consummation of the Restructuring.

Notwithstanding the foregoing, nothing in this Agreement shall be construed to prohibit any Restructuring Support Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases so long as such appearance and the positions advocated in connection therewith are not materially inconsistent with this Agreement and the Restructuring and are not for the purpose of hindering, delaying or preventing the consummation of the Restructuring.

Notwithstanding anything contained in this Agreement, neither a vote to accept the Plan by any Restructuring Support Party, nor the acceptance of the Plan by any class of creditors, shall in any way be deemed to impair or waive the rights of any Restructuring Support Party to assert or raise any objection permitted under subsections (a) or (b) above in connection with any Confirmation Hearing.

5.  <u>Commitment of the Company</u>.  Subject to its fiduciary duties as debtor-in-possession, the Company agrees to use its best efforts to (i) support and complete the Restructuring and all transactions set forth in the Restructuring Term Sheet and this Agreement, (ii) take any and all necessary and appropriate actions in furtherance of the Restructuring and the transactions set forth in the Restructuring Term Sheet and this Agreement, (iii) consummate the Marie Callender's IP Transaction on terms and conditions acceptable to the Wayzata Entities and the Company on or prior to June 9, 2011 and distribute the proceeds thereof as specified by subsection (b) of section 3 of this Agreement, (iv) complete the Restructuring and all transactions set forth in the Restructuring Term Sheet within the time-frame specified in Section 3 of this Agreement, and (v) obtain any and all required regulatory and/or third-party approvals for the Restructuring.

6.  <u>Intentionally Omitted</u>.

7.  <u>Termination by the Wayzata Entities</u>.  This Agreement shall automatically terminate upon the occurrence of any of the following events (each, a "<u>Termination Event</u>"), subject to the rights of the Wayzata Entities to fully or conditionally waive, on a prospective or retroactive basis, the occurrence of a Termination Event:

a)  the failure to meet any Milestone;

b)  the failure of the Company to (i) consummate the Marie Callender's IP Transaction on terms and conditions acceptable to the Wayzata Entities and the Company, and (ii) distribute the proceeds thereof as specified by subsection (b) of section 3 of this Agreement, on or prior to June 9, 2011;

c)  the occurrence of a breach of this Agreement by the Company, <u>provided</u>, <u>however</u>, the Wayzata Entities shall provide the Company with notice of such breach and provide the Company with three (3) Business Days to cure such breach (only if such breach is susceptible to cure);

d)  the occurrence of an event of default under the DIP Credit Facility which has not been cured (only if such breach is susceptible to cure) or waived within the applicable time period under the DIP Credit Facility;

e)  the conversion of one or more of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, unless such conversion is made with the prior written consent of the Wayzata Entities;

f)  the appointment of a trustee, receiver or examiner with expanded powers in one or more of the Chapter 11 Cases, unless such appointment is made with the prior written consent of the Wayzata Entities;

g)      the Company files, or the Court grants, an amendment, modification or filing of a pleading to amend or modify the DIP Credit Facility, Plan, Disclosure Statement or any documents related to the foregoing, including motions, plan supplement documents, notices, exhibits, appendices and orders, in a manner that is not acceptable to the Wayzata Entities;

h)      the Company files, propounds or otherwise supports any plan of reorganization other than the Plan, or files any motion or application seeking authority to sell any material assets, without the prior written consent of the Wayzata Entities;

i)      the issuance by any governmental authority, including the Bankruptcy Court or any other regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of a material portion of the Restructuring;

j)      the entry of an order by any court of competent jurisdiction invalidating, disallowing, subordinating, or limiting, in any respect, as applicable, the enforceability, priority, or validity of the Notes; or

k)      the Company fails to pay the reasonable fees and expenses incurred by the legal and financial advisors to the Wayzata Entities as they become due and owing.

8.      <u>Company Termination Events</u>. This Agreement shall automatically terminate upon the occurrence of any of the following events (each, a "<u>Company Termination Event</u>"), subject to the rights of the Company to fully or conditionally waive, on a prospective or retroactive basis, the occurrence of a Company Termination Event:  (a) breach by any Restructuring Support Party of any of the representations, warranties or covenants of such Restructuring Support Party set forth in this Agreement that would have a material adverse impact on the Company, or the consummation of the Restructuring, that remains uncured for a period of three (3) Business Days after the receipt by such Restructuring Support Party of notice and description of such breach; (b) the board of directors of the Company determines, based upon the advice of the Company's counsel, that proceeding with the Restructuring, the Plan or the solicitation of the Plan would be inconsistent with the exercise of the board of directors' fiduciary duties; or (c) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of a material portion of the Restructuring.

9.      <u>Effect of Termination</u>.  The date on which this Agreement is terminated in accordance with sections 7 and 8 of this Agreement shall be referred to as the "<u>Termination Date</u>". Upon the occurrence of the Termination Date or the Effective Date, termination of this Agreement shall be effective immediately and all obligations hereunder (other than the Company's obligations under section 31 hereof) shall terminate and this Agreement shall be of no further force and effect; <u>provided</u>, <u>however</u>, that any claim for breach of this Agreement that occurs prior to termination shall survive such termination and all rights and remedies with respect to such claims shall not be prejudiced in any way; <u>provided</u>, <u>further</u>, that except as set forth in section 25 hereof, the breach of this Agreement by one or more Parties shall not create any rights or remedies against any non-breaching Party.  Upon any termination of this Agreement prior to the Effective Date, each of the Parties shall have the immediate right, without further order of the Bankruptcy Court, and without

the consent of the Company, to withdraw or change any vote previously tendered by such Party, irrespective of whether or not any voting deadline or similar deadline or bar has passed.

10. <u>Transfer of Notes Claims</u>. Prior to the consummation of the Restructuring, and with the exception of the permitted Transfers enumerated in subsections (a) through (c) below, no Restructuring Support Party will, directly or indirectly, sell, contract to sell, give, assign, hypothecate, pledge, encumber, grant a security interest in, sell a participation in, offer, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, any economic, voting or other rights in or to, by operation of law or otherwise (collectively, "<u>Transfer</u>"), all or any portion of its Senior Secured Notes Claims or Senior Notes Claims, and no such Transfer will be effective (and any such Transfer will be void *ab initio*), unless: (i) such Transfer consists of a simultaneous Transfer by such Restructuring Support Party of the applicable Notes and the corresponding claims, rights and obligations under this Agreement, (ii) the transferee furnishes to the other Parties to this Agreement a joinder, in form and substance reasonably acceptable to such Parties, pursuant to which such transferee agrees to be bound by all of the terms and conditions of this Agreement, (iii) the Restructuring Support Party effecting such Transfer provides written notice of such Transfer to the respective legal counsel of the other Restructuring Support Parties and the Company, in each case no more than one (1) Business Day after the execution of an agreement (or trade confirmation) in respect of such Transfer, and (iv) the Company and the Restructuring Support Parties are each reasonably satisfied prior to such Transfer that registration under the Securities Act of 1933, as amended, and the applicable securities laws of any other jurisdiction is not required in connection with or as a result of the transaction resulting in such Transfer. In addition to the foregoing Transfers, the following Transfers shall be permitted:

a) any Transfer by one Restructuring Support Party to an Affiliate of such Restructuring Support Party or one or more affiliated funds or affiliated entity or entities with a common investment advisor (in each case, other than portfolio companies) so long as such Affiliate agrees in writing to be bound by the terms hereof in the same manner as the transferee;

b) any Transfer by one Restructuring Support Party to another Restructuring Support Party;

c) any other Transfer that is approved in writing in advance of such Transfer by each of the Company and the Wayzata Entities.

11. <u>Ownership of Claims</u>. Each Restructuring Support Party represents and warrants (severally and not jointly) that:

a) as of the date of this Agreement, it is the beneficial owner of the principal amount of the Senior Secured Notes Claims or Senior Notes Claims or is the nominee, investment manager or advisor for each such beneficial holders of such Senior Secured Notes Claims or Senior Notes Claims, with the legal authority to bind such beneficial holder to the terms hereof, as such Restructuring Support Party has indicated on its applicable signature page; and

b) other than pursuant to this Agreement, such Senior Secured Notes Claims or Senior Notes Claims are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition or encumbrances of any kind, that would adversely affect in any way such Restructuring Support Party's performance of its obligations contained in this Agreement at the time such obligations are required to be performed.

12.    <u>Cooperation</u>.  The Company shall provide draft copies of all "first day" motions or applications and other documents the Company intends to file with the Bankruptcy Court to counsel for the Wayzata Entities at least four (4) Business Days prior to the date when the Company intends to file such document and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court.  The Company will use reasonable efforts to provide draft copies of all other material pleadings the Company intends to file with the Bankruptcy Court to counsel to the Wayzata Entities within a reasonable time prior to filing such pleading to the extent practicable and shall consult in good faith with such counsel regarding the form and substance of any such proposed pleading.

13.    <u>Claim Resolution Matters</u>.  Prior to the entry of the Confirmation Order and the Effective Date, the Company shall not enter into any agreements with holders of Claims (as such term shall be defined in the Plan) or Equity Interests (as such term shall be as defined in the Plan) in Perkins & Marie Callender's Inc. relating to the allowance, estimation, validity, extent or priority of such Claims or Equity Interests, or the treatment and classification of such Claims or Equity Interests under the Plan, without the prior written consent of the Wayzata Entities (which consent shall not be unreasonably withheld), except with respect to (i) trade payables and employee benefits and obligations which arise in the ordinary course of the Company's business, (ii) Claims asserted in a liquidated amount of $25,000 or less, and (iii) Claims which the Company is authorized to resolve or pay pursuant to "first day" orders.

14.    <u>Intentionally Omitted</u>.

15.    <u>Business Continuance</u>.  Except as contemplated by this Agreement or with the prior written consent of the Restructuring Support Parties and subject to applicable bankruptcy law, the Company covenants and agrees that, between the date hereof and the Effective Date, the Company shall continue to operate its businesses in accordance with prudent business judgment, and shall confer with the Restructuring Support Parties and their representatives, as reasonably requested, to report on operational matters and the general status of ongoing operations.  Notwithstanding the generality of the foregoing, the Company shall, between the date hereof and the Effective Date, except as expressly contemplated by this Agreement or with the prior written consent of the Restructuring Support Parties and, subject to applicable bankruptcy law, use all commercially reasonable efforts consistent with the Restructuring to, (i) continue to operate their businesses in compliance with all applicable laws, rules and regulations, (ii)  preserve the relationships with the current customers, distributors, suppliers, vendors and others having business dealings with the Company, (iii) maintain their physical assets, properties and facilities in their current working order, condition and repair as of the date hereof, ordinary wear and tear excepted, (iv) not take any action, or omit to take any action, the intent of which is to cause the termination of their current officers, (v) perform all obligations required to be performed by the Company under any assumed executory contracts, (vi) maintain their books and records on a basis consistent with prior practice, (vii) bill

for products sold or services rendered and pay accounts payable in a manner consistent with past practice, (viii) maintain all insurance policies required, or suitable replacements therefor, in full force and effect through the close of business on the Effective Date, (ix) provide the Restructuring Support Parties with updated monthly financial information concerning the Company, (x) not encumber nor enter into any material new leases, licenses or other use or occupancy agreements for real property or any part thereof, except for the trademark license from ConAgra Foods RDM, Inc. to Marie Callender's Pie Shops, Inc. entered into pursuant to the Marie Callender's IP Transaction and except as provided under the DIP Credit Facility and the order of the Bankruptcy Court approving the DIP Credit Facility and use of any cash collateral of the Wayzata Entities, (xi) timely pay any and all required fees and taxes with respect to patents (if any), patent applications (if any), any trademark applications and any registered trademarks, and (xii) not enter into any agreement with any labor union or labor organization, including but not limited to any collective bargaining agreement, except as required by applicable law.

16. <u>Access</u>. The Company will afford Wayzata Entities and its attorneys, consultants, accountants and other authorized representatives full access, upon reasonable notice during normal business hours, and at other reasonable times, to all properties, books, contracts, commitments, records, management personnel, lenders and advisors of the Company.

17. <u>Existence; Due Authorization; Enforceability; No Conflicts</u>. Each Party represents to each other Party that, as of the date of this Agreement, (i) such Party is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization, and has all requisite corporate, partnership, or limited liability company power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement, (ii) such Party has taken all corporate, limited liability company or other action necessary for the authorization, execution, delivery and performance of this Agreement by such Party, (iii) assuming due execution and delivery hereof by the other Parties hereto, this Agreement shall constitute the valid and legally binding obligation of such Party, enforceable in accordance with the terms hereof, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting the enforcement of creditors' rights generally and general principles of equity that restrict the availability of equitable remedies, and (iv) the execution and performance of the transactions contemplated by this Agreement and compliance with the terms hereof by such Party do not and shall not (A) conflict with or violate any provision of the certificate of formation, charter, bylaws, operating agreement or other organizational document of such Party, (B) require on the part of such Party any filing with, or any permit, authorization, consent or approval of, any court, arbitrational tribunal, administrative agency or commission or other governmental regulatory authority or agency, (C) conflict with, result in a breach of, constitute (with or without due notice or lapse of time or both) a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice, consent or waiver under, any contract, lease, sublease, license, sublicense, franchise, permit, indenture, agreement or mortgage for borrowed money, instrument of indebtedness, security interest or other arrangement to which such Party is a party or by which such Party is bound or to which its assets are subject or (D) violate any order, writ, injunction, decree, statute, rule or regulation applicable to such Party or any of its properties or assets.

18. <u>Entire Agreement</u>. This Agreement, including the exhibits, schedules and annexes hereto constitutes the entire agreement of the Parties with respect to the subject matter of this

Agreement, and supersedes all other prior negotiations, agreements and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement.

19.    Survival of Agreement.    Each of the Parties acknowledges and agrees that this Agreement is being executed in connection with negotiations concerning a possible financial restructuring of the Company and in contemplation of possible Chapter 11 filings by the Company, and (a) the rights granted in this Agreement are enforceable by each signatory hereto without approval of the Bankruptcy Court, and (b) the Company waives any right to assert that the exercise of the termination rights under Section 7 of this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising the termination rights under Section 7 of this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

20.    Waiver.    If the transactions contemplated herein are or are not consummated, or following the occurrence of the Termination Date, if applicable, nothing shall be construed herein as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights.    Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

21.    Counterparts.    This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

22.    Amendments.    Except as otherwise provided herein, this Agreement may not be modified, amended or supplemented without the prior written consent of the Company and Wayzata Entities.

23.    Headings.    The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

24.    Relationship Among Parties.    Notwithstanding anything herein to the contrary, the duties and obligations of the Restructuring Support Parties under this Agreement shall be several, not joint.    It is understood and agreed that any Restructuring Support Party may trade in the Senior Secured Notes, the Senior Notes or other debt or equity securities of the Company without the consent of the Company or any other Restructuring Support Party, subject to applicable securities laws and section 10 of this Agreement.    No Restructuring Support Party shall have any responsibility for any such trading by any other entity by virtue of this Agreement.    No prior history, pattern or practice of sharing confidences among or between Restructuring Support Parties shall in any way affect or negate this understanding and agreement.

25.    Specific Performance.    It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or

other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

26.     <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction.  By its execution and delivery of this Agreement, each of the Parties irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in the United States District Court for the Southern District of New York, and by execution and delivery of this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding.  Notwithstanding the foregoing consent to New York jurisdiction, if the Chapter 11 Cases are commenced, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

27.     <u>Tax Matters</u>.  None of the Company or its shareholders will take any steps to change the Company's current entity classification for income tax purposes by changing its legal form or otherwise except as provided in the Restructuring Term Sheet.

28.     <u>Notices</u>.  All notices, requests and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally or by facsimile transmission or mailed (first class postage prepaid) to the parties at the following addresses or facsimile numbers:

If to the Company:

Perkins & Marie Callender's Inc.
6075 Poplar Avenue Suite 900
Memphis, TN 38119
Attn: Chief Executive Officer
Telephone:     (901) 766-6400
Facsimile:      (901) 766-6482

with a copy (which shall not constitute notice) to:

Troutman Sanders LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
Attn: Mitchel H. Perkiel, Esq.
Telephone:     (212) 704-6016
Facsimile:      (212) 704-5915

If to the Wayzata Entities, to the addresses set forth below such party's signature block, with a copy (which shall not constitute notice) to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Attn:   Ira S. Dizengoff, Esq.
Telephone:     (212) 872-1000
Facsimile:     (212) 872-1002

      and

Akin Gump Strauss Hauer & Feld LLP
Robert S. Strauss Building
1333 New Hampshire Avenue, N.W.
Washington, DC 20036-1564
Attn:  Scott L. Alberino, Esq.
Telephone:  (202) 887-4000
Facsimile: (202) 887-4288

29.     <u>No Third-Party Beneficiaries</u>.   The terms and provisions of this Agreement are intended solely for the benefit of the Parties hereto and their respective successors and permitted assigns, and it is not the intention of the Parties to confer third-party beneficiary rights upon any other Person.

30.     <u>Effectiveness of this Agreement</u>.   This Agreement shall become effective, and the obligations contained herein shall become binding upon the Parties, upon execution by (a) the Company and (b) the Wayzata Entities.

31.     <u>Public Disclosure</u>.   The Company will submit to counsel to Wayzata Entities all press releases and public filings relating to this Agreement or the transactions contemplated hereby and thereby and any amendments thereof.  The Company shall not, without the consent of each of the Wayzata Entities, (a) use the name of any Restructuring Support Party in any press release without such Restructuring Support Party's prior written consent or (b) disclose to any Person other than legal, financial and tax advisors to the Company the principal amount or percentage of any Notes or Notes Claims held by the Wayzata Entities or any of its subsidiaries or Affiliates.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK - SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the undersigned Parties have executed this Agreement as of the date first above written.

PERKINS & MARIE CALLENDER'S HOLDING INC., ON BEHALF OF ITSELF AND ITS DIRECT AND INDIRECT SUBSIDIARIES PARTIES TO THIS AGREEMENT

By: _____
Name: Joseph J. TRungale
Title: President & CEO

## Exhibit A
## Restructuring Term Sheet

(See attached.)

# PERKINS & MARIE CALLENDER'S INC.
## RESTRUCTURING TERM SHEET

## JUNE 6, 2011

THIS TERM SHEET DOES NOT CONSTITUTE A SOLICITATION OF VOTES FOR A PLAN OF REORGANIZATION FOR PURPOSES OF BANKRUPTCY CODE SECTIONS 1125 AND 1126 OR AN OFFER WITH RESPECT TO ANY SECURITIES. ANY SUCH OFFER OR SOLICITATION WILL BE MADE IN COMPLIANCE WITH ALL APPLICABLE LAW.

## TRANSACTION OVERVIEW

| | |
|---|---|
| **Proposed Parties** | Perkins & Marie Callender's Holding Inc. ("<u>Holding</u>"), Perkins & Marie Callender's Inc. ("<u>PMCI</u>") and certain of its subsidiaries who are counterparties to the RSA (as defined below) (collectively, the "<u>Subsidiaries</u>" and, together with Holding and PMCI, the "<u>Company</u>"). |
| | Wells Fargo Capital Finance, LLC (the "<u>First Lien Agent</u>"), in its capacity as administrative agent under that certain Credit Agreement dated as of September 24, 2008 (the "<u>First Lien Credit Agreement</u>"). |
| | Wayzata Investment Partners LLC and certain funds and accounts managed thereby (collectively, the "<u>Wayzata Entities</u>"), in their capacity as holders of (i) the 14% Senior Secured Notes due 2013 (the "<u>Senior Secured Notes</u>") issued by the Company under an indenture dated as of September 24, 2008 (the "<u>Senior Secured Notes Indenture</u>") and (ii) the 10% Senior Notes due 2013 (the "<u>Senior Notes</u>") issued by the Company under an indenture dated as of September 21, 2005. |
| **Transaction Summary** | Subject to the terms of this Term Sheet and the Restructuring Support Agreement to which this Term Sheet is attached (the "<u>RSA</u>"), the Company shall restructure its capital structure (the "<u>Restructuring</u>") through a pre-negotiated chapter 11 plan of reorganization (the "<u>Plan</u>") filed with the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"), in cases (the "<u>Chapter 11 Cases</u>") commenced by the Company by no later than June 13, 2011 (the "<u>Petition Date</u>") under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware, the material terms and conditions of which are set forth in this Term Sheet and the RSA. |
| **Post-Emergence Corporate Structure and Tax Status** | On or prior to the effective date of the Plan (the "<u>Effective Date</u>"), Holding shall be merged with PMCI, with Holding as the surviving entity. The corporate existence of all Subsidiaries of PMCI shall not be changed by the Restructuring unless otherwise determined by the Company, with the consent of the Wayzata Entities. |
| | If on or prior to the date of the hearing on the approval of the disclosure statement (the "<u>Disclosure Statement</u>") for the Plan, the Wayzata Entities, in the exercise of their sole discretion, direct the Company to change the tax structure of the reorganized Company to a pass-through structure (the "<u>Pass-Through Tax Election</u>"), the Company, in accordance with applicable law, shall make such amendments and modifications as are necessary and required to the Plan and Disclosure Statement (such changes to be acceptable to the Wayzata Entities) to effect the Pass-Through Tax Election. In the event the Pass-Through Tax Election is made, the Plan shall be modified to provide, |

among other things, that (i) Holding shall convert to a limited liability company, which shall be governed by the terms of a new limited liability company agreement (the "<u>Holding LLC Agreement</u>") and (ii) each of PMCI and the Subsidiaries shall convert to limited liability companies, which shall be governed by the terms of new limited liability company agreements (the "<u>Subsidiary LLC Agreements</u>" and, together with the Holding LLC Agreement, the "<u>New LLC Agreements</u>"). The New LLC Agreements shall be in form and substance acceptable to the Wayzata Entities.

**DIP Financing**

The Company shall obtain authorization to enter into a $21 million senior secured, superpriority debtor-in-possession revolving credit facility with Wells Fargo Capital Finance, LLC, as agent and arranger, (the "<u>DIP Credit Facility</u>"), on such terms and conditions as substantially set forth in the term sheet between the Company and Wells Fargo Capital Finance, LLC, dated May 24, 2011 attached hereto as Annex 1 (the "<u>DIP Term Sheet</u>") and on such other terms and conditions as are acceptable to the Company and the Wayzata Entities. The proceeds of the DIP Credit Facility shall be used for the purposes outlined in the DIP Term Sheet. All documentation relating to the DIP Credit Facility, including, without limitation, the credit agreement and financing orders (interim and final) shall be acceptable to the Company and the Wayzata Entities.

**Adequate Protection**

In consideration for the consent of the Wayzata Entities to the DIP Credit Facility and the use of the Wayzata Entities' cash collateral, the Company agrees that the order (interim and final) approving the DIP Credit Facility shall provide the holders of Senior Secured Notes with, among others, the following forms of adequate protection: (i) current payment of interest as and when due under the Senior Secured Notes; (ii) payment of reasonable professional fees and expenses of the Wayzata Entities' legal and financial advisors on a monthly basis; and (iii) replacement liens of a priority ranking consistent with the Intercreditor Agreement (as defined in the Senior Secured Notes Indenture).

## SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

## <u>Unclassified Claims</u>

**DIP Credit Facility Claims**

On or as soon as practicable after the Effective Date, each holder of an allowed DIP Credit Facility Claim shall receive payment in full in cash from the proceeds of the Exit Facility (as defined below).

**Administrative Expense Claims**

On or as soon as practicable after the Effective Date, each holder of an allowed Administrative Expense Claim shall receive cash equal to the full allowed amount of its claim or otherwise receive treatment consistent with the provisions of Bankruptcy Code section 1129(a)(9).

**Priority Tax Claims**

On or as soon as practicable after the Effective Date, each holder of an allowed Priority Tax Claim shall be treated in accordance with Bankruptcy Code section 1129(a)(9)(C).

## <u>Classified Claims and Interests</u>

**Senior Secured Notes Claims**

*Description*: Senior Secured Notes Claims shall consist of all outstanding obligations owed to the holders of the Senior Secured Notes, including, without limitation, for payment of principal, accrued and unpaid interest at the

| | |
|---|---|
| <u>Estimated Aggregate Allowed Amount</u>: $132,000,000 <u>plus</u> accrued and unpaid interest at the applicable contract rate, if any, <u>less</u> the aggregate principal amount of Senior Secured Notes redeemed in connection with the Marie Callender's IP Transaction (as defined in the RSA). | applicable contract rate, and accrued and unpaid prepayment premiums, if any.

*Treatment*: On or as soon as reasonably practicable after the Effective Date, each holder of Senior Secured Notes shall retain its Senior Secured Notes, as amended by the Indenture Supplement. A vote to accept the plan shall constitute a consent to the waiver of any prepayment premium due and owing to holders of Senior Secured Notes Claims as of the Effective Date, <u>provided</u>, <u>however</u>, that waiver shall be deemed null and void if the Effective Date of the Plan does not occur.

*Voting Status*: Impaired/Voting. |
| **Senior Notes Claims**

<u>Estimated Aggregate Allowed Amount</u>: $190,000,000 <u>plus</u> accrued and unpaid interest at the applicable contract rate as of the Petition Date. | *Description:* Senior Notes Claims shall consist of all outstanding obligations owed to the holders of the Senior Notes, including without limitation, for payment of principal, accrued and unpaid interest at the applicable contract rate.

*Treatment*: On or as soon as reasonably practicable after the Effective Date, the Senior Notes shall be cancelled, and in full and final satisfaction of and in exchange for all allowed Senior Notes Claims, each holder of Senior Notes shall receive its pro rata percentage of the New Equity Interests subject to dilution on account of New Equity Interests issued pursuant to any management incentive plan, with such pro rata percentage determined by dividing the allowed amount of such holder's Senior Notes Claim by the total aggregate amount of all allowed Senior Notes Claims and allowed General Unsecured Claims that receive New Equity Interests under the Plan.

*Voting Status:* Impaired/ Voting. |
| **General Unsecured Claims**

<u>Estimated Aggregate Allowed Amount</u>: At least $15,000,000. | *Description*: General Unsecured Claims shall consist of all prepetition unsecured non-priority claims against the Company other than Senior Notes Claims and Convenience Class Claims.

*Treatment*: On or as soon as reasonably practicable after the Effective Date, in full and final satisfaction of and in exchange for all allowed General Unsecured Claims, each holder of a General Unsecured Claim shall receive its pro rata percentage of the New Equity Interests subject to dilution on account of New Equity Interests issued pursuant to any management incentive plan, with such pro rata percentage determined by dividing the allowed amount of such holder's General Unsecured Claim by the total aggregate amount of all allowed Senior Notes Claims and allowed General Unsecured Claims that receive New Equity Interests under the Plan, provided, however, that if such holder's allowed General Unsecured Claim is an amount less than $500,000, such holder may elect on its ballot to receive cash in an amount equal to the lesser of (i) 10% of the holder's allowed General Unsecured Claim or (ii) such holder's pro rata share of $1.5 million.

*Voting Status*: Impaired/Voting. |
| **Convenience Class Claims** | *Description*: Convenience Class Claims shall consist of allowed General Unsecured Claims, in the amount of $5,000 or less, including those holders who elect on their ballot to reduce the allowed amount of their General Unsecured Claim to $5,000. |

*Treatment*: On or as soon as reasonably practicable after the Effective Date, in full and final satisfaction and in exchange for all allowed Convenience Class Claims, each holder of an allowed Convenience Class Claim shall receive payment in full in cash.

*Voting Status*:  Impaired/Voting.

**Intercompany Claims**

*Treatment*: All of the Company's Intercompany Claims will be paid, adjusted, or discharged to the extent reasonably determined to be appropriate by the Company, subject to the consent of the Wayzata Entities.

*Voting Status*:  Unimpaired/Non-Voting.

**Parent Equity Interests**

*Description*:   Parent Equity Interests consist of all outstanding equity interests in Holding.

*Treatment*:  Holders of Parent Equity Interests shall not be entitled to any distribution under the Plan.  All existing equity interests in Holding, as well as options, warrants, rights or similar instruments derived from, relating to or convertible or exchangeable therefore, shall be cancelled and extinguished on the Effective Date.  All equity interests in the Subsidiaries shall be retained by existing holders of such equity interests.

*Voting Status*:  Impaired/Non-voting.

## SOURCES OF FUNDING/PLAN SECURITIES

**Amendment to the Senior Secured Notes Indenture**

On the Effective Date, the Company and the indenture trustee (the "Senior Secured Notes Indenture Trustee") under the Senior Secured Notes Indenture shall enter into a supplement to the Senior Secured Notes Indenture (the "Indenture Supplement") pursuant to a direction from 100 percent (100%) of the holders of the Senior Secured Notes.  The Indenture Supplement shall be in form and substance acceptable to the Company and the Wayzata Entities and shall be disclosed in the Plan Supplement.  The obligations of the Company in respect of the Senior Secured Notes Claims, as amended by the Indenture Supplement, shall not be discharged, cancelled, or extinguished under the Plan.

The Indenture Supplement shall provide, among other things, for a waiver of all claims for default interest and any past defaults not previously waived.  In addition, the Indenture Supplement shall provide for, among others, the following modifications to the terms and conditions governing the Senior Secured Notes:

- *Maturity*: November 30, 2015.

- *Interest*: Payable at existing non-default rate under the Senior Secured Notes Indenture semiannually on May 31 and November 30.

- *Prepayment Premium/Call Schedule*: The Senior Secured Notes shall not be callable during the period prior to the first anniversary of the Effective Date.  After the first anniversary date, subject to the concurrent payment of the Applicable Premium, the Company may prepay the Senior Secured Notes, together with the accrued but unpaid interest thereon, if any, in whole or in part, from time to time

and in minimum amounts to be agreed upon. Optional prepayments of the Senior Secured Notes shall be applied ratably in accordance with the then outstanding amounts thereof and may not be reborrowed. For purposes hereof, the "Applicable Premium" shall be a cash amount equal to the percentages of principal amount of the Loans being prepaid set forth below:

| YEAR | PRICE |
|------|-------|
| After the first anniversary of the Effective Date but on or prior to the second anniversary of the Effective Date | 107% |
| After the second anniversary of the Effective Date but on or prior to the third anniversary of the Effective Date | 103.5% |
| Any time after the third anniversary of the Effective Date but prior to maturity | 100% |

- **_Permitted Senior Indebtedness_**: The Company may incur up to $35 million in indebtedness (the "Permitted Senior Indebtedness") under a senior secured revolving credit facility. The amount of Permitted Senior Indebtedness will be subject to reduction upon any permanent reduction or termination of commitments under the Exit Facility.

**New Equity Interests**

On the Effective Date, Reorganized Holding shall issue 1,000,000 shares of new common stock, provided, however, if the Pass-Through Tax Election is made as set forth above, Reorganized Holding shall issue 1,000,000 Class A membership units under the Holding LLC Agreement (the "New Equity Interests").

## Other Principal Plan Terms

**Treatment of Unexpired Leases and Executory Contracts**

Unexpired leases and executory contracts shall be treated in a manner acceptable to the Company and the Wayzata Entities.

**Initial Board of Directors/Managers of Reorganized Holding**

On the Effective Date, the board of directors/managers of Reorganized Holding shall be composed of 5 members, which members shall be designated by the Wayzata Entities, and one of whom, on the Effective Date, shall be the chief executive officer. The identity of the members of the initial board of directors/managers shall be disclosed in the plan supplement (the "Plan Supplement").

**Initial Officers of Reorganized Holding**

The initial officers of Reorganized Holding shall be designated by the Wayzata Entities. The identity of the initial officers of Reorganized Holding shall be disclosed in the Plan Supplement.

**Corporate Governance Documents**

The corporate governance documents of Reorganized Holding and the reorganized Subsidiaries that will take effect on and after the Effective Date shall be in form and substance acceptable to the Wayzata Entities.

**Stockholder/Membership Agreement**

On the Effective Date, an agreement will be adopted by the Company and be binding upon all holders of New Equity Interests (the "Stockholder/Membership Agreement"). The Stockholder/Membership Agreement will, among other things, (i) govern the access each holder of New Equity Interests will have to information with respect to the Company and the ability to transfer such holder's New Equity Interests, (ii) provide for a right of first refusal for significant stockholders, and customary drag rights and tag rights, and (iii) in the event the Pass-Through Tax Election occurs, subject

|                                  | holders of New Equity Interests to capital call requirements. The Stockholder/Membership Agreement will take effect on the Effective Date and will be in form and substance acceptable to the Wayzata Entities. |
|---|---|
| **Management Incentive Plan** | As soon as reasonably practicable after the Effective Date, the board of directors/managers of Reorganized Holding shall adopt a management incentive plan pursuant to which, among other things, up to 10% of the New Equity Interests shall be reserved for issuance pursuant to the management incentive plan. |
| **Castle Harlan Management Agreement** | On or prior to the Effective Date, the Company shall reject the Management Agreement, dated September 21, 2006, by and between Castle Harlan, Inc. ("Castle"), The Restaurant Holding Company, The Restaurant Company, TRC Holding Corp., and TRC Holding, LLC (the "Management Agreement"). In the event of any objection, contested matter or adversary proceeding filed with respect to the claims of Castle or any other person or entity arising under or from the rejection of the Management Agreement, the Company will not interfere with the prosecution of any such objection, contested matter or adversary proceeding regarding the validity, extent, priority or characterization of all accrued and unpaid management fees allegedly owed under the Management Agreement or any similar agreement prior to and subsequent to the Petition Date. |
| **Releases** | To the extent permitted by law, the Plan shall provide for the Company's release of any and all claims or causes of action, known or unknown, relating to any pre-Petition Date acts or omissions, except for willful misconduct or fraud, committed by any of the following: (i) the officers; directors; employees; legal, financial and tax advisors; and other representatives of the Company as of the Petition Date, in their capacity as such; (ii) all direct and indirect holders of equity interests in Holding as of the Petition Date, in their capacity as such; (iii) the Wayzata Entities and their legal, financial and tax advisors, in their capacity as such; (iv) the First Lien Agent and the lenders under the First Lien Credit Agreement, in their respective capacities as such; (v) the Senior Secured Notes Indenture Trustee, in its capacity as such; (vi) the indenture trustee for the Senior Notes, in its capacity as such; and (vii) the administrative agent and lenders under the DIP Credit Facility, including their legal and financial advisors, in their capacity as such (collectively, the "Released Parties"); provided, however, that the Plan shall not provide for a release of any claims or causes of action against the Company's current directors or any holders of equity interests in the Company as of the Petition Date in any way relating to (i) the Management Agreement or (ii) any claims of Castle or any other person or entity arising under or from the rejection of the Management Agreement. |
| **Exculpation** | To the extent permitted under applicable law, the Released Parties shall not have or incur any liability for any act or omission in connection with, related to, or arising out of, the Restructuring, the Chapter 11 Cases, the pursuit of confirmation of this Plan, the consummation of this Plan or the administration of the Plan or the property to be distributed under this Plan except for claims resulting from willful misconduct or fraud; provided, however, that the Company's current directors and any holders of equity interests in the Company as of the Petition Date shall not be exculpated from any liability for any act or omission in connection with, related to, or arising out of (i) the Management Agreement or (ii) any claims of Castle or any other person or entity arising under or from the rejection of the Management Agreement. |

| **Indemnification Rights** | The Company shall assume all existing indemnification obligations of the Debtors in favor of the directors and officers serving as of the Effective Date (whether in the Debtors' bylaws, contracts or otherwise). All other indemnification obligations shall be rejected by the Company on the Effective Date. |
|---|---|

On or before the Effective Date, the Company shall use commercially reasonable efforts to obtain run-off coverage in a commercially reasonable scope and amount for a term up to, but not to exceed six (6) years, under a directors and officers liability policy and a management practices insurance policy (collectively, the "<u>Tail Insurance Policies</u>") for the directors and officers serving as of the Petition Date. The Tail Insurance Policies shall not be bound, nor any premiums paid, without the prior written consent of the Wayzata Entities.

**Restructuring Expenses**   All reasonable and necessary documented fees and expenses of the Wayzata Entities, including all reasonable documented fees and expenses incurred by the Wayzata Entities' legal and financial advisors, shall be paid on a current basis monthly after receipt of invoice.

**Exit Facility**   On the Effective Date, the Company shall enter into a senior secured revolving credit facility in an aggregate principal amount not to exceed $35 million (the "<u>Exit Facility</u>") from a commercial lender acceptable to the Wayzata Entities. The terms and conditions of the Exit Facility shall be acceptable to the Company and the Wayzata Entities. The terms and conditions of the Exit Facility shall be disclosed in the Plan Supplement.

**Definitive Documents and Due Diligence**   Any final agreement shall be subject to definitive agreements, pleadings, court submissions and other documents (the "<u>Definitive Documents</u>"), as well as additional legal, financial, tax and business due diligence, each consistent with the terms of this Term Sheet and the RSA. The Definitive Documents shall be consistent with the terms of this Term Sheet and the RSA and otherwise acceptable to the Wayzata Entities.

**Annex 1**
**DIP Term Sheet**

(See attached.)

<u>**FOR DISCUSSION PURPOSES ONLY**</u>

*THIS DIP CREDIT FACILITY TERM SHEET IS NOT INTENDED TO, AND DOES NOT, CONSTITUTE A BINDING AGREEMENT WITH RESPECT TO THE FACILITY OUTLINED HEREIN OR OTHERWISE. THIS TERM SHEET IS PROFFERED IN THE NATURE OF A SETTLEMENT PROPOSAL IN FURTHERANCE OF SETTLEMENT DISCUSSIONS, AND IS INTENDED TO BE ENTITLED TO THE PROTECTIONS OF FEDERAL RULE OF EVIDENCE 408 AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL INFORMATION AND INFORMATION EXCHANGED IN THE CONTEXT OF SETTLEMENT DISCUSSIONS.*

**SUMMARY OF PRELIMINARY TERMS AND CONDITIONS OF THE $[21,000,000][1] SENIOR SECURED, SUPER PRIORITY DEBTOR-IN-POSSESSION REVOLVING CREDIT FACILITY**

<u>Borrower</u>:    Perkins & Marie Callender's Inc., a Delaware corporation (the "<u>Borrower</u>"), as a debtor and debtor-in-possession in a chapter 11 bankruptcy case (a "<u>Chapter 11 Case</u>") filed under chapter 11, 11 U.S.C. §§ 101 et. seq. (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"). The Borrower is currently the borrower under that certain Credit Agreement, dated as of September 24, 2008 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Existing Credit Agreement</u>"), by and among Perkins & Marie Callender's Holding Inc., a Delaware corporation ("<u>Parent</u>"), Borrower, the lenders party thereto (the "<u>Existing Lenders</u>"), and Wells Fargo Capital Finance, LLC, a Delaware limited liability company (f/k/a Wells Fargo Foothill, LLC, "<u>WFCF</u>"), as arranger and administrative agent for the Existing Lenders.

<u>Guarantors</u>:[2]    The DIP Credit Facility (as defined below) will be fully and unconditionally guarantied, on a joint and several basis, by Parent and each Existing Subsidiary Guarantor, in each case as a debtor and debtor-in-possession in a Chapter 11 Case filed in the Bankruptcy Court (together with the Chapter 11 Case of Borrower, collectively, the "<u>Chapter 11 Cases</u>"). The Existing Subsidiary Guarantors , along with Parent, are the guarantors under that certain General Continuing Guaranty, dated as of September 24, 2008 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Existing Guaranty</u>"), in favor of WFCF in its capacity as administrative agent for the Existing Lenders. The "Existing Subsidiary Guarantors" consist of the following nine (9) direct and indirect subsidiaries of the Borrower:

- Perkins & Marie Callender's Realty LLC, a Delaware limited liability company;

---

[1] Confirm amount with the Borrower.

[2] [To the extent that any of the guarantors will receive proceeds of the DIP Facility, they will need to be direct Borrowers under the DIP Facility. Please confirm whether any of the guarantors will receive proceeds of the DIP Facility during the Chapter 11 Cases.]

- Perkins Finance Corp., a Delaware corporation;
- Wilshire Restaurant Group LLC, a Delaware limited liability company;
- Marie Callender Pie Shops, Inc., a California corporation;
- MACAL Investors, Inc., a California corporation;
- Marie Callender Wholesalers, Inc., a California corporation;
- FIV Corp., a Delaware corporation;
- MCID, Inc., an Idaho corporation; and
- Wilshire Beverage, Inc., a Texas corporation.

The DIP Credit Facility will also be fully and unconditionally gurantied, on a joint and several basis, by (i) PMCI Promotions LLC, a Colorado limited liability company wholly owned by the Borrower, and (ii) all of Parent's future direct and indirect domestic subsidiaries and, unless it would result in material adverse tax consequences, foreign subsidiaries. Parent, the Existing Subsidiary Guarantors, PMCI Promotions LLC, and such future subsidiaries, collectively, the "<u>Guarantors</u>", and together with the Borrower, each a "<u>Loan Party</u>" and collectively, the "<u>Loan Parties</u>".

For the avoidance of doubt and consistent with the Existing Credit Agreement, none of the 12 existing franchisee partnerships in which the Borrower or any other Loan Party has an interest will guarantee the DIP Credit Facility or otherwise provide credit support therefor.[3]

<u>Agent</u>:        Wells Fargo Capital Finance, LLC (the "<u>Agent</u>"), as agent for the lenders party to the DIP Credit Facility (the "<u>DIP Lenders</u>").

<u>Arranger</u>:       Wells Fargo Capital Finance, LLC (the "<u>Arranger</u>").

---

[3] [Please confirm that none of the 12 franchisee partnerships will be debtors-in-possession.]

DIP Lenders:                All of the Existing Lenders.

Type and Amount of
DIP Credit Facility:        DIP Credit Facility: A first priority senior secured revolving credit facility (the "DIP Credit Facility") in an aggregate principal amount of $[21,000,000] ("Revolving Loan Commitment"), subject to Availability (as defined below) and the Initial DIP Budget (as defined below) and Updated DIP Budget (as defined below), including a "roll-up" of then-existing obligations under the Existing Credit Agreement (anticipated to consist solely of letters of credit issued thereunder ("Existing Letters of Credit") and any applicable fees or charges thereunder). Under the DIP Credit Facility, the DIP Lenders will provide the Borrower with a revolving credit facility (the "Revolver"), including the L/C Sublimit (as defined below) for the issuance of commercial and standby letters of credit ("Letters of Credit"). Existing Letters of Credit rolled up into the DIP Credit Facility shall count toward the L/C Sublimit. The DIP Credit Facility shall be authorized pursuant to Sections 364(c) and (d) of the Bankruptcy Code.

Upon the entry of an interim order authorizing and approving the DIP Credit Facility, which shall be in form and substance satisfactory to Agent (the "Interim Order"), the Borrower shall be entitled to borrow, and receive other extensions of credit, in an amount equal to the lesser of (a) $[15,000,000] (the "Interim Amount")[4] and (b) an amount sufficient to meet the Loan Parties' working capital and other needs pending the final hearing subject to the terms and conditions of the final documentation of the DIP Credit Facility and in accordance with the Initial DIP Budget, and the terms and conditions of the Interim Order. In addition, all Existing Letters of Credit shall be deemed to have arisen under the DIP Credit Facility and shall count as utilization for the purposes of the Interim Amount.

Upon the entry of a final order authorizing and approving the DIP Credit Facility, which shall be in form and substance satisfactory to Agent (the "Final Order"), the Borrower shall be entitled to borrow, and receive other extensions of credit in, all amounts available under the DIP Credit Facility, subject to the terms and conditions of the final documentation for the DIP Credit Facility, including, without limitation, compliance with the Initial DIP Budget and the terms and conditions of the Final Order.

Use of Proceeds:           The proceeds of the loans under the DIP Credit Facility (the "DIP Loans") shall be used by Borrower (a) upon entry of the Final Order, to repay in full any amounts outstanding under the Existing Credit Agreement, (b) to fund postpetition general corporate needs, including working capital needs, subject to the provisions of the DIP Budget (as defined below) most recently delivered to Agent, and (c) to pay administrative expenses of the Chapter 11 Cases, including reasonable

---

[4] Need to confirm amount with the Borrower.

fees and expenses of professionals, subject to the provisions of the DIP Budget most recently delivered to Agent. Proceeds of the DIP Loans may not be used postpetition to pay (i) principal or interest with respect to the Senior Secured Notes[5] (but may be used to pay fees and expenses of professionals with respect to the Senior Secured Notes in accordance with the DIP Budget), or (ii) principal, interest, or professional fees and expenses with respect to the Junior Notes.[6]

Petition Date:  Date of commencement of the Chapter 11 Cases with respect to the Loan Parties in the Bankruptcy Court.

Maturity:  Six (6) months from the Petition Date (the "Maturity Date").

Termination:  The DIP Credit Facility shall terminate on the earliest to occur of (i) the date on which all the DIP Loans have been indefeasibly repaid in full and all commitments under the DIP Credit Facility have terminated, (ii) the Maturity Date, (iii) the closing date of a sale of all or substantially all of the Loan Parties' assets or stock under Section 363 of the Bankruptcy Code (the "363 Sale"), unless otherwise waived by the Agent and the Required Lenders (to be defined in the DIP Credit Facility), (iv) the effective date of a confirmed plan of reorganization in any Chapter 11 Case pursuant to Chapter 11 of the Bankruptcy Code and (v) the date of termination of the commitments and/or acceleration of any outstanding extensions of credit following the occurrence and during the continuance of an Event of Default (as defined below). The earliest to occur of the foregoing shall be referred to as the "DIP Facility Termination Date".

Availability:  Upon satisfaction or waiver by the Required Lenders of customary conditions precedent to drawing to be specified in the definitive DIP Credit Facility documentation, up to the lesser of (i) $[21,000,000.00] *minus* reserves established by the Agent, including a reserve for the Carve-Out, and (ii) the amount necessary to fund general corporate needs, including working capital needs, as set forth on the DIP Budget most recently delivered to Agent. Other than the Carve-Out, all other reserves against Availability shall be consistent with those reserves which may be determined as provided under the Existing Credit Agreement.

Carve-Out:  (i) all unpaid fees required to be paid in the Chapter 11 Cases to the Clerk of the Bankruptcy Court and to the office of the U.S. Trustee under

---

[5] "Senior Secured Notes" refers to the secured notes issued pursuant to that certain Indenture dated as of September 24, 2008 among Perkins & Marie Callender's Holding Inc., Perkins & Marie Callender's Inc., certain of its subsidiaries from time to time party thereto, and The Bank of New York Mellon, as Trustee and Collateral Agent (including all amendments, modifications, and supplements thereto).

[6] "Junior Notes" refers to the unsecured notes issued pursuant to that certain Indenture dated as of September 21, 2005 among Perkins & Marie Callender's Holding Inc., Perkins & Marie Callender's Inc., the guarantors from time to time party thereto, and The Bank of New York, as Trustee (including all amendments, modifications, and supplements thereto).

28 U.S.C. §1930, whether arising prior to or after the delivery of the Carve-Out Trigger Notice (as defined below); and

(ii)     all reasonable and documented unpaid fees, costs, disbursements and expenses, including, without limitation, success fees, of professionals retained by the Loan Parties and any Committee in the Chapter 11 Cases (collectively, the "Professionals"), that are: (A) (1) incurred prior to the delivery by Agent of a Carve-Out Trigger Notice, (2) allowed by the Bankruptcy Court (prior to or after the delivery of such notice) and (3) remain unpaid after application of any retainers, or (B) (1) incurred after the delivery by the Agent of a Carve-Out Trigger Notice in an aggregate amount not to exceed a maximum amount which shall be mutually acceptable to the Loan Parties and the DIP Lenders, allocated among such Professionals on a pro rata basis based on amounts incurred, (2) allowed by the Bankruptcy Court and (3) remain unpaid after application of any retainers.

| | |
|---|---|
| Carve-Out Trigger Notice: | A written notice issued by the Agent to Borrower's lead counsel, the U.S. Trustee, and lead counsel to any Committee, which notice may be issued at any time following the occurrence and during the continuation of any Event of Default. |
| L/C Sublimit: | $15,000,000, for the issuance of Letters of Credit.  The amount of outstanding Letters of Credit shall be reserved against the Availability under the Revolving Loan Commitment.  Upon entry of the Interim Order, Existing Letters of Credit shall be deemed have been issued under the DIP Credit Facility. |
| Swingline Facility: | $5,000,000.00. |
| Pricing and Payment of Interest: | (i) LIBOR plus 4.50% per annum, or alternatively as provided in the Existing Credit Agreement, Base Rate plus 3.50% per annum, each subject to the Default Rate during the continuance of an Event of Default, and with a LIBOR floor of 1.00% annual rate and a Base Rate floor of 2.00% annual rate; and |
| | (ii) All interest payable monthly. |
| Default Rate: | 2.00% per annum plus the rate otherwise applicable with respect to advances under the Revolver and with respect to Letters of Credit, as applicable. |
| Closing Fee: | $200,000 for the benefit of the Agent and the DIP Lenders, to be paid upon entry of the Interim Order with credit to be given for any forbearance fee paid or to be paid under that certain Forbearance Agreement dated as of May 9, 2011, by and among, inter alia, the Borrower, WFCF and the Existing Lenders.  No additional fee shall be due upon entry of the Final Order. |

All fees payable to the Agent for the benefit of the Agent or the DIP Lenders shall be fully earned on the date such payment is due and shall be non-refundable.

Unused Revolver Fee: 0.50% per annum.

Letter of Credit Fees: (i) Issuance charge equal to 0.825% per annum times the undrawn amount of each underlying Letter of Credit, (ii) letter of credit participation fees equal to 4.50% per annum times the undrawn amount of each underlying Letter of Credit, subject to the Default Rate during the continuance of an Event of Default, and (iii) customary fees and expenses with respect to the administration of such Letters of Credit.

Collateral: The DIP Credit Facility will be secured by liens having first priority, except for and subject only to the Carve-Out, on all assets of the Loan Parties, exclusive of avoidance actions and proceeds thereof under Chapter 5 of the Bankruptcy Code (the "DIP Collateral") and shall "prime" the liens and security interests granted in connection with the Existing Credit Agreement and any liens and security interests with respect to the Senior Secured Notes.

Application of Proceeds from Dispositions of DIP Collateral: (i) Proceeds from any disposition of DIP Collateral in the ordinary course of business shall be applied in accordance with the DIP Credit Facility.

(ii) In each case, subject to the Carve-Out, proceeds from any disposition of DIP Collateral not in the ordinary course of business shall be applied (unless the Agent consents to some other application) to repay the obligations under the DIP Credit Facility in accordance with its terms.

Conditions Precedent: The definitive documentation for the DIP Credit Facility will include such conditions precedent as are usual and customary for financings of this kind, and consistent with the conditions precedent contained in the Existing Credit Agreement (as modified to take account of the current financial condition of the Loan Parties and the commencement of the Chapter 11 Cases), including, but not limited to, delivery of the Initial DIP Budget in form and substance reasonably satisfactory to Agent and mutual agreement as to variances with respect thereto, and the entry of the Interim Order in form and substance satisfactory to the Agent.

Financial Reports: The credit agreement governing the DIP Credit Facility will include financial reporting requirements that are usual and customary for Agent's financings of this type, and consistent with the financial reporting contained in the Existing Credit Agreement (as modified to take account of the current financial condition of the Loan Parties and the commencement of Chapter 11 Cases), including, without limitation, the following:

(i) Prior to the Petition Date, the Loan Parties will furnish a budget, in form and substance reasonably satisfactory to Agent, reflecting a

forecast of cash receipts and disbursements (a) for the coming thirteen week period of the Loan Parties on a consolidated basis, broken down by week, and (b) for the following six month period of the Loan Parties on a consolidated basis, broken down by month, including in each case the anticipated uses of the DIP Credit Facility for such period which shall provide, among other things, for the payment of the fees and expenses relating to the DIP Credit Facility, ordinary course expenses, bankruptcy-related and court authorized expenses and working capital and other general corporate needs (the "Initial DIP Budget"). Thereafter, on each Friday prior to the beginning of each fiscal month, the Loan Parties will furnish an updated budget in form and substance reasonably satisfactory to Agent (the "Updated DIP Budget"; the Initial DIP Budget, together with each Updated DIP Budget delivered to Agent, each a "DIP Budget" and collectively the "DIP Budgets") (x) for the following thirteen week period of the Loan Parties on a consolidated basis, broken down by week, and (y) for the period thereafter through the Maturity Date, broken down by month, in each case consistent with the form of the Initial DIP Budget.

(ii)     Beginning on the first Friday that is two weeks after the Petition Date and on each Friday thereafter, the Loan Parties will furnish a variance report ("Variance Report") setting forth actual cash receipts and disbursements of the Loan Parties for the prior week and setting forth for such week as compared to (A) the Initial DIP Budget  on a weekly and cumulative basis, and (B) the most recent Updated DIP Budget (as applicable) delivered by the Loan Parties on a weekly and cumulative basis; each such Variance Report shall include explanations for all material variances and shall be certified by the Chief Financial Officer or Chief Restructuring Officer of Borrower.

| | |
|---|---|
| Cash Management: | The cash management system used by the Loan Parties shall be satisfactory to Agent and shall be consistent with the cash management system in use under the Existing Credit Agreement. |
| Representations and Warranties: | The definitive documentation for the DIP Credit Facility will include such representations and warranties with respect to the Loan Parties and their subsidiaries as are usual and customary for financings of this kind, and consistent with the representations and warranties contained in the Existing Credit Agreement (as modified to take account of the current financial condition of the Loan Parties and the commencement of the Chapter 11 Cases). |
| Affirmative Covenants: | The definitive documentation for the DIP Credit Facility will include such affirmative covenants as are usual and customary for financings of this kind, and consistent with the affirmative covenants contained in the Existing Credit Agreement (as modified to take account of the current financial condition of the Loan Parties and the commencement of the Chapter 11 Cases). |
| Negative Covenants: | The definitive documentation for the DIP Credit Facility will include such negative covenants as are usual and customary for financings of this |

kind, and consistent with the negative covenants contained in the Existing Credit Agreement (as modified to take account of the current financial condition of the Loan Parties and the commencement of the Chapter 11 Cases).

Financial Covenants: Compliance with the DIP Budget most recently delivered to Agent within a to-be-agreed upon variance amount, calculated on a weekly basis, as a percentage of (i) each category of cash inflows for such week set forth on the DIP Budget then most recently delivered to Agent, (ii) the aggregate amount of all cash inflows for such week set forth on the DIP Budget then most recently delivered to Agent, (iii) each category of expenditures for such week set forth on the DIP Budget then most recently delivered to Agent, (iv) the aggregate amount of all expenditures for such week set forth on the DIP Budget then most recently delivered to Agent, and (v) the aggregate amount of cash inflows for such week over the aggregate amount of expenditures for such week, in each case as set forth on the DIP Budget then most recently delivered to Agent.

Events of Default: The definitive documentation for the DIP Credit Facility will include such events of default as are usual and customary for financings of this kind, and consistent with the events of default contained in the Existing Credit Agreement (as modified to take account of the current financial condition of the Loan Parties and the commencement of the Chapter 11 Cases). In addition, an event of default shall occur if the Borrower (i) exceeds agreed-upon variances with respect to the DIP Budget, and (ii) fails to achieve certain "milestones" towards consummation of a plan of reorganization on terms reasonably satisfactory to Agent by dates to be agreed as more completely set forth on Schedule A attached hereto unless otherwise extended by Agent and Required Lenders.

Adequate Protection for Existing Lenders: To the extent there remain any claims under the Existing Credit Agreement, as adequate protection for any diminution in the value of their collateral resulting from the Borrower's use of cash collateral, the priming liens in favor of the DIP Credit Facility, or otherwise, the Loan Parties shall (a) grant to the Existing Lenders replacement liens on all of the DIP Collateral, subordinate only to the liens in favor of the DIP Credit Facility, the Carve-Out and Permitted Liens (as defined in the Existing Credit Agreement), (b) provide for a super-priority administrative claim, subject only to the claims of the DIP Credit Facility and the Carve-Out, (c) timely pay the reasonable fees and expenses of the professionals retained by the Existing Lenders (including counsel), and (d) timely pay in cash interest due, if any, under the Existing Credit Agreement at the same rate as is being paid on such facility as of the Petition Date (excluding any default rate that may then be in effect).

Any claims for indemnification as to the Existing Credit Agreement or any similar claims under such agreement which are outstanding or survive the termination of commitments thereunder shall be assumed under the DIP Credit Facility and made thereunder.

| | |
|---|---|
| <u>Governing Law</u>: | New York. |
| <u>Fee Reimbursement</u>: | The Agent, on behalf of itself and with respect to each of the DIP Lenders, shall be entitled to prompt reimbursement of the reasonable fees and expenses of their counsel and financial advisors, arising from or related to the DIP Credit Facility or the Loan Parties' Chapter 11 Cases. Agent agrees to engage one primary legal counsel and one local Delaware counsel on its behalf and on behalf of the DIP Lenders with respect to the Chapter 11 Cases. |
| <u>Financial Advisor</u>: | Agent shall be entitled to retain a financial advisor, appraisers and other third-party consultants under the DIP Credit Facility, as may otherwise be provided for in the Existing Credit Agreement. |
| <u>Counsel to Agent</u>: | Paul, Hastings, Janofsky & Walker, LLP. |

<u>Schedule A</u>

<u>Milestones</u>

See attached