**THIS PROPOSED SECOND AMENDED DISCLOSURE STATEMENT IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION DESCRIBED HEREIN. ACCEPTANCES AND REJECTIONS OF THAT PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS PROPOSED SECOND AMENDED DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PERKINS & MARIE CALLENDER'S INC.,[1] et al., | Case No. 11-11795 (KG) |
| Debtors. | Jointly Administered |

### SECOND AMENDED DISCLOSURE STATEMENT FOR
### DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION
### UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

TROUTMAN SANDERS LLP
Mitchel H. Perkiel (admitted *pro hac vice*)
Hollace T. Cohen (admitted *pro hac vice*)
Brett D. Goodman (admitted *pro hac vice*)
The Chrysler Building
405 Lexington Avenue, 7th Floor
New York, NY 10174
Telephone:   (212) 704-6000
Facsimile:    (212) 704-6288

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Robert S. Brady (DE Bar No. 2847)
Robert F. Poppiti, Jr. (DE Bar No. 5052)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
Telephone:   (302) 571-6600
Facsimile:    (302) 571-1253

Counsel for the Debtors and Debtors-in-Possession

Dated:   September 9, 2011
Wilmington, Delaware

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Perkins & Marie Callender's Inc. (4388); Perkins & Marie Callender's Holding Inc. (3999); Perkins & Marie Callender's Realty LLC (N/A); Perkins Finance Corp. (0081); Wilshire Restaurant Group LLC (0938); PMCI Promotions LLC (7308); Marie Callender Pie Shops, Inc. (7414); Marie Callender Wholesalers, Inc. (1978); MACAL Investors, Inc. (4225); MCID, Inc. (2015); Wilshire Beverage, Inc. (5887); and FIV Corp. (3448). The mailing address for the Debtors is 6075 Poplar Avenue, Suite 800, Memphis, TN 38119.

Table of Contents

Article I        Introduction.................................................................................................1

Article II       Overview of the Plan ..................................................................................12

Article III      Overview of Chapter 11..............................................................................16

Article IV       Company Background .................................................................................17

Article V        Events Leading Up to the Commencement of the Chapter 11 Cases ...................29

Article VI       The Chapter 11 Cases ................................................................................33

Article VII      Summary of the Plan..................................................................................40

Article VIII     Projections and Valuation ...........................................................................87

Article IX       Certain Risk Factors to be Considered.........................................................96

Article X        Confirmation Procedure.............................................................................113

Article XI       Alternatives to Confirmation and Consummation of the Plan.............................119

Article XII      Securities Laws Matters.............................................................................121

Article XIII     Certain U.S. Federal Income Tax Consequences of the Plan .............................123

Article XIV      Conclusion ..............................................................................................137

Exhibit A     Debtors' Second Amended Joint Plan of Reorganization

Exhibit B     Disclosure Statement Order (including Confirmation Hearing Notice)

Exhibit C     Financial Projections

Exhibit D     Liquidation Analysis

THIS SECOND AMENDED DISCLOSURE STATEMENT (THIS "**DISCLOSURE STATEMENT**") HAS BEEN PREPARED FOR THE PURPOSE OF PROVIDING CERTAIN APPLICABLE INFORMATION TO CREDITORS OF THE DEBTORS WHO, AS DESCRIBED HEREIN, ARE ENTITLED TO VOTE WHETHER TO ACCEPT OR REJECT THE DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION (THE "**PLAN**").  A COPY OF THE PLAN IS ATTACHED AS EXHIBIT A HERETO.  THIS DISCLOSURE STATEMENT INCLUDES, AMONG OTHER THINGS, A SUMMARY OF THE PLAN, AS WELL AS SUMMARIES OF CERTAIN OTHER MATERIALS REFERENCED IN THIS DISCLOSURE STATEMENT INCLUDING (AMONG OTHER THINGS) CERTAIN OTHER DOCUMENTS ATTACHED AS EXHIBITS TO THIS DISCLOSURE STATEMENT OR ATTACHED AS EXHIBITS TO THE PLAN SUPPLEMENT REFERENCED IN THIS DISCLOSURE STATEMENT.  THE SUMMARIES AND OTHER INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THOSE OTHER EXHIBITS TO THIS DISCLOSURE STATEMENT, AND THE EXHIBITS TO THE PLAN SUPPLEMENT.

PERSONS ENTITLED TO VOTE WHETHER TO ACCEPT OR REJECT THE PLAN ARE ADVISED AND ENCOURAGED TO READ, IN THEIR ENTIRETY, THIS DISCLOSURE STATEMENT, THE PLAN ATTACHED AS AN EXHIBIT HERETO, AND THE OTHER EXHIBITS HERETO OR THERETO, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  THE PLAN SUPPLEMENT WILL NOT BE FILED WITH THE BANKRUPTCY COURT PRIOR TO THE VOTING DEADLINE AND, ACCORDINGLY, THE INFORMATION AND MATERIALS TO BE CONTAINED THEREIN WILL NOT BE AVAILABLE IN CONNECTION WITH THE DETERMINATION OF WHETHER TO ACCEPT OR REJECT THE PLAN.

**ALL PERSONS ENTITLED TO VOTE SHOULD READ CAREFULLY THE SECTION OF THIS DISCLOSURE STATEMENT DESCRIBING CERTAIN APPLICABLE RISK FACTORS, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF (UNLESS OTHERWISE SPECIFIED), AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH APPLICABLE DATE.  THE DEBTORS DO NOT WARRANT THAT THE STATEMENTS OR INFORMATION CONTAINED HEREIN ARE WITHOUT ANY INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW.  THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  PERSONS TRADING IN OR OTHERWISE PURCHASING, SELLING, OR

TRANSFERRING CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF THE DETERMINATION BY HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE ON ACCEPTANCE OR REJECTION OF THE PLAN AS TO WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY OTHER PERSON OR FOR ANY OTHER PURPOSE.  AS DESCRIBED IN GREATER DETAIL BELOW, NOT ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ARE ENTITLED TO VOTE ON WHETHER TO ACCEPT OR REJECT THE PLAN.  ALSO AS DESCRIBED IN GREATER DETAIL BELOW, HOLDERS OF EQUITY INTERESTS IN THE DEBTORS ARE NOT ENTITLED TO VOTE ON ACCEPTANCE OR REJECTION OF THE PLAN, EXCEPT INSOFAR AS ANY SUCH HOLDER ALSO HOLDS CLAIMS THAT GIVE RISE TO ANY SUCH VOTING RIGHT.

IN THE EVENT OF ANY INCONSISTENCY OR AMBIGUITY BETWEEN THE TERMS OF THE PLAN ITSELF AND THE SUMMARY OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL GOVERN.  ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

AS TO CONTESTED MATTERS, EXISTING LITIGATION INVOLVING, OR POSSIBLE ADDITIONAL LITIGATION TO BE BROUGHT BY, OR AGAINST, THE DEBTORS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION, OR A WAIVER, BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER BY ANY PARTY IN INTEREST OR OTHER PERSON.  ACCORDINGLY, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING INVOLVING ANY DEBTOR OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST THE DEBTORS OR HOLDERS OF EQUITY INTERESTS IN THE DEBTORS.

## ARTICLE I

## INTRODUCTION

### A.    General Background.

On June 13, 2011 (the "**Petition Date**"), Perkins & Marie Callender's Inc., a Delaware corporation ("**PMCI**")[2] formerly known as "The Restaurant Company", along with its parent corporation and ten (10) direct and indirect subsidiary corporations and limited liability companies of PMCI, filed voluntary petitions (the "**Petitions**") for relief under chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**").  The Petitions were filed with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").  [See Docket No. 1.][3]  Upon the filing of the Petitions, their respective reorganization cases under the Bankruptcy Code (the "**Chapter 11 Cases**") commenced.  As described in greater detail below, on June 14, 2011, the Bankruptcy Court ordered that the Chapter 11 Cases be consolidated for administrative purposes only.  PMCI, along with its parent corporation and those ten (10) subsidiaries, are referred to collectively in this Disclosure Statement as the "**Debtors**".

In addition to PMCI, the Debtors include PMCI's parent corporation and sole stockholder, Perkins & Marie Callender's Holding Inc., a Delaware corporation ("**PMC Holding**") formerly known as "The Restaurant Holding Corporation", and the following ten (10) direct and indirect PMCI subsidiaries (the "**Subsidiary Debtors**"):

  -- Perkins & Marie Callender's Realty LLC, a Delaware limited liability company ("**PMC Realty**") formerly known as "TRC Realty LLC";

  -- Perkins Finance Corp., a Delaware corporation ("**Finance**");

  -- Wilshire Restaurant Group LLC, a Delaware limited liability company ("**Wilshire**") formerly a Delaware corporation known as "Wilshire Restaurant Group, Inc.";

  -- PMCI Promotions LLC, a Colorado limited liability company ("**Promotions**") formerly known as Perkins Promotions, LLC;

  -- Marie Callender Pie Shops, Inc., a California corporation ("**MCPSI**");

---

[2]    References in this Disclosure Statement to PMCI or to any other Debtor include such Person, as in existence prior to the commencement of the Chapter 11 Cases and as a debtor and a debtor-in-possession during the pendency of the Chapter 11 Cases.  Where applicable, however, this Disclosure Statement instead makes reference to such entity as a reorganized entity (*e.g.*, "**Reorganized PMCI**") when necessary or appropriate to reference such entity as constituted following its emergence from its respective Chapter 11 Case.

[3]    References in this Disclosure Statement to the "Docket" are to the Docket maintained in the Debtors' Chapter 11 Cases.  The Docket can be inspected in the office of the Clerk of the Bankruptcy Court (or on a website maintained by the Bankruptcy Court).  Alternatively, the Docket can be accessed at www.PRKMCRestructuring.com, a website maintained by the Debtors' claims and noticing agent.

--      Marie Callender Wholesalers, Inc., a California corporation ("**Wholesalers**");

--      MACAL Investors, Inc., a California corporation ("**MACAL**");

--      MCID, Inc., an Idaho corporation ("**MCID**");

--      Wilshire Beverage, Inc., a Texas corporation ("**Wilshire Beverage**"); and

--      FIV Corp., a Delaware corporation ("**FIV**").

The Debtors previously filed with the Bankruptcy Court their proposed "Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code" and a related "Disclosure Statement for Debtors' Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code", each dated July 14, 2011. [Docket Nos. 221 and 222] Since those filings, the Debtors have engaged in substantial discussions and negotiations with their principal creditor constituencies, including the Creditors' Committee, in order to address various questions and concerns. Those efforts led to the filing by the Debtors with the Bankruptcy Court, on September 3, 2011, of the "Debtors' Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code" [Docket No. 896], as well as the "First Amended Disclosure Statement for Debtors' Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code" [Docket No. 897]; and then to the filing by the Debtors with the Bankruptcy Court, on September 9, 2011, of the "Debtors' Second Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code" (the "**Plan**"), as well as this "Second Amended Disclosure Statement for Debtors' Second Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code" (this "**Disclosure Statement**"). All capitalized terms used in this Disclosure Statement but not defined herein have the respective meanings ascribed to such terms in the Plan. A complete copy of the Plan is attached as **Exhibit A** to this Disclosure Statement.

This Disclosure Statement is being submitted pursuant to section 1125 of the Bankruptcy Code for use by those entitled to vote on whether to accept or reject the Plan in connection with (a) the solicitation by the Debtors of acceptances of the Plan and (b) the hearing by the Bankruptcy Court to consider confirmation of the Plan. That hearing (the "**Confirmation Hearing**") presently is scheduled for October 31, 2011, at 10:00 a.m., prevailing Eastern Time.

The Plan sets forth the manner in which Claims against the Debtors, and Equity Interests in the Debtors, are proposed to be treated in connection with the reorganization of the Debtors in connection with their Chapter 11 Cases. This Disclosure Statement describes certain aspects of the Plan, and also provides a general description of the Debtors' business as well as information regarding various other matters relevant to the purpose for which this Disclosure Statement has been prepared. This Disclosure Statement is intended to provide sufficient information to enable those who are entitled to vote on the acceptance or rejection of the Plan, as explained below, to make an informed decision in connection with that vote. Among other things, this Disclosure Statement describes:

▫      in summary form how the Plan treats creditors of the Debtors, and holders of Equity Interests in the Debtors (Article II);

▫      how Chapter 11 works (Article III);

▫      the Debtors' business and prepetition capital structure (Article IV);

▫      the events leading up to the filing of the Bankruptcy Petitions (Article V);

- □ significant events in the Chapter 11 Cases (Article VI);
- □ the matters dealt with under the Plan (Article VII);
- □ certain projections and valuations (Article VIII);
- □ certain risk factors to be considered before voting (Article IX);
- □ the procedures for confirming the Plan (Article X);
- □ alternatives to confirmation and consummation of the Plan (Article XI);
- □ certain securities laws matters regarding the Plan (Article XII); and
- □ certain U.S. federal income tax consequences of the Plan (Article XIII).

This Disclosure Statement has been carefully prepared in order to, among other things, describe the material aspects of the Plan, but it is not intended to override the Plan or any aspect of it. Accordingly, in the event there are any inconsistencies or ambiguities between the Plan itself and the descriptions of the Plan contained in this Disclosure Statement, the terms of the Plan will govern. The Plan and this Disclosure Statement, along with the other exhibits attached to this Disclosure Statement, and the exhibits attached to the Plan, are the only materials that those who are entitled to vote on acceptance or rejection of the Plan should use in determining how to vote. THE PLAN SUPPLEMENT WILL NOT BE FILED WITH THE BANKRUPTCY COURT PRIOR TO THE VOTING DEADLINE AND, ACCORDINGLY, THE INFORMATION AND MATERIALS TO BE CONTAINED THEREIN WILL NOT BE AVAILABLE IN CONNECTION WITH THE DETERMINATION OF WHETHER TO ACCEPT OR REJECT THE PLAN.

The Plan is the product of extensive negotiations among the Debtors and certain of their major creditor constituencies. As described in more detail in Article V below, effective as of June 6, 2011, the Debtors entered into the Restructuring Support Agreement with the Restructuring Support Parties. Those Restructuring Support Parties are the holders, in the aggregate, of (x) 100% of the aggregate outstanding principal amount of Senior Secured Notes and (y) more than 80% of the aggregate outstanding principal amount of Senior Notes. Pursuant to the Restructuring Support Agreement, the Restructuring Support Parties agreed to support a financial restructuring of the Debtors' outstanding indebtedness, obligations and capital structure on the terms set forth in the Plan and described in this Disclosure Statement.

As discussed in more detail in Article VII below, the Plan contemplates that the voting on and confirmation of the Plan, as well as Distributions to holders of Claims in the Chapter 11 Cases, would be effected under the Plan as though the Estates of the Debtors were consolidated for such purposes.

After careful consideration of the Debtors' business and assets, and their prospects for reorganization, as well as the alternatives to reorganization, the Debtors have determined that the recoveries to creditors will be maximized by utilizing the treatment established under the Plan. The Debtors further have determined it is not possible to afford any recovery at all to holders of Equity Interests in the Debtors (apart from the pre-existing direct and indirect intercompany ownership interests held in the Other Subsidiary Debtors, which under the Plan would be preserved; and also apart from the Reorganized PMCI Membership Interests to be issued by Reorganized PMCI to Reorganized PMC Holding on the Effective Date, concurrently with the termination of the pre-existing Equity Interest that had been held by PMC Holding in PMCI,

pursuant to the Plan), whether under the reorganization proposed in the Plan or in any liquidation alternative.

The following additional materials are attached as Exhibits to this Disclosure Statement:

1. as "**Exhibit A**", a copy of the Plan, including the exhibits thereto (excluding any exhibit included as an exhibit to the Plan Supplement);

2. as "**Exhibit B**", a copy of the order of the Bankruptcy Court (excluding the exhibits thereto), dated September 9, 2011 (the "**Disclosure Statement Order**"), that, among other things, approves this Disclosure Statement, establishes procedures for the solicitation and tabulation of votes to accept or reject the Plan, and schedules the hearing on confirmation of the Plan; and including a copy of the notice of the confirmation hearing (the "**Confirmation Hearing Notice**");

3. as "**Exhibit C**", a copy of the Financial Projections of the Debtors; and

4. as "**Exhibit D**", a copy of the Liquidation Analysis of the Debtors.

To the extent this Disclosure Statement is being submitted to a holder of a Claim that is entitled to vote to accept or reject the Plan, this Disclosure Statement also is accompanied by a Ballot to be used by such holder in connection with that vote. As further described below, holders of certain categories of Claims against, and Equity Interests in, the Debtors automatically are deemed to have accepted the Plan or to have rejected it, depending on the particular category of Claims or Equity Interests. Holders of Claims and Equity Interests that are deemed to have accepted or rejected the Plan are not entitled to vote to accept or reject the Plan.

In addition to the exhibits attached to this Disclosure Statement and the exhibits attached to the Plan, the Debtors anticipate there will be certain additional materials that are necessary or appropriate to the implementation and/or confirmation of the Plan. Those additional materials are summarized in this Disclosure Statement, to the extent now known or reasonably determinable; and copies of those materials (in final or substantially final form), or summaries thereof, will be contained in the Plan Supplement. The Plan Supplement will be filed by the Debtors with the Clerk of the Bankruptcy Court no later than (A) ten (10) calendar days prior to the Confirmation Hearing or (B) such later date as may be approved by the Bankruptcy Court on notice to parties in interest. Once so filed, the Plan Supplement will be available for inspection in the office of the Clerk of the Bankruptcy Court (or on a website maintained by the Bankruptcy Court); and, in addition, will be accessible at www.PRKMCRestructuring.com, a website maintained by the Debtors' claims and noticing agent. However, the Plan Supplement will not be filed with the Bankruptcy Court prior to the Voting Deadline and, accordingly, the information and materials to be contained therein will not be available in connection with the determination of whether to accept or reject the Plan.

This Disclosure Statement also contains information about the Debtors and their business, including certain financial information. Prior to the commencement of the Chapter 11 Cases, PMCI had been filing certain information, including financial information, with the SEC on its

Edgar database, at the following address: http://sec.gov/cgi-bin/browse-edgar?action= getcompany&CIK=0001047040&owner=exclude&count=40 . However, PMCI failed to file certain information, including but not limited to its Annual Report on Form 10-K for its fiscal year ended December 26, 2010 (which was required to contain, among other things, annual audited financial statements for such fiscal year), in the months leading up to the filing of the Petitions. Moreover, as PMCI had been a voluntary rather than mandatory filer with the SEC, PMCI, on June 16, 2011, filed a Certification and Notice with the SEC indicating the suspension and termination of any duty to continue such filings. No further filings have been made with the SEC since the commencement of the Chapter 11 Cases. Accordingly, the information contained in the SEC's Edgar database may be useful for historical information but should not be regarded as containing current information (financial or otherwise) about the Debtors or their business. CAUTION SHOULD BE USED IN RELYING UPON THE INFORMATION, INCLUDING THE FINANCIAL INFORMATION, THAT IS AVAILABLE ABOUT THE DEBTORS ON THE SEC'S EDGAR DATABASE.

On September 9, 2011, after notice and a hearing, the Bankruptcy Court approved the Disclosure Statement Order, determining that this Disclosure Statement contains "adequate information" (as that term is defined in section 1125 of the Bankruptcy Code). Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and the history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material U.S. federal income tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information...." 11 U.S.C. §1125(a)(1). NO STATEMENTS OR INFORMATION CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY HAVE BEEN AUTHORIZED, OTHER THAN THE STATEMENTS AND INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE INFORMATION ACCOMPANYING OR SUPPLEMENTING THIS DISCLOSURE STATEMENT (INCLUDING THE PLAN AND THE PLAN SUPPLEMENT). ALL OTHER STATEMENTS REGARDING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER WRITTEN OR ORAL, ARE UNAUTHORIZED AND SHOULD NOT BE RELIED UPON.

APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S ENDORSEMENT OF THE PLAN. THE BANKRUPTCY COURT MAKES NO DETERMINATION AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The Disclosure Statement Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes, and the applicable standards for tabulating Ballots. In

the event of any discrepancy between the provisions of the Disclosure Statement Order and the summary thereof contained in this Disclosure Statement, the provisions of the Disclosure Statement Order will govern.  In addition, detailed voting instructions will accompany each Ballot.  Each person entitled to vote on acceptance or rejection of the Plan should read in their entirety this Disclosure Statement (including the exhibits hereto), the Plan (including the exhibits thereto), the Disclosure Statement Order, and the instructions accompanying the Ballot(s) received by such person before voting on whether to accept or reject the Plan.  (The Plan Supplement will not be filed with the Bankruptcy Court prior to the Voting Deadline and, accordingly, the information and materials to be contained therein will not be available in connection with the determination of whether to accept or reject the Plan.)  These documents contain, among other things, important information concerning the classification of Claims and Equity Interests for voting purposes and the tabulation of votes.  No solicitation of votes to accept or reject the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

### B.      Holders Entitled to Vote.

Not all holders of Claims against a debtor and holders of Equity Interests in that debtor are entitled to vote to accept or reject that debtor's proposed chapter 11 plan of reorganization.  Rather, the Bankruptcy Code limits the right to vote to holders of Claims against that debtor, or holders of Equity Interests in that debtor, that are regarded as being "allowed" (within the meaning of section 502 of the Bankruptcy Code), and only where those allowed Claims or Equity Interests have been classified in classes of Claims or Equity Interests that are regarded as being "impaired" (within the meaning of section 1124 of the Bankruptcy Code) by the treatment proposed under that reorganization plan, with certain exceptions described below.  Where an allowed Claim or Equity Interest is classified in a class that is regarded as unimpaired under the proposed reorganization plan, the holder of that Claim or Equity Interest is not entitled to vote to accept or reject the plan and instead automatically is conclusively presumed to have accepted the plan.  Correspondingly, where an allowed Claim or Equity Interest is classified in a class that is regarded as impaired under the proposed reorganization plan and the plan provides that the holders of allowed Claims or Equity Interests in that class will not be entitled to receive or retain any property on account of such Claims or Equity Interests (sometimes known as being "wiped out"), the holder of such Claim or Equity Interest is not entitled to vote to accept or reject the plan and instead automatically is deemed to have rejected the plan.  In addition, the Bankruptcy Code provides that certain specific categories of allowed Claims against a debtor need not be classified for purposes of a plan of reorganization; and, where those categories of unclassified allowed Claims are unimpaired under the reorganization plan, the holders of such Claims do not actually vote on acceptance or rejection and instead automatically are conclusively presumed to have accepted the plan.

In the Chapter 11 Cases, the Plan establishes four (4) categories of unclassified Claims against the Debtors, eight (8) classes of Claims against the Debtors, and two (2) classes of Equity Interests in the Debtors.  Of those 14 categories of Claims and Equity Interests, only holders of Allowed Claims in three (3) categories are entitled to vote to accept or reject the Plan.  The other eleven (11) categories automatically are conclusively presumed to have accepted the Plan or are deemed to have rejected it.  As more fully summarized in Article II below (and described in detail in Article VII below):

-6-

▫ Administrative Claims, Professional Fee Claims, Priority Tax Claims, and DIP Financing Claims are unclassified and Unimpaired under the Plan. Accordingly, holders of Allowed Claims in those categories are not entitled to vote to accept or reject the Plan and instead are conclusively presumed to have accepted the Plan.

▫ Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), Class 6 (Convenience Claims), Class 7 (Intercompany Claims), and Class 9B (Equity Interests in the Other Subsidiary Debtors) are Unimpaired under the Plan. Accordingly, holders of Allowed Claims and Allowed Equity Interests in those Classes are not entitled to vote to accept or reject the Plan and instead are conclusively presumed to have accepted the Plan.

▫ Class 8 (Subordinated Claims) and Class 9A (Equity Interests in PMC Holding and PMCI) are Impaired under the Plan, and the holders of Allowed Claims in Class 8 and Allowed Equity Interests in Class 9A will not be entitled to receive or retain any property on account of such Claims and Equity Interests. Accordingly, holders of Allowed Claims in Class 8 and Allowed Equity Interests in Class 9A are not entitled to vote to accept or reject the Plan and instead are deemed to have rejected the Plan; and

▫ Class 3 (Senior Secured Notes Claims), Class 4 (Senior Notes Claims), and Class 5 (General Unsecured Claims) are Impaired under the Plan. Accordingly, to the extent Claims in those Classes are not the subject of an objection or request for estimation which remains pending, holders of Allowed Claims in each of those Classes are entitled to vote to accept or reject the Plan.

A BALLOT TO BE USED IN VOTING TO ACCEPT OR REJECT THE PLAN WILL BE PROVIDED ONLY TO HOLDERS OF CLAIMS IN THE CLASSES THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN, AS FOLLOWS:

▫ CLASS 3 (SENIOR SECURED NOTES CLAIMS);

▫ CLASS 4 (SENIOR NOTES CLAIMS); AND

▫ CLASS 5 (GENERAL UNSECURED CLAIMS).

The Bankruptcy Code defines "acceptance" of a reorganization plan by a class of allowed claims as acceptance by creditors in that class that hold at least two-thirds in aggregate dollar amount of claims in such class and represent more than one-half in number of the allowed claims in such class that cast ballots for acceptance or rejection of that reorganization plan. For a more detailed description of the requirements for confirmation of the Plan, see Article X below.

Two Classes (Class 8 (Subordinated Claims) and Class 9A (Equity Interests in PMC Holding and PMCI) automatically are deemed to have rejected the Plan. Accordingly, the Debtors intend to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) permits the Bankruptcy Court to confirm a plan of reorganization notwithstanding the nonacceptance of that plan by one or more impaired classes of Claims or Equity Interests. Under section 1129(b), a plan may be confirmed as long as such plan does not

"discriminate unfairly" and is "fair and equitable" with respect to each nonaccepting class.  The requirements for confirmation of a nonconsensual plan are described more fully in Article X below.

### C.    Voting Procedures.

On September 9, 2011, the Bankruptcy Court issued the Disclosure Statement Order, among other things, approving this Disclosure Statement, setting voting procedures and scheduling the hearing on confirmation of the Plan.  A copy of the Disclosure Statement Order, including a copy of the Confirmation Hearing Notice, is attached as Exhibit B to this Disclosure Statement.  The Confirmation Hearing Notice sets forth in detail, among other things, the voting deadlines and objection deadlines with respect to the Plan.  The Confirmation Hearing Notice and the instructions attached to the Ballot should be read in conjunction with this section of the Disclosure Statement.

If you are a holder of an Allowed Claim that is entitled to vote to accept or reject the Plan, a Ballot is enclosed with this Disclosure Statement for the purpose of casting your vote.  If you hold an Allowed Claim in more than one Class that is entitled to vote to accept or reject the Plan, you will receive a separate Ballot for each Class in which you hold an Allowed Claim.  In order for your Ballot to be counted, you must use the particular Ballot pertaining to the particular Class of Allowed Claims.  The Debtors urge you to vote and return your Ballot(s) by no later than 4:00 p.m., prevailing Eastern Time, on October 14, 2011 (the "**Voting Deadline**"), in accordance with the instructions accompanying your Ballot(s) and described in this section.

With the approval of the Bankruptcy Court [Docket No. 36], the Debtors have retained Omni Management Group, LLC ("**Omni**") as their claims, balloting and noticing agent for purposes of these Chapter 11 Cases.  If you received a Ballot(s) from the Debtors (or from Omni on behalf of the Debtors), please vote and return your Ballot(s) directly to Omni at the following address: Perkins & Marie Callender's Ballot Processing, c/o Omni Management Group, LLC, 16161 Ventura Boulevard, Suite C, PMB 446, Encino, CA 91436.

If you did not receive your Ballot(s) directly from the Debtors (or from Omni on behalf of the Debtors), and instead received such Ballot(s) from a broker, bank, dealer, or other agent or nominee (each, a "**Voting Nominee**"), please do not return those completed original Ballot(s) directly to Omni.  Instead, you must return your original Ballot(s) to your Voting Nominee.  Your Ballot(s) must be returned promptly, so that your Voting Nominee can forward your Ballot(s) to Omni for receipt by Omni by the Voting Deadline.

PLEASE RETURN YOUR BALLOT(S) ONLY. DO NOT ALSO RETURN ANY PROMISSORY NOTE OR OTHER INSTRUMENTS OR AGREEMENTS THAT YOU MAY HAVE RELATING TO YOUR CLAIM.

TO BE COUNTED, YOUR DULY COMPLETED BALLOT(S) -- INDICATING ACCEPTANCE OR REJECTION OF THE PLAN – MUST BE ACTUALLY RECEIVED BY OMNI NO LATER THAN THE VOTING DEADLINE.  BALLOTS NOT ACTUALLY RECEIVED BY OMNI BY THE VOTING DEADLINE WILL NOT BE COUNTED, EVEN IN

THE CASE OF BALLOTS THAT FIRST MUST BE RETURNED TO AN APPLICABLE VOTING NOMINEE. IN THE CASE OF BALLOTS WHICH FIRST MUST BE RETURNED TO AN APPLICABLE VOTING NOMINEE, CARE MUST BE TAKEN TO RETURN ANY SUCH BALLOT(S) TO SUCH VOTING NOMINEE IN SUFFICIENT TIME SO SUCH BALLOT(S) THEN CAN BE DELIVERED BY SUCH VOTING NOMINEE TO OMNI BY THE VOTING DEADLINE. Any Ballot not received by Omni by the Voting Deadline (including, without limitation, where a Voting Nominee timely received a duly completed Ballot from the beneficial owner of the Claim being voted but failed to return it to Omni by the Voting Deadline) shall not be counted, except insofar as the Bankruptcy Court may order otherwise.

Any Claim in Class 3 (Senior Secured Notes Claims), Class 4 (Senior Notes Claims), or Class 5 (General Unsecured Claims) to which an objection or request for estimation is pending shall not be entitled to vote (unless the holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing such Claim for the purpose of voting on the Plan). In addition, the Debtors propose that Ballots cast by alleged creditors whose Claims (a) are not listed on the Debtors' Schedules or (b) are listed on the Debtors' Schedules as being disputed, contingent and/or unliquidated, but who have timely filed proofs of claim in unliquidated or unknown amounts that are not the subject of an objection filed by the Debtors, will have their Ballots counted towards satisfying the numerosity requirement, but not also toward satisfying the aggregate claim amount requirement, of section 1126(c) of the Bankruptcy Code. The numerosity and aggregate claim amount requirements of section 1126(c) are further described in Article X below.

In its Disclosure Statement Order, the Bankruptcy Court set September 9, 2011, the date on which the Disclosure Statement Order was entered, as the record date (the "**Voting Record Date**") for purposes of voting on the Plan. Accordingly, only holders of record, as of the Voting Record Date, of Allowed Claims otherwise entitled to vote to accept or reject the Plan will receive a Ballot and be entitled vote on the Plan. If, as of the Voting Record Date, you were a holder of an Allowed Claim entitled to vote on the Plan and did not receive a Ballot(s), received a damaged Ballot(s) or lost your Ballot(s), or if you have any questions concerning the procedures for voting on the Plan, please contact Omni, at (866) 989-6148 from 9:00 a.m. to 5:00 p.m., prevailing Eastern Time, excluding weekends and holidays, sufficiently in advance of the deadline referenced above for receipt back of duly completed Ballots.

### D.    Confirmation Hearing.

In accordance with section 1128 of the Bankruptcy Code, and as referenced in the Confirmation Hearing Notice, the Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan. That hearing will be held on October 31, 2011, at 10:00 a.m., prevailing Eastern Time, before the Honorable Kevin Gross, United States Bankruptcy Court, 824 North Market Street, 6th Floor, Courtroom #3, Wilmington, Delaware 19801 (the "**Confirmation Hearing**"). The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before October 14, 2011, at 4:00 p.m., prevailing Eastern Time, in the manner described below in Article X. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court, without

further notice (except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing).

### E.   Recommendation.

THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THEM TO REORGANIZE SUCCESSFULLY AND TO ACCOMPLISH THE OBJECTIVES OF CHAPTER 11, AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS.  THE DEBTORS RECOMMEND THAT CREDITORS VOTE TO ACCEPT THE PLAN.

### F.   Creditors' Committee Recommendation.

Pursuant to and as described more fully in the Plan, each holder of an Allowed General Unsecured Claim less than or equal to $5,000,000 (unless such holder elects to receive Reorganized PMC Holding Membership Interests), and each holder of an Allowed Senior Notes Claim less than or equal to $5,000,000 that elects to receive Cash, will receive Cash in an amount equal to: (a) the lesser of (i) fourteen percent (14%) of such holder's Allowed General Unsecured Claim or Allowed Senior Notes Claim or (ii) such holder's Pro Rata share of the Cash Cap Amount ($7,000,000); plus (b) such holder's Pro Rata share of the Avoidance Action Recovery Pool.  Also pursuant to and as described more fully in the Plan, each other holder of an Allowed General Unsecured Claim (those Claims greater than $5,000,000 that are not reduced to $5,000,000 or less so that the Cash option can be received, and those Claims of $5,000,000 or less where the Class 5 Equity Election is made), and each other holder of an Allowed Senior Notes Claim greater than $5,000,000 who does not reduce its Claim and/or who does not make the Cash Election, will receive such holder's Pro Rata share of Reorganized PMC Holding Membership Interests.

The Creditors' Committee believes that the above recoveries to holders of Allowed General Unsecured Claims and holders of Allowed Senior Notes Claims are fair to such holders, in the context of these Chapter 11 Cases and, accordingly, that holders of Allowed General Unsecured Claims and holders of Allowed Senior Notes Claims should vote in favor of the Plan. However, the Creditors' Committee makes no recommendation whether a holder of an Allowed General Unsecured Claim eligible to make the Class 5 Equity Election, or a holder of Senior Notes Claims eligible to make the Cash Election, should elect to receive Cash or Reorganized PMC Holding Membership Interests.

The Creditors' Committee and the Restructuring Support Parties engaged in lengthy, good faith negotiations regarding the terms of the Plan.  The Creditors' Committee believes that the Plan, in its current form, presents substantial improvements over the Plan filed with the Bankruptcy Court on July 14, 2011.  Specifically, the Plan now provides for an increased Cash recovery for holders of Allowed General Unsecured Claims who are to receive Cash, both in whole dollars (an aggregate pool of $7,000,000, as opposed to $1,500,000 in the July 14, 2011 Plan (although we note the Convenience Claim Amount has been reduced)) and percentage (fourteen percent (14%), as opposed to ten percent (10%) in the July 14, 2011 Plan) and also provides for such holders to receive their Pro Rata share of the Avoidance Action Recovery Pool.

-10-

The Plan now also provides for a Cash recovery for eligible holders of Allowed Senior Notes Claims, with those holders sharing in the Cash recovery described in the preceding sentence. The Creditors' Committee believes that the maximum fourteen percent (14%) recovery for holders of Allowed General Unsecured Claims and holders of Allowed Senior Notes Claims who are to receive Cash (which recovery could be lower, depending on the total amount of Allowed General Unsecured Claims and Allowed Senior Notes Claims that are to receive Cash) represents a substantial discount to the potential recovery to holders of Allowed General Unsecured Claims and Allowed Senior Notes Claims that are to receive Reorganized PMC Holding Membership Interests.  The Creditors' Committee believes that this discount is appropriate given the certainty that a Cash recovery provides to creditors who are to receive Cash and is within the range of reasonableness in the context of these Chapter 11 Cases.  Creditors are advised to carefully review the terms of this Disclosure Statement (including Article IX – Risk Factors) and to consult with independent legal counsel before making their recovery election.

Creditors are also advised to review Article IX (Risk Factors) of this Disclosure Statement with respect to the risks of an increase in the amount of Allowed General Unsecured Claims.  The risks include that the Allowed Specified General Unsecured Claims (which the Creditors' Committee understands will include Claims relating to the existing franchise development agreements (the territorial exclusivity arrangements discussed in Article IV(A)(6) of this Disclosure Statement), and the CHI Management Agreements, in each case to the extent determined to constitute Allowed Claims), to the extent they exceed $5,000,000 (or, alternatively, if the holders thereof made the Class 5 Equity Election) may significantly reduce the recovery to creditors who are to receive Reorganized PMC Holding Membership Interests. (To address dilution concerns in the case where any such Allowed Specified General Unsecured Claims are to receive Cash, the Plan provides that the Cash Cap Amount would be increased by an amount equal to 14% of the aggregate amount of Allowed Specified General Unsecured Claims receiving Cash.)  Creditors should also be aware, when considering whether to receive Reorganized PMC Holding Membership Interests, that those interests are highly illiquid, are subject to majority control by the Restructuring Support Parties, and are subject to various other risks, all of which likely would affect the actual value of small minority interests in Reorganized PMC Holding Membership Interests, as discussed more fully in the Risk Factors section of this Disclosure Statement.

# ARTICLE II

# OVERVIEW OF THE PLAN

The following table briefly summarizes how the Plan classifies and treats Allowed Claims and Equity Interests, and also provides the estimated Distributions to be received by the holders of Allowed Claims and Equity Interests in accordance with the Plan:

SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS
AND EQUITY INTERESTS UNDER THE PLAN[4]

| Class | Designation | Impaired | Treatment of Allowed Claims and Interests[5] | Entitled to Vote | Estimated Recovery (or Estimated Amount of Claims) |
|---|---|---|---|---|---|
| -- | Administrative Claims | No | With certain exceptions, each holder of an Allowed Administrative Claim shall receive either (i) Cash equal to the amount of such Allowed Claim, or (ii) such other treatment as the Debtors and such holder shall have agreed upon in writing. | No (conclusively presumed to accept) | 100% |
| -- | Professional Fee Claims | No | Treatment is comparable to that for Administrative Claims, generally. | No (conclusively presumed to accept) | 100% |
| -- | Priority Tax Claims | No | Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Debtors (with the consent of the Restructuring Support Parties and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld)) or the Reorganized Debtors: (a) Cash in an amount equal to such Allowed Priority Tax Claim, with such Distribution to be made on the later of (i) the Effective Date and (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; or (b) treatment in any other manner such that its Allowed Priority Tax Claim shall not be Impaired, including equal annual installment payments in | No (conclusively presumed to accept) | 100% |

---

[4]    This table is provided as a brief summary for convenience purposes only.  Reference should be made to this entire Disclosure Statement, and to the Plan itself (to which this Disclosure Statement is qualified in its entirety by reference), for a complete description of the classification and treatment of all Allowed Claims and Equity Interests.

[5]    The Restructuring Support Agreement imposes certain limitations and restrictions on the Debtors, among which are limitations on the Debtors' ability, without the consent of the Restructuring Support Parties, to enter into agreements with holders of Claims and Equity Interest as to the allowance, estimation, validity, extent or priority of such Claims or Equity Interests, or the treatment and classification of such Claims or Equity Interests under the Plan.

| Class | Designation | Impaired | Treatment of Allowed Claims and Interests[5] | Entitled to Vote | Estimated Recovery (or Estimated Amount of Claims) |
|---|---|---|---|---|---|
| | | | Cash of an aggregate value, as of the Effective Date, equal to the Allowed amount of such Claim, over a period ending not later than five (5) years after the Petition Date. | | |
| -- | DIP Financing Claims | No | On or as soon as reasonably practicable after the Effective Date, each holder of an Allowed DIP Financing Claim shall receive payment in full in Cash of all debts, Claims, liabilities and obligations calculated in accordance with the DIP Credit Agreement, except to the extent that the holders of DIP Financing Claims agree to a different treatment. | No (conclusively presumed to accept) | 100% |
| 1 | Other Priority Claims | No | Except to the extent that a holder of an Allowed Other Priority Claim (i) has been paid in full by the Debtors, prior to the Effective Date, or (ii) agrees to a less favorable treatment with the Debtors (with the consent of the Restructuring Support Parties and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld), if the Claim is greater than $25,000) or the Reorganized Debtors, each holder of an Allowed Other Priority Claim shall receive Cash in the full amount of such Allowed Other Priority Claim. | No (conclusively presumed to accept) | 100% |
| 2 | Other Secured Claims | No | Except to the extent that a holder of an Allowed Other Secured Claim shall have agreed in writing to a less favorable treatment, at the option of the Debtors (with the consent of the Restructuring Support Parties and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld)) or the Reorganized Debtors, in full and final satisfaction of such Claim: (i) such holder's Allowed Other Secured Claim shall be reinstated and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code; (ii) such holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code; or (iii) such holder of an Allowed Other Secured Claim shall receive the Collateral securing its Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code. | No (conclusively presumed to accept) | 100% |
| 3 | Senior Secured Notes Claims | Yes | Each holder of Senior Secured Notes shall receive (a) New Secured Term Loans in a principal amount equal to the principal amount of such holder's Senior Secured Notes Claim and (b) Cash equal to the amount of any accrued and unpaid interest owed on account of its Senior Secured Notes Claim, if any, due as of the Effective Date.[6] | Yes | $103 million in Claims |

---

[6]   Under the Plan, holders of Senior Secured Notes would receive rights (and obligations) as lenders under the New Secured Term Loan Agreement (under which the New Secured Term Loans shall be outstanding). Such receipt would include, among other things, rights under any promissory notes or other evidences of indebtedness, if any, that may be required under the New Secured Term Loan Agreement to be delivered by

| Class | Designation | Impaired | Treatment of Allowed Claims and Interests[5] | Entitled to Vote | Estimated Recovery (or Estimated Amount of Claims) |
|---|---|---|---|---|---|
| 4 | Senior Notes Claims | Yes | Each holder of Senior Notes will receive a pro rata Distribution of Reorganized PMC Holding Membership Interests (subject to dilution in certain cases); provided, however, that any Cash Eligible Claimant holding an Allowed Senior Notes Claim may, in lieu of such pro rata Distribution, make the Cash Election.[7] | Yes | $203 million in Claims |
| 5 | General Unsecured Claims | Yes | Each holder of an Allowed General Unsecured Claim that is a Cash Eligible Claimant shall receive Cash in an amount equal to: (a) the lesser of (i) 14% of the holder's Allowed General Unsecured Claim or (ii) such holder's Pro Rata share of the Cash Cap Amount;[8] plus (b) such holder's Pro Rata share of the Avoidance Action Recovery Pool; provided, however, that such Cash Eligible Claimant may, in lieu of receiving Cash, make the Class 5 Equity Election.<br><br>Each holder of an Allowed General Unsecured Claim that is not a Cash Eligible Claimant shall receive its pro rata Distribution (subject to dilution in certain cases) of Reorganized PMC Holding Membership Interests. | Yes | $30 million in Claims[9] |
| 6 | Convenience Claims | No | Each holder of an Allowed Convenience Claim shall receive Cash in an amount equal to such holder's Allowed Convenience Claim.[10] | No (conclusively presumed to accept) | 100% |

the Reorganized Debtors in respect of the New Secured Term Loans. For simplicity, this Disclosure Statement refers to those holders as "receiving" New Secured Term Loans. As discussed in greater detail below, in addition to the $103,063,000 aggregate principal amount of New Secured Term Loans being received by holders of Claims in Class 3, an additional New Secured Term Loan (in the principal amount of $7,500,000) will be made, in Cash, on the Effective Date; and certain additional drawdowns of New Secured Term Loans (in an aggregate principal amount of $10,000,000) will be permitted from time to time thereafter in the discretion of the New Secured Term Loan Lenders.

[7]    Under the Cash Election, such holder would receive Cash in an amount equal to: (a) the lesser of (i) 14% of the holder's Allowed Senior Notes Claim or (ii) such holder's Pro Rata share of the Cash Cap Amount; plus (b) such holder's Pro Rata share of the Avoidance Action Recovery Pool. The Cash Cap Amount is described in the next footnote.

[8]    The "Cash Cap Amount" is $7,000,000. However, the Plan provides that this amount will be increased by an amount equal to 14% of the total aggregate amount of Allowed Specified General Unsecured Claims that do not make the Class 5 Equity Election, to the extent applicable. Upon completion of distributions made to holders of Allowed Class 5 General Unsecured Claims and Allowed Class 4 Senior Notes Claims that make the Cash Election, any unnecessary reserve established by the Reorganized Debtors to fund such payments shall revert to the Reorganized Debtors.

[9]    The estimated amount of Class 5 General Unsecured Claims, as reflected in the table, does not include the Claims (if and to the extent determined to constitute Allowed Claims) arising under the franchise development agreements or the CHI Management Agreements (see the immediately preceding footnote); but such estimated amount does include, among other things, an estimate of potential General Unsecured Claims which may arise relating to the Debtors' rejection of various leases and other executory contracts.

| Class | Designation | Impaired | Treatment of Allowed Claims and Interests[5] | Entitled to Vote | Estimated Recovery (or Estimated Amount of Claims) |
|---|---|---|---|---|---|
| 7 | Intercompany Claims | No | At the option of the Debtors (with the consent of the Restructuring Support Parties and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld)) or the Reorganized Debtors, each Allowed Intercompany Claim shall be either: (i) reinstated and continued in full or in part; or (ii) eliminated in full or in part by offset, distribution, cancellation, assumption or contribution of such Intercompany Claim or otherwise to the extent determined by the applicable Debtor(s), subject to the consent of the Restructuring Support Parties and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld), or by the Reorganized Debtor(s). | No (conclusively presumed to accept) | 100% |
| 8 | Subordinated Claims | Yes | The holders of Subordinated Claims shall neither receive Distributions nor retain any property under the Plan for or on account of such Subordinated Claims. | No (deemed to reject) | 0% |
| 9A | Equity Interests in PMC Holding and PMCI | Yes | The Equity Interests in PMC Holding and PMCI (including any debt or other Claim recharacterized as an Equity Interest in PMC Holding or in PMCI) shall be discharged, cancelled, released and extinguished as of the Effective Date; and the holders of such Equity Interests shall neither receive any Distributions nor retain any property under the Plan for or on account of such Equity Interests. | No (deemed to reject) | 0% |
| 9B | Equity Interests in the Other Subsidiary Debtors | No | The Equity Interests in the Other Subsidiary Debtors (as Reorganized Subsidiary Debtors, as applicable) shall remain effective and outstanding (in the form of corporate stock or Subsidiary Membership Interests, as applicable), and shall be owned and held by the same applicable Debtor (as a Reorganized Debtor) that had held and/or owned such Equity Interests prior to the Effective Date. However, to the extent that a Reorganized Debtor (other than MCID and Wilshire Beverage) had been a corporation prior to its conversion into a limited liability company on the Effective Date in accordance with the Plan, the Plan provides that the corporate stock held in such Debtor automatically upon such conversion is converted into a Subsidiary Membership Interest in such Reorganized Debtor. | No (conclusively presumed to accept) | 100% |

---

[10]     The Plan generally provides that a Convenience Claim is any Claim that otherwise would be a General Unsecured Claim but that has been Allowed in an amount not exceeding the Convenience Claim Amount ($2,500).

# ARTICLE III

# OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, the company or other entity to which the particular bankruptcy case relates, called the "debtor", is authorized to reorganize its business for its own benefit as well as the benefit of its creditors and equity interest holders. In addition to permitting rehabilitation of a debtor, chapter 11 is intended to promote equality of treatment for similarly situated creditors and equity interest holders, including with respect to the distribution of that debtor's assets.

The debtor commences its chapter 11 case by filing a voluntary bankruptcy petition with an appropriate United States Bankruptcy Court. The commencement of that case immediately creates an "estate" that is comprised of all of the legal and equitable interests of the debtor, including interests in its assets, as of the date of filing of its bankruptcy petition. In addition, in the case of bankruptcy petitions filed under chapter 11, the Bankruptcy Code generally provides that the debtor may continue to operate its business and remain in possession of its property as a so-called "debtor in possession", rather than have control of its business and possession of its property instead transferred to an independent bankruptcy trustee.

The principal objective of a chapter 11 reorganization case is to confirm and then consummate a plan of reorganization. A plan of reorganization sets forth the means for satisfying Claims against the debtor and Equity Interests in the debtor. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon the debtor as well as upon various other interested constituencies, including any issuer of securities under the plan, any person acquiring property under the plan, and any creditor of or Equity Interest holder in the debtor. Subject to certain limited exceptions, the bankruptcy court's confirmation order discharges a debtor from any debt that arose prior to the date of confirmation of the plan (including, among other things, debts that arose prior to the filing of the debtor's original bankruptcy petition) and substitutes therefor the obligations specified under the confirmed plan.

Once a plan of reorganization meeting the requirements of the Bankruptcy Code has been filed with the Bankruptcy Court, then, with certain exceptions, the holders of Claims against, or Equity Interests in, the debtor generally are entitled to vote whether to accept or reject that plan. Before the debtor may solicit acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires the debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about whether to accept or reject the plan.

In connection with the Chapter 11 Cases, and to satisfy the requirements of section 1125 of the Bankruptcy Code, the Debtors have prepared this Disclosure Statement and are submitting it to holders of Allowed Claims against the Debtors who, under the Plan, are entitled to vote on whether to accept or reject the Plan.

-16-

## ARTICLE IV

## COMPANY BACKGROUND

### A.    History of the Debtors.

#### 1.    Overview.

The Debtors are one of the leading operators and franchisors of family dining and casual dining restaurants, under their two highly recognized brands: (1) their full-service family dining restaurants, located primarily in the Midwest, Florida and Pennsylvania, operating under the name *Perkins Restaurant & Bakery* ("**Perkins**"); and (2) their full-service, mid-priced casual dining restaurants, specializing in the sale of pies and other bakery items, located primarily in the Western United States, operating under the name *Marie Callender's Restaurant & Bakery* ("**Marie Callender's**").  Until they began a store reduction program shortly before the Petition Date to discontinue approximately sixty-five (65) company-operated restaurant locations (as more fully described below), the Debtors had operated or franchised nearly six hundred (600) restaurants throughout the United States, Canada and Mexico.  The Debtors' operations also include a bakery goods manufacturing segment known as *Foxtail Foods* ("**Foxtail**").

#### 2.    Perkins.

Perkins, founded in 1958, serves a variety of demographically and geographically diverse customers for a wide range of dining occasions that are appropriate for the entire family.  Perkins has continued to adapt its menu, product offerings and, until the recent recession, building décor to meet changing consumer preferences.  Perkins offers a full menu of more than ninety (90) assorted breakfast, lunch, dinner, snack and dessert items, generally ranging in price from $4.00 to $14.00, with an average guest check, at company-operated Perkins restaurants, of approximately $9.00.  Perkins' signature menu items include omelettes, secret-recipe real buttermilk pancakes, Mammoth Muffins®, the Tremendous Twelve® platters, salads, burgers and melt sandwiches, and Butterball® turkey entrees.  Breakfast items, which are available throughout the day, can account for more than half of the entrees sold in the Debtors' company-operated Perkins restaurants.

Until shortly before the Petition Date, the Debtors owned and operated approximately one hundred sixty (160) Perkins restaurants, located in thirteen (13) states (with significant concentrations in Minnesota, Wisconsin and Florida); and they franchised approximately three hundred fourteen (314) other Perkins restaurants, located in thirty-one (31) states[11] and five (5) Canadian provinces, to one hundred eight (108) franchisees.  Of those franchisees, three of them, otherwise unaffiliated with the Debtors, owned in the aggregate approximately twenty-eight

---

[11]    In most cases, franchisees operate in the same states as company-owned locations.

percent (28%) of all Perkins franchises.[12] Perkins restaurants primarily operate in freestanding buildings, and each restaurant generally seats between 90 and 250 customers. As of April 17, 2010, the Debtors' then-existing company-operated Perkins restaurants generated average annual revenues of approximately $1,653,000 for fiscal year 2010.

As described in greater detail below, in connection with the Chapter 11 Cases the Debtors initiated a store reduction program, resulting in the closing, initially, of approximately sixty-five (65) company-operated Perkins and Marie Callender's restaurant locations. Of those, twenty-seven (27) had been operating as company-operated Perkins restaurants. During these Chapter 11 Cases, the Debtors rejected three (3) leases for company-operated Perkins restaurants, resulting in the closing of those locations. Consequently, the Debtors now own and operate approximately one hundred thirty (130) Perkins restaurants, located in twelve (12) states, in addition to the franchised locations described above.

The Perkins franchised restaurants operate pursuant to franchise or license agreements, with PMCI as franchisor. Perkins franchise agreements generally have an initial term of twenty (20) years and require both a royalty fee (typically four percent (4%) of gross sales) and an advertising contribution (typically three percent (3%) of gross sales) from the franchisee. Franchisees also pay a non-refundable one-time, initial franchise fee of between $25,000 and $50,000 per restaurant, depending on the number of existing franchises and the level of assistance provided by PMCI in opening each restaurant. Typically, these franchise agreements permit the franchisees to terminate their franchise upon a minimum of 12 months' prior notice and payment of specified liquidated damages. Perkins franchisees do not typically have express renewal rights.

For fiscal year 2010, average annual royalties earned by PMCI per franchised Perkins restaurant were approximately $59,000. The following number of Perkins franchise agreements are scheduled to expire, through 2015: nineteen (19), in 2011; five (5), in 2012; eight (8), in 2013; sixteen (16), in 2014; and nineteen (19), in 2015. Historically, Perkins franchisees typically have applied for, and received, new franchise agreements upon the expiration of their existing agreements, subject to a renewal fee ranging from $5,000 to $7,500 (depending on the length of the particular renewal term).

All of the Perkins company-operated and franchised locations operate under the *Perkins Restaurant & Bakery* trade name.

### 3.    Marie Callender's.

Marie Callender's is a mid-priced casual-dining concept. Founded in 1948, it has one of the longest operating histories within the full-service dining sector. Marie Callender's is known for serving quality food in a warm and pleasant atmosphere, and for its premium pies that are baked fresh daily. Marie Callender's offers a full menu of more than fifty (50) items, generally ranging in price from $5.00 to $18.00. Marie Callender's signature menu items include pot pies,

---

[12]    One or more of these franchisees may be affiliates of (or otherwise related to) the parties to certain exclusive territory arrangements discussed in Article IV(A)(6) of this Disclosure Statement.

quiches, a plentiful salad bar and Sunday brunch.    Breakfast sales typically account for approximately twelve percent (12%) of total sales at company-operated Marie Callender's restaurants, with the remaining sales roughly split evenly between the lunch and dinner day parts.

Marie Callender's restaurants operate primarily in the western United States.    Until shortly before the Petition Date, the Debtors owned and operated eighty-five (85) Marie Callender's restaurants located in nine (9) states (with a high concentration in California), and franchised thirty-seven (37) other Marie Callender's restaurants, located in four (4) states and Mexico, to approximately twenty-six (26) franchisees.    Of those franchisees, three of them, otherwise unaffiliated with the Debtors, own in the aggregate thirty-two percent (32%) of all Marie Callender's franchises.    Like Perkins restaurants, Marie Callender's restaurants also primarily operate in freestanding buildings, and each restaurant generally seats between 70 and 385 customers.    As of April 17, 2011, the Debtors' then-existing company-operated Marie Callender's restaurants generated average annual revenues of approximately $1,994,000 for fiscal year 2010.

In connection with the Chapter 11 Cases the Debtors initiated a store reduction program, resulting in the closing, initially, of approximately sixty-five (65) company-operated Perkins and Marie Callender's restaurant locations.    Of those, thirty-four (34) had been operating as company-operated Marie Callender's restaurants.[13]    During these Chapter 11 Cases, the Debtors rejected four (4) leases for company-operated Marie Callender's restaurants, resulting in the closing of those restaurant locations.    Consequently, the Debtors now own and operate forty-six (46) Marie Callender's restaurants, located in five (5) states, in addition to the franchised locations described above.

All of the Marie Callender's company-operated and franchised locations operate under the *Marie Callender's Restaurant & Bakery* trade name, with three exceptions:

- two restaurants, one of them a company-operated restaurant located in Los Angeles and the other a franchised location in Seal Beach, California (a Los Angeles suburb), operate under the *Callender's Grill* name, featuring upscale food choices and bars; and

- one (1) company-operated restaurant, located in Lakewood, California, is a mid-priced Italian restaurant operating under the *East Side Mario's* name.

Through MCPSI, the Debtors also have an ownership interest in twelve partnerships that operate twelve (12) Marie Callender's restaurants.    MCPSI has a minority equity interest (thirty percent (30%), in one case; and forty percent (40%), in the other) in two (2) partnerships; a majority equity interest (ranging from fifty-seven percent (57%) to ninety-five percent (95%)) in nine (9) partnerships; and (including a 3.77% interest held by MACAL), owns one hundred percent (100%) of the twelfth partnership.

---

[13]    Certain of the locations closed were not operating as Perkins or Marie Callender's restaurants on the date closed.

Marie Callender's franchised restaurants operate pursuant to franchise agreements entered into with MCPSI, as franchisor. Marie Callender's franchise agreements generally have an initial term of fifteen (15) years and require both a royalty fee (typically five percent (5%) of gross sales) and, often, a specified level of marketing expenditures (typically one and one-half percent (1.5%) of gross sales) from the franchisee. Franchisees also pay a non-refundable one-time, initial franchise fee of $25,000, and a training fee of $35,000, prior to opening a Marie Callender's restaurant. Marie Callender's franchisees, unlike Perkins franchisees, typically have the right to renew their Marie Callender's franchise agreement (generally, for two renewal terms of five years each).

For fiscal year 2010, average annual royalties earned by MCPSI per franchised Marie Callender's restaurant were approximately $92,000. The following number of Marie Callender's franchise agreements are scheduled to expire, through 2015: one (1), in 2011; three (3), in 2012; one (1), in 2013; none, in 2014; and one (1), in 2015. Historically, upon the expiration of their franchise agreements, Marie Callender's franchisees typically renew their franchise, subject to a franchise agreement renewal fee of $2,500.

### 4. Foxtail.

Foxtail manufactures pies, pancake mixes, cookie doughs, muffin batters and other bakery products for in-store bakeries (both company-owned and franchised locations), as well as for third-party customers. Foxtail operates from three (3) locations, one located in Corona, California and the other two (2) located in Cincinnati, Ohio. The Corona facility produces pies and other bakery products, primarily for Marie Callender's restaurants (both company-owned and franchised restaurants). The facilities in Cincinnati produce pies, pancake mixes, cookie doughs, muffin batters and other baking products, primarily for the Perkins restaurants (both company-owned and franchised restaurants), as well as for various third parties. Foxtail products also are sold on-line directly to the public. Sales of bakery products to company-owned and franchised restaurants accounted for 41% and 34.2% of Foxtail's revenues, respectively, during fiscal year 2010. Sales of bakery products to third-party customers (such as food service distributors and supermarkets, as well as on-line directly to the public) accounted for the remainder, or 24.8%, of Foxtail's sales during fiscal year 2010.

### 5. Material Intellectual Property.

Prior to the Marie Callender's IP Sale, described below, the Debtors owned all of their material trademarks and other intellectual property, including the marks "Perkins" and "Marie Callender's". Certain of those marks had been registered in the U.S. Patent and Trademark Office, and elsewhere. The Debtors had claimed common law rights with respect to other important marks, menu offerings, promotions and slogans. The Debtors also had copyrighted architectural drawings for Perkins restaurants and claim copyright protection for certain manuals, menus, advertising and promotional materials. The Debtors have no patents.

In addition to their arrangements with franchisees, the Debtors had licensed to certain third parties the right to distribute and market *Marie Callender's* branded products. The two most significant licensing arrangements had been, in one case, with ConAgra Foods, Inc. (f/k/a

ConAgra, Inc.) and/or its affiliate, ConAgra Foods RDM, Inc. (collectively, "**ConAgra**"), and, in the other case, with American Pie, LLC. The arrangements with ConAgra had been in connection with the manufacture and distribution of various food products by ConAgra in various domestic and foreign markets. The arrangements with American Pie had been to distribute, primarily, frozen pies throughout most of the United States. Both of those license agreements provided for perpetual duration, terminable by the respective licensee, upon 180 days' notice, but were not also terminable at all by the licensor unless the respective licensee failed to achieve specified sales levels. License income under those two agreements totaled approximately $5,175,000 for fiscal year 2010.

Effective as of June 9, 2011, MCPSI, one of the Debtors, sold ownership of all or substantially all of its material trademarks (and related intellectual property) pertaining to the Marie Callender's business, including various *Marie Callender's* trademarks, to ConAgra for an aggregate cash purchase price of $57,500,000, in accordance with the terms of a certain Asset Purchase Agreement, dated as of June 9, 2011. The cash purchase price from that sale was used to repay certain of the secured indebtedness owed under the Pre-Petition Secured Credit Facility or under the Senior Secured Notes, and the balance was retained by the Debtors for use as working capital. As part of that sale transaction, ConAgra and MCPSI also entered into a certain Trademark License Agreement, dated as of June 9, 2011, pursuant to which MCPSI (and, through MCPSI, the other Debtors) received a perpetual, royalty-free, worldwide license to use the applicable marks in connection with restaurant operation services (including the sale of fresh bakery products). That license includes the right to sublicense those same marks to applicable franchisees for similar use by them.

### 6. Territorial Exclusivity.

As of the Petition Date, the Debtors had agreements with three different parties to whom the Debtors had previously granted territorial exclusivity for Perkins restaurants. Under these three agreements (often referred to as the "franchise development agreements"), the Debtors have been permitted to operate Perkins restaurants in the exclusive territories in exchange for specified payments from the Debtors to the holders of those territorial rights. Those payments, for fiscal year 2010, aggregated $2,512,000. Of the three agreements granting such territorial exclusivity rights, one expires in 2075, and one expires upon the death of the beneficiary. The third remains in effect so long as the Debtors operate Perkins restaurants in the applicable territory.

The Creditors' Committee has advised the Debtors that they believe these agreements constitute equity interests that would constitute Equity Interests for purposes of the Plan and, therefore, would be cancelled under the Plan and not entitled to any Distribution under the Plan. The Creditors' Committee has indicated that it will object to the Claims filed by the counterparties to the agreements that granted territorial exclusivity and seek recharacterization of those Claims as Equity Interests in PMC Holding or in PMCI. The Creditors' Committee has also indicated that it may seek an order of the Bankruptcy Court permitting it to pursue against such counterparties actions to avoid and recover certain amounts paid under such agreements prior to the commencement of these Chapter 11 Cases.

One of the counterparties has filed a proof of claim asserting a Claim in the approximate amount of $50.6 million. If a Claim of that size were Allowed as a General Unsecured Claim, it would have a significant impact on recoveries to other holders of Allowed General Unsecured Claims and Allowed Senior Notes Claims under the Plan that receive Reorganized PMC Holding Membership Interests; however, the Debtors believe that the calculation of that Claim is greatly overstated. Moreover, to the extent that a General Unsecured Claim in excess of $5,000,000 were Allowed, then (unless the holder elected to reduce that Claim in order to qualify as a Cash Eligible Claimant) the holder would receive a Pro Rata share of Reorganized PMC Holding Membership Interests.

The filed Claim referenced in the preceding paragraph, as well as all other Claims relating to the franchise development agreements, will be included as Specified General Unsecured Claims. Certain provisions of the Plan (including the Cash Cap Amount) make provision for the funding of payment of each such Claim's Pro Rata share of Cash, in the event that any portion of any such Specified General Unsecured Claim is an Allowed General Unsecured Claim and such Allowed General Unsecured Claim does not exceed $5,000,000 (or the holder of such Allowed General Unsecured Claim otherwise irrevocably elects to reduce its Allowed Claim to an amount of $5 million or less).

### 7.    Employees.

As of April 17, 2011, the Debtors employed approximately 12,350 people, mostly at company-operated Perkins and Marie Callender's company-operated restaurants, with the remainder employed as administrative or manufacturing personnel. Of those restaurant employees, approximately 5,350 were employed on a part-time basis. None of the Debtors employees were represented by a union. As a result of the Debtors' store reduction program, initiated prior to the Petition Date and continuing during these Chapter 11 Cases, the Debtors aggregate workforce has been reduced by approximately 2,767 people.

### 8.    Acquisition by Castle Harlan Affiliates.

Affiliates of Castle Harlan, Inc., a New York-based private equity investment manager ("**CHI**"), have owned Marie Callender's since 1999 and have owned Perkins since 2005. The two businesses were combined in 2006.

On November 12, 1999, Castle Harlan Partners III, L.P. ("**CHP-III**"), a private equity fund managed by CHI, acquired Marie Callender's through the purchase of a majority interest in the equity of Wilshire, one of the Debtors.

On September 21, 2005, a different private equity fund managed by CHI acquired Perkins. In that transaction, a portfolio holding company owned by Castle Harlan Partners IV, L.P. ("**CHP-IV**") purchased all of the stock of PMC Holding, one of the Debtors and the parent holding company of PMCI. At the time, PMC Holding was known as "The Restaurant Holding Corporation", and PMCI was known as "The Restaurant Company", and their business related only to Perkins.

Less than one year later, on May 3, 2006, the Perkins and the Marie Callender's businesses were combined, through PMCI's purchase of all of the outstanding equity interests in Wilshire (at the time, a corporation), in a stock-for-stock transaction. The two businesses have remained combined since that time, with CHP-III and CHP-IV holding, in the aggregate, indirectly, substantially all of the equity interest in PMC Holding.

Certain of the Debtors are parties to the CHI Management Agreements whereby CHI receives payment of certain fees and reimbursement of certain expenses in exchange for providing services to the Debtors. The Creditors' Committee has indicated that it intends to object to any Claim by CHI arising under or related to the CHI Management Agreements. The claims filed by CHI will be included as Specified General Unsecured Claims and therefore, to the extent Allowed in an amount of $5,000,000 or less or CHI agrees to reduce its Claim to $5,000,000 or less, then such Allowed Specified General Unsecured Claim will be paid in accordance with the Cash Cap Amount and the other relevant provisions of the Plan.

### 9. Pre-Petition Capital Structure of the Debtors. [14]

PMC Holding owns, directly or indirectly, 100% of each of the other Debtors. PMC Holding is 100% owned, indirectly, by CHP-III, CHP-IV and certain other investors, through several intervening holding companies.

CHP-III, CHP-IV and others collectively own P&MC's Holding LLC, a Delaware limited liability company which, in turn, owns 100% of P&MC's Real Estate Holding LLC, a Delaware limited liability company which, in turn, owns 100% of P&MC's Holding Corp., a Delaware corporation ("**P&MC**") which, in turn, owns 100% of PMC Holding. Neither P&MC, nor any of the holding companies above it, is itself a Debtor in the Chapter 11 Cases.[15]

The following chart illustrates the current corporate structure of the Debtors, including their interest in various general and limited partnerships (depicted as vertical ovals in the chart) and setting forth their approximate ownership percentage of such partnerships:

---

[14] This discussion of capital structure, including the accompanying chart, does not give effect to any debt or other Claim that the Bankruptcy Court recharacterizes as Equity Interests for purposes of the Plan and these Chapter 11 Cases.

[15] As discussed in greater detail below, the Plan provides that each of the corporate Debtors (other than MCID and Wilshire Beverage) will convert into limited liability companies. Certain arrangements relating to the U.S. federal income tax liability associated with that conversion are discussed in Article VII(G)(5) of this Disclosure Statement.



Prior to the Marie Callender's IP Sale, the Debtors' prepetition funded indebtedness consisted primarily of three elements: (1) a $26,000,000 senior secured revolving credit facility, established by Wells Fargo Capital Finance, LLC (formerly known as Wells Fargo Foothill, LLC) ("**Wells Fargo**"); (2) an aggregate principal amount of $132,000,000 of Senior Secured Notes, due 2013; and (3) an aggregate principal amount of $190,000,000 of Senior Notes, due 2013, which are unsecured.  Each of these three elements is described below.

As of September 24, 2008, PMCI, as borrower, PMC Holding, as guarantor, and Wells Fargo, as the initial lender thereunder and as administrative agent thereunder (the "**Pre-Petition Administrative Agent**"), entered into a certain Credit Agreement under which there had been established in PMCI's favor a revolving credit facility (the "**Pre-Petition Secured Credit Facility**") in a maximum committed principal amount of $26,000,000.  Up to $15,000,000 of that amount had been available, alternatively, for the issuance of letters of credit under the Pre-Petition Secured Credit Facility.  In addition to PMCI, as borrower, and PMC Holding, as guarantor, each of the Subsidiary Debtors (except Promotions) guaranteed the Pre-Petition Secured Credit Facility.[16]  To secure their obligations as borrower (in the case of PMCI) or guarantor (in the other cases) under the Pre-Petition Secured Credit Facility, each Debtor (except Promotions) granted a first priority lien and security interest in substantially all of its respective assets.  The Pre-Petition Secured Credit Facility was amended three times, as of November 21, 2008, as of April 19, 2010, and (in connection with the Marie Callender's IP Sale) as of June 9, 2011.  As further discussed below, at the request of the Debtors Wells Fargo, as the sole Pre-Petition Secured Credit Facility Lender and as the Pre-Petition Administrative Agent, entered into a certain Forbearance Agreement, dated as of May 9, 2011.  In connection with the Marie Callender's IP Sale, all revolving loans then outstanding under the Pre-Petition Secured Credit Facility (aggregating approximately $15,800,000) were repaid (along with accrued and unpaid interest) out of the proceeds of the Marie Callender's IP Sale; and no further revolving advances were permitted to be made under the Pre-Petition Secured Credit Facility.  Accordingly, as of the Petition Date, the only outstanding obligations under the Pre-Petition Secured Credit Facility related to letters of credit previously issued thereunder which remained outstanding, aggregating approximately $10,060,000 in face amount.  As more fully described below, such prepetition letters of credit subsequently were rolled up into the DIP Credit Facility.

Also as of September 24, 2008, PMCI, as issuer, along with PMC Holding and each of the other Debtors (excluding Promotions),[17] as guarantors, entered into a certain Indenture (the "**Senior Secured Notes Indenture**") with The Bank of New York Mellon ("**BNYM**"), in its capacities as trustee and collateral agent thereunder.[18]  Pursuant to the Senior Secured Notes

---

[16]    Promotions did not exist at the time the Pre-Petition Secured Credit Facility was established.  Although Promotions, upon its formation in 2009, was required to have joined the Pre-Petition Secured Credit Facility as a guarantor and collateral grantor thereunder, that did not occur.

[17]    As indicated above, Promotions did not exist at the time this indenture was established.  Although Promotions, upon its formation in 2009, was required to have entered into a supplemental indenture, as a guarantor and collateral grantor under that indenture and related security documents, that did not occur.

[18]    The Bank of New York Mellon Trust Company, N.A., an affiliate of BNYM, succeeded BNYM as trustee under the Senior Secured Notes Indenture.  BNYM remained as collateral agent thereunder.

Indenture, PMCI issued, and PMC Holding and each of the other Debtors (excluding Promotions) guaranteed, an original aggregate principal amount of $132,000,000 in 14% Senior Secured Notes due 2013 (the "**Senior Secured Notes**"). To secure their obligations as issuer (in the case of PMCI) or guarantor (in the other cases) of the Senior Secured Notes, each Debtor (excluding Promotions) had granted a second priority lien and security interest in substantially all of its respective assets. Of the net cash sale proceeds received by the Debtors in connection with the Marie Callender's IP Sale, approximately $9,240,000 was used to pay the semiannual interest payment on the Senior Secured Notes, which had become due and payable on May 31, 2011, and approximately $29,038,280 was applied as a partial redemption of the Senior Secured Notes (of which, approximately $101,280 constituted payment of accrued and unpaid interest on the principal amount redeemed, and the balance was applied as a redemption of principal). Accordingly, as of the Petition Date, approximately $103,000,000 in aggregate principal amount of Senior Secured Notes remained outstanding.

In connection with the 2005 acquisition by CHP-IV (and others) of Perkins, as described above, an aggregate principal amount of $190,000,000 in 10% Senior Notes due 2013 (the "**Senior Notes**") was issued under a certain Indenture (as currently in effect, the "**Senior Notes Indenture**") among TRC Finance, Inc. (at the time a newly formed Delaware corporation acting as the transitory issuer thereunder), PMCI (as the forthcoming successor by merger to that transitory issuer), PMCI's three subsidiaries existing at that time (as the initial guarantors thereunder), and BNYM (then known as The Bank of New York), in its capacity as trustee thereunder.[19]  Upon the acquisition of Perkins by CHP-IV (and others), TRC Finance, Inc., as transitory issuer, merged with and into PMCI which, as the surviving corporation, became the successor issuer under the Senior Notes. Of the three initial guarantors, two (Realty and Finance) continue as guarantors and are Debtors in the Chapter 11 Cases. The third initial guarantor was merged into PMCI in 2007. The Senior Notes Indenture was amended twice, as of April 28, 2006 and as of May 3, 2006. Pursuant to the second amendment (which coincided with the combination of Perkins and Marie Callender's, as described above), Wilshire, MCPSI and MCPSI's five corporate and limited liability company subsidiaries at that time (all of which continue to exist, and they, along with Wilshire and MCPSI, are Debtors), all joined the Senior Notes Indenture as additional guarantors of the Senior Notes.

As further discussed below, the Debtors and the holders of more than 80% of the outstanding aggregate principal amount of the Senior Notes entered into a certain Forbearance Agreement, dated as of May 4, 2011, in order to address (among other things) the default by PMCI in making the $9,500,000 semiannual interest payment, due on April 1, 2011, that was required to have been made under the Senior Notes. No portion of the sale proceeds from the Marie Callender's IP Sale was applied against the outstanding amount of principal or interest owed under the Senior Notes. Accordingly, as of the Petition Date, the entire $190,000,000 in original aggregate principal amount of Senior Notes (plus accrued and unpaid interest, from and after October 1, 2010) was outstanding. All of the Debtors (other than Holding and

---

[19]    The Bank of New York Mellon Trust Company, N.A., an affiliate of BNYM, succeeded BNYM as trustee under the Senior Notes Indenture, but itself resigned and was replaced as trustee thereunder by Wilmington Trust Company, on or about the Petition Date.

Promotions)[20] are obligated under the Senior Notes Indenture, as issuer (in the case of PMCI) or guarantor (in the other cases). The Debtors' obligations in respect of the Senior Notes are unsecured.

As part of the 2008 financing transactions described above, the Pre-Petition Administrative Agent, as first priority agent on behalf of the lenders under the Pre-Petition Secured Credit Facility and certain other obligees, and the Senior Secured Notes Collateral Agent, as second priority agent on behalf of the holders of the Senior Secured Notes and certain other obligees, entered into a certain Intercreditor Agreement, dated as of September 24, 2008 (as currently in effect, the "**Intercreditor Agreement**"). Each Debtor (other than Promotions) executed the Intercreditor Agreement as an acknowledger thereof. The Intercreditor Agreement sets forth, among other things, the relative rights and priorities of the "First Priority Secured Parties" and "Second Priority Secured Parties" with respect to the collateral securing the Pre-Petition Secured Credit Facility (and related obligations), on the one hand, and securing the Senior Secured Notes (and related obligations), on the other hand. The Intercreditor Agreement pertains to lien subordination only. The obligations of the obligated Debtors in respect of the Pre-Petition Secured Credit Facility (and related obligations), and in respect of the Senior Secured Notes (and related obligations), are *pari passu.* In the case of each obligated Debtor (other than PMC Holding, which is not obligated under the Senior Notes) all of those obligations also are *pari passu* with the obligor's respective obligations in respect of the Senior Notes. In general, the Intercreditor Agreement establishes that the liens in favor of the "First Priority Secured Parties" shall be senior to those in favor of the "Second Priority Secured Parties" up to a specified maximum principal indebtedness amount (plus related interest, fees, costs and indemnities), at which point the liens in favor of the "Second Priority Secured Parties" shall have priority up to a specified maximum principal indebtedness amount (plus related interest, fees, costs and indemnities). Above that latter point, the "First Priority Secured Parties" again have lien priority in respect of their remaining secured claims (if any).

Like many other restaurant companies, the Debtors had been able to operate, and more often than not had been operating, with negative working capital. The Debtors had been able to operate with a substantial working capital deficit because (1) restaurant revenues are received primarily on a cash or near-cash basis with a low level of accounts receivable, (2) rapid turnover results in a limited investment in inventories and (3) accounts payable for food and beverages usually become due several days after the receipt of cash from the related sales.

### 10. Historical Financial Information.

In the past, the Debtors had been filing financial and other information with the SEC on the EDGAR database the SEC maintains. That information is available through the SEC's EDGAR website, which can be accessed at: http://www.sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0001047040&owner=exclude&count=40 .

---

[20]     PMC Holding, although in existence at the time of the Senior Notes Indenture, was not required to become a guarantor thereunder. As indicated above, Promotions did not exist at the time this indenture was established. Although Promotions, upon its formation in 2009, was required to have entered into a supplemental indenture, as a guarantor under that indenture, that did not occur.

-28-

However, the Debtors have not filed annual financial information with the SEC since the Debtors' fiscal year ended December 27, 2009, nor have the Debtors filed quarterly financial information with the SEC since the Debtors' fiscal quarter ended October 3, 2010.  The Debtors' filings on the SEC's EDGAR database have not been kept current and should not be regarded as providing current accurate information (financial or otherwise) about the Debtors.  Certain limited more recent financial information relating to the Debtors has been filed with the Bankruptcy Court.

The Debtors' consolidated revenues for their fiscal year ended December 26, 2010 were approximately $507.0 million.

**ARTICLE V**

**EVENTS LEADING UP TO THE COMMENCEMENT OF THE CHAPTER 11 CASES**

Prior to the commencement of these Chapter 11 Cases, the Debtors' operations and financial performance were severely and adversely affected due to excessive leverage and poor sales results. The poor economic climate has been a primary factor in the decline in restaurant sales, particularly in Florida and California where there are large concentrations of Perkins and Marie Callender's restaurant locations, and where foreclosure rates and depressed economies have prevailed. With overall employment rates at record high levels, discretionary income for many historically-loyal customers and other consumers has been severely constrained, with a direct correlation to depressed restaurant sales and reduced or eliminated customer traffic. Restaurant sales were also negatively impacted by a lack of restaurant remodeling expenditures due to the Debtors' internal constraints on deploying cash for capital expenditures. As better resourced competitors continued to build new locations and upgrade their existing facilities (and in some cases, through the vehicle of their own chapter 11 proceedings, restructured their financial affairs), many of the Debtors' restaurants became facially dated and stale, which also negatively impacted the ability of the Debtors to maintain customer traffic at the levels prevailing prior to the economic downturn.

These economic realities placed increasing financial and capital structure pressure on the Debtors, and increasingly complicated their efforts to adhere to their contractual commitments to their largest prepetition creditor constituencies -- the Pre-Petition Secured Credit Facility, the Senior Secured Notes, and the Senior Notes -- while at the same time seeking to preserve their relationships with other constituencies vital to the success of the Debtors and their business, including suppliers, franchisees and customers. Ultimately, the Debtors were unable to provide audited financial statements for their fiscal year ended December 26, 2010, and the Debtors failed to file their Annual Report on Form 10-K with the SEC for that fiscal year. Those events resulted in "defaults" or "events of default" under the Pre-Petition Secured Credit Facility and the Senior Notes.[21] Notwithstanding those events, the Debtors sought to maintain their business. The seminal event -- related to the Debtors' overlevered capital structure -- was the impending semiannual interest payment on the Senior Notes, an interest payment the Debtors would be unable to make.

On April 1, 2011, a scheduled semiannual interest payment, in the amount of $9,500,000, became due and payable in respect of the Senior Notes. PMCI and the other obligated Debtors defaulted on that interest payment. By the terms of the Senior Notes Indenture, their continuing failure to make that payment resulted, after thirty (30) days, in an "event of default" under the Senior Notes Indenture. When that "event of default" occurred, it permitted potential acceleration of the Senior Notes by the holders of at least twenty-five percent (25%) in aggregate

---

[21] There also were related notice and reporting defaults under the Pre-Petition Secured Credit Facility and under the Senior Notes Indenture; as well as under the Senior Secured Notes Indenture.

principal amount of the Senior Notes.  That interest payment default and subsequent "event of default" under the Senior Notes Indenture also gave rise to various potential collection and enforcement remedies available to the Senior Notes Trustee and the holders of the Senior Notes; and also created a "cross-default" under the Pre-Petition Secured Credit Facility, thereby giving Wells Fargo (as the Pre-Petition Administrative Agent and the sole Pre-Petition Secured Credit Facility Lender) similar potential rights and remedies.

To address this interest payment default (as well as the other existing defaults, and certain future anticipated comparable defaults), the Debtors immediately commenced discussions with the Pre-Petition Administrative Agent, and with representatives of Wayzata Investment Partners, LLC, acting on behalf of the Restructuring Support Parties, the beneficial holders in the aggregate of more than eighty percent (80%) in principal amount of the outstanding Senior Notes.  Those Senior Notes holders, and their affiliates, also beneficially hold, in the aggregate, one hundred percent (100%) of the outstanding Senior Secured Notes.  As a result of those discussions, PMCI and the other applicable Debtors entered into two (2) forbearance agreements, each effective as of April 30, 2011, in order to assure the Debtors the opportunity, in conjunction with their principal creditors, to evaluate their options and allow for the orderly implementation of an agreed-upon course of action.  In one case, PMCI, as issuer, and each of the Subsidiary Debtors (except Promotions), as guarantors, entered into a certain Forbearance Agreement, dated as of May 4, 2011 (but effective as of April 30, 2011), with the Restructuring Support Parties (the "**Senior Notes Forbearance Agreement**"), pursuant to which those Senior Notes holders agreed to forbear from exercising any and all of their rights and remedies under the Senior Notes Indenture with respect to the aforesaid interest payment default, and other identified or anticipated defaults, until June 30, 2011 (or, if earlier, the occurrence of certain specific events).  In the other case, PMCI, as borrower, and PMC Holding and each of the other Subsidiary Debtors (except Promotions), as guarantors, entered into a certain Forbearance Agreement, dated as of May 9, 2011 (but effective as of April 30, 2011), with Wells Fargo in its capacity as the Pre-Petition Administrative Agent and sole Pre-Petition Secured Credit Facility Lender (the "**Pre-Petition Secured Credit Facility Forbearance Agreement**"), pursuant to which the Pre-Petition Administrative Agent and sole Pre-Petition Secured Credit Facility Lender agreed to forbear from exercising any and all of their rights and remedies under the Pre-Petition Secured Credit Facility with respect to the identified or anticipated defaults, until June 30, 2011 (or, if earlier, the occurrence of certain specific events).  The Senior Notes Forbearance Agreement and the Pre-Petition Secured Credit Facility Forbearance Agreement are sometimes referred to in this Disclosure Statement as the "**Forbearance Agreements**".

During the window of opportunity created by the execution and delivery of the two Forbearance Agreements, the Debtors entered into negotiations with the Restructuring Support Parties, which negotiations were designed to restructure and recapitalize the Debtors' businesses and balance sheet.  To that end, in the weeks preceding the Petition Date, the Debtors and the Restructuring Support Parties entered into a certain Restructuring Support Agreement, dated as of June 6, 2011 (as amended as described below, the "**Restructuring Support Agreement**"), designed to mutually and consensually develop and agree upon the parameters of a reorganization program for the Debtors that would, among other things, delever the Debtors' capital structure, and thereby establish a pre-filing blueprint for an effective and efficient chapter

11 reorganization process.[22]   In connection with the entry into the Restructuring Support Agreement, the Debtors and the Restructuring Support Parties also negotiated the principal terms of the Debtors' plan of reorganization, which terms were attached as an exhibit to the Restructuring Support Agreement.  The Plan, as attached to this Disclosure Statement and as described herein, is the direct result of those negotiations and (apart from modifications made with the mutual agreement of the Debtors and the Restructuring Support Parties) conforms substantially to the requirements outlined in the Restructuring Support Agreement.

The Restructuring Support Agreement established a series of milestones to which the Debtors would be required to adhere as a condition to retaining the support of the Restructuring Support Parties.  Those milestones include: (i) the consummation of the then-pending Marie Callender's IP Sale and the application of the net proceeds from that sale to, among other things, repay in full all amounts outstanding under the Pre-Petition Secured Credit Facility (excluding outstanding letters of credit thereunder, which were proposed to roll over into the DIP Credit Facility), pay all accrued and unpaid interest due and owing in respect of the semiannual interest payment under Senior Secured Notes that was required to have been made on May 31, 2011 but had not yet been paid, provide a specified level of interim liquidity to the Debtors, and redeem a specified aggregate principal amount of Senior Secured Notes (plus interest thereon to the date of redemption on the principal amount redeemed);[23] (ii) the filing of the Debtors' plan of reorganization, and related disclosure statement, with the Bankruptcy Court, on or prior to July 14, 2011;[24] (iii) the entry of an order of the Bankruptcy Court approving this Disclosure Statement, on or prior to September 14, 2011;[25] (iv) the entry of the Confirmation Order, on or prior to November 8, 2011;[26] and (v) the occurrence of the Effective Date, on or prior to

---

[22]   A copy of the Restructuring Support Agreement was filed with the Bankruptcy Court on June 13, 2011 as "Exhibit B" to Declaration of Joseph F. Trungale in Support of Debtors' Chapter 11 Petitions and First Day Motions [Docket No. 19].

[23]   Based on the interplay between the structure of the Marie Callender's IP Sale and the terms of the Senior Secured Notes Indenture, the consummation of the Marie Callender's IP Sale may have given rise to an obligation on the part of the Debtors obligated under the Senior Secured Notes Indenture also to have paid a prepayment premium (of seven percent (7%) of the principal amount being redeemed) in respect of the Senior Secured Notes then being redeemed.  As part of the Restructuring Support Agreement the Restructuring Support Parties agreed to waive irrevocably receipt of any such prepayment premium, on the terms and subject to the conditions set forth in the Restructuring Support Agreement.  Confirmation of the Plan, and its effectiveness as contemplated in this Disclosure Statement, would satisfy the criteria for that irrevocable waiver to take effect.

[24]   The Debtors' original plan of reorganization was filed on July 14th; however, the related disclosure statement was not docketed as filed until shortly after midnight on July 15th.  The Restructuring Support Parties deemed that filing timely.

[25]   In order to accommodate ongoing discussions and negotiations, the Debtors and the Restructuring Support Parties entered into a certain Amendment No. 1 to Restructuring Support Agreement, dated as of August 22, 2011 ("**RSA Amendment No. 1**").  Prior to RSA Amendment No. 1, this milestone required the entry of an order of the Bankruptcy Court approving the Debtors' disclosure statement, on or prior to the earlier of August 23, 2011 or six weeks from the date of filing of the Debtors' plan of reorganization and related disclosure statement.

[26]   Prior to RSA Amendment No. 1, this milestone required the entry of the Confirmation Order, on or prior to the earlier of October 4, 2011 or five weeks from the Confirmation Hearing.

November 29, 2011.[27]  These milestones, as modified by RSA Amendment No. 1, may be further waived by the Restructuring Support Parties from time to time in their discretion.  Comparable milestones also are contained in the DIP Credit Facility, except that those milestones contain an approximately two-week "cushion" beyond the dates set forth in the Restructuring Support Agreement.[28]

The Restructuring Support Agreement provides the Restructuring Support Parties with the right to determine certain material aspects of the Plan.  Those aspects include the form and substance of the PMC Holding LLC Agreement.  The term sheet for such agreement is attached as an exhibit to the Plan and the final form (or substantially final form) of such agreement will be attached as an exhibit to the Plan Supplement.  Accordingly, the descriptions thereof in this Disclosure Statement are qualified in their entirety by reference to that term sheet, and to the final form (or substantially final form) of such agreement as is filed as part of the Plan Supplement.

In consultation with their professionals and certain of their constituencies, including the Restructuring Support Parties, the Debtors have diligently evaluated a number of options to address their current financial and capital issues.  These efforts have included sharing information with and engaging in discussions with a variety of the Debtors' stakeholders, with the goal of restructuring the Debtors' balance sheet to bring it into line with the Debtors' current debt servicing capabilities.  Based on the Debtors' evaluation of their options for addressing their current financial and capital issues, and their discussions with those stakeholder constituencies, the Debtors concluded that proceeding with a restructuring through a bankruptcy reorganization, on the terms set forth in the Restructuring Support Agreement, provided the Debtors with the best available means of achieving their goals.

---

[27]   Prior to RSA Amendment No. 1, this milestone required the occurrence of the Effective Date, on or prior to the earlier of October 21, 2011 or seventeen (17) days from entry of the Confirmation Order.

[28]   In conjunction with RSA Amendment No. 1, the Debtors entered into a corresponding amendment to the DIP Credit Agreement (as defined below).

# ARTICLE VI

# THE CHAPTER 11 CASES

## A.    Significant "First Day" Motions.

Upon the commencement of a case under chapter 11 of the Bankruptcy Code, the Bankruptcy Code imposes an automatic stay on creditors and others in dealing with the debtor, and also imposes strict limitations on actions that may be taken by the debtor absent authorization by the bankruptcy court.  For that reason, a debtor typically files a number of so-called "first day" motions, either on the actual petition date itself or within the first few business days thereafter, seeking bankruptcy court approval to continue to operate its business and to facilitate its bankruptcy reorganization.

The Debtors filed a number of customary "first day" motions with the Bankruptcy Court relative to their Chapter 11 Cases, intended to facilitate the ability of the Debtors to continue their relationships with various prepetition customers, employees and critical vendors in light of the commencement of the Chapter 11 Cases.  The motions sought Bankruptcy Court approval authorizing the Debtors, among other things, to: (i) pay prepetition compensation, benefits and expense reimbursements to employees (and continue certain workers' compensation and employee benefit programs); (ii) continue certain insurance policies and practices; (iii) continue certain customer practices and programs; (iv) pay certain taxes that the Debtors are required to collect from third parties and remit to the appropriate taxing authorities; (v) authorize the payment of claims under PACA (the Perishable Agricultural Commodities Act) and the payment of certain prepetition claims of suppliers and vendors of goods entitled to administrative priority; and (vi) pay prepetition claims of freight forwarders, carriers, warehousemen and similar claimants.  The Debtors also filed motions seeking (x) relief from certain administrative requirements of the Bankruptcy Code, (y) to establish procedures to resolve adequate assurance requests for their utility providers, and (z) the retention of Omni as their claims, balloting and noticing agent for purposes of these Chapter 11 Cases.  All of such motions ultimately were granted by the Bankruptcy Court, on a final basis.

## B.    Retention of Professionals.

The Debtors also filed several applications seeking orders authorizing the retention of certain professionals needed by the Debtors in connection with the Chapter 11 Cases, including the retention of: (i) Troutman Sanders LLP, as bankruptcy counsel; (ii) Young Conaway Sargatt & Taylor, LLP, as Delaware bankruptcy counsel and conflicts counsel; and (iii) Whitby Santarlasci & Company, as financial advisor ("**Whitby Santarlasci**").  On July 9, 2011, the Bankruptcy Court entered a series of Orders approving the retention of the foregoing professionals. [Docket Nos. 170, 171, 172].

In addition, on June 24, 2011, the Debtors filed a motion with the Bankruptcy Court seeking authority to employ and compensate certain professionals utilized by the Debtors in the ordinary course of their business (nunc pro tunc to the Petition Date). [Docket No. 108]. Subsequently, on July 12, 2011, the Bankruptcy Court entered an Order granting the foregoing motion, authorizing the Debtors in their sole discretion to retain those ordinary course professional listed in connection with the motion, and establishing procedures and guidelines for the Debtors to retain and pay such professionals. [Docket No. 208].

### C.    Official Committee of Unsecured Creditors.

On June 24, 2011, the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors in the Chapter 11 Cases (as such committee may be reconstituted from time to time, the "**Creditors' Committee**"). The Creditors' Committee is currently comprised of the following seven (7) members: (i) The Coca-Cola Company; (ii) Wilmington Trust Company (the Senior Notes Trustee); (iii) Standard General Master Fund LP; (iv) News America Marketing; (v) Luna Family Trust; (vi) Northgate Station, LP; and (vii) Mr. Benjamin Monroy.  The Coca-Cola Company and Wilmington Trust Company currently serve as Co-Chairs of the Creditors' Committee.  With the approval of the Bankruptcy Court, the Creditors' Committee has retained its own counsel and financial advisor.

### D.    DIP Credit Facility.

Given the defaults that then existed under the Pre-Petition Secured Credit Facility, Wells Fargo, as the Pre-Petition Administrative Agent and sole Pre-Petition Secured Credit Facility Lender, imposed certain requirements in connection with granting its consent to the Marie Callender's IP Sale and in entering into the Pre-Petition Credit Facility Forbearance Agreement. Among other things, Wells Fargo required that (x) the net sale proceeds be applied to repay in full all amounts then outstanding under the Pre-Petition Secured Credit Facility (except for the requirement that all then-outstanding letters of credit be cash collateralized) and (y) any further drawdowns under the Pre-Petition Secured Credit Facility would be permitted only in Wells Fargo's sole and absolute discretion.  Those requirements were in addition to the requirements, discussed above, imposed by the Restructuring Support Parties as a condition to their own granting of consent in connection with the Marie Callender's IP Sale.  Ultimately, given that the Marie Callender's IP Sale involved the sale of property that secured the obligations owing under the Pre-Petition Secured Credit Facility and under the Senior Secured Notes Indenture, it was agreed that the entirety of the net sale proceeds of the Marie Callender's IP Sale would be applied in the manner required by Wells Fargo and the Restructuring Support Parties, except for an agreed-upon amount that the Debtors would be permitted to retain in order to fund their working capital needs through the period leading up to the filing of their Petitions, and also for an anticipated short additional period following the commencement of the Chapter 11 Cases while the Bankruptcy Court considered the Debtors' request for postpetition debtor-in-possession financing.

Consistent with that understanding, as one of their "first day" motions the Debtors filed a motion seeking approval of the Bankruptcy Court to obtain postpetition financing and grant first

priority liens and super-priority administrative expense status to the Debtors' postpetition lender.[29]   [Docket No. 18.]

The DIP Credit Facility is established pursuant to a certain Senior Secured, Super-Priority Debtor-in-Possession Credit Facility, dated as of June 14, 2011 (as in effect from time to time, the "**DIP Credit Agreement**"),[30] entered into among PMC Holding, as parent, PMCI, as borrower, the lenders party thereto (the "**DIP Lenders**"),[31] and Wells Fargo, as administrative agent thereunder (the "**DIP Administrative Agent**").   PMC Holding, along with each of the Subsidiary Debtors (including Promotions, which had not been obligated under the Pre-Petition Secured Credit Facility), have guaranteed all of PMCI's obligations under the DIP Credit Facility; and all twelve (12) Debtors have granted a lien upon and security interest in all or substantially all of the respective real and personal property as collateral security therefor.   By virtue of the entry of the Interim DIP Order and, subsequently, Final DIP Order, as referenced below, those liens and security interests constitute superpriority liens, and the DIP Financing Claims constitute a superpriority administrative claim subject only to certain "Permitted Liens" and the "Carve-Out" (as such terms are defined in the DIP Credit Agreement).   The DIP Credit Facility, by its terms, is a maximum six-month credit facility (subject to certain milestones, as discussed below).   The DIP Credit Facility imposes severe restrictions on the ability of the Debtors to create or acquire any new subsidiary but, with certain exceptions, were any such new subsidiary in fact to be created or acquired it would be required to become obligated under the DIP Credit Facility, as an additional guarantor, on a fully secured basis.   None of the twelve (12) franchisee partnerships in which the Debtors have an interest is obligated under, or otherwise providing any credit support for, the DIP Credit Facility.

The DIP Credit Facility allows PMCI, as borrower, to obtain up to twenty-one million dollars ($21,000,000) in revolving loans under a senior secured, superpriority debtor-in-possession revolving credit facility, for use by PMCI and the other Debtors for certain specified purposes (including, among other things, their working capital and general corporate purposes) in accordance with weekly budgets that must be prepared by the Debtors and approved by the DIP Administrative Agent.   Drawings under the DIP Credit Facility are subject to the terms and conditions contained in the DIP Credit Agreement and other definitive documentation relating to such facility, and also to the terms and conditions of the Bankruptcy Court's Interim DIP Order and subsequent Final DIP Order under which the DIP Credit Facility had been approved.   The definitive documentation limits drawings to amounts, and times, contemplated in the budgets periodically furnished by the Debtors to the DIP Administrative Agent.   The DIP Credit Facility also has a $15,000,000 subfacility for the issuance of letters of credit (inclusive of the letters of credit originally issued under the Pre-Petition Secured Credit Facility and subsequently rolled up

---

[29]   That motion also sought adequate protection for the creditors under the Pre-Petition Secured Credit Facility and the Senior Secured Notes Indenture, in the form of, among other things, replacement liens and super-priority administrative expense status.   That adequate protection was sought because the liens and claims of those secured prepetition creditors were being primed by the DIP Credit Facility, and for the use by the Debtors of those prepetition secured creditors' cash collateral.   The Final DIP Order also granted such adequate protection.

[30]   A copy of the DIP Credit Agreement, as originally entered into, is attached as an exhibit to the Final DIP Order [Docket No. 211].

[31]   Since the inception of the DIP Credit Facility, Wells Fargo has been the sole DIP Lender.

into the DIP Credit Facility).  Under the DIP Credit Facility, Wells Fargo, as DIP Administrative Agent and sole DIP Lender, is permitted to establish certain reserves against availability, relating to, among other things, a carve-out for certain administrative fees and professional expenses arising in the context of a bankruptcy reorganization.

By its terms, the DIP Credit Facility will terminate upon its scheduled maturity (December 14, 2011, the date that is six months after establishment of the DIP Credit Facility) or upon the earlier occurrence of certain events, including (among other things) (x) the sale of all or substantially all of the assets or equity interests in the Debtors under a sale pursuant to section 363 of the Bankruptcy Code or (y) the date of termination of the lending commitments, and acceleration of the repayment obligations, under the DIP Credit Facility following the occurrence and continuance of an "event of default" thereunder.  The DIP Credit Facility also contains several milestones, modeled after those contained in the Restructuring Support Agreement but containing "cushions" of approximately two weeks beyond the corresponding milestones contained in the Restructuring Support Agreement.

On June 14, 2011, the Bankruptcy Court approved the DIP Credit Facility, on an interim basis, upon the terms and subject to the conditions set forth in the Bankruptcy Court's interim order (the "**Interim DIP Order**") in respect thereof.  [Docket No. 47.]  Then, on July 12, 2011, the Bankruptcy Court entered a final order (the "**Final DIP Order**") approving, on a final basis, the DIP Credit Facility upon the terms and subject to the conditions set forth therein.  [Docket No. 211.]  The DIP Credit Agreement was amended twice (initially, to modify certain conditions to borrowings and, more recently, to modify the bankruptcy milestones contained therein consistent with the milestone amendments effected pursuant to RSA Amendment No. 1).

### E.    Utilities Motion.

As part of the Debtors' "first day motions", the Debtors also filed a motion seeking interim and final relief from the Bankruptcy Court prohibiting utilities from altering, refusing or discontinuing utility services during the pendency of the Chapter 11 Cases and establishing procedures for determining adequate assurance of payment. [Docket No. 5] (the "**Utilities Motion**").  In connection with the Utilities Motion, on June 14, 2011, the Court entered an "**Interim Utilities Order**" [Docket No. 37] which, among other things, prohibited utility providers from discontinuing, altering or refusing service to the Debtors on account of any unpaid pre-petition charges, or requiring payment of a deposit or receipt of any other security for continued services as a result of the Debtors' bankruptcy filings or any outstanding prepetition invoices.  The Interim Utilities Order also provided that within twenty (20) days of the Petition Date the Debtors were required to deposit $750,000 into an interest-bearing, segregated account with such deposit to be held in escrow for the purpose of providing each utility provider with adequate assurance of payment for post-petition utility services.  The Debtors have since fully funded the requisite utilities deposit account.

On July 12, 2011, the Bankruptcy Court entered a "Final Utilities Order" [Docket No. 209] which, absent further order of the Bankruptcy Court, prohibits utility providers from discontinuing, altering or refusing service to the Debtors for the duration of the chapter 11 cases, establishes procedures for determining adequate assurance, and allows the Debtors, in their sole

discretion and without further order of the Bankruptcy Court, to enter into agreements granting additional adequate assurance to utility providers serving requests.

### F.        Assumption/Rejection of Leases and Executory Contracts.

Under the Bankruptcy Code, the Debtors have 120 days after the Petition Date to assume or reject unexpired leases of nonresidential real property.  The Bankruptcy Court may extend such period for 90 days for cause; and may further extend such period only upon prior written consent of the affected lessor.  Also under the Bankruptcy Code, the Debtors have until confirmation of the Plan to assume or reject executory contracts.  The deadline for assuming or rejecting the Debtors' unexpired leases of nonresidential real property in the Chapter 11 Cases is October 11, 2011.  The Debtors reserve the right to seek extensions of that current deadline if necessary.  In addition, on July 11, 2011, the Bankruptcy Court entered an Order approving expedited procedures for the Debtors' (i) proposed assumption of certain unexpired non-residential real property leases, (ii) entry into certain amendments and modifications to such leases, and (iii) fixing of certain cure amounts for such lease. [Docket No. 181].

Since the commencement of their Chapter 11 Cases, the Debtors have continued their process, begun in the months preceding the filing of the Petitions (and which resulted in, among other things, the store reduction program the Debtors began to implement shortly before the Petitions were filed), of analyzing their portfolio of leases of nonresidential real property, in order to determine whether it would be in the best interests of the Debtors and their creditors to assume or reject those leases.  Among the factors considered in this analysis were the following:

(a)        operating performance (both historical and projected);

(b)        competition;

(c)        rent and other material terms under the applicable lease;

(d)        remaining term of the applicable lease;

(e)        suitability and condition of the applicable building; and

(f)        a variety of other considerations (e.g., local market demographics, trade vendor relations, etc.).

Based on the Debtors' analysis, the Debtors closed approximately sixty-five (65) restaurants in connection with their store reduction program implemented shortly before the filing of their Petitions, in connection with their rejection of the leases relating to those locations.  As one of their "first day" motions filed with the Bankruptcy Court, the Debtors sought authority (*nunc pro tunc* to the Petition Date) for the Debtors to reject the nonresidential real estate leases relating to those closed locations. [Docket No. 15]  On July 12, 2011, the Bankruptcy Court entered an Order rejecting the sixty-five (65) leases relating to those closed locations. [Docket No. 210.] Subsequently, the Debtors filed a second motion to reject, *nunc pro tunc* to July 28, 2011, seven (7) additional leases for company-operated restaurant locations. [Docket No. 451] On August 17, 2011, the Bankruptcy Court entered an Order rejecting those seven additional leases. [Docket No. 742]

-37-

The Debtors also have been conducting a comparable analysis relating to their executory contracts, and have made motions to reject certain specific executory contracts.

In addition, the Debtors intend to assume the ACE Insurance Program in accordance with Article VIII(F) of the Plan.

The Debtors are continuing to review their real estate leases and executory contracts in order to determine if additional leases and contracts should be rejected, to best position the Debtors for long-term success and growth.  As more fully described in Article VII(H) of this Disclosure Statement, the Plan sets forth a mechanism for dealing with the assumption or rejection by the Debtors of their leases and executory contracts.

### G.    Claims Process.

#### 1.    Last Date to File Proof of Claim.

On July 9, 2011, the Bankruptcy Court entered an order (the "**Bar Date Order**") requiring any Person holding or asserting a prepetition Claim against the Debtors to file a written Proof of Claim with Omni on or before August 16, 2011.  [Docket No. 174.]  The Bar Date Order further provides that any Person (other than, among others, professionals retained in the Chapter 11 Cases, any Debtor asserting a Claim against another Debtor, and any direct or indirect non-debtor subsidiary of a Debtor asserting a Claim against a Debtor) that fails to timely file a Proof of Claim will be forever barred, estopped and enjoined from voting on, or receiving a Distribution under, the Plan and will be forever barred, estopped and enjoined from asserting a Claim against the Debtors, their estates, the Reorganized Debtors, and any of their successors or assigns.

On August 17, 2011, the Debtors amended certain of their Schedules initially filed in these Chapter 11 Cases on July 11, 2011 to, among other things, amend, remove, or add certain scheduled Claims.  Consistent with the Bar Date Order, those parties affected by the Debtors' amended Schedules were notified that they must file a Proof of Claim, as a result of such amendment, with Omni on or before September 7, 2011 at 4:00 p.m., prevailing Eastern Time.

#### 2.    Claims Objection Deadline.

The Plan provides that, with certain exceptions, the Reorganized Debtors and, subject to certain limitations, the Claims Administrator have until the first business day that is sixty (60) days after the Effective Date (or such other later date as the Bankruptcy Court may establish upon a motion by the Reorganized Debtors) to file objections to Claims.  Any such motion may be approved without a hearing and without notice to any party.

### H.    Employment-Related Compensation.

As one of their "first day" motions filed with the Bankruptcy Court, the Debtors sought authority for the Debtors, in their discretion, to pay certain prepetition employee salary, wages, bonuses, and other compensation; withholding taxes to federal, state and local authorities related

to those payments; certain amounts withheld from some employees for insurance programs, savings plans, child support, and garnishments, vacation, sick and holiday time and/or vacation time compensation; outstanding claims for reimbursement of business expenses incurred and paid by employees prepetition; and obligations under worker's compensation programs. [Docket No. 14] That motion also sought the right to continue to provide certain employee benefits (including, among other things, medical, dental, prescription drug, long and short term disability, and life insurance; 401(k), deferred compensation and supplemental retirement plans for eligible employees; and other miscellaneous benefits). On June 14, 2011, the Bankruptcy Court entered an Order, as amended [Docket Nos. 46 and 77] (the "**Employee Order**") authorizing the Debtors, in their discretion, to pay certain prepetition employee wages, compensation and employee benefits and continue payment of wages, compensation and employee benefits in the ordinary course of business. The Employee Order provided, however, that authorization of payment of certain unpaid compensation and unpaid incentive compensation for senior level employees that exceeds in the aggregate the statutory cap of $11,725 per person, and certain severance and outplacement packages for terminated employees, would not occur until the entry of a final order. Such Final Order was entered on July 9, 2011 [Docket No. 168].

### I. Post-Petition Insurance Policies.

As one of their "first day" motions filed with the Bankruptcy Court, the Debtors sought authority for the Debtors, in their discretion, to continue financing arrangements for insurance policies which provide primary coverage (and, in certain instances, excess and umbrella coverage) from, among other things, liability of the Debtors' directors and officers, property, crime and casualty risks on the Debtors' real and personal property, workers' compensation, liability that may result from the Debtors' products, and liability that may arise out of the Debtors' errors and omissions and employment practices. [Docket No. 8] On June 14, 2011 the Court entered an Order [Docket No. 40] permitting the Debtors to honor the terms of their existing premium finance and security agreements with respect to those policies, including any prepetition amounts outstanding under such agreements up to an aggregate amount of $145,000, to pay, in the ordinary course of business, all pre-petition obligations as are necessary to maintain those policies up to an aggregate amount of $150,000, and to renew those policies and/or those premium finance agreements and/or enter into new premium finance agreements in the ordinary course of business postpetition.

### J. Disclosure Statement/Plan Confirmation Hearings.

On September 9, 2011, the Bankruptcy Court entered the Disclosure Statement Order. [Docket No. [l ]] A copy of the Disclosure Statement Order is attached to this Disclosure Statement as **Exhibit B**. As provided by the Disclosure Statement Order, the Confirmation Hearing presently is scheduled for October 31, 2011, at 10:00 a.m., prevailing Eastern Time.

## ARTICLE VII

## SUMMARY OF THE PLAN

### A.      Introduction.

The Debtors have proposed the Plan, consistent with the requirements described in Subsection B below, and in consultation with Wells Fargo Capital Finance LLC (the Pre-Petition Administrative Agent, and the sole Pre-Petition Secured Credit Facility Lender; and also the DIP Administrative Agent, and the sole DIP Lender), and with the Restructuring Support Parties (holders, in the aggregate, of 100% of the Senior Secured Notes Claims and of more than 80% of the Senior Notes Claims). The Debtors believe, and at the Confirmation Hearing will demonstrate to the Bankruptcy Court,[32] that the Debtors' creditors will receive at least as much, and likely more, in value under the Plan than they would receive were there instead to be a liquidation of the Debtors under chapter 7 of the Bankruptcy Code. As discussed in Article I(F) of this Disclosure Statement, the Creditors' Committee recommends voting in favor of the Plan.

**THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN ITSELF. CREDITORS ARE URGED TO READ THE PLAN IN ITS ENTIRETY.**

### B.      Classification and Treatment of Claims, and Equity Interests, Generally.

In general, the Bankruptcy Code only permits distributions to be made, under a debtor's chapter 11 reorganization plan, on account of "allowed" expenses relating to the administration of the debtor's bankruptcy estate, as well as "allowed" prepetition Claims against the debtor and "allowed" prepetition Equity Interests in the debtor. "Allowance" simply means that the debtor has agreed (or, in the event of a dispute, that the Bankruptcy Court has determined) the particular administrative expense, Claim or Equity Interest, including the amount thereof, in fact is a valid obligation of (or Equity Interest in) that debtor. Bankruptcy Code section 502(a) provides that a timely filed administrative expense, Claim or Equity Interest is "allowed" automatically unless the debtor (or another party in interest) objects to its allowance. Bankruptcy Code section 502(b), however, specifies certain types of Claims (including, among other things, Claims for unmatured interest on unsecured or undersecured obligations, and nonresidential real property lease and employment contract rejection damage claims above specified thresholds) that cannot be "allowed" in the bankruptcy case even where a valid Proof of Claim has been timely filed in the debtor's bankruptcy case.

---

[32]    The Plan makes reference to "Court" rather than to the "Bankruptcy Court", in order to address also those instances where there is no reference pursuant to section 157 of title 28 of the United States Code, or where some other court has jurisdiction over the Chapter 11 Cases or any proceedings arising therefrom. For ease of reference, this Disclosure Statement refers simply to the "Bankruptcy Court" (with such reference also to reference that more broadly defined term "Court" as and to the extent applicable under the Plan).

The Bankruptcy Code requires that, for purposes of treatment and voting, and subject to certain exceptions, a chapter 11 reorganization plan must divide the different "allowed" Claims against, and Equity Interest in, the debtor into separate "classes" based upon the nature of such Claims and Equity Interests.  Generally, Claims of a substantially similar legal nature would be classified together.  The same is true for Equity Interests having a substantially similar legal nature.  This classification process focuses on the legal nature of the particular Claims and Equity Interests, rather than on the holders of those Claims and Equity Interests, making it common for holders of multiple Claims and/or Equity Interests to find themselves as members of multiple classes for purposes of treatment and voting under a debtor's chapter 11 reorganization plan.

The Bankruptcy Code further requires, in this classification process, that classes of Claims and Equity Interests must be designated either as "impaired" (if altered by the reorganization plan in some way) or "unimpaired" (if not).  The Bankruptcy Code then provides the holders of impaired Claims and impaired Equity Interests with certain additional rights (such as the right to vote to accept or reject the plan), and the right to receive not less than the value the holder would have received were the debtor instead to liquidate under chapter 7 of the Bankruptcy Code), with certain limited exceptions.  The Bankruptcy Code establishes the criteria for determining whether or not a class of Claims or Equity Interests is "impaired" or "unimpaired" for purposes of treatment and voting under the plan.

The classification, treatment, question of impairment, and entitlement to vote of the Allowed Claims against the Debtors, and Allowed Equity Interests in the Debtors, were summarized briefly in Article II of this Disclosure Statement, and are described in greater detail below.  As provided in the Plan, a Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes.  Further, a Claim is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

### C.    Treatment of Certain Unclassified Claims.

Under section 1123(a)(1) of the Bankruptcy Code, certain categories of Claims that must be addressed in the proposed reorganization plan need not be classified (that is, put into one of the specific Classes established in that plan) for purposes of such plan.  In connection with the Chapter 11 Cases, the Debtors have identified four (4) applicable categories of unclassified Claims.

### 1.    Unclassified – Administrative Claims.

Administrative Claims consist of any Claim for costs and expenses of administration of the Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and

through the Effective Date of preserving and operating the Estates; (b) any indebtedness or obligations incurred or assumed by the Debtors in Possession in connection with the conduct of their businesses, including for wages, salaries, or commissions for services, and payments for goods and other services and leased premises; and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

The Plan provides that each holder of an Allowed Administrative Claim (other than Professional Fee Claims and DIP Financing Claims) shall receive from the Debtors: (a) Cash in an amount equal to the amount of such Allowed Administrative Claim, with such Distribution to be made on the later of the (i) Effective Date and (ii) the date such Administrative Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable; or (b) such other treatment as the Debtors and such holder shall have agreed upon in writing.  Allowed Ordinary Course Administrative Claims shall be paid in full in the ordinary course of business of the Reorganized Debtors consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.  In no event shall a post-Petition Date obligation that is contingent or disputed and subject to liquidation through pending or prospective litigation, including alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law, secondary payor liability, or any other disputed legal or equitable claim based on tort, statute, contract, equity, or common law, be considered to be an obligation which is payable in the ordinary course of business.

Unless a prior date has been established pursuant to the Bankruptcy Code, the Bankruptcy Rules or a prior order of the Bankruptcy Court, the Confirmation Order will establish a bar date for filing notices, requests, Proofs of Claim, applications or motions for allowance of Administrative Claims (other than Professional Fee Claims, Ordinary Course Administrative Claims, DIP Financing Claims of the DIP Administrative Agent and the DIP Lenders, the post-Petition Date fees and expenses of the Restructuring Support Parties, the Senior Secured Notes Trustee, the Senior Secured Notes Collateral Agent and the Senior Notes Trustee).  That date is referred to as the "**Administrative Claims Bar Date**".  Holders of Administrative Claims not paid prior to the Confirmation Date shall file with the Bankruptcy Court and serve upon the Debtors or Reorganized Debtors, as applicable, a motion requesting payment of such Administrative Claim on or before the Administrative Claims Bar Date or forever be barred from doing so. The notice of entry of the Confirmation Order to be delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) will set forth the Administrative Claims Bar Date and constitute good and sufficient notice of the Administrative Claims Bar Date.  The Reorganized Debtors shall have thirty (30) days (or such longer period as may be allowed by Final Order of the Bankruptcy Court, which may be entered without notice or a hearing) following the Administrative Claims Bar Date to review and object to all Administrative Claims (other than those listed in the parenthetical above).

### 2. Unclassified – Professional Fee Claims.

Professional Fee Claims consist of Administrative Claims Allowed under section 328, 330(a), 331 or 503 of the Bankruptcy Code for reasonable compensation of a Professional or other Person for services rendered or expenses incurred in the Chapter 11 Cases on or prior to the

Effective Date (including the reasonable, actual and necessary expenses of the members of the Creditors' Committee incurred as members of the Creditors' Committee in discharge of their duties as such), but specifically excluding the fees and expenses of professionals of (a) the Pre-Petition Administrative Agent, (b) the DIP Administrative Agent, (c) the Restructuring Support Parties, (d) the Senior Secured Notes Trustee, (e) the Senior Secured Notes Collateral Agent, and (f) the Senior Notes Trustee.

The Plan provides that all requests for compensation or reimbursement of Professional Fee Claims pursuant to sections 327, 328, 330, 331, 503 or 1103 of the Bankruptcy Code for services rendered prior to the Effective Date shall be filed and served on the Reorganized Debtors, counsel to the Reorganized Debtors, the United States Trustee, counsel to the Restructuring Support Parties and counsel to the Creditors' Committee and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, no later than thirty (30) days after the Effective Date. Holders of Professional Fee Claims that are required to file and serve applications for final allowance of their Professional Fee Claims and that do not file and serve such applications by the required deadline shall be forever barred from asserting such Claims against the Debtors, the Reorganized Debtors or their respective properties, and such Professional Fee Claims shall be deemed discharged as of the Effective Date. Objections to any Professional Fee Claims must be filed and served no later than twenty (20) days following the filing with the Bankruptcy Court of any request for compensation or reimbursement of Professional Fee Claims. Objections must be served on the Reorganized Debtors, counsel for the Reorganized Debtors, counsel to the Restructuring Support Parties, counsel to the Creditors' Committee and the holders of Professional Fee Claims requesting payment no later than fifty (50) days after the Effective Date.

### 3.    Unclassified – Priority Tax Claims.

Priority Tax Claims include any unsecured Claim that is entitled to a priority in right of payment under section 507(a)(8) of the Bankruptcy Code.

The Plan provides that, except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Debtors (with the consent of the Restructuring Support Parties and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld)) or the Reorganized Debtors: (a) Cash in an amount equal to such Allowed Priority Tax Claim, with such Distribution to be made on the later of (i) the Effective Date and (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; or (b) treatment in any other manner such that its Allowed Priority Tax Claim shall not be Impaired, including equal annual installment payments in Cash of an aggregate value, as of the Effective Date, equal to the Allowed amount of such Claim, over a period ending not later than five (5) years after the Petition Date.

-43-

### 4.      Unclassified – DIP Financing Claims.

DIP Financing Claims include all Claims arising under or relating to the DIP Credit Facility, whether pursuant to the DIP Credit Agreement, any other DIP Credit Document, the Final DIP Order, or otherwise.  DIP Financing Claims would include, among other things, Claims originally arising under the Pre-Petition Secured Credit Facility that have been rolled up into the DIP Credit Facility in accordance with the terms of the DIP Credit Facility and with the approval of the Bankruptcy Court pursuant to the Final DIP Order.

The Plan provides that, on or as soon as reasonably practicable after the Effective Date, each holder of an Allowed DIP Financing Claim shall receive payment in full in Cash of all debts, Claims, liabilities and obligations calculated in accordance with the DIP Credit Agreement, except to the extent that the holders of DIP Financing Claims agree to a different treatment.

### D.      Classification and Treatment of Claims and Equity Interests.

### 1.      Class 1 – Other Priority Claims.

Other Priority Claims include any Claim against any of the Debtors (other than an Administrative Claim, a Professional Fee Claim, a Priority Tax Claim or a DIP Financing Claim) that is entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7), or (9) of Bankruptcy Code.

The Plan provides that, except to the extent that a holder of an Allowed Other Priority Claim (i) has been paid in full by the Debtors, prior to the Effective Date, or (ii) agrees to a less favorable treatment with the Debtors (with the consent of the Restructuring Support Parties and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld), if the Claim is greater than $25,000) or the Reorganized Debtors, each holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of and in exchange for such Other Priority Claim, Cash in the full amount of such Allowed Other Priority Claim.  Such payment shall be made on or as soon as practicable after the later of (a) the Effective Date and (b) the date when such Other Priority Claim becomes Allowed.

Because the Bankruptcy Court entered an order authorizing the Debtors to pay, among other things, unpaid prepetition employee compensation and benefits, the Debtors estimate that the Allowed Claims in Class 1 that are due and payable pursuant to the Plan on or before the Effective Date will be nominal.

Class 1 is Unimpaired under the Plan.  Holders of Allowed Other Priority Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

**2.      Class 2 – Other Secured Claims.**

Other Secured Claims include any Claim (other than the DIP Financing Claims, and the Senior Secured Notes Claims) to the extent reflected in the Schedules or a Proof of Claim filed as a secured Claim, which is (i) secured by a Lien on Collateral (to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code), or (ii) in the event that such Claim is subject to a right of setoff under section 553 of the Bankruptcy Code, to the extent of such right of setoff.

The Plan provides that, except to the extent that a holder of an Allowed Other Secured Claim shall have agreed in writing to a less favorable treatment, at the option of the Debtors (with the consent of the Restructuring Support Parties and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld)) or the Reorganized Debtors, in full and final satisfaction of such Claim: (i) such holder's Allowed Other Secured Claim shall be reinstated and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default; (ii) such holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code; or (iii) such holder of an Allowed Other Secured Claim shall receive the Collateral securing its Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, with such payment to be made on or as soon as practicable after the later of (a) the Effective Date and (b) the date when such Other Secured Claim becomes Allowed.

Notwithstanding the foregoing, to the extent any Allowed Other Secured Claim arises on account of property taxes, the Plan provides that such Allowed Other Secured Claim shall be treated as a Priority Tax Claim, and any applicable Liens shall remain Unimpaired until such Allowed Other Secured Claim is paid in full. Any applicable interest in respect of such Allowed Other Secured Claim shall be calculated in a manner consistent with section 511 of the Bankruptcy Code.

Class 2 is Unimpaired under the Plan.  Holders of Allowed Other Secured Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.  The Debtors anticipate there will be few, if any, Allowed Other Secured Claims.

**3.      Class 3 – Senior Secured Notes Claims.**

Senior Secured Notes Claims include any Claim of a holder of Senior Secured Notes based on the Senior Secured Notes.  Such Claims would include Claims for principal outstanding on the Petition Date and any accrued and unpaid interest thereon from and after May 31, 2011 (the most recent semiannual interest payment date), including interest accruing during the

pendency of the Chapter 11 Cases, to the date of payment. Such Claims also would include any Claim in respect of the Prepayment Premium, subject to the Prepayment Premium Waiver.

The Plan provides that the Senior Secured Notes Claims shall be Allowed and deemed to be Allowed in the amount of (i) $103,063,000 on account of the aggregate outstanding principal amount of the Senior Secured Notes plus (ii) accrued and unpaid interest thereon at the applicable contract rate, if any, as of the Effective Date.

The Plan further provides that, on or as soon as reasonably practicable after the Effective Date, the Senior Secured Notes shall be cancelled, and, in full and final satisfaction of and in exchange for all Allowed Senior Secured Notes Claims, each holder of Senior Secured Notes shall receive (a) New Secured Term Loans in a principal amount equal to the principal amount of such holder's Senior Secured Notes Claim and (b) Cash equal to the amount of any accrued and unpaid interest owed on account of its Senior Secured Notes Claim, if any, due as of the Effective Date. The vote by the holders of the Senior Secured Notes to accept the Plan shall constitute such holders' consent to the Prepayment Premium Waiver, which automatically becomes effective on the Effective Date and is given effect in connection with this calculation. However, such Prepayment Premium Waiver shall be deemed null and void if the Effective Date does not occur.

Class 3 is Impaired under the Plan. Holders of Allowed Senior Secured Notes Claims in Class 3 are entitled to vote to accept or reject the Plan.

### 4.     Class 4 – Senior Notes Claims.

Senior Notes Claims include any Claim of a holder of Senior Notes based on the Senior Notes. Such Claims would include Claims for principal and any accrued and unpaid interest thereon to the Petition Date (but not thereafter) including, as more fully described in Article V of this Disclosure Statement, the accrued and unpaid interest on the Senior Notes for the period from and after October 1, 2010 to April 1, 2011 that was required to have been paid on April 1, 2011.

The Plan provides that the Senior Notes Claims shall be Allowed and deemed to be Allowed in the amount of (i) $190,000,000 on account of the aggregate outstanding principal amount of the Senior Notes plus (ii) accrued and unpaid interest thereon at the applicable contract rate from October 1, 2010 to the Petition Date.

The Plan provides that, on or as soon as reasonably practicable after the Effective Date, the Senior Notes shall be cancelled, and, in full and final satisfaction of and in exchange for all Allowed Senior Notes Claims, each holder of an Allowed Senior Notes Claim shall receive its Pro Rata percentage of the Reorganized PMC Holding Membership Interests (subject to dilution on account of Reorganized PMC Holding Membership Interests or other similar Interests, if any, that may be issued from time to time pursuant to the Management Incentive Plan), with such Pro Rata percentage determined by dividing the Allowed amount of such holder's Senior Notes Claim by the total aggregate amount of all Allowed Senior Notes Claims and Allowed General Unsecured Claims that receive Reorganized PMC Holding Membership Interests under the Plan.

-46-

However, any Cash Eligible Claimant holding an Allowed Senior Notes Claim may, in lieu of such Pro Rata percentage of Reorganized PMC Holding Membership Interests, make the Cash Election and receive Cash in an amount equal to: (a) the lesser of (i) 14% of such holder's Allowed Senior Notes Claim or (ii) such holder's Pro Rata share of the Cash Cap Amount; plus (b) such holder's Pro Rata share of the Avoidance Action Recovery Pool.

Class 4 is Impaired under the Plan.  Holders of Allowed Senior Notes Claims in Class 4 are entitled to vote to accept or reject the Plan.

### 5.        Class 5 – General Unsecured Claims.

A General Unsecured Claim consists of any Claim against any of the Debtors that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, Professional Fee Claim, DIP Financing Claim, Other Secured Claim, Senior Secured Notes Claim, Senior Notes Claim, Convenience Claim, Intercompany Claim, or Subordinated Claim.  Claims in this Class would include, among other things, Claims arising as a result of the rejection by any of the Debtors of executory contracts or unexpired leases pursuant to section 365 of the Bankruptcy Code, and Claims arising as a result of pre-Petition Date litigation against any of the Debtors.

The Plan provides that, on or as soon as reasonably practicable after the Effective Date, in full and final satisfaction of and in exchange for all Allowed General Unsecured Claims, each holder of an Allowed General Unsecured Claim that is a Cash Eligible Claimant shall receive Cash in an amount equal to: (a) the lesser of (i) 14% of the holder's Allowed General Unsecured Claim or (ii) such holder's Pro Rata share of the Cash Cap Amount; plus (b) such holder's Pro Rata share of the Avoidance Action Recovery Pool.  However, such Cash Eligible Claimant may, in lieu of receiving Cash, make the Class 5 Equity Election and receive its Pro Rata share of the Reorganized PMC Holding Membership Interests (subject to dilution on account of Reorganized PMC Holding Membership Interests or other similar Interests, if any, that may be issued from time to time pursuant to the Management Incentive Plan), with such Pro Rata percentage determined by dividing the Allowed amount of such holder's General Unsecured Claim by the total aggregate amount of all Allowed Senior Notes Claims and Allowed General Unsecured Claims that receive Reorganized PMC Holding Membership Interests under the Plan.

The Plan further provides that, on or as soon as reasonably practicable after the Effective Date, in full and final satisfaction of and in exchange for all Allowed General Unsecured Claims, each holder of an Allowed General Unsecured Claim that is not a Cash Eligible Claimant shall receive its Pro Rata share of the Reorganized PMC Holding Membership Interests (subject to dilution on account of Reorganized PMC Holding Membership Interests or other similar Interests, if any, that may be issued from time to time pursuant to the Management Incentive Plan), with such Pro Rata percentage determined by dividing the Allowed amount of such holder's General Unsecured Claim by the total aggregate amount of all Allowed Senior Notes Claims and Allowed General Unsecured Claims that receive Reorganized PMC Holding Membership Interests under the Plan.

The Plan provides that the holder of an Allowed General Unsecured Claim shall be a Cash Eligible Claimant if that Allowed General Unsecured Claim is in the amount of $5 million

or less.  The Plan permits the holder of an Allowed General Unsecured Claim in the amount of more than $5 million to irrevocably elect to reduce that Claim to an amount of $5 million or less thereby be considered a Cash Eligible Claimant.  However, unless the Debtors (with the consent of the Restructuring Support Parties and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld) otherwise agree in writing, any General Unsecured Claim that is Allowed in the amount of more than $5 million may not be subdivided into multiple General Unsecured Claims for the purpose of determining whether the holder of such Claim is a Cash Eligible Claimant.  Nevertheless, in the event a holder of an Allowed General Unsecured Claim holds multiple Allowed General Unsecured Claims against the Debtors, such Allowed General Unsecured Claims shall not be aggregated for purposes of determining whether such holder of an Allowed General Unsecured Claim is a Cash Eligible Claimant.

This limited option to receive a Cash Distribution in lieu of an Equity Interest in Reorganized PMC Holding is intended to allow eligible creditors to opportunity to receive immediate liquidity without materially impairing the anticipated working capital of the Reorganized Debtors from and after the Effective Date.

Class 5 is Impaired under the Plan.  Holders of Allowed General Unsecured Claims in Class 5 are entitled to vote to accept or reject the Plan.

### 6.    Class 6 – Convenience Claims.

Convenience Claims include any Claim that would otherwise be a General Unsecured Claim that is Allowed in the Convenience Claim Amount ($2,500) or less.  A Claim in this Class would include, among other things, a Claim that would otherwise be a General Unsecured Claim that would be Allowed in an amount greater than the Convenience Claim Amount but which is reduced to the Convenience Claim Amount or less by an irrevocable written election of the holder of such Claim delivered to the Debtors.  However, absent the prior written consent of the Debtors (with the consent of the Restructuring Support Parties and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld)), any Claim that was originally Allowed in excess of the Convenience Claim Amount may not be subdivided into multiple Convenience Claims in the Convenience Claim Amount or less for purposes of receiving the treatment provided under the Plan to holders of Allowed Convenience Claims. Nevertheless, in the event a holder of an Allowed General Unsecured Claim holds multiple Allowed General Unsecured Claims against the Debtors, such Allowed General Unsecured Claims shall not be aggregated for purposes of determining whether each such Allowed General Unsecured Claim is a Convenience Claim.

The Plan provides that each holder of an Allowed Convenience Claim shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such holder's Allowed Convenience Claim as soon as practicable after the later of (a) the Effective Date and (b) the date such Convenience Claim becomes Allowed.

-48-

Class 6 Claims are Unimpaired under the Plan.  Holders of Allowed Convenience Claims in Class 6 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

### 7.    Class 7 – Intercompany Claims.

Intercompany Claims include any Claim held by one of the Debtors against any other Debtor.  Such Claims include, among other things, (a) any account reflecting intercompany book entries by a Debtor with respect to any other Debtor, (b) any Claim not reflected in book entries that is held by such Debtor against any other Debtor or Debtors, and (c) any derivative Claim asserted, or that may be asserted, by or on behalf of a Debtor against any other Debtor or Debtors.

The Plan provides that, on or as soon as reasonably practicable after the Effective Date, at the option of the Debtors (with the consent of the Restructuring Support Parties and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld)) or the Reorganized Debtors, each Allowed Intercompany Claim shall be either: (i) reinstated and continued in full or in part; or (ii) eliminated in full or in part by offset, distribution, cancellation, assumption or contribution of such Intercompany Claim or otherwise to the extent determined by the applicable Debtor(s), subject to the consent of the Restructuring Support Parties and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld), or the Reorganized Debtor(s).

Class 7 is Unimpaired under the Plan.  Holders of Allowed Intercompany Claims in Class 7 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

### 8.    Class 8 – Subordinated Claims.

A Subordinated Claim includes any Claim that is subordinated by Final Order of the Bankruptcy Court pursuant to section 510(b) or 510(c) of the Bankruptcy Code.

The Plan provides that the holders of Subordinated Claims shall neither receive Distributions nor retain any property under the Plan for or on account of such Subordinated Claims.

Class 8 is Impaired under the Plan.  Holders of Subordinated Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

### 9A.    Class 9A – Equity Interests in PMC Holding and PMCI.

The Plan defines an Equity Interest as meaning any equity security within the meaning of section 101(16) of the Bankruptcy Code, or any other instrument evidencing an ownership interest in any of the Debtors (or Reorganized Debtors, as applicable), whether or not transferable, and any option, warrant, or right, contractual or otherwise, to acquire, sell or

subscribe for any such interest.  The Plan further provides that an Equity Interest also would include any and all Claims that are otherwise determined by the Bankruptcy Court to be an equity interest; this would include (among other things) any debt or other Claim that the Bankruptcy Court recharacterizes as an equity interest for purposes of these Chapter 11 Cases.[33]

The Plan provides that the existing Equity Interests in PMC Holding and in PMCI (which would include any debt or other Claim that has been recharacterized as an Equity Interest in PMC Holding or in PMCI) shall be discharged, cancelled, released and extinguished as of the Effective Date, and that the holders of such Equity Interests in PMC Holding and in PMCI shall neither receive any Distributions nor retain any property under the Plan for or on account of such Equity Interests.  However, the Plan further provides that, as part of the Plan, Reorganized PMCI will issue the Reorganized PMCI Membership Interests to Reorganized PMC Holding on the Effective Date; thus, Reorganized PMC Holding will own 100% of Reorganized PMCI.

Class 9A is Impaired under the Plan. Holders of Equity Interests of PMC Holding and PMCI are presumed and deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

### 9B.    Class 9B – Equity Interests in the Other Subsidiary Debtors.

Class 9B consists of the Equity Interests in the Other Subsidiary Debtors.

The Plan provides that, on the Effective Date, the Equity Interests in the Other Subsidiary Debtors (as Reorganized Subsidiary Debtors, as applicable) shall remain effective and outstanding (in the form of corporate stock or Subsidiary Membership Interests, as applicable), and shall be owned and held by the same applicable Debtor (as a Reorganized Debtor) that had held and/or owned such Equity Interests prior to the Effective Date.  However, to the extent that a Reorganized Debtor (other than MCID and Wilshire Beverage) had been a corporation prior to its conversion into a limited liability company on the Effective Date in accordance with the Plan, the Plan provides that the corporate stock held in such Debtor automatically upon such conversion is converted into a Subsidiary Membership Interest in such Reorganized Debtor.

Nothing contained in the Plan is intended to affect any Equity Interests held by any Debtor in any non-debtor affiliate of such Debtor, except for certain income tax consequences and elections more fully described in Article XIII of this Disclosure Statement.

Class 9B is Unimpaired under the Plan.  Holders of Equity Interests in the Other Subsidiary Debtors are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

---

[33]    As more fully discussed in Article IV(A)(6) below, the Creditors' Committee has advised the Debtors that the Creditors' Committee will seek to have certain identified Claims recharacterized as Equity Interests in PMC Holding or in PMCI, for purposes of these Chapter 11 Cases.

**E.      Provisions Regarding Corporate Governance of the Reorganized Debtors.**

**1.      Amendments to Corporate Charter Documents.**[34]

(a)      <u>Reorganized PMC Holding.</u>   The Plan provides that, on the Effective Date, PMC Holding shall convert to a Delaware limited liability company which shall be governed by the New Charter Document of Reorganized PMC Holding, and by the PMC Holding LLC Agreement, which PMC Holding LLC Agreement shall, among other things, (i) authorize the issuance of Reorganized PMC Holding Membership Interests and (ii) prohibit the issuance of nonvoting equity interests, only so long as, and to the extent that, the issuance of nonvoting securities is prohibited.  The New Charter Document of Reorganized PMC Holding, and the PMC Holding LLC Agreement, shall be substantially in the form set forth in the Plan Supplement (on terms in all material respects consistent with the term sheet attached as an exhibit to the Plan) and shall be acceptable in form and substance to the Restructuring Support Parties.  The receipt and ownership of Reorganized PMC Holding Membership Interests entails substantial risk (including risks that may be unrelated, or only partly related, to the value of the Reorganized Debtors or to the results of their future operations); and, accordingly, holders of Claims in Class 4 (Senior Notes Claims) and Class 5 (General Unsecured Claims) are urged to read Article IX of this Disclosure Statement, and the other applicable provisions of this Disclosure Statement, where certain of those risks have been summarized.

(b)      <u>Reorganized Subsidiary Debtors.</u>   The Plan provides that, on the Effective Date, each Reorganized Subsidiary Debtor (other than MCID and Wilshire Beverage) that was not a limited liability company prior thereto shall convert to a limited liability company in its respective state of incorporation, and thereupon shall be governed by its respective New Charter Document and by its respective Subsidiary LLC Agreement.  On the Effective Date, each other Reorganized Subsidiary Debtor shall be governed by its respective New Charter Document and by its respective Subsidiary LLC Agreement, as applicable.  Each of such Subsidiary LLC Agreements shall, among other things, (i) authorize the issuance of corporate stock or Subsidiary Membership Interests, as applicable, and (ii) prohibit the issuance of nonvoting equity interests, only so long as, and to the extent that, the issuance of nonvoting securities is prohibited.  The New Charter Documents of the Reorganized Subsidiary Debtors, and their respective Subsidiary LLC Agreements (as applicable), shall be substantially in the form set forth in the Plan Supplement and shall be acceptable in form and substance to the Restructuring Support Parties.

(c)      <u>New Charter Documents</u>.   The Plan provides that, on or immediately before the Effective Date, the Debtors, on behalf of the Reorganized Debtors, or the Reorganized Debtors will file their respective New Charter Documents (including, in the case of any Debtor being converted into a limited liability company, all other related conversion filings) with the applicable Secretaries of State and/or other applicable authorities in their respective states of formation in accordance with the limited liability company and corporate laws of the

---

[34]      References in this Disclosure Statement to "corporate formation", "corporate action", and "corporate existence", and other such terms reflective of or relating to a corporation, shall be construed, *mutatis mutandis*, as applicable to any Debtor or Reorganized Debtor that is a limited liability company rather than a corporation.

respective states of formation.  After the Effective Date, the Reorganized Debtors may amend, or amend and restate, their New Charter Documents and other constituent documents as permitted by the laws of their respective states of formation or incorporation and their respective New Charter Documents and Subsidiary LLC Agreements (the PMC Holding LLC Agreement, in the case of Reorganized PMC Holding).

## 2. Equity Interests to Be Issued Pursuant to the Plan.

On the Effective Date: (i) Reorganized PMCI will issue the Reorganized PMCI Membership Interests to Reorganized PMC Holding; and (ii) Reorganized PMC Holding shall issue the Reorganized PMC Holding Membership Interests to holders of Allowed Senior Notes Claims and Allowed General Unsecured Claims (to the extent that the holders of such Allowed Senior Notes Claims and Allowed General Unsecured Claims are receiving Reorganized PMC Holding Membership Interests pursuant to the Plan).  The principal terms of the Reorganized PMC Holding Membership Interests are described in the PMC Holding LLC Agreement.  Also on the Effective Date, the corporate stock and Subsidiary Membership Interests, as applicable, (including the Reorganized PMCI Membership Interests) shall become effective, the principal terms of which are described in the Subsidiary LLC Agreements.

## 3. Management.

### (a) Appointment of Officers and Managers.

The Plan provides that Reorganized PMC Holding shall be a manager-managed limited liability company.  The initial board of managers of Reorganized PMC Holding shall be a seven-member board comprised of seven (7) managers designated by the Restructuring Support Parties, one of whom shall be the Chief Executive Officer of Reorganized PMC Holding and one of whom shall be selected by the Restructuring Support Parties and acceptable to the Creditors' Committee in the exercise of its reasonable discretion. The initial officers of Reorganized PMC Holding shall be designated by the Restructuring Support Parties.

The Plan provides that Reorganized PMCI and each other Reorganized Subsidiary Debtor that is a limited liability company shall be a manager-managed limited liability company.  The initial boards of managers or directors, as applicable, of each of the Reorganized Subsidiary Debtors shall have the same membership and composition as the board of managers for Reorganized PMC Holding (or such other membership or composition as determined by the board of managers of Reorganized PMC Holding), provided that the board of managers or directors, as applicable, of any material Reorganized Subsidiary Debtor shall have the same membership and composition as the board of managers of Reorganized PMC Holding.  The initial officers of each of the Reorganized Subsidiary Debtors shall be determined in accordance with the Plan.

The Plan provides that the identities, affiliations and other information relating to the initial board members will be disclosed in the Plan Supplement and shall be acceptable to the Restructuring Support Parties.  The identity of the initial officers of each Reorganized Debtor will also be disclosed in the Plan Supplement and shall be acceptable to the Debtors, the

Restructuring Support Parties and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld).  (The Debtors presently do not know who will be approved as managers or officers of Reorganized PMC Holding, or as managers, directors or officers of any of the other Reorganized Debtors.)  No individual shall be designated as a manager, director or officer who has not consented to serve in such respective capacity.  Any successors to the Reorganized Debtors' initial boards of managers or directors, and officers, will be appointed in compliance with the applicable Reorganized Debtor's governance documents. Each member of the boards of directors or boards of managers of the Debtors shall be deemed to have resigned on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act, or action under applicable law, resolution, order or rule of the vote, consent, or authority of any Debtor.

(b)    Powers of Officers.  Under the Plan, the officers of the Debtors (with the consent of the Restructuring Support Parties) or the Reorganized Debtors, as applicable, shall have the power to (i) enter into, execute or deliver any documents or agreements that may be necessary and appropriate to implement and effectuate the terms of the Plan, and (ii) take any and all other actions that may be necessary and appropriate to effectuate the terms of the Plan, including the making of appropriate filings, applications or recordings, provided that such documents and agreements are in form and substance acceptable to the Restructuring Support Parties.

(c)    Management of Reorganized Debtors.  The Plan provides that, subject to the consent of the Restructuring Support Parties (in consultation with the Creditors' Committee, (i) the initial officers of the Reorganized Debtors shall be substantially the same as the officers of the Debtors on the Effective Date (except as otherwise provided in the Plan, in the case of officers of Reorganized PMC Holding), and (ii) such officers shall serve in accordance with any employment agreement previously in effect with the Debtor or to be entered into with the Reorganized Debtors as well as in accordance with applicable nonbankruptcy law.  The Debtors will disclose the terms of such employment agreements in the Plan Supplement.

(d)    Management Incentive Plan.  The Plan provides that, as soon as reasonably practicable after the Effective Date, the board of managers of Reorganized PMC Holding will adopt and implement the Management Incentive Plan, which may provide for the issuance of Cash and equity incentive awards.  Specific awards shall be as determined by the board of managers of Reorganized PMC Holding (or, if applicable, a compensation committee established by such board of managers) from time to time.  Issuances of Reorganized PMC Holding Membership Interests (or other types of equity interests, if any) made under the Management Incentive Plan will dilute the interests of the holders of Reorganized PMC Holding Membership Interests issued by Reorganized PMC Holding.  However, the Plan provides that no more than ten percent (10%) of Reorganized PMC Holding Membership Interests or similar equity interests will be issued in the aggregate pursuant to the Management Incentive Plan.  In connection with any such issuances (or exercises, in the case of options and warrants), the Reorganized Debtors may take whatever actions they may determine to be necessary or appropriate to comply with applicable federal, state, local and international tax withholding obligations (including withholding from distributions a portion of the Reorganized PMC Holding

-53-

Membership Interests and selling such securities to satisfy tax withholding obligations including income, social security and Medicare taxes).

(e)    PMC Holding LLC Agreement.    The Plan provides that, on the Effective Date, the PMC Holding LLC Agreement (which must be on terms in all material respects consistent with the term sheet attached as **Exhibit B** hereto) will be adopted by Reorganized PMC Holding and will be binding upon all holders of Reorganized PMC Holding Membership Interests, and their respective successors and assigns, in each case, whether or not any such holder (or successor or assign) shall have executed and delivered a counterpart to the PMC Holding LLC Agreement agreeing to be bound thereby, and also whether or not any certificate evidencing the Reorganized PMC Holding Membership Interests (or, if interests are uncertificated, any ledger or book entry) shall have been legended to reflect the existence of the PMC Holding LLC Agreement.    The Plan also provides that the PMC Holding LLC Agreement will, among other things, (i) govern the access that each holder of Reorganized PMC Holding Membership Interests will have to information with respect to Reorganized PMC Holding, (ii) govern the ability to transfer such holder's Reorganized PMC Holding Membership Interests, (iii) provide for a right of first refusal for the majority holders of Reorganized PMC Holding Membership Interests, (iv) provide for customary drag-along and tag-along rights, and (v) unless and until the board of managers of Reorganized PMC Holding shall determine otherwise in accordance with the PMC Holding LLC Agreement, Reorganized PMC Holding Membership Interests will be uncertificated.    The PMC Holding LLC Agreement will take effect on the Effective Date.    Notwithstanding the foregoing, pursuant to the Plan all holders of Senior Notes Claims and General Unsecured Claims that are to receive Reorganized PMC Holding Membership Interests pursuant to the Plan shall be required to execute a counterpart signature page (or comparable joinder), in the discretion of the board of managers of Reorganized PMC Holding, as a condition precedent to receiving their respective allocation of Reorganized PMC Holding Membership Interests; and the failure of any such holder to deliver such executed counterpart (or joinder) within the time frame specified in the Plan shall have the effects set forth in the Plan.    The receipt and ownership of Reorganized PMC Holding Membership Interests entail substantial risk.    See Article IX of this Disclosure Statement for a summary discussion of certain of those risks.

F.    **Limited Substantive Consolidation of the Debtors for Voting, Confirmation, and Distribution Purposes.**

Early into the Chapter 11 Cases, upon the motion of the Debtors, the Bankruptcy Court ordered that the Chapter 11 Cases be administered on a joint rather than individual basis.  (See Docket No. 35.)  Joint administration of the bankruptcy reorganization cases of affiliated debtors commonly occurs, as it greatly simplifies that administration, for the bankruptcy court, the debtors, and the debtors' claimants.  Joint administration of the bankruptcy cases of affiliated debtors does not, in and of itself, displace or otherwise impact the substantive rights of any party in interest; nor does it necessarily presage the substantive consolidation of those affiliated debtors for any purpose.

Unlike joint administration, substantive consolidation does affect substantive rights, and is permissible only under certain narrowly prescribed circumstances.  "Substantive consolidation,

a construct of federal common law, emanates from equity. It 'treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities (save for inter-entity liabilities, which are erased). The result is that claims of creditors against separate debtors morph to claims against the consolidated survivor.' Consolidation restructures (and thus revalues) rights of creditors and for certain creditors this may result in significantly less recovery." In re Owens Corning, 419 F.3d 195 (3d Cir. 2005), as amended (internal citation omitted).

The United States Supreme Court has not established any set framework, binding nationwide, for determining when substantive consolidation may be appropriate.  In the absence of any such nationwide framework, a patchwork of frameworks has developed, largely based on the decisions of those federal circuit courts of appeal that have weighed in on the matter (and decisions of the lower courts in those particular federal circuits in reliance on that appellate guidance), as well as the lower court decisions in the federal circuits lacking definitive direction from their respective court of appeals.  Further complicating the legal landscape, it is unclear whether the analysis of certain earlier-decided cases of certain of those federal courts of appeal still would be regarded as good law, were those appellate courts to revisit the question with the benefit of the more-refined analysis gained from certain of the later-decided appellate cases.  In the case of the Chapter 11 Cases, the governing analysis is contained in the Owens Corning case referenced above.  Owens Corning was decided by the United States Court of Appeals for the Third Circuit, which circuit includes bankruptcy courts located in the State of Delaware and which decision also constitutes perhaps the most recent full substantive consolidation analysis of any federal circuit court.

In Owens Corning, the Third Circuit confirmed that substantive consolidation exists as a remedy available to a bankruptcy court for use in appropriate circumstances over the objections of creditors. Owens Corning, at 210.  In reversing the district court's consolidation of a parent company and a number of its subsidiary guarantors, the Third Circuit did not endorse any specific set of "factors" a court should consider in ordering substantive consolidation.  Instead, the Third Circuit articulated the following five (5) "principles" to guide the court in its analysis: (i) absent compelling circumstances calling equity (and even then only possibly substantive consolidation) into play, courts must respect entity separateness; (ii) substantive consolidation nearly always addresses harms caused by debtors disregarding separateness (with other tools being available to address harms caused by creditors); (iii) mere benefit of administration of the case is "hardly a harm calling substantive consolidation into play"; (iv) substantive consolidation rarely should be used, and only as a last resort after alternative remedies have been considered and rejected; and (v) substantive consolidation may be used defensively, to remedy identified harms caused by entangled affairs, but may not be used as a "sword." Owens Corning, at 211.

Applying those five (5) principles, the Third Circuit established two alternate rationales to be used by a bankruptcy court in this jurisdiction in order to order substantive consolidation, absent the consent of the parties.  The bankruptcy court must find that "(i) prepetition [the applicable debtors] disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii)

-55-

postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." Id. (footnotes omitted).

The Plan provides that, solely for purposes of voting on, confirmation of, and Distributions to be made to holders of Allowed Claims under the Plan, the Plan is predicated upon, and it is a condition precedent to confirmation of the Plan, that the Bankruptcy Court provide in the Confirmation Order for the limited consolidation of the Estates of the Debtors into a single Estate for purposes of the Plan, its confirmation, and Distributions to be made thereunder.

As provided in the Plan, pursuant to the Confirmation Order: (i) all assets and liabilities of the consolidated Debtors will be deemed to be merged solely for purposes of the Plan, its confirmation, and Distributions to be made thereunder; (ii) the obligations of each Debtor will be deemed to be the obligation of the consolidated Debtors solely for purposes of the Plan, its confirmation, and Distributions to be made thereunder; (iii) any Claims filed or to be filed in connection with any such obligations will be deemed Claims against the consolidated Debtors; (iv) each Claim filed in the Chapter 11 Case of any Debtor will be deemed filed against the Debtors in the consolidated Chapter 11 Cases in accordance with the limited consolidation of the assets and liabilities of the Debtors provided for under the Plan; (v) all transfers, disbursements and Distributions made by any Debtor under the Plan will be deemed to be made by the consolidated Debtors; and (vi) all guarantees of the Debtors of the obligations of any other Debtors shall be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors. Holders of Allowed Claims in each Class shall be entitled to their share of assets available for Distribution to such Class without regard to which Debtor was originally liable for such Claim. Intercompany Claims shall be treated as provided in Class 7 of the Plan, and Equity Interests in the Other Subsidiary Debtors shall be treated as provided in Class 9B of the Plan.

The Plan provides that, notwithstanding the limited consolidation provided for in the Plan and described above, such limited consolidation shall not affect: (a) the legal and corporate structure of the Reorganized Debtors; (b) any obligations under any contracts or leases that were entered into during the Chapter 11 Cases or executory contracts or unexpired leases that have been or will be assumed pursuant to the Plan; (c) distributions from any insurance policies or proceeds of such policies; (d) the revesting of assets in the separate Reorganized Debtors pursuant to the Plan; or (e) guarantees that are required to be maintained post-Effective Date (i) in connection with executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been, or will (under the Plan) be, assumed, (ii) pursuant to the express terms of the Plan, (iii) in connection with the First Lien Exit Facility, or (iv) in connection with the New Secured Term Loans. The limited consolidation proposed in the Plan shall not affect each Debtor's obligation to file the necessary operating reports and pay any required fees pursuant to 28 U.S.C. § 1930(a)(6). Such obligations shall continue until a Final Order is entered closing, dismissing or converting each such Debtor's Chapter 11 Case.

Unless the Bankruptcy Court has approved the substantive consolidation of the Estates by a prior order, the Plan shall serve as, and shall be deemed to be, a motion for entry of an order consolidating the Estates in the manner and for the limited purposes set forth in the Plan. If no objection to such consolidation is timely filed and served, then the holders of Claims will be deemed to have consented to such consolidation in the manner and for the limited purposes of the Plan only, and the Bankruptcy Court may approve such consolidation of the Debtors' Estates in the Confirmation Order. If an objection to the limited consolidation described above is timely filed and served, a hearing with respect to such consolidation and the objections thereto shall be scheduled by the Bankruptcy Court, which hearing may coincide with the Confirmation Hearing.

The Debtors believe that substantive consolidation, in the manner and for the limited purposes set forth in the Plan, is warranted in the Chapter 11 Cases for several reasons. The Debtors historically have operated on a consolidated basis. For purposes of the Debtors' negotiation of secured and certain unsecured financing, both prepetition and postpetition, the parties to such financing arrangements treated the Debtors' operations as unitary. For example, each of the Debtors (excluding Promotions)[35] is fully obligated, as borrower or guarantor, on the Debtors' two prepetition secured financings (the Pre-Petition Secured Credit Facility, and the Senior Secured Notes); and each of the Debtors (excluding Promotions and PMC Holding)[36] is fully obligated on the Senior Notes. Those three financings collectively constitute the vast majority of the Debtors' prepetition liabilities. Other than for its Equity Interest in PMCI, PMC Holding has no material assets; and Promotions has no material assets or liabilities. Moreover, it is a requirement, under the First Lien Exit Facility and under the New Secured Term Loan Agreement, that each of the Reorganized Debtors -- including Reorganized PMC Holding and Reorganized Promotions -- be obligated thereunder and provide a lien on and security interest in substantially all of its respective assets as credit support therefor.

In addition, the Debtors believe that customers and creditors identified the Debtors and dealt with them as one aggregation, by their trade names at particular restaurant locations, rather than by their separate corporate identities, particularly in light of the fact that virtually all company-owned locations operated under one of only two principal trade names. The Debtors also believe that their general unsecured creditors viewed the Debtors as one single entity when extending trade credit and other credit terms, and the Debtors capitalized upon the scale and operations of the entirety of the Debtors' business operations to negotiate such agreements and maximize value. Further, all accounts payable functions were performed from one centralized location (Memphis, Tennessee), by the same administrative staff working on behalf of all Debtors, and all debts were centralized and paid

---

[35]    Promotions was not formed until after the Pre-Petition Secured Credit Facility had been established and the Senior Secured Notes and the Senior Notes had been issued. Indeed, by the terms of such financings Promotions was required to have become fully obligated thereunder upon its formation.

[36]    The Senior Notes Indenture did not require that PMC Holding guarantee the Senior Notes. That exclusion is not unusual in a financing involving a holding company structure where the parent holding company's operating subsidiary is the principal obligor under that financing. Typically, the parent holding company is required to guarantee its subsidiary's obligations only where the financing is collateralized, in order to facilitate the pledge of all of the Equity Interests in the subsidiary operating company as further collateral security for that facility. The Senior Notes are unsecured.

by one Debtor entity.   Additionally, while the Debtors' financial systems did track intercompany transactions and debts in the aggregate, such amounts customarily were simply forgiven and written off at varying intervals by the Debtors as a matter of administrative and accounting convenience; and few (if any) of the Debtors' general unsecured creditors sought or were provided with stand-alone financial statements or other financial information regarding each specific Debtor entity.

Determining the sources of the Debtors' prepetition assets and liabilities on a per-entity basis would involve the nearly impossible task of reviewing and categorizing records of millions of individual transactions to trace such transactions back to the proper entity. Moreover, given the nominal amount of assets held by various of the Debtors, the relatively few creditors of each of the Debtors (other than PMCI and MCPSI), the fact that virtually all of the Debtors are obligors under the Senior Secured Notes Indenture and the Senior Notes Indenture  and the obligations thereunder represent the vast majority of Claims in the Chapter 11 cases, and the expense of generating separate plans of reorganization for each of the Debtors, the Debtors believe that the overall effect of substantive consolidation will be more beneficial than harmful to creditors and will allow for greater efficiencies and simplification in processing Claims and making distributions to holders of Allowed Claims.  Accordingly, the Debtors believe that substantive consolidation of the Debtors' estates, under the terms of the Plan, will not adversely impact the treatment of any of the Debtors' creditors, but rather will reduce administrative expenses by automatically eliminating duplicative claims asserted against more than one of the Debtors, decreasing the administrative difficulties and costs related to the administration of twelve (12) separate Debtor's estates separately, as well as eliminating the need to determine professional fees on a case-by-case basis and streamlining the process of making Distributions.

For the above reasons, the Debtors believe that substantive consolidation is justified in these Chapter 11 Cases.  Apart from Convenience Claims (Class 6), which are to be paid in full in Cash, Intercompany Claims (Class 7), which are to survive unless the Debtors or Reorganized Debtors determine otherwise, and Subordinated Claims (Class 8), which are to be uncompensated, the Plan provides that the net equity value of the Reorganized Debtors inures to the benefit of holders of Allowed Senior Notes Claims (Class 4) (excepting holders who instead are to receive Cash under the Plan), by far the largest unsecured Class, and holders of Allowed General Unsecured Claims (Class 5) (excepting holders who instead are to receive Cash under the Plan), the second largest unsecured Class, on a pro rata basis. Class 4 has claims against substantially all of the Debtors.  Class 5 does not.[37]  Arguably, such claimants are the only parties whose rights might be prejudiced by the substantive consolidation of all the assets and liabilities of all Debtors.  The Debtors submit that holders of General Unsecured Claims in Class 5, who did not have guarantees from substantially all of the Debtors, will receive comparable or improved treatment as a result of a substantive consolidation order than such claimants would receive without such substantive consolidation.   Absent a timely objection to the Debtors' proposed substantive consolidation, substantive consolidation may be ordered by the Bankruptcy Court.  If an

---

[37]       As more fully described above, the Plan affords certain holders of Allowed Claims in Class 4 and Class 5 the opportunity to receive a discounted amount in Cash as an alternative to receiving such holder's pro rata Distribution of Reorganized PMC Holding Membership Interests to be issued in the reorganization.

objection is timely filed and served, a hearing with respect to the substantive consolidation of the Debtors' estates in the manner provided for under the Plan may be requested by the Debtors, at which time the Debtors will seek to establish the requisites for substantive consolidation.

**G.      Provisions Regarding Means of Implementation, Voting, Distributions, and Resolution of Disputed Claims.**

**1.      Exit Financing.**

The Exit Financing is to consist of the First Lien Exit Facility and the New Secured Term Loans to be made or deemed to be made under the New Secured Term Loan Agreement.  The Cash advanced under the First Lien Exit Facility and the Cash advanced under the New Secured Term Loan Agreement shall be used to make required Distributions under the Plan, satisfy certain Plan-related expenses and fund the Reorganized Debtors' working capital needs.

a.      <u>First Lien Exist Facility</u>.

The Plan provides that, on the Effective Date, the Reorganized Debtors shall enter into the First Lien Exit Facility.  The terms and conditions of the First Lien Exit Facility shall be substantially in the form set forth in the Plan Supplement.

Anticipated utilization of the First Lien Exit Facility is addressed in Article VIII below (and in the Financial Projections attached as Exhibit C to this Disclosure Statement).  The Debtors have not yet accepted any proposal for the First Lien Exit Facility.

b.      <u>New Secured Term Loans</u>.

The Plan provides for the New Secured Term Loans, and further provides that the incurrence of obligations under the New Secured Term Loans by the Reorganized Debtors is authorized without need for any further corporate action or without any further action.  Pursuant to the Plan, on the Effective Date, the Reorganized Debtors, the New Secured Term Loan Agent and the New Secured Term Loan Lenders shall be deemed to have executed the New Secured Term Loan Agreement and shall be bound by the terms thereof.

The New Secured Term Loans consist of three components.  First, an aggregate principal amount of $103,063,000 in New Secured Term Loans shall be deemed outstanding (without the receipt of any Cash by the Reorganized Debtors) by virtue of the treatment accorded to holders of Senior Secured Notes Claims under Class 3 of the Plan.  Second, an aggregate principal amount of $7,500,000 in New Secured Term Loans shall be made on the Effective Date, in Cash, by one or more of the New Secured Term Loan Lenders to Reorganized PMCI.  Third, the New Secured Term Loan Agreement provides the potential for up to $10,000,000 in aggregate principal amount of additional availability, in Cash, of New Secured Term Loans upon the satisfaction of certain conditions to be specified in the New Secured Term Loan Agreement. One of those conditions will be that the New Secured Term Loan Lenders holding a majority of

the New Secured Term Loans must consent to any such additional advance; accordingly, this additional availability should be regarded as an uncommitted, conditional line of credit.

### 2.    Issuance of Reorganized PMC Holding Membership Interests.

The Plan provides that the issuance of Reorganized PMC Holding Membership Interests (including any Reorganized PMC Holding Membership Interests, options or other equity awards reserved for the Management Incentive Plan) by Reorganized PMC Holding is authorized without the need for any further corporate action (except in the case of the Management Incentive Plan, which must be adopted by the board of managers of Reorganized PMC Holding; and issuances under which shall be as determined from time to time by the board of managers of Reorganized PMC Holding or by any compensation committee thereof) or without any further action by a holder of Claims or Interests. On the Effective Date (or as soon as reasonably practicable thereafter), the Reorganized PMC Holding Membership Interests shall be issued, subject to the provisions of the Plan, to: (i) the Senior Notes Trustee, for the benefit of holders of Senior Notes Claims who are receiving Reorganized PMC Holding Membership Interests pursuant to the Plan; and (ii) holders of Allowed General Unsecured Claims who are receiving Reorganized PMC Holding Membership Interests pursuant to the Plan.  The amount of the Reorganized PMC Holding Membership Interests to be issued pursuant to the Plan shall be disclosed in the Plan Supplement.

All of the Reorganized PMC Holding Membership Interests issued pursuant to the Plan shall be duly authorized and validly issued.  The receipt and ownership of Equity Interests entails substantial risk (see Article IX of this Disclosure Statement).  Each Distributions and issuances of the Reorganized PMC Holding Membership Interests shall be governed by, among other things, the terms and conditions set forth in the PMC Holding LLC Agreement, which terms and conditions shall bind each Person receiving such Distribution or issuance.  Unless and until changed by the board of managers of Reorganized PMC Holding in accordance with the PMC Holding LLC Agreement, Reorganized PMC Holding Membership Interests shall be uncertificated.

The Plan provides that, upon the Effective Date, the PMC Holding LLC Agreement shall be deemed to become valid, binding and enforceable in accordance with its terms, and each holder of Reorganized PMC Holding Membership Interests shall be bound thereby, in each case, without need for execution by any party thereto other than Reorganized PMC Holding. However, the Plan further provides that any holder of Senior Notes Claims or Allowed General Unsecured Claims who has received Reorganized PMC Holding Membership Interests pursuant to the Plan that fails to register its Reorganized PMC Holding Membership Interests with the Reorganized Debtors or such transfer agent as may be designated by the Debtors (with the consent of the Restructuring Support Parties), and execute a counterpart signature page (or other joinder, approved by the board of managers of Reorganized PMC Holding) to the PMC Holding LLC Agreement, and to provide applicable information required to be collected by the Internal Revenue Service in respect of pass-through entities, by the later of (i) the one year anniversary of the Effective Date or (ii) 60 days after the allowance by Final Order of such holder's Senior Notes Claim or General Unsecured Claim, shall be deemed to have forever forfeited its right to receive Reorganized PMC Holding Membership Interests on account of its Claim.

-60-

The Plan requires that the Reorganized Debtors provide written notification, on not less than a quarterly basis, of the requirement to execute a counterpart signature page to the PMC Holding LLC Agreement to (i) the Senior Notes Trustee for distribution to holders of Allowed Senior Notes Claims who are receiving Reorganized PMC Holding Membership Interests pursuant to the Plan and (ii) holders of Allowed General Unsecured Claims who are receiving the Reorganized PMC Holding Membership Interests pursuant to the Plan, and in the event that the Reorganized Debtors fail to provide such notice in a particular quarter, the one year time period shall be extended for an additional quarter year for each quarter for which such failure to provide such notice occurs.

### 3.    New Intercreditor Agreement.

Upon the Effective Date, the New Intercreditor Agreement shall be deemed to become valid, binding and enforceable in accordance with its terms, and each lender and agent under the New Secured Term Loan Agreement and the First Lien Exit Facility shall be bound thereby.

### 4.    Avoidance Actions.

Pursuant to the Plan, on the Effective Date, the Claims Administrator shall be granted standing to investigate and prosecute the Assigned Avoidance Actions, co-extensive with the Reorganized Debtors' standing to investigate and prosecute such actions.  The Claims Administrator shall cooperate, and coordinate, with the Reorganized Debtors regarding the pursuit of such Assigned Avoidance Actions and strategy related thereto, and the Assigned Avoidance Actions may be settled or otherwise resolved only with the consent of the Reorganized Debtors and the Claims Administrator, which consent shall not be unreasonably withheld.  Any proceeds recovered on account of the Assigned Avoidance Actions shall be retained by the Reorganized Debtors other than the Avoidance Action Recovery Pool.

The Debtors and the Creditors' Committee have not yet completed their review of Avoidance Actions and, therefore, cannot presently predict what recoveries, if any, may be achieved from any Avoidance Actions that ultimately may be brought.

The Plan further provides, however, that the foregoing rights in favor of the Claims Administrator shall affect the Reorganized Debtors' rights to pursue the Assigned Avoidance Actions to the extent not otherwise being pursued by the Claims Administrator.

Under the Plan, all other Avoidance Actions shall be retained by the Reorganized Debtors; provided, however, that the Claims Administrator shall have consent rights (not to be unreasonably withheld) over the settlement or other resolution of any such Avoidance Actions.

### 5.    Restructuring Transactions.

Pursuant to the Plan, on the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (i) the execution and delivery of appropriate agreements or other documents of

merger, consolidation, restructuring, conversion (including related formation), disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties may agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion (including related formation) or dissolution pursuant to applicable state law; and (iv) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.  Among other things, the restructuring transactions shall include, without limitation: (a) on the Effective Date (i) the discharge cancellation, release, and extinguishment of the Equity Interests of PMC Holding and PMCI and (ii) the issuance of the Reorganized PMCI Membership Interests from Reorganized PMCI to Reorganized PMC Holding; and (b) from and after the Effective Date, Reorganized PMCI shall pay when due (and shall indemnify and hold harmless P&MC (and the other members of any consolidated group or affiliated group of which P&MC is a member (collectively, "*P&MC Group*")) from and against any and all Applicable Tax Liabilities of P&MC Group, and neither Reorganized PMCI nor any of the other Reorganized Debtors will assert any actual or potential claims they may have against P&MC Group (for reimbursement, restitution or contribution, or by way of subrogation, or otherwise) with respect to the payment of such Applicable Tax Liabilities. For purposes of the foregoing "*Applicable Tax Liabilities*" shall include: (x) corporate income and income-based franchise tax liabilities of the Debtors (or, if applicable, Reorganized Debtors) attributable to their operations on or prior to the Effective Date (including operations on or prior to the Petition Date); plus (y) tax liabilities of P&MC Group attributable to the restructuring transactions provided for pursuant to the Plan, in each case (net of any losses or credits available to P&MC Group), less (z) any tax refunds subsequently received by P&MC Group with respect to the tax liabilities described in clauses (x) and (y) which are paid by Reorganized PMCI. Any such tax refunds received by P&MC Group shall be held by P&MC Group in trust for Reorganized PMCI.  Nothing in the Plan shall affect the right of Reorganized PMCI (or any other Reorganized Debtor) to the refund of any amounts previously paid by PMCI or any other Debtor and the Reorganized Debtors reserve all rights with respect to any and all such refunds.

The conversion of the corporate Debtors (other than MCID and Wilshire Beverage) into limited liability companies is expected to be a taxable transaction, generating a U.S. federal income tax liability of approximately $8,500,000 (based on present estimates).  It is expected that P&MC will be the entity recognizing the income associated with such conversions and that the P&MC Group will be responsible for the payment of that tax liability on behalf of such consolidated group (with P&MC's Real Estate Holding LLC as the parent entity).  The Plan nevertheless provides for Reorganized PMCI to pay that resulting tax liability (as part of the Applicable Tax Liabilities), given that these tax liabilities are expected to constitute administrative expenses for which the Debtors effectively are jointly and severally liable.

6.      **Corporate Action.**

Under the Plan, upon the Effective Date, all corporate actions contemplated by the Plan shall be deemed authorized and approved in all respects, including: (i) the transactions contemplated by the preceding paragraph in this Disclosure Statement; (ii) the adoption of the PMC Holding LLC Agreement and the Subsidiary LLC Agreements; (iii) the conversion of each of the Reorganized Debtors that is not a limited liability company (other than MCID and Wilshire Beverage) to a limited liability company; (iv) the filing of New Charter Documents; (v) the initial selection of managers, directors and officers for the Reorganized Debtors; (vi) the Distribution of Reorganized PMC Holding Membership Interests, New Secured Term Loans, and Cash pursuant to the Plan; (vii) the execution and entry into the New Secured Term Loan Agreement; (viii) the execution and entry into the First Lien Exit Facility; and (ix) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case unless otherwise provided in the Plan. All matters provided for under the Plan involving the corporate structure of the Debtors and Reorganized Debtors or corporate action to be taken by or required of a Debtor or a Reorganized Debtor will be deemed, under the Plan, to occur and be effective as of the Effective Date, if no such other date is specified in such documents, and shall be authorized, approved, adopted and, to the extent taken prior to the Effective Date, ratified and confirmed in all respects and for all purposes without any requirement of further action by holders of Claims or Interests, directors or managers of the Debtors or the Reorganized Debtors, as applicable, or any other Person, except for applicable filings necessary to convert corporate Debtors into limited liability companies in accordance with the Plan, and to effect the filing of the New Charter Documents respecting the Debtors.

7.      **Effectuating Documents; Further Transactions.**

In accordance with the Plan, on and after the Effective Date, the Reorganized Debtors and the officers and members of the boards of managers or board of directors thereof, are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan and applicable non-bankruptcy law.

8.      **Cancellation of Securities and Agreements.**

Pursuant to the Plan, on the Effective Date, except as otherwise specifically provided for in the Plan: (1) the obligations of the Debtors under the Pre-Petition Secured Credit Facility, the Senior Secured Notes Indenture, the Senior Notes Indenture and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Equity Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the

obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the membership interests, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically reinstated pursuant to the Plan) shall be released and discharged.  The Plan further provides, however, that notwithstanding confirmation of the Plan or the occurrence of the Effective Date, any agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of allowing holders to receive Distributions under the Plan as provided therein.  The Plan also provides that, notwithstanding confirmation of the Plan or the occurrence of the Effective Date, the Senior Secured Notes Indenture and the Senior Notes Indenture shall continue in effect solely for the purposes of: (1) allowing holders of the Senior Secured Notes Claims and the Senior Notes Claims to receive Distributions under the Plan; and (2) allowing and preserving the rights of the Senior Secured Notes Trustee and the Senior Notes Trustee to (a) make Distributions in satisfaction of the applicable Senior Secured Notes Claims and Senior Notes Claims, (b) exercise its charging lien against any such Distributions, and (c) seek compensation and reimbursement for any fees and expenses incurred in making Distributions; provided, however, that the foregoing shall not affect the discharge of Claims or Equity Interests pursuant to the Bankruptcy Code, the Confirmation Order or the Plan, or result in any expense or liability to the Reorganized Debtors.

### 9.      Voting of Claims.

Under the Plan, each holder of an Allowed Claim in an Impaired Class of Claims shall be entitled to vote to accept or reject the Plan as provided in such Final Order as may be entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

### 10.      Nonconsensual Confirmation.

Section 1129(b) of the Bankruptcy Code provides for the ability of a bankruptcy court to confirm a reorganization plan in certain cases where at least one (1) Class of Impaired Claims has accepted the proposed plan (with such acceptance being determined without inclusion of Insiders), even where one (1) or more other Classes of Impaired Claims have not.  This ability is commonly referred to as a "cram-down".  Inasmuch as certain Impaired Classes automatically are deemed to have rejected the Plan, the Debtors intend to seek to have the Bankruptcy Court confirm the Plan under section 1129(b) regardless of the outcome of the vote by holders in Classes that are entitled to vote on acceptance or rejection of the Plan, so long as at least one (1) Class of Claims Impaired under the Plan has accepted the Plan (and which Class's acceptance is determined without inclusion of Claims of Insiders).

## 11.    Distributions in Respect of Allowed Claims.

(a)    Record Date for Distributions.  As provided in the Plan, as of the close of business on the Record Date, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes made to reflect any new record holders of any Claims or Equity Interests occurring on or after the Record Date. The Debtors and the Reorganized Debtors shall have no obligation to recognize any transfer of any Claims or Equity Interests occurring after the Record Date.

(b)    Date of Distributions.  Except as otherwise provided in the Plan, Distributions and deliveries under the Plan with respect to Allowed Claims shall be made before the close of business on or as soon as reasonably practicable after the Effective Date.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

(c)    Disbursing Agent.  Except as otherwise provided in the Plan, all Distributions under the Plan are to be made by the Reorganized Debtors as Disbursing Agent or such other entity (as defined in section 101(15) of the Bankruptcy Code) designated by the Reorganized Debtors to assist the Disbursing Agent on the Effective Date.  If the Disbursing Agent is an independent third party designated by the Reorganized Debtors to serve in such capacity, such Disbursing Agent shall receive, without further Bankruptcy Court approval, reasonable compensation for distribution services rendered pursuant to the Plan and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services from the Reorganized Debtors on terms acceptable to the Reorganized Debtors.  No Disbursing Agent shall be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  If otherwise so ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

(d)    Powers of Disbursing Agent.  Pursuant to the Plan, the Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan, (ii) make all Distributions contemplated by the Plan, and (iii) exercise such other powers as may be vested in the Disbursing Agent by Final Order of the Bankruptcy Court or pursuant to the Plan.

(e)    Delivery of Distributions.

The Plan provides that, except as otherwise provided therein, the Disbursing Agent shall make Distributions to holders of Allowed Claims at the address for each holder indicated on the Debtors' records as of the date of any such Distribution unless such addresses are superseded by Proofs of Claim or transfers of Claim filed pursuant to Bankruptcy Rule 3001 by the Record Date.  If any Distribution to a holder of a Claim is returned as undeliverable, no further Distributions shall be made unless and until the Disbursing Agent is notified of the then-current address of such holder of the Claim, at which time all missed distributions shall be made to such

holder of the Claim without interest. Amounts in respect of undeliverable distributions shall be returned to the Reorganized Debtors until such Distributions are claimed. The Reorganized Debtors shall make reasonable efforts to locate holders of undeliverable Distributions.

Except as otherwise provided in the Plan, all Distributions to holders of DIP Financing Claims shall be governed by the DIP Credit Facility, and shall be deemed completed when made to the DIP Administrative Agent, who shall in turn make distributions in accordance with the DIP Credit Facility, for further Distribution to the holders of DIP Financing Claims.

Except as otherwise provided in the Plan, all Distributions to holders of Senior Secured Notes Claims and Senior Notes Claims shall be governed by the Senior Secured Notes Indenture and the Senior Notes Indenture, respectively, and shall be deemed completed when made to the Senior Secured Notes Trustee and the Senior Notes Trustee, respectively, who shall in turn make Distributions in accordance with the Senior Secured Notes Indenture and Senior Notes Indenture, as applicable, for further distribution to holders of Senior Secured Notes Claims and Senior Notes Claims.

(f)     Distribution of Cash.  Under the Plan, any payment of Cash by the Reorganized Debtors pursuant to the Plan shall be made at the option and in the sole discretion of the Reorganized Debtors by (i) a check drawn on, or (ii) wire transfer from, a U.S. domestic bank selected by the Reorganized Debtors.

(g)     Unclaimed Distributions.  Pursuant to the Plan, any Distribution under the Plan that is unclaimed six (6) months after the Disbursing Agent has delivered (or has attempted to deliver) such Distribution shall become the property of the Reorganized Debtor against which such Claim was Allowed, notwithstanding any federal or state escheat, abandoned or unclaimed property laws to the contrary; and, from and after that time, the entitlement by the holder of such unclaimed Allowed Claim to such Distribution or any subsequent Distribution on account of such Allowed Claim shall be discharged and forever barred.  In the case of any unclaimed Distributions of Reorganized PMC Holding Membership Interests that remain unclaimed for six (6) months after the Disbursing Agent has delivered (or attempted to deliver) such Distribution, the Plan provides that such unclaimed Reorganized PMC Holding Membership Interests shall be forfeited, and the holder of the Allowed Claim otherwise entitled to receive such Reorganized PMC Holding Membership Interests shall have forever forfeited its right to receive any recovery or Distribution under the Plan on account of its Allowed Claim.

(h)     Fractional Reorganized PMC Holding Membership Interests and De Minimis Distributions.  The Plan provides that, notwithstanding any other provision in the Plan to the contrary, no fractional units of Reorganized PMC Holding Membership Interests shall be issued or distributed pursuant to the Plan.  Pursuant to the Plan, whenever any payment of a fraction of a unit of Reorganized PMC Holding Membership Interests would otherwise be required under the Plan, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole share (up or down), with half interests or less being rounded down and fractions in excess of a half of an interest being rounded up. In accordance with the Plan, any holder whose Claim has been so rounded down shall not be entitled to receive any compensation whatsoever on account of such reduction. If two or more holders are entitled to equal fractional

entitlements and the number of holders so entitled exceeds the number of whole interests, as the case may be, which remain to be allocated, the Reorganized Debtors shall allocate the remaining whole units to such holders by random lot or such other impartial method as the Reorganized Debtors deem fair, in the their sole discretion. Upon the allocation of all of the whole Reorganized PMC Holding Membership Interests authorized under the Plan, all remaining fractional portions of the entitlements shall be canceled and shall be of no further force and effect.

The Debtors (with the consent of the Restructuring Support Parties) or the Reorganized Debtors, as the case may be, shall not be required to, but may in their discretion, make distributions to any holder of a Claim of Cash in an amount less than twenty-five dollars ($25). In addition, the Debtors (with the consent of the Restructuring Support Parties) and the Reorganized Debtors shall not be required to, but may in their discretion, make any payment on account of any Claim in the event that the costs of making such payment exceeds the amount of such payment.

(i)    Distributions for Claims Allowed as of the Effective Date.  Unless otherwise provided in the Plan, the Plan provides that, on the Effective Date the Reorganized Debtors shall distribute Cash, Reorganized PMC Holding Membership Interests, New Secured Term Loans, or other appropriate consideration, as the case may be, to the holders of Allowed Claims as contemplated therein.

(j)    Interest on Claims.  Except as expressly provided for in the Plan, the Confirmation Order or any contract, instrument, release, settlement or other agreement entered into in connection with the Plan, or as required by applicable bankruptcy law, including sections 511 and 1129(a)(9)(C)-(D) of the Bankruptcy Code, the Plan provides that post-Petition Date interest shall not be treated as accruing in respect of any Claim for purposes of determining the allowance of, and Distribution for or on account of, such Claim.  However, the Plan further provides that post-Petition Date interest shall accrue on the principal amount of the Senior Secured Notes outstanding at the applicable contract rate set forth in the Senior Secured Notes and the Senior Secured Notes Indenture.

(k)    Withholding and Reporting Requirements.  In connection with the Plan and all instruments issued in connection therewith, the Disbursing Agent is required by the Plan to comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Distributions under the Plan shall be subject to any such withholding or reporting requirements.

(l)    Setoffs.  Under the Plan, the Debtors (with the consent of the Restructuring Support Parties), the Reorganized Debtors and the Claims Administrator, as applicable, may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which Distribution shall be made), any claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim thereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim the Debtors or the Reorganized Debtors may have against the holder of such Claim.

Nothing in the Plan shall be deemed to expand rights to setoff under applicable non-bankruptcy law.  Notwithstanding the foregoing, the Plan provides that the Reorganized Debtors shall be deemed to waive and shall have no right to setoff or recoupment against the holders of Senior Secured Notes Claims or Senior Notes Claims.

(m)      Allocation of Consideration. To the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and, accrued but unpaid interest thereon, the Plan provides that the consideration distributed to the holder of such Allowed Claim shall be treated as first satisfying the principal amount of such Claim (as determined for U.S. federal income tax purposes), and any remaining consideration shall be treated as satisfying accrued but unpaid interest.

## 12.      Resolution of Disputed Claims.

(a)      Objections to Claims.   The Plan provides that, prior to the Effective Date, the Debtors (with the consent of the Restructuring Support Parties, as to any claims in excess of $25,000) shall have the right and authority to file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under the Plan.  Unless otherwise ordered by the Bankruptcy Court, under the Plan objections to, or other proceedings concerning, the allowance of Claims are to be filed and served upon the holders of such Claims as to which the objection is made, or otherwise commenced, as the case may be, as soon as practicable, but in no event later than the Claims Objection Deadline. The Plan also provides procedures regarding the filing and service of objections to Professional Fee Claims.

The Plan further provides that, from and after the Effective Date, the Reorganized Debtors shall have the right to object to any and all Claims and shall provide periodic updates to the Claims Administrator on the claims reconciliation process.  To the extent the Reorganized Debtors opt not to object to certain General Unsecured Claims, the Claims Administrator may, with the consent of the Reorganized Debtors not to be unreasonably withheld, object to any such General Unsecured Claims.  However, pursuant to the Plan, the Claims Administrator must demonstrate to the Reorganized Debtors that the prosecution of the objection to any such General Unsecured Claim is reasonably likely to result in a benefit (net of costs and expenses) to the Cash recoveries of those holders of Allowed Senior Notes Claims and Allowed General Unsecured Claims that are receiving Cash pursuant to the Plan.  The Reorganized Debtors (i) shall have consent rights over any settlements of objections to any such General Unsecured Claims pursued by the Claims Administrator, which consent shall not be unreasonably withheld, and (ii) shall reserve the right to enter into settlements of objections to any such General Unsecured Claims.

(b)      Settlement of Claims.  Pursuant to the Plan, and notwithstanding the requirements that may be imposed pursuant to Bankruptcy Rule 9019, from and after the Effective Date, the Reorganized Debtors shall have the authority to settle or compromise any objections or proceedings relating to the allowance of Claims as and to the extent deemed prudent and reasonable without further review or approval of the Bankruptcy Court.  The Plan further provides that, except as otherwise provided in the Plan, the Claims Administrator shall have consent rights over any settlement of objections to General Unsecured Claims to the extent

that such General Unsecured Claim is (i) settled for an Allowed amount equal to or greater than $150,000, and (ii) such claimant is a Cash Eligible Claimant and has not made the Class 5 Equity Election.  The Plan also provides that nothing in the Plan's provisions dealing with the resolution of Disputed Claim shall be deemed to effect or modify the applicable Bar Dates previously established in these Chapter 11 Cases.

(c)    No Distributions Pending Allowance.    The Plan provides that, notwithstanding any other provision of the Plan, if any portion of a Claim is a Disputed Claim, no payment or Distribution provided under the Plan shall be made on account of the disputed portion of such Claim until the disputed portion of such Disputed Claim becomes an Allowed Claim.

(d)    Establishment of General Unsecured Claims Reserve.    In accordance with the Plan, on the Effective Date or as soon as practicable thereafter, the Reorganized Debtors shall place into reserve, Cash from the Cash Cap Amount and the Avoidance Action Recovery Pool and Reorganized PMC Holding Membership Interests (to the extent the holder of a Disputed General Unsecured Claim is to receive Reorganized PMC Holding Membership Interests or Cash) with an aggregate value equal to 100% of the Distributions of Cash or Reorganized PMC Holding Membership Interests to which holders of Disputed General Unsecured Claims would be entitled under the Plan as of such date as if the Disputed General Unsecured Claims were Allowed General Unsecured Claims either in the amounts of the Claims as filed or in such amounts as estimated by the Court (the "**General Unsecured Claims Reserve**").    Accordingly, until such time as all Disputed Claims are resolved, Pro Rata Distributions will be calculated taking into account all Disputed and Allowed Claims of the Class or Classes of Claims to which the pro ration applies.

(e)    Reorganized PMC Holding Membership Interests and Cash Held in General Unsecured Claims Reserve.    Under the Plan, Cash and Reorganized PMC Holding Membership Interests held in the General Unsecured Claims Reserve are to be held by the Reorganized Debtors in trust for the benefit of holders of Allowed General Unsecured Claims. Cash and Reorganized PMC Holding Membership Interests held in the General Unsecured Claims Reserve shall not constitute property of the Reorganized Debtors or any of them and no Reorganized PMC Holding Membership Interests held in the General Unsecured Claims Reserve shall have any voting rights unless and until such interests are distributed in accordance with the Plan. The Plan requires that the Reorganized Debtors pay, or cause to be paid, out of any dividends or distributions paid on account of Reorganized PMC Holding Membership Interests held in the General Unsecured Claims Reserve, any tax imposed on the General Unsecured Claims Reserve by any Governmental Unit with respect to income generated by Reorganized PMC Holding Membership Interests held in the General Unsecured Claims Reserve and any costs associated with maintaining the General Unsecured Claims Reserve. Any Reorganized PMC Holding Membership Interests held in the General Unsecured Claims Reserve after all General Unsecured Claims have been Allowed or disallowed, including any unclaimed Distributions forfeited in accordance with the Plan, shall be forfeited.

(f)    Distributions after Allowance.  The Plan provides that, in the event that a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall distribute to the

-69-

holder of such Claim such holder's Pro Rata portion of the property distributable with respect to the Class in which such Claim is classified under the Plan.  To the extent that all or a portion of a Disputed Claim is disallowed, the holder of such Claim shall not receive any distributions on account of the portion of such Claim that is disallowed and any property withheld pending the resolution of such Claim shall be reallocated Pro Rata to the holders of Allowed Claims in the same Class.  The Disbursing Agent shall make Distributions to holders of Disputed Claims that become Allowed at such time that the Reorganized Debtors determine, in their sole discretion, to make subsequent Distributions to holders of other Claims Allowed following the Initial Distribution Date.  However, the Plan provides that the Reorganized Debtors shall make such Distributions at least semi-annually.  Nothing set forth in the Plan is intended to, nor shall it, prohibit the Reorganized Debtors, in their sole discretion, from making a Distribution on account of any Claim at any time after such Claim becomes an Allowed Claim.

(g)    <u>Interest on Disputed Claims.</u>    Unless otherwise specifically provided for in the Plan or as otherwise required by sections 506(b), 511 or 1129(a)(9)(C)-(D) of the Bankruptcy Code, under the Plan interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final Distribution is made when and if such Disputed Claim becomes and Allowed Claim.

(h)    <u>Estimation of Claims.</u>  The Plan provides that the Debtors (with the consent of the Restructuring Support Parties and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld)) or the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code or other applicable law regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during the pendency of litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Disputed Claim, such estimated amount shall constitute either (a) the Allowed amount of such Claim, (b) the amount on which a reserve is to be calculated for purposes of any reserve requirement to the Plan or (c) a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors (with the consent of the Restructuring Support Parties and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld)) or the Reorganized Debtors, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

## H.    Executory Contracts and Unexpired Leases.

### 1.    Assumption and Rejection of Executory Contracts and Unexpired Leases.

Except as otherwise provided in the Plan or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, the Plan provides that,

as of the Effective Date, all executory contracts and unexpired leases governed by section 365 of the Bankruptcy Code to which any of the Debtors are parties are thereby assumed except for any executory contract or unexpired lease that: (i) previously has been assumed or rejected by the Debtors in the Chapter 11 Cases; (ii) previously expired or terminated pursuant to its own terms; (iii) is specifically identified on the schedule of rejected executory contracts and unexpired leases filed as part of the Plan Supplement (the "**Schedule of Rejected Contracts and Leases**"); or (iv) is the subject of a separate motion to assume or reject such executory contract or unexpired lease filed by the Debtors under section 365 of the Bankruptcy Code prior to the Effective Date. Under the Plan, the Debtors reserve the right to amend the Schedule of Rejected Contracts and Leases at any time prior to the Effective Date, subject to the consent of the Restructuring Support Parties and in consultation with the Creditors' Committee and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld).

### 2.    Limited Extension of Time to Reject.

As provided in the Plan, in the event the Reorganized Debtors become aware after the Effective Date of the existence of an executory contract or unexpired lease that was not included in the Schedules, the right of the Reorganized Debtors to move to reject such executory contract or lease shall be extended until the date that is thirty (30) days after the date on which the Reorganized Debtors become aware of the existence of such executory contract or lease. The deemed assumptions and rejections provided for in the Plan shall not apply to any such executory contract or lease.

### 3.    Cure.

Under the Plan, except to the extent that different treatment has been agreed to by the non-Debtor party or parties to any executory contract or unexpired lease to be assumed pursuant to the Plan, within ten (10) Business Days prior to the Confirmation Hearing, the Debtors shall, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code, and consistent with the requirements of section 365 of the Bankruptcy Code, file and serve a pleading with the Bankruptcy Court listing the cure amounts of all executory contracts or unexpired leases to be assumed.  The parties to such executory contracts or unexpired leases to be assumed by the Debtors shall have five (5) Business Days from service of such pleading to object to the cure amounts listed by the Debtors.  If there are any objections filed with respect thereto, the Bankruptcy Court shall conduct a hearing to consider such cure amounts and any objections thereto.  The Debtors shall retain their right to reject any of their executory contracts or unexpired leases, including any executory contracts or leases that are subject to a dispute concerning amounts necessary to cure any defaults.

### 4.    Rejection Damage Claims.

The Plan provides that any and all Claims for damages arising from the rejection of an executory contract or unexpired lease must be filed with the Bankruptcy Court in accordance with the terms of the Final Order authorizing such rejection, but in no event later than thirty (30) days after the Effective Date. The Plan further provides that any Claims for damages arising from the rejection of an executory contract or unexpired lease that is not filed within such time

period will be forever barred from assertion against the Debtors, their respective estates and the Reorganized Debtors. Under the Plan, all Allowed Claims arising from the rejection of executory contracts or unexpired leases shall be treated as General Unsecured Claims or Convenience Claims, as appropriate under the circumstances.

### 5.    Benefit Plans.

As of and subject to the Effective Date, the Plan provides that all employment and severance agreements and policies, and all employee compensation and benefit plans, policies, and programs of the Debtors applicable generally to their employees, including agreements and programs subject to section 1114 of the Bankruptcy Code, as in effect on the Effective Date, including all savings plans, retirement plans, health care plans, disability plans, severance benefit plans, incentive plans, and life, accidental death, and dismemberment insurance plans, nonqualified deferred compensation plans, and senior executive retirement plans shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under the Plan, and the Debtors' obligations under all such agreements and programs shall survive the Effective Date of the Plan, without prejudice to the Reorganized Debtors' rights under applicable nonbankruptcy law to modify, amend, or terminate the foregoing arrangements in accordance with the terms and provisions thereof, except for (i) such executory contracts or plans specifically rejected pursuant to the Plan (to the extent such rejection does not violate section 1114 of the Bankruptcy Code), and (ii) such executory contracts or plans as have previously been terminated, or rejected, pursuant to a Final Order, or specifically waived by the beneficiaries of such plans, benefits, contracts, or programs.

### 6.    Assumption of ACE Insurance Program.

The Plan provides that notwithstanding anything to the contrary therein: (a) the ACE Insurance Program shall be deemed to be, and shall be treated as though it is, "executory", and on the Effective Date, the applicable Reorganized Debtors shall assume the ACE Insurance Program in its entirety; (b) the ACE Insurance Program and all letters of credit and other collateral and security previously provided to, and in effect as of the Confirmation Date for the benefit of, the ACE Companies (or any of them) pursuant to the ACE Insurance Program, and any and all valid debts, obligations, and liabilities of Debtors (and after the Effective Date, the Reorganized Debtors) thereunder, shall survive and shall not be amended, modified, waived or impaired in any respect by the Plan without the prior written consent of both the ACE Companies and the Debtors (with the consent of the Restructuring Support Parties) or the Reorganized Debtors, as the case may be; (c) as of the Effective Date, the Reorganized Debtors shall be liable for all of the Debtors' valid obligations and liabilities, whether now existing or hereafter arising, under the ACE Insurance Program, including, without limitation, the duty to continue to provide collateral and security as required by the ACE Insurance Program; (d) the valid claims of the ACE Companies arising under the ACE Insurance Program (i) shall be Allowed Administrative Claims; (ii) shall be due and payable in the ordinary course of business by the Debtors (or after the Effective Date, by the Reorganized Debtors) pursuant to the ACE Insurance Program without the need or requirement for the ACE Companies to file claims; and (iii) shall not be discharged or released by the Plan or the Confirmation Order; (e) nothing in the Plan in any way: (i) alters, modifies or amends the terms of the ACE Insurance Program

including, but not limited to, the provisions prohibiting the assignment of the policies and agreements except to the extent assumed or succeeded to by the Reorganized Debtors (as to which assumption and succession the ACE Companies shall have been deemed to have consented); (ii) alters the rights and obligations of the ACE Companies or of the Debtors (or after the Effective Date, the Reorganized Debtors) under the ACE Insurance Program or modifies the coverage provided thereunder; (iii) discharges, releases or relieves the Debtors (or on or after the Effective Date, the Reorganized Debtors) from any valid debt or other liability under the ACE Insurance Program; and (iv) the injunction set forth in section IX.H of the Plan and the automatic stay of section 362(a) of the Bankruptcy Code, if and to the extent applicable, shall be lifted, without further order of the Bankruptcy Court, to permit (a) claimants with valid workers' compensation claims that are covered by the ACE Insurance Program to proceed with their claims and (b) the ACE Companies to administer, handle, defend, settle and/or pay all workers' compensation claims arising under the ACE Insurance Program and the costs related thereto without further order of the Bankruptcy Court.

### 7.    Assumption of Indemnification Obligations.

(a)    Indemnification Obligations of PMC Holding and PMCI.  The Plan provides that, upon the Effective Date, Reorganized PMC Holding shall assume all existing Indemnification Obligations of PMC Holding and of PMCI in favor of those individuals serving, as of the Effective Date, as directors or officers of PMC Holding or of PMCI, or serving, as of the Effective Date, at their request, as directors, managers or officers of any of the other Subsidiary Debtors.

(b)    Indemnification Obligations of Other Subsidiary Debtors.  The Plan provides that, upon the Effective Date, each other respective Reorganized Subsidiary Debtor shall assume all existing Indemnification Obligations in favor of those individuals serving, as of the Effective Date, as directors (or managers) or officers of such respective Reorganized Subsidiary Debtor, or serving, as of the Effective Date, at the request of such respective Reorganized Subsidiary Debtor as directors, managers or officers of any of the other Subsidiary Debtors.

## I.    Effect of Confirmation of the Plan.

### 1.    Continued Corporate Existence.

Pursuant to the Plan, each of the Debtors, as Reorganized Debtors (converted into limited liability companies, in the case of Debtors that were corporations prior to the Effective Date (other than MCID and Wilshire Beverage)), shall continue to exist after the Effective Date with all powers of a corporation or a limited liability company under the laws of the respective states governing their formation or incorporation and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under applicable state law, except as such rights may be limited, modified and conditioned by the Plan and the documents and instruments executed and delivered in connection therewith.

### 2.    Vesting of Assets.

The Plan provides that, except as otherwise set forth therein or any agreement, instrument, or other document incorporated into the Plan, on the Effective Date all property in each Estate, all Causes of Action, and any other property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens, if any, granted to secure the First Lien Exit Facility, the New Secured Term Loans, and any liens applicable to any capitalized leases existing on the Effective Date).  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and conduct its affairs, and may use, acquire, or dispose of their property and assets and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

### 3.    Preservation of Causes of Action.

In accordance with section 1123(b)(3) of the Bankruptcy Code and except as otherwise provided in the Plan, under the Plan the Debtors (with the consent of the Restructuring Support Parties) and the Reorganized Debtors shall retain all Litigation Rights, and nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any such Litigation Rights. The Debtors may (but are not required to) enforce all Litigation Rights and all other similar claims arising under applicable state laws, including fraudulent transfer claims, if any, and all other Causes of Action of a trustee and debtor-in-possession under the Bankruptcy Code.  Except as otherwise provided in the Plan, the Reorganized Debtors, as applicable, in their sole and absolute discretion, shall determine whether to bring, settle, release, compromise, or enforce any such Litigation Rights (or decline to do any of the foregoing), and shall not be required to seek further approval of the Bankruptcy Court for such action.  Except as otherwise provided in the Plan, the Debtors (with the consent of the Restructuring Support Parties), the Reorganized Debtors, or any successors thereof may pursue such Litigation Rights in accordance with the best interests of the Reorganized Debtors or any successors holding such rights of action.

### 4.    Discharge of the Debtors.

The Plan provides that pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in the Plan or in the Confirmation Order, the Distributions and rights that are provided in the Plan shall be in complete satisfaction, discharge and release, effective as of the Effective Date, of any and all Claims and Causes of Action (whether known or unknown) against, liabilities of, liens on, obligations of, rights against, and Equity Interests in, the Debtors or any of their assets or properties, regardless of whether any property or assets shall have been distributed or retained pursuant to the Plan on account of such Claims, rights, and Equity Interests, including Claims and Equity Interests that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims relate to services performed by employees of the Debtors prior to the Petition Date and that arise from a termination of employment or a termination of any employee or retiree benefit program which occurred prior to

the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (a) a Proof of Claim or Equity Interest based upon such Claim, debt, right, or Equity Interest was filed, is filed, or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim or Equity Interests based upon such Claim, debt, right, or Equity Interest is allowed under section 502 of the Bankruptcy Code, or (c) the holder of such a Claim, right, or Equity Interest accepted the Plan.  As provided in the Plan, the Confirmation Order shall be a judicial determination of the discharge of all Claims against and Equity Interests in the Debtors, subject to the terms thereof and the occurrence of the Effective Date.

### 5.    Releases by the Debtors of Certain Parties.

In accordance with the Plan and pursuant to section 1123(b)(3) of the Bankruptcy Code, effective as of the Effective Date, each Debtor, in its individual capacity and as a debtor in possession for and on behalf of its Estate, shall release and discharge and be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Released Parties for and from any and all claims or Causes of Action existing as of the Effective Date in any manner arising from, based on, or relating to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Equity Interests prior to or in the Chapter 11 Cases, or any act, omission, occurrence, or event in any manner related to any such Claims, Equity Interests, corporate or debt restructuring, or the Chapter 11 Cases, including any claim relating to or arising out of the Chapter 11 Cases, the negotiation and filing of the Plan, the filing of the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, filing, implementation, administration, confirmation, or consummation of the Plan, the Disclosure Statement, any document filed by the Debtors in respect of the Plan, the Plan Supplement, any employee benefit plan, instrument, release, or other agreement or document created, modified amended or entered into in connection with the Plan.  The Reorganized Debtors and any newly-formed entities that will be continuing the Reorganized Debtors' businesses after the Effective Date shall be bound, to the same extent that the Debtors are bound, by the releases and discharges set forth above.  However, the Plan provides that the Debtors shall not release any claims or Causes of Action if any, against the Debtors' directors as of the Petition Date (other than any director who continued to serve as an officer and a director subsequent to the Petition Date) or any holders of Equity Interests in the Debtors as of the Petition Date in any way relating to (i) the CHI Management Agreements and (ii) any claims of CHI or any other Person arising under or from the rejection of the CHI Management Agreements.

The Debtors are not aware of any claims or Causes of Action, existing as of the date of this Disclosure Statement, that they have against any Released Party that would be released and discharged by operation of the releases described in the preceding paragraph.

### 6.    Releases by Non-Debtors.

The Plan provides that, on the Effective Date, each Persons who (a) directly or indirectly, has held, holds, or may hold any Claim, (b) votes to accept the Plan in its capacity as a holder of any Claim or Equity Interest, and (c) does not mark their Ballot to indicate their refusal to grant the releases provided in the Plan (as described in this paragraph), in consideration for the

obligations of the Debtors and the Reorganized Debtors under the Plan including the New Secured Term Loans and the Cash, Reorganized PMC Holding Membership Interests, and other contracts, instruments, releases, agreements, or documents to be delivered in connection with the Plan (each, a "**Release Obligor**"), shall have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Debtors, the Reorganized Debtors, and all Released Parties for and from any Claim or Cause of Action existing as of the Effective Date in any manner arising from, based on, or relating to, in whole or in part, any or all of the Debtors, the subject matter of, or the transaction or event giving rise to, the Claim of such Release Obligor prior to or in connection with the Chapter 11 Cases, the business or contractual arrangements between or among any Debtors and Release Obligor or any Released Party, the restructuring of the claim of such Release Obligor prior to or in connection with the Chapter 11 Cases, or any act, omission, occurrence, or event in any manner related to such subject matter, transaction, obligation, restructuring or the Chapter 11 Cases, including any Claim relating to, or arising out of the Chapter 11 Cases, the filing of the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, filing, implementation, administration, confirmation, or consummation of the Plan, this Disclosure Statement, any document filed by the Debtors in respect of the Plan, the Plan Supplement, any employee benefit plan, instrument, release, or other agreement or document, created, modified, amended or entered into in connection with the Plan. The Plan further provides, however, that such release shall not apply to (i) any obligations of the Debtors or the Reorganized Debtors arising under the Plan, (ii) any of the Released Parties from any claim based on any act or omission that constitutes gross negligence or willful misconduct as determined by Final Order or (iii) any Claims or Causes of Action against the Debtors' directors as of the Petition Date (other than any director who continued to serve as an officer and a director subsequent to the Petition Date) or any holders of Equity Interests in the Debtors as of the Petition Date in any way relating to (x) the CHI Management Agreements and (y) any claims of CHI or any other Person arising under or from the rejection of the CHI Management Agreements.

### 7.    Exculpation.

Except as otherwise specifically provided in the Plan, the Plan Supplement or related documents, the Plan stipulates that the Debtors, the Reorganized Debtors and the Released Parties shall neither have, nor incur any liability to any entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to, or arising out of the Chapter 11 Cases, the filing of the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, filing, implantation, administration, confirmation or consummation of the Plan, this Disclosure Statement, the exhibits to the Plan and this Disclosure Statement, the Plan Supplement documents, any employee benefit plan, instrument, release or other agreement or document created, modified, amended or entered into in connection with the Plan, except for their willful misconduct or gross negligence as determined by a Final Order and except with respect to obligations arising under confidentiality agreements, joint interest agreements, or protective orders, if any, entered during the Chapter 11 Cases.  The Plan further provides, however, that each Released Party shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities pursuant to, or in connection with, the above referenced documents, actions, or inactions; and further provides that Debtors' directors as of the Petition Date (other than any director who continued to serve as an officer and a director

subsequent to the Petition Date) and any holders of Equity Interests as of the Petition Date shall not be exculpated from any liability for any act or omission in connection with, related to, or arising out of (i) the CHI Management Agreements or (ii) any claims of CHI or any other Person arising under or from the rejection of the CHI Management Agreements.

### 8.   Injunction.

The Plan provides that the satisfaction, release, and discharge pursuant to the Plan shall act as an injunction against any Person commencing or continuing any action, employment of process, or act to collect, offset or recover any Claim, Interest, or Cause of Action satisfied, released, or discharged under the Plan to the fullest extent authorized or provided by the Bankruptcy Code, including to the extent provided for or authorized by sections 524 or 1141 of the Bankruptcy Code.

### 9.   Term of Bankruptcy Injunction or Stays.

Pursuant to the Plan, all injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### 10.   Preservation of Insurance.

Under the Plan, and except as otherwise provided therein, the Debtors' discharge and release from all Claims as provided therein, except as necessary to be consistent with the Plan, shall not diminish or impair the enforceability of any insurance policy that may cover Claims against the Debtors or the Reorganized Debtors, including its officers and current and former directors, or any other Person.

### J.   Effectiveness of the Plan.

### 1.   Conditions Precedent to Confirmation.

It is a condition to confirmation of the Plan that the following conditions shall have been satisfied or waived in accordance with the Plan: (a) the Confirmation Order, in form and substance satisfactory to the Debtors, the Restructuring Support Parties and the Creditors' Committee (in the exercise of the Creditors' Committee's reasonable discretion), shall have been entered and shall be in full force and effect and there shall not be a stay or injunction in effect with respect thereto; and (b) the Plan, the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in form and substance acceptable to (i) the Debtors (to the extent the Plan otherwise provides that such schedule, document or exhibit must be acceptable to the Debtors), (ii) the Creditors' Committee (to the extent the Plan otherwise provides that such schedule, document or exhibit must be acceptable to the Creditors' Committee), and (iii) the Restructuring Support Parties.

### 2.      Conditions Precedent to the Effective Date.

It is a condition to the Effective Date of the Plan that the following provisions, terms and conditions are approved or waived in accordance with the Plan: (a) the Confirmation Order, in form and substance acceptable to the Debtors, the Restructuring Support Parties and the Creditors' Committee (in the exercise of the Creditors' Committee's reasonable discretion), shall be in full force and effect and there shall not be a stay or injunction in effect with respect thereto; (b) the number of holders of record of Reorganized PMC Holding Membership Interests shall be less than 400 after taking into account all Distributions of Reorganized PMC Holding Membership Interests to be made under the Plan to holders of all Allowed Senior Notes Claims and Allowed General Unsecured Claims who are receiving Reorganized PMC Holding Membership Interests pursuant to the Plan and all Disputed General Unsecured Claims who made the Class 5 Equity Election or otherwise will receive Reorganized PMC Holding Membership Interests on account of their Claims to the extent such Claims are ultimately Allowed; (c) all authorizations, consents and regulatory approvals required (if any) for the Plan's effectiveness shall have been obtained; (d) the formation and governance documents for each of the Reorganized Debtors (including the Charter Documents, the PMC Holding LLC Agreement and the Subsidiary LLC Agreements) shall be consistent with the Plan and acceptable to the Restructuring Support Parties and the Creditors' Committee (in the exercise of the Creditors' Committee's reasonable discretion); (e) the Reorganized Debtors shall have entered into the First Lien Exit Facility, which shall be on terms and conditions acceptable to the Debtors and the Restructuring Support Parties in consultation with the Creditors' Committee; (f) the Reorganized Debtors shall have entered into the New Secured Term Loan Agreement, which shall be in form and substance acceptable to the Debtors and the Restructuring Support Parties in consultation with the Creditors' Committee; (g) the administrative agent (or collateral agent) under the First Lien Exit Facility and the New Secured Term Loan Agent shall have entered into the New Intercreditor Agreement, which shall be in form and substance acceptable to the Debtors and the Restructuring Support Parties in consultation with the Creditors' Committee; and (h) the $7,500,000 Cash portion of New Secured Term Loans to be funded on the Effective Date shall have been fully funded.

### 3.      Waiver of Conditions.

The Plan provides that the conditions to confirmation of the Plan, and to the Effective Date, may be waived by the Debtors (with the consent of the Restructuring Support Parties in consultation with the Creditors' Committee) without notice, leave or order of the Court or any formal action other than proceeding to confirm or consummate the Plan.

### 4.      Notice of Confirmation and Effective Date.

Pursuant to the Plan, on or before five (5) Business Days after the occurrence of the Effective Date, the Reorganized Debtors shall mail or cause to be mailed to all holders of Claims and Equity Interests a notice that informs such holders of (i) the entry of the Confirmation Order, (ii) the occurrence of the Effective Date, (iii) the occurrence of the applicable Bar Date, and (iv) such other matters as the Debtors deem appropriate.

**5.      Effect of Failure of Conditions.**

In the event that the Effective Date does not occur, the Plan provides that: (a) the Confirmation Order shall be vacated; (b) no Distributions under the Plan shall be made; (c) the Debtors and all holders of Claims and Equity Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; and (d) the Debtors' obligations with respect to Claims and Equity Interests shall remain unchanged and nothing contained in the Plan shall (i) constitute or be deemed a waiver or release of any Claims against or any Equity Interests in  the Debtors or any other Person, (ii) prejudice in any manner any right, remedy or claim of the Debtors or any Person in any further proceedings involving the Debtors or otherwise, or (iv) be deemed an admission against interest by the Debtors or any other Person.

**6.      Vacatur of Confirmation Order.**

If a Final Order denying confirmation of the Plan is entered, or if the Confirmation Order is vacated, then the Plan provides it shall be null and void in all respects, and nothing contained in the Plan shall (a) constitute a waiver or release of any Claims against or Equity Interests in the Debtors, (b) prejudice in any manner the rights of the holder of any Claim against, or Equity Interest in, the Debtors, (c) prejudice in any manner any right, remedy or claim of the Debtors, or (d) be deemed an admission against interest by the Debtors.

**7.      Revocation, Withdrawal, Modification or Non-Consummation.**

The Debtors reserve the right to revoke, withdraw, amend or modify the Plan at any time prior to the Confirmation Date (in each case subject to the consent of the Restructuring Support Parties, except as otherwise described below, and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld)).   If the Debtors revoke or withdraw the Plan, the Confirmation Order is not entered, or the Effective Date does not occur, then, under the Plan, (i) the Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting the amount of any Claim or Class of Claims), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (iii) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (a) constitute or be deemed a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors or any other Person, (b) prejudice in any manner any right, remedy or claim of the Debtors or any other Person in any further proceeding involving the Debtors or otherwise, or (c) constitute an admission against interest by the Debtors or any other Person.

**K.      Retention of Jurisdiction.**

Pursuant to the Plan, the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, section 105(a) and section 1142 of the Bankruptcy Code and for, among other things, the following purposes: (1) to hear and determine motions for the assumption or rejection

of executory contracts or unexpired leases pending on the Confirmation Date, and the allowance of Claims resulting therefrom; (2) to determine any other applications, adversary proceedings, and contested matters pending on the Effective Date; (3) to ensure that Distributions to holders of Allowed Claims are accomplished as provided in the Plan; (4) to resolve disputes as to the ownership of any Claim or Equity Interest; (5) to hear and determine timely objections to Claims; (6) to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated; (7) to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code; (8) to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order; (9) to hear and determine all applications for compensation and reimbursement of expenses of Professionals under sections 328, 330, 331 and 503(b) of the Bankruptcy Code; (10) to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan; (11) to hear and determine any issue for which the Plan requires a Final Order of the Bankruptcy Court; (12) to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code; (13) to hear and determine disputes arising in connection with compensation and reimbursement of expenses of professionals for the Restructuring Support Parties, the Senior Secured Notes Trustee, the Senior Secured Notes Collateral Agent or the Senior Notes Trustee for services rendered and expenses incurred during the period commencing on the Petition Date through and including the Effective Date; (14) to hear and determine any Causes of Action preserved under the Plan under Bankruptcy Code sections 544, 547, 548, 549, 550, 551, 553, and 1123(b)(3); (15) to hear and determine any matter regarding the existence, nature and scope of the Debtors' discharge; (16) to hear and determine any matter regarding the existence, nature, and scope of the releases and exculpation provided in the Plan; and (17) to enter a final decree closing the Chapter 11 Cases.

## L.    Miscellaneous Provisions.

### 1.    Payment of Statutory Fees.

Under the Plan, all fees payable on or before the Effective Date pursuant to section 1930 of title 28 of the United States Code shall be paid by the Debtors on or before the Effective Date and all such fees payable after the Effective Date shall be paid by the applicable Reorganized Debtor.

### 2.    Payment of Fees and Expenses of Restructuring Support Parties.

The Plan requires that the Debtors or the Reorganized Debtors promptly pay in Cash in full (following receipt of an appropriate invoice in reasonable detail) all reasonable and documented fees and expenses incurred by the Restructuring Support Parties in connection with the restructuring described in the Plan that have not previously been paid, including the fees and expenses of (i) Akin Gump Strauss Hauer & Feld LLP, in its capacity as legal advisor to the Restructuring Support Parties, and (ii) local Delaware counsel to the Restructuring Support Parties.  All amounts distributed and paid to the foregoing parties pursuant to the Plan shall not

be subject to setoff, recoupment, reduction or allocation of any kind and shall not require the filing or approval of any fee application.

### 3. Payment of Fees and Expenses of the Senior Secured Notes Trustee, Senior Secured Notes Collateral Agent and the Senior Notes Trustee.

The Plan requires that the Debtors or the Reorganized Debtors promptly pay in Cash in full (following receipt of an appropriate invoice in reasonable detail) all reasonable and documented fees and expenses incurred by the Senior Secured Notes Trustee, the Senior Secured Notes Collateral Agent and the Senior Notes Trustee without the need of such parties to file fee applications with the Bankruptcy Court. However, the Plan does require that the Senior Secured Notes Trustee, the Senior Secured Notes Collateral Agent and the Senior Notes Trustee provide the Debtors, the Restructuring Support Parties and the Creditors' Committee with invoices (or such other documentation as the Debtors or another of such parties may reasonably request) for which it seeks payment on or before the Effective Date, and that, provided that the Debtors, the Restructuring Support Parties and the Creditors' Committee shall not have objected to the payment of such fees or expenses within five (5) Business Days after the later to occur of the receipt of the applicable invoice or the date of approval of the Disclosure Statement, such fees and expenses shall be promptly paid. To the extent that the Debtors or any of such other parties object to any of the fees and expenses of the Senior Secured Notes Trustee, the Senior Secured Notes Collateral Agent or the Senior Notes Trustee, then under the Plan the Debtors or the Reorganized Debtors shall not pay any disputed portion of such fees and expenses until a resolution of such objection is agreed to by the Debtors (or Reorganized Debtors) and such party and/or their counsel or a further order of the Bankruptcy Court upon a motion filed with the Bankruptcy Court by the party whose fees and expenses have been objected to.

### 4. Modification of the Plan.

Subject to the limitations contained in the Plan: (1) the Debtors (with the consent of the Restructuring Support Parties and in consultation with the Creditors' Committee) reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend, modify, revoke or withdraw the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Debtors (with the consent of the Restructuring Support Parties) or the Reorganized Debtors, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with Section 1127(b) of the Bankruptcy Code.

The Plan further provides, however, that, notwithstanding anything to the contrary contained elsewhere in the Plan, the Debtors may revoke or withdraw the Plan upon the occurrence of a "Company Termination Event" under (and as defined in) the Restructuring Support Agreement; and that the Debtors reserve the right to fully or conditionally waive, on a prospective or retroactive basis, the effects of this paragraph in respect of any such Company Termination Event, with any such waiver effective only if in writing and signed by the Debtors.

### 5.      Dissolution of Creditors' Committee.

Under the Plan, the Creditors' Committee shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code. The Plan further provides that, on the Effective Date, the Creditors' Committee shall be dissolved and its members shall be deemed released of all their duties, responsibilities and obligations in connection with the Chapter 11 Cases or the Plan and its implementation, and the retention or employment of the Creditors' Committee's attorneys, financial advisors, and other agents shall terminate as of the Effective Date.  However, with respect to any objections to Claims or other actions brought by the Creditors' Committee during the pendency of the Chapter 11 Cases (solely to the extent that the Creditors' Committee requested and obtained necessary authority from the Bankruptcy Court to bring such actions and such actions were validly commenced), the Claims Administrator shall become successor in interest to the Creditors' Committee on the Effective Date.   In addition, the Creditors' Committee's attorneys and financial advisors shall be entitled to pursue their own Professional Fee Claims and represent the Creditors' Committee in connection with the review of and the right to be heard in connection with all Professional Fee Claims.  In the event an appeal is pending from the Confirmation Order as of the Effective Date, the Creditors' Committee shall remain in existence for all purposes related to the prosecution and defense of such appeal, and the Creditors' Committee Professionals shall be entitled to reasonable compensation and reimbursement of expenses in connection with such matters.

### 6.      Votes Solicited in Good Faith.

The Plan stipulates that the Debtors have, and upon confirmation of the Plan shall be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. The Plan also provides that the Debtors (and each of their respective affiliates, agents, directors, managers, officers, members, employees, advisors, and attorneys) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of the securities offered and sold under the Plan and, therefore, are not, and on account of such offer and issuance will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer or issuance of the securities offered and distributed under the Plan.

### 7.      Administrative Claims Incurred After the Effective Date.

Under the Plan (and except as otherwise specifically provided for in the Plan), from and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash (i) any Administrative Claims and (ii) the reasonable legal, professional, or other fees and expenses related to the implementation of the Plan incurred by the Reorganized Debtors.  Also under the Plan, upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation of services rendered after such date shall terminate, and the Reorganized Debtors may employ and

-82-

pay any Professional in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

### 8.     Request for Expedited Determination of Taxes.

The Reorganized Debtors shall have the right, under the Plan, to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns (other than U.S. federal tax returns) filed by any of them, or to be filed by any of them, for any and all taxable periods ending after the Petition Date through the Effective Date.

### 9.     Governing Law.

The Plan provides that, unless a rule of law or procedure is supplied by U.S. federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of Delaware shall govern the construction and implementation of the Plan, any agreements, documents, and instruments executed in connection with the Plan (except as otherwise set forth in those agreements or instruments, in which case the governing law of such agreements shall control). Corporate governance matters shall be governed by the laws of the state of incorporation or formation of the applicable Debtor.

### 10.     Filing or Execution of Additional Documents.

On or before the Effective Date, the Debtors (with the consent of the Restructuring Support Parties) or the Reorganized Debtors, shall file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 11.     Exemption From Transfer Taxes.

As provided in the Plan, and pursuant to section 1146(c) of the Bankruptcy Code, (a) the issuance, transfer or exchange under the Plan of Reorganized PMC Holding Membership Interests, corporate stock and Subsidiary Membership Interests and corporate stock and the security interests in favor of the administrative agent and lenders under the First Lien Exit Facility and in favor of the New Secured Term Loan Agent and lenders under the New Secured Term Loan Agreement, (b) the making or assignment of any lease or sublease, or (c) the making or delivery of any other instrument whatsoever, in furtherance of or in connection with the Plan shall not be subject to any stamp, real estate transfer, mortgage, recording sales or use or other similar tax.

### 12.     Exemption for Issuance of Reorganized PMC Holding Membership Interests and New Secured Term Loans.

The Plan provides that the issuance of the Reorganized PMC Holding Membership Interests and Distribution thereof to holders of Allowed Senior Notes Claims and Allowed General Unsecured Claims and the issuance of New Secured Term Loans to holders of Allowed Senior Secured Notes Claims under the Plan, to the extent they are deemed securities (as defined

in the Securities Act), shall be authorized and exempt from registration under the securities laws solely to the extent permitted under section 1145 of the Bankruptcy Code, as of the Effective Date, without further act or action by any person, unless required by provision of the relevant governance documents or applicable law, regulation, order or rule; and all documents evidencing the same shall be executed and delivered as provided for in the Plan or the Plan Supplement.

It is contemplated that the additional $7,500,000 in New Secured Term Loans to be funded in Cash on the Effective Date, and any subsequent funding in Cash of up to an additional $10,000,000 in aggregate principal amount of New Secured Term Loans, to the extent they are deemed securities (as defined in the Securities Act), would be exempt from registration under the securities laws by virtue of one or more exemptions to any such registration.

The exemptions afforded pursuant to section 1145 of the Bankruptcy Code, and by any such securities laws exemptions, may or may not be sufficient to enable any such holder of New Secured Term Loans to be able to transfer such loans without registration under the Securities Act or other applicable securities laws. This treatment is discussed in greater detail in Article XII below.

### 13. Waiver of Federal Rule of Civil Procedure 62(a).

Under the Plan, the Debtors may request that the Confirmation Order include (a) a finding that Fed. R. Civ. P. 62(a) shall not apply to the Confirmation Order, and (b) authorization for the Debtors to consummate the Plan immediately after entry of the Confirmation Order.

### 14. Exhibits/Schedules.

The Plan provides that all Exhibits and schedules to the Plan and the Plan Supplement are incorporated into and constitute a part of the Plan as if set forth therein.

### 15. Notices.

In accordance with the Plan, all notices, requests, and demands under the Plan, to be effective, shall be in writing and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

To the Debtors: Perkins & Marie Callender's Inc., in care of Troutman Sanders LLP, The Chrysler Building, 405 Lexington Avenue, New York, NY 10174, attention: Mitchel H. Perkiel, Esq., Tel: (212) 704-6000, Fax: (212) 704-6288.

To the Creditors' Committee: Official Committee of Unsecured Creditors of Perkins & Marie Callender's Inc., in care of Ropes & Gray, LLP, 1211 Avenue of the Americas, New York, New York 10036, attention: Mark Somerstein, Esq., Tel: (212) 841-8814, Fax: (646) 728-1663.

To the Pre-Petition Administrative Agent and DIP Administrative Agent: In care of Paul Hastings LLP, 600 Peachtree Street, N.E., Suite 2400, Atlanta, Georgia 30308, attention: Jesse H. Austin, III, Esq., Tel: (404) 815-2400, Fax: (404) 685-5167.

To the Restructuring Support Parties: In care of Akin Gump Strauss Hauer & Feld LLP, 1333 New Hampshire Avenue, N.W., Washington, D.C. 20036, attention: Scott Alberino, Esq., Tel: (202) 887-4000, Fax: (202) 887-4288.

### 16. Plan Supplement.

The Plan provides that the Plan Supplement will be filed with the Clerk of the Bankruptcy Court no later than ten (10) calendar days prior to the Confirmation Hearing, unless such date is further extended by order of the Bankruptcy Court on notice to parties in interest. The Plan Supplement may be inspected in the office of the Clerk of the Court during normal court hours and shall be available online at https://ecf.deb.uscourts.gov . Holders of Claims or Equity Interests may obtain a copy of the Plan Supplement upon written request to counsel to the Debtors at their address set forth above, or by accessing the website maintained by Omni (the Debtors' claims and noticing agent) at www.PRKMCRestructuring.com . The Plan Supplement will not be filed with the Bankruptcy Court prior to the Voting Deadline and, accordingly, the information and materials to be contained therein will not be available in connection with the determination of whether to accept or reject the Plan.

### 17. Further Actions; Implementations.

As provided in the Plan, the Debtors shall be authorized to execute, deliver, file or record such documents, contracts, instruments, releases and other agreements and take such other or further actions as may be necessary to effectuate or further evidence the terms and conditions of the Plan. From and after the Confirmation Date, the Debtors shall be authorized to take any and all steps and execute all documents necessary to effectuate the provisions contained in the Plan.

### 18. Severability.

As provided in the Plan, if, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors (with the consent of the Restructuring Support Parties and, to the extent such provision affects the rights of the Creditors' Committee, the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld)), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the Plan provides that the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Plan stipulates that the Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as

it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 19.    Entire Agreement.

The Plan states that, except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 20.    Binding Effect.

The Plan, by its terms, shall be binding on and inure to the benefit of the Debtors, the holders of Claims against and Equity Interests in the Debtors, and each of their respective successors and assigns, including each of the Reorganized Debtors, and all other parties in interest in the Chapter 11 Cases.

### 21.    Substantial Consummation.

Under the Plan, on the Effective Date the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.  However, the Plan further provides nothing in the Plan shall prevent the Debtors or any other party in interest from arguing that substantial consummation of the Plan has occurred prior to the Effective Date.

### 22.    Conflict.

The terms of the Plan shall govern in the event of any inconsistency with the summary of the Plan set forth in this Disclosure Statement. The Plan also provides that, in the event of any inconsistency or ambiguity between and among the terms of the Plan, this Disclosure Statement, and the Confirmation Order, the terms of the Confirmation Order shall govern and control.

## ARTICLE VIII

## PROJECTIONS AND VALUATION

With the assistance of Whitby Santarlasci (the Debtors' financial advisor), the Debtors have developed a set of financial projections (the "**Financial Projections**") to assess, in general terms, the value of the Reorganized Debtors and, specifically, to determine: (x) the value of the Reorganized PMC Holding Membership Interests to be distributed under the Plan to holders of Claims in Class 4 (Senior Notes Claims) and Class 5 (General Unsecured Claims), excluding holders of Claims in Class 4 and Class 5 who are to receive Cash under the Plan; and (y) the amount of Cash that would be available to make Distributions under the Plan, including the Cash Distribution available to holders of Claims in Class 4 and Class 5 who are to receive Cash under the Plan. The Financial Projections are attached as **Exhibit C** hereto; and the below summary is qualified in its entirety by reference to **Exhibit C**.

The fiscal year of the Debtors ends on the last Sunday in December, and it is anticipated that, for the projection period utilized in the Financial Projections, the fiscal year of each Reorganized Debtor will end at that same time. A reference below to "**FY**" followed by a specifically identified calendar year means the fiscal year of the Reorganized Debtors ending on the last Sunday in December of that referenced calendar year.[38]

THE FINANCIAL PROJECTIONS, AND VALUATION ANALYSIS, ARE BASED UPON A NUMBER OF SIGNIFICANT ASSUMPTIONS, INCLUDING (AMONG OTHER THINGS) THE SUCCESSFUL REORGANIZATION OF THE DEBTORS. ACTUAL OPERATING RESULTS AND VALUES LIKELY WILL VARY.

A.    **Financial Projections.**

1.    **Overview.**

As a condition to confirmation of a reorganization plan, the Bankruptcy Code requires, among other things, that a bankruptcy court determine that confirmation is not likely to be followed by the liquidation of the debtor or the need for further financial reorganization of the debtor. This requirement is referred to as a feasibility requirement. In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility requirement, management of the Debtors, through the development of the Financial Projections, has analyzed the Debtors' ability to meet their obligations under the Plan and to maintain sufficient liquidity and capital resources to conduct their business subsequent to their emergence from chapter 11. The Financial Projections also have been prepared to assist holders

---

[38]    For example, "FY 2012" means the fiscal year of the Reorganized Debtors ending on December 30, 2012, which is the last Sunday in calendar year 2012.

of Allowed Claims entitled to vote on the Plan in determining whether to accept or reject the Plan.

The Financial Projections should be read in conjunction with the assumptions and qualifications set forth in this Disclosure Statement and in the materials attached as **Exhibit C**. The Financial Projections were prepared in good faith based upon assumptions believed to be reasonable at the time of such preparation. The Financial Projections have been based, in part, on economic, competitive, and general business conditions prevailing at the time of preparation. Any changes in these conditions since that time, or in the future, may materially impact the Debtors' ability to achieve the Financial Projections.

THE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARDS COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. NO INDEPENDENT ACCOUNTANT HAS PARTICIPATED IN THE PREPARATION OF THE FINANCIAL PROJECTIONS OR EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.

Unless the Bankruptcy Court otherwise requires, the Debtors do not intend to, and disclaim any obligation to, furnish updated projections to holders of any Claims against or Equity Interests in the Debtors or to holders of any Reorganized PMC Holding Membership Interests, except for the reporting obligation under the First Lien Exit Facility and the New Secured Term Loan Agreement and in the case of the Reorganized PMC Holding Membership Interests as provided under the PMC Holding LLC Agreement. The term sheet for the PMC Holding LLC Agreement outlines certain reporting requirements to be included in the PMC Holding LLC Agreement.

The Financial Projections necessarily have been based on a variety of estimates and assumptions that were considered reasonable by the Debtors during the preparation of those projections. Even so, the Financial Projections, like all financial projections, inherently are subject to a variety of uncertainties and contingencies, many of which are beyond the control of the Debtors. Consequently, no assurance can be given that the results indicated in the Financial Projections ultimately will be realized, and the discrepancy between projected results and actual results may be adverse and material.

Furthermore, the Financial Projections, and related Valuation Analysis, include assumptions as to the estimated enterprise value of the Reorganized Debtors and the fair value of their assets and their actual liabilities as of the Effective Date. That determination was made using data reasonably current at the time the Financial Projections and Valuation Analysis were prepared. In the event that, the Debtors need to demonstrate any such valuation in connection with the Confirmation Hearing, the Debtors reserve the right to utilize more recent information in connection with that demonstration.

**2. Scope of Financial Projections.**

The Financial Projections include projections of the financial performance of the Reorganized Debtors for the period through the end of FY 2015 (the "**Projection Period**"). The financial information and projections attached as **Exhibit C** to this Disclosure Statement include for each fiscal year in the Projection Period pro forma projected consolidated balance sheets, pro forma projected consolidated income statements and pro forma projected consolidated statements of cash flow. They are based on the assumption that the Plan will be confirmed by the Bankruptcy Court and, for projection purposes, the Effective Date under the Plan will occur during the fourth quarter of FY 2011.

**3. Summary of Significant Assumptions.**

The following summarizes management's projections regarding revenues, expenses, EBITDA, capital expenditures and financing needs of the Reorganized Debtors and their consolidated subsidiaries for the fiscal years ended December 2011 (FY 2011) through December 2015 (FY 2015) (the "**Projection Period**"). The projections are based on a number of assumptions, including the expectation that the Reorganized Debtors have ample liquidity to achieve these projections, either through the generation of free cash flow, significant cash reserves or availability under a line of credit. Capital may be required to remodel existing stores in a timely fashion and renovate current locations to support current and future growth in guest traffic.

**Number of Restaurants.** The projections assume the Reorganized Debtors will emerge from bankruptcy with a total of 178 company-owned stores, including 130 Perkins and 48 Marie Callender's brand restaurants. In addition, the projections also assume 349 franchise stores, consisting of 312 Perkins and 37 Marie Callender's brand locations. The financial projections also assume the closure of underperforming stores over time as it remains within the normal course of business to periodically assess renewal/nonrenewal opportunities under current lease or franchise agreements.

**Manufacturing Facilities.** In addition to the restaurant locations, the Debtors also operate 3 manufacturing locations under the Foxtail Foods segment. One facility, in Corona, California produces pies and other bakery products, primarily for both Company-owned and franchised Marie Callender's restaurants. The other 2 facilities, located in Cincinnati, Ohio produce pies, pancake mixes, cookie doughs and muffin batters primarily for the Company-owned and franchised Perkins restaurants, as well as for various third parties.

**Revenue Assumptions.** During FY 2011 the Reorganized Debtors expect to generate $388.1 million in restaurant sales, down from $449.2 million the prior year, primarily due to the closure of 65 company-owned stores during the period and lower guest counts given a difficult economic environment. Restaurant sales are then projected to increase from $342.1 million during FY 2012 to $398.5 in FY 2015, due to modest increases in comparable sales, remodel activity and a limited number of new Perkins brand restaurants. Manufacturing revenues (net of intercompany sales to Company-owned locations) are projected to increase from $31.5 million in FY 2011 to $41.5 million during FY 2015 driven primarily by anticipated increases in outside sales to third

parties.   Franchise royalty revenues are expected to be $21.8 million in FY 2011.   Royalty revenues are then projected to increase from $22.1 million in FY 2012 to $24.3 million in FY 2015, driven by modest increases in comparable sales and a limited number of new Perkins franchise restaurant openings.

**Cost Assumptions.**   Segment Operating Profit is expected to increase from $45.3 million in FY 2011 to $60.0 million in FY 2015.

Restaurant food, labor and benefit costs are projected to decline as a percentage of restaurant sales by 1.7% from 56.7% in FY 2011 to 55.0% in FY 2015.   This decrease is expected to result from the benefit of closing underperforming restaurants and enhanced efficiencies.

Manufacturing costs of goods sold as a percentage of net manufacturing revenue is forecast to improve by 9.7% over the Projection Period as a result of improved efficiencies.

Occupancy costs reflect estimated rent reductions of $0.35 million in FY 2011 and $1.1 million in FY 2012 and thereafter.   Such estimates are based on current discussions with lessors.

Operating costs reflect ongoing payment of approximately $2.5 million per year related to territory development agreements.   No determination has been made as to whether or not these arrangements will continue.

Corporate overhead expenses are expected to increase by $1.7 million in FY 2012 as incentive programs, wage increases and employee 401K matching contributions are reinstated.   As a percentage of total revenue, such expenses are expected to decline from 7.6% in FY 2012 to 6.8% in FY 2015.

**EBITDA**.   EBITDA for FY 2011 is projected to be approximately $32.1 million.   Over the Projected Period, EBITDA is expected to increase to $43.4 million by FY 2015.   EBITDA margin is projected to increase from 7.2% of total revenues during FY 2011 to 9.4% during FY 2015.   The increase in EBITDA and EBITDA margin is attributable to the elimination of underperforming restaurants, economies of scale, operating efficiencies and the expected success of new initiatives.

**Capital Expenditures.**   Total capital expenditures are projected to increase from $5.4 million in FY 2011 to $14.9 million in FY 2015.   In addition to addressing deferred maintenance in many locations, the Reorganized Debtors are expected to increase their capital expenditures for remodeling, a limited number of new Perkins restaurants and other initiatives to drive growth in business beginning in FY 2012.

**Working Capital.**   The projections do not contemplate any significant investments in Working Capital over the Projection Period.

**Fresh Start Accounting.**   The pro forma balance sheet adjustments shown include adjustments for (i) the reorganization and related transactions pursuant to the Reorganization Plan, and (ii) the implementation of "fresh start" accounting pursuant to the Financial Accounting Standards

Board's Accounting Standards Codification 852 "Reorganizations". The fresh start adjustments are based on a total equity value of $58.7 million.

**Debt.** The Plan contemplates the entry by the Reorganized Debtors into the Exit Facilities, which will include the First Lien Exit Facility and the New Secured Term Loans. The projections assume the First Lien Exit Facility of $30 million with a maturity in 2016. The First Lien Exit Facility will be used to make required Distributions under the Plan, satisfy certain Plan-related expenses and fund the Reorganized Debtors' working capital needs. The projections assume the New Secured Term Loans will be $110.6 million ($7.5 million of which will be in the form of Cash advanced on the Effective Date, to provide a portion of the funding for Cash Distributions under the Plan), with a maturity in 2016. The terms and conditions incorporated into the projection related to each of these debt instruments (including interest rates, maturity, amendments, etc.) are illustrative and make general assumptions taking into account current financing market conditions. The actual terms and conditions will be subject to obtaining financing from a combination of third party lenders and existing lenders subject to definitive documentation which may have terms and conditions materially different from those assumed herein.

**Equity Interests.** The holders of Allowed Senior Notes Claims and holders of Allowed General Unsecured Claims that do not receive Cash in payment of their Claims in accordance with the terms of the Plan will receive their Pro Rata percentage of 10,000,000 Reorganized PMC Holding Membership Interests, in each case, subject to dilution on account of Reorganized PMC Holding Membership Interests or other similar Equity Interests, if any, that may be issued from time to time pursuant to the Management Incentive Plan that may be adopted and implemented by the board of managers of Reorganized PMC Holding after the Effective Date.

**The above financial projections are based on assumptions that are inherently uncertain and unpredictable.** The operating and financial information contained in the Reorganized Debtors' projected financial data have been prepared by management and reflect management's current estimates of the Reorganized Debtors' future performance. The projection and assumptions have not been reviewed or independently verified by any third party. The projected results are dependent on the successful implementation of management's growth strategies and are based on assumptions and events over which, in many cases, the Reorganized Debtors will have only partial or no control. The selection of assumptions underlying such projected information require the exercise of judgment, and the projections are subject to uncertainty due to the effects that economic, business, competitive, legislative, political or other changes may have on future events. Changes in the facts or circumstances underlying such assumptions could materially affect the projections. To the extent that assumed events do not materialize, actual results may vary substantially from the projected results. As a result, no assurance can be made that the Reorganized Debtors will achieve the operating or financial results set forth in the financial projections, nor can there be any assurance that results will not vary, perhaps materially and/or adversely.

Any statements included in the Plan or Disclosure Statement regarding plans, objectives, goals strategies, future events or performance of the Reorganized Debtors, including the above financial projections, are based on various assumptions, many of which in turn are uncertain and

unpredictable. The assumptions underlying projections may be incomplete and inaccurate, and unanticipated events and circumstances are likely to occur. For these reasons, actual results achieved during periods covered may vary from the projections, and such variations may be material or adverse. The projection are included solely to provide holders of Claims information concerning estimates of future operating results based on the assumptions, and no representation is intended that such results will be achieved. The Reorganized Debtors make no representation or warranty as to the accuracy or completeness of any of the foregoing information.

## B.    Valuation of the Reorganized Debtors.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES WHICH ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. WHITBY SANTARLASCI, THE FINANCIAL ADVISOR TO THE DEBTORS, HAS PREPARED AN ESTIMATE AS TO THE HYPOTHETICAL ENTERPRISE VALUE OF THE REORGANIZED DEBTORS. IT ASSUMES THAT THE REORGANIZED DEBTORS WILL CONTINUE AS THE OWNERS AND OPERATORS OF THEIR BUSINESSES AND ASSETS. WHITBY SANTARLASCI'S ESTIMATED VALUATION, INCLUDING ASSOCIATED METHODOLOGY, HAS BEEN DEVELOPED BY THEM SOLELY FOR PURPOSES OF THE FORMULATION AND NEGOTIATION OF THE PLAN AND THE ANALYSIS OF IMPLIED RELATIVE RECOVERIES TO CREDITORS THEREUNDER. SUCH ESTIMATE REFLECTS COMPUTATIONS MADE THROUGH THE APPLICATION OF VARIOUS VALUATION TECHNIQUES. IT DOES NOT PURPORT TO REFLECT OR CONSTITUTE AN APPRAISAL, LIQUIDATION VALUE OR ESTIMATE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY EQUITY INTERESTS OR OTHER SECURITIES TO BE ISSUED PURSUANT TO THE PLAN, EACH OF WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH HEREIN AND IN THE INFORMATION CONTAINED IN EXHIBIT C.

In preparing its analysis, Whitby Santarlasci, among other things, (i) reviewed certain financial statements of the Debtors for recent years and interim periods; (ii) reviewed certain internal financial and operating data prepared by the Debtors; (iii) discussed the current operations and prospects of the business with the Debtors' management; (iv) reviewed publicly available information regarding certain companies engaged in businesses deemed reasonably comparable to that of the Debtors; (v) reviewed certain information regarding merger and acquisition transactions, to the extent publicly available, involving certain companies engaged in businesses deemed reasonably comparable to that of the Debtors; (vi) considered certain economic and industry information relevant to the Debtors' business; (vii) reviewed various documents relating to the Plan; and (viii) reviewed such other information, performed such other analyses and took into account such other factors as Whitby Santarlasci deemed relevant, necessary or appropriate.

Solely for purposes of the Plan, the estimated range of reorganization value from operations of the Reorganized Debtors is assumed to be approximately $161 million to $208 million, with an approximate mean value of $177 million, as of an assumed emergence date of November 15, 2011. The estimated range of the reorganization value from operations of the Reorganized

Debtors does not include any value for tax attributes that may or may not be available in the future.  Based upon the assumed range of the reorganization value from operations of the Reorganized Debtors of $161 million to $208 million and an assumed total funded debt amount of approximately $118.6 million, Whitby Santarlasci has determined an imputed estimate of the range of equity value for the Reorganized Debtors of between $42 million and $89 million, with an approximate mean value of $59 million.  The foregoing estimate of the reorganization value of the Reorganized Debtors is based on a number of assumptions, including a successful reorganization of the Debtors' business and finances in a timely manner, the implementation of the Reorganized Debtors' business plan, the achievement of the forecasts reflected in the projections attached as Exhibit C, access to adequate exit financing, market conditions through the period covered by the projections, and the Plan becoming effective in accordance with the estimates and other assumptions discussed herein.

**Valuation Methodology**

Whitby Santarlasci performed a variety of analyses and considered a variety of factors in preparing the valuation of the Reorganized Debtors.  Whitby Santarlasci primarily relied on three methodologies: discounted cash flow analysis, guideline public company analysis, and guideline transactions analysis.  Whitby Santarlasci made judgments as to the significance of each analysis in determining the Debtors' indicated enterprise value range.  Whitby Santarlasci's analysis must be considered as a whole, and selecting just one methodology or portions of the analysis, without considering the analyses as a whole, could create a misleading or incomplete conclusion as to the Reorganized Debtors' enterprise value.

The following summary does not purport to be a complete description of the analyses and factors undertaken to support Whitby Santarlasci's estimate of value.  The preparation of a valuation is a complex process involving various determinations as to the most appropriate valuation approaches and methods to consider, as well as the application of those analyses under the particular circumstances.  As a result, the process involved in preparing a valuation is not readily summarized.

**Discounted Cash Flow Method**.  The discounted cash flow ("**DCF**") method is an income approach methodology that converts anticipated economic benefits into a present single amount.  Application of the DCF methodology requires three elements: (1) a forecast of expected future cash flows; (2) a determination of the terminal value, or the value of all benefits occurring beyond the specific forecast period; and (3) the selection of an appropriate discount rate with which to discount the forecasted stream of cash flows to the present.  Whitby Santarlasci's DCF valuation analysis is based on the Financial Projections prepared by the Reorganized Debtors.  The projected unlevered, after-tax cash flows and terminal value were discounted to the present using an estimated weighted average cost of capital ("**WACC**").  The WACC was developed with reference to the estimated cost of debt and equity for publicly traded companies that are generally similar to the Debtors.  The terminal value was calculated using the WACC and a constant terminal year growth rate into perpetuity.  The present value of the projected interim and terminal cash flows results in an estimate of total enterprise value.

The DCF method relies on the company's ability to project future cash flows with some degree of accuracy. Because the Debtors' Financial Projections reflect significant assumptions made by the Reorganized Debtors' management concerning anticipated results, the assumptions and judgments used in the Projections may or may not prove correct and, therefore, no assurance can be provided that projected results are attainable or will be realized. Whitby Santarlasci cannot and does not make any representations or warranties as to the accuracy or completeness of the Debtors' Projections.

**Guideline Public Company Method**. The guideline public company ("**GPC**") method is a market approach methodology that estimates value using pricing multiples derived from the market prices of stocks of publicly traded companies that are deemed to be reasonably comparable to the subject company. The selection of appropriate guideline companies involves the screening and review of each potential company's business similarity, financial performance, growth prospects, and overall comparability to the subject entity. Based on these analyses, selected financial ratios and valuation multiples were calculated and applied to appropriate representative levels of the Debtors' revenues and cash flow to determine a range of estimated enterprise values.

**Guideline Transactions Method**. The guideline transactions method is a market approach methodology that estimates value using pricing multiples observed in publicly announced merger and acquisition transactions. These pricing multiples are generally calculated based on the purchase price (including any debt assumed) paid to acquire companies that are reasonably comparable to the subject entity. The selection of appropriate and comparable transactions involves review of each acquired company's operating, financial, industry, and market characteristics, as well as a review of the structure and particular circumstances of the transaction itself. Based on these analyses, Whitby Santarlasci selected a group of guideline transactions from which to draw financial ratios and valuation multiples. These valuation multiples were then applied to appropriate representative levels of the Debtors' revenues and cash flow to determine a range of estimated enterprise values.

THE ESTIMATE OF THE ENTERPRISE VALUE (AND THE ESTIMATED EQUITY VALUE IMPUTED THEREFROM), AS DETERMINED BY WHITBY SANTARLASCI, REPRESENTS THE ESTIMATED ENTERPRISE VALUE ONLY; AND DOES NOT REFLECT THE ENTERPRISE VALUE THAT COULD BE ACCORDED, OR THE EQUITY VALUE THAT COULD BE ATTAINABLE, IN PUBLIC OR PRIVATE MARKETS. THE IMPUTED ESTIMATE OF THE EQUITY VALUE OF THE REORGANIZED DEBTORS, AS DETERMINED BY WHITBY SANTARLASCI, DOES NOT PURPORT TO BE AN ESTIMATE OF THE ACTUAL EXPECTED MARKET VALUE OF THE EQUITY INTERESTS OF THE REORGANIZED DEBTORS UPON EMERGENCE FROM BANKRUPTCY, WHICH MAY DIFFER MATERIALLY FROM THE IMPUTED ESTIMATE MADE BY WHITBY SANTARLASCI FOR PURPOSES OF ITS VALUATION ANALYSIS MADE IN CONNECTION WITH THE CHAPTER 11 CASES.

If the Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Cases will continue, rather than be converted into a liquidation under chapter 7 of the Bankruptcy Code, or that any alternative plan of reorganization would be on terms at least as

favorable to the holders of the impaired Claims and Equity Interests as the terms contained in the Plan.  If a liquidation were to occur, there is a risk that the value of the Debtors' assets could decline.  Information regarding the estimated valuation of the Debtors' assets in a liquidation scenario is set forth in the liquidation analysis developed by the Debtors.  The Debtors' liquidation analysis is attached as **Exhibit D** to this Disclosure Statement.

# ARTICLE IX

# CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST THE DEBTORS THAT ARE ENTITLED TO VOTE ON WHETHER TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, ALONG WITH THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED HEREIN BY REFERENCE), PRIOR TO VOTING WHETHER TO ACCEPT OR REJECT THE PLAN.   THESE RISK FACTORS ARE NOT NECESSARILY THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

**A.      Certain Risks Relating to the Reorganized PMC Holding Membership Interests.**

The receipt and ownership of Reorganized PMC Holding Membership Interests entails substantial risk.  Only some of that risk relates to the value of the Reorganized Debtors.  The Debtors have identified certain significant risks, as described below:

**1.      Form and Substance of PMC Holding LLC Agreement.**

In accordance with the Plan, PMC Holding, presently a Delaware corporation, will convert into a Delaware limited liability company.  Under Delaware law, substantially all of the economic and noneconomic rights and obligations of a holder of membership interests in a Delaware limited liability company are determined by reference to the limited liability company operating agreement of that limited liability company.  The Plan provides that the PMC Holding LLC Agreement shall be on terms in all material respects consistent with the term sheet attached as an exhibit to the Plan, and that the final or substantially final form of PMC Holding LLC Agreement will be attached to the Plan Supplement.

**2.      Fiduciary Duties.**

Delaware law permits (with certain exceptions) the expansion, restriction or elimination of fiduciary duties that a manager, or a controlling member, of a limited liability company otherwise would have to the limited liability company or to another member or manager.  The PMC Holding LLC Agreement eliminates such fiduciary duties.  The elimination of such fiduciary duties would eliminate important constraints that, for example, would be applicable to a director of a Delaware corporation.

### 3.     Phantom Income For Tax Purposes.

As is explained in greater detail in Article XIII of this Disclosure Statement, ownership of a membership interest in a limited liability company that is a "pass-through" entity for U.S. federal income tax purposes implicates a variety of considerations that would not also apply in the case of ownership of stock of a publicly traded corporation.  For example, as "pass-through" entities, the Reorganized Debtors will not themselves pay U.S. federal income taxes on any taxable income they may earn.  Rather, that income will be allocated among the holders of Reorganized PMC Holding Membership Interests, who will be obligated to report that income on their own personal tax returns and then to pay any tax liability that may arise on account thereof. That tax payment liability arises out of the taxable income earned by the Reorganized Debtors, whether or not any actual cash distribution has been made by Reorganized PMC Holding to holders of the Reorganized PMC Holding Membership Interests.  Although it is expected that the First Lien Exit Facility, and the New Secured Term Loan Agreement, will permit so-called "tax distributions" (that is, cash distributions from Reorganized PMC Holding to holders of the Reorganized PMC Holding Membership Interests in an amount roughly approximating the pass-through tax liability), those tax distributions would be made only if, and when, so determined by the board of managers of Reorganized PMC Holding in that board's sole discretion.  Holders of Reorganized PMC Holding Membership Interests will have to satisfy their respective "pass-through" tax liability whether or not any such "tax distributions" are made.

Further, it is likely that there will be comparable "pass-through" tax liability in respect of state, local and foreign income taxes.  And, in addition, holders of Reorganized PMC Holding Membership Interests should anticipate being required to file their own personal tax return in each state, locality and foreign jurisdiction in which the Reorganized Debtors conduct their business from time to time.

### 4.     Significant Holder.

As of the Petition Date, the Restructuring Support Parties held, in the aggregate, one hundred percent (100%) of the Senior Secured Notes then outstanding and in excess of eighty percent (80%) of the Senior Notes then outstanding.  Were they and their affiliates to continue to hold those Senior Secured Notes and Senior Notes as of the Effective Date, then they would be significant creditors of the Reorganized Debtors (by virtue of the New Secured Term Loans, as contemplated by the Plan) and also would constitute the controlling equity holders of the Reorganized Debtors (by virtue of their receipt of a supermajority of the Reorganized PMC Holding Membership Interests as Distributions on account of their Senior Notes Claims).  Even if all holders of Allowed General Unsecured Claims were to elect to receive Reorganized PMC Holding Membership Interests (that is, no holder of an Allowed Claim in Class 5 were to receive Cash as such holder's Distribution under the Plan), the Restructuring Support Parties and their affiliates would hold a substantial majority of the aggregate Reorganized PMC Holding Membership Interests to be outstanding on the Effective Date (prior to any issuances under the Management Incentive Plan), and therefore would be able to, among other things, elect all of the members of the board of managers of Reorganized PMC Holding.  The interests of the Restructuring Support Parties, as the controlling equity holders of Reorganized PMC Holding, may conflict with the interests of other holders of Reorganized PMC Holding Membership

Interests.    The Restructuring Support Parties are in the business of making investments in companies and may, from time to time, hold or acquire interests in businesses that compete directly or indirectly with the business of the Reorganized Debtors.

### 5.        Reorganized PMC Holding Membership Interests Illiquid.

The Reorganized PMC Holding Membership Interests to be issued under the Plan will be a new issue of equity securities for which no trading market currently exists, and will not be listed on any securities exchange or over-the-counter-market.    In light of the concentrated ownership to be held by the Restructuring Support Parties and their affiliates, it is unlikely that an active trading market for Reorganized PMC Holding Membership Interests will develop so long as such concentrated ownership is maintained, and there can be no assurance that an active trading market would develop even were such concentrated ownership to cease.    A holder of noncontrolling Reorganized PMC Holding Membership Interests should be prepared to retain such ownership for an undetermined period of time.    In addition, assuming that transferability of Reorganized PMC Holding Membership Interests is permitted at all under the PMC Holding LLC Agreement, were other noncontrolling holders to prefer to liquidate their investment, even at a significant discount, rather than to hold it on a long-term basis, any market that otherwise may exist for minority ownership interests in the Reorganized Debtors could be depressed significantly.

The imputed reorganized aggregate equity value of Reorganized PMC Holding Membership Interests being developed for purposes of the Plan is not an estimate of the price at which Reorganized PMC Holding Membership Interests would be valued in the marketplace on and after the Effective Date.    The marketplace could value such interests at prices higher or lower than the imputed value used for purposes of this Disclosure Statement, depending on many factors, including prevailing interest rates, markets for similar securities, the general economic and industry conditions, and the performance of, and investor expectations for, the Reorganized Debtors.

The transferability of a particular holder's Reorganized PMC Holding Membership Interests also may be subject to compliance with the Securities Act of 1933 and applicable state securities laws.    Those laws are addressed in Article XII of this Disclosure Statement.

It should be expected that the Restructuring Support Parties will include significant restraints on the ability of a holder of Reorganized PMC Holding Membership Interests to transfer such interests, including (among other things) a right of first refusal in connection with proposed transfers.

### 6.        Control Premium; and Minority Interest Discount.

In the marketplace, a unit of Reorganized PMC Holding Membership Interests may not actually be valued as a pro rata share of the marketplace's valuation of 100% of the Reorganized PMC Holding Membership Interests. Typically, the marketplace ascribes a premium (commonly called a "control premium") to a block of ownership interest in a company where that block is significant enough to be able to influence, or control, the management and business of that

company.  Correspondingly, in the case where there exists a control block of equity interests in a company, other outstanding equity interests in that company, outside of that controlling block, normally are ascribed a discount (commonly called a "minority interest discount") on account of the disproportionate inability to influence the management and business of that company and the probable materially adverse impact on the liquidity of that minority interest.  The marketplace may ascribe a significant control premium to the Reorganized PMC Holding Membership Interests held by the Restructuring Support Parties and their affiliates; and may ascribe a corresponding minority interest discount to the Reorganized PMC Holding Membership Interests held by others.

### 7.    Lack of Publicly Available Information about the Reorganized Debtors.

As a result of covenants that had been contained in the Secured Notes Indenture and in the Senior Notes Indenture, in each case as in existence prior to the Petition Date, the Debtors were required to have filed certain financial and other information with the SEC.  The Debtors failed to file certain of that financial information, including the Debtors' audited financial statements for FY 2010.  It is not anticipated that the Reorganized Debtors will resume filings with the SEC.  Accordingly, there now is, and after the Effective Date will continue to be, limited public information available about the Reorganized Debtors, particularly financial information.  The PMC Holding LLC Agreement will establish what rights (if any) noncontrolling holders of Reorganized PMC Holding Membership Interests have to receive information concerning the financial condition of the Reorganized Debtors or the results of their operations.

### 8.    Increased Claims Pool Risk.

As discussed above, certain specific Claims may exist (designated in the Plan as Specified General Unsecured Claims) which, if determined to be Allowed Claims, would qualify as General Unsecured Claims and would constitute a significant portion of the overall amount of General Unsecured Claims ultimately to be Allowed in these Chapter 11 Cases.  The exact list of Specified General Unsecured Claims will be included in the Plan Supplement, but such Specified General Unsecured Claims will include General Unsecured Claims in respect of existing franchise development agreements (the territorial exclusivity arrangements discussed in Article IV(A)(6) of this Disclosure Statement), and General Unsecured Claims in respect of the CHI Management Agreements.  To the extent a large amount of Specified General Unsecured Claims are Allowed, and the holders of such Claims either elect to make the Class 5 Equity Election or determine not to reduce the amount of such Claims in order to become Cash Eligible Claimants, as the case may be, then such Claims may significantly reduce the recovery to creditors electing to receive Reorganized PMC Holding Membership Interests, such that other holders of such Allowed General Unsecured Claims and holders of such Allowed Senior Notes Claims who are to receive Reorganized PMC Holding Membership Interests would receive a substantially lower allocation of Reorganized PMC Holding Membership Interests than otherwise would be the case were the Specified General Unsecured Claims disallowed entirely or in material part.

To address dilution concerns in the case where any such Allowed Specified General Unsecured Claims are to receive Cash, the Plan provides that the Cash Cap Amount would be increased by an amount equal to 14% of the aggregate amount of Allowed Specified General Unsecured Claims receiving Cash.

## B.    Projected Financial Information.

The Financial Projections included in this Disclosure Statement, and the estimated valuations to be contained herein and based in part on the Financial Projections, are dependent upon the successful implementation of the Reorganized Debtors' business plan and the validity of the assumptions contained therein.    Those projections reflect numerous assumptions, including, without limitation, confirmation and consummation of the Plan in accordance with its terms, the Reorganized Debtors' anticipated future performance, the future performance of the restaurant industry, certain assumptions with respect to the Reorganized Debtors' competitors, general business and economic conditions, and other matters.  Many or most of those matters are beyond the control of the Reorganized Debtors.    In addition, unanticipated events and circumstances occurring subsequent to the preparation of the Financial Projections may affect the Reorganized Debtors' actual financial results.    Although the Reorganized Debtors believe that the Financial Projections are reasonably attainable, variations between the actual financial results and those projected may occur and, if they do occur, they may be material and adverse.

## C.    Risks Related to the Debtors' Business and Operations.

### 1.    Marketing and Competition.

The Debtors' restaurants operate in an intensely competitive industry comprising a large number of restaurants, including national and regional restaurant chains and franchised restaurant operations, as well as locally-owned, independent restaurants.    The Debtors consider their principal competitors to be mid-priced family dining venues and casual dining operations, including other national and regional chains, as well as locally-owned restaurants.    Price, restaurant location, food quality, service and attractiveness of facilities are important aspects of competition, and the competitive environment is often affected by factors beyond a particular restaurant management's control, including changes in the public's taste and eating habits, population and traffic patterns and economic conditions. Many of the Debtors' competitors have greater financial resources and there are few non-economic barriers to entry.    Therefore, new competitors may emerge at any time.    It cannot be certain that the Debtors will be able to compete successfully against their competitors in the future or that competition will not have a material adverse effect on the Debtors' operations or earnings.

The Debtors are exposed to vulnerabilities associated with being a mature restaurant concept.  Perkins restaurants have operated since 1958, and Marie Callender's since 1948.  As a result, the Debtors are at risk to innovations by competitors and out-positioning in markets where the demographics or customer preferences have changed.  Moreover, mature units require greater expenditures for repair, maintenance, refurbishments and re-concepting, and the Debtors will be required to continue making such expenditures in the future in order to preserve traffic at many of the Debtors' restaurants. The Debtors curtailed these expenditures significantly in the period

leading up to the filing of the Petitions, and during the pendency of the Chapter 11 Cases. The Debtors cannot be sure they will have sufficient funds available (from the First Lien Exit Facility, or other funding sources (including funds generated internally)) to fund these expenditures (particularly for remodeling and refurbishing); nor, assuming such funds in fact are available, whether that remodeling and refurbishing will be successful in preserving or building their customer base.

If the Debtors' competitors respond to the continuing economic recession, or to any further adverse economic changes, by adopting or expanding discount pricing strategies, it could have the effect of drawing customers away, thereby reducing sales and further pressuring margins. Because certain elements of the Debtors' cost structure are fixed in nature, particularly over shorter time horizons, changes in marginal sales volume can have a more significant impact on the Debtors' profitability than for a business operating in a more variable cost structure. Were the Reorganized Debtors to implement menu price discounts and/or promotions in response to these conditions, the Reorganized Debtors' margins could be reduced. The store reduction program implemented by the Debtors shortly before the commencement of the Chapter 11 Cases was undertaken in recognition of, among other things, the opportunity the Chapter 11 Cases would be providing to the Debtors to address certain of these fixed costs.

### 2.    Employees and Labor Costs.

The Debtors operate in the service sector. Consequently, they are highly dependent upon the availability of qualified restaurant personnel. Availability of staff varies widely from market to market. If restaurant management and staff turnover trends increase, the Reorganized Debtors would suffer higher direct costs associated with recruiting, training and retaining replacement personnel. Moreover, the Reorganized Debtors could suffer from significant indirect costs, including restaurant disruptions due to management changeover, increased above-store management staffing and potential delays in new store openings due to staff shortages. Competition for qualified employees exerts pressure on wages paid to attract qualified personnel and raises recruiting expenses, resulting in higher labor costs.

A substantial number of the Debtors' employees are hourly workers, who are paid wage rates at or slightly above the minimum wage. Those wages may be impacted by an increase in the federal or state minimum wage. Legislation is regularly introduced at federal and state levels to increase minimum wage levels. In addition certain or all of the jurisdictions in which the Debtors operate also have minimum wage requirements, in some cases higher than those in effect nationally. An increase in any applicable minimum wage may create pressure to increase the pay scale for the Reorganized Debtors' employees more broadly. In addition, a shortage in the labor pool, competition for employees or other general inflationary pressures or changes also could increase the Reorganized Debtors' labor costs.

The retention of executive management familiar with the Debtors' core business is important to the Reorganized Debtors' continuing success. The departure of one or more key operations executives or the departure of multiple executives, particularly if occurring within a short period of time, could have a material and adverse impact on the Reorganized Debtors' business.

The Debtors' workers' compensation and employee benefit expenses are disproportionately concentrated in states with adverse legislative climates. The Debtors' highest per-employee workers' compensation insurance costs are in California, where the Debtors retain a large employment presence. Under enacted federal and state legislation, the Debtors are or likely will be required to provide health insurance or equivalent funding for workers who have traditionally not been covered by employer health plans. Other actual or potential state and federal mandates, such as compulsory paid absences, increases in overtime wages and unemployment tax rates, stricter citizenship requirements and revisions in the tax treatment of employee gratuities, also would affect the Reorganized Debtors' business in a material and adverse manner. Any increases in labor costs could have a material adverse affect on the Reorganized Debtors' results of operations and could decrease the Debtors' profitability and cash available to service the Reorganized Debtors' debt obligations, if the Reorganized Debtors were unable to compensate for such increased labor costs by raising the prices charged or realizing additional operational efficiencies.

As part of the Debtors' store reduction program undertaken by the Debtors, the Debtors reduced their overall workforce by approximately 2,767 people.

### 3.    Vendors; Raw Material Costs.

The Debtors are dependent on timely deliveries of ingredients, including fresh produce, dairy products and meat. The cost, availability and quality of the ingredients used to prepare food are subject to a range of factors, many of which are beyond the Debtors' control. For example, fluctuations in weather, supply and demand, as well as economic and political conditions, could adversely affect the cost, availability and quality of ingredients. Significant menu items that could be subject to price fluctuations include beef, pork, poultry, coffee, eggs, dairy products, wheat products and corn products. The Debtors may not be able to recover increased costs through menu price increases, because competition may limit the ability to implement those increases or may preclude them entirely. If food quality declines due to the lack, or lower quality, of ingredients or due to interruptions in the flow of fresh ingredients and similar factors, customer traffic may decline and negatively affect the restaurants' results of operations. The Debtors rely on third-party distributors and suppliers for deliveries. The number of companies capable of servicing the Debtors' distribution needs on a national basis has declined over time, reducing the Debtors' bargaining leverage and increasing vulnerability to distributor interruptions. In addition, the Debtors' suppliers typically provide trade credit in connection with Reorganized Debtors' purchases.

The Debtors currently do not engage in futures contracts or other financial risk management strategies with respect to potential price fluctuations in the cost of food and other supplies, which they purchase at prevailing market or contracted prices. The Reorganized Debtors' inability to obtain requisite quantities of high-quality ingredients on favorable terms would adversely affect their ability to provide the menu items that are central to their business, and the highly competitive nature of the restaurant industry may limit the ability of the Reorganized Debtors to pass increased costs on to their guests, which could reduce their gross

margins.  If the Reorganized Debtors were to raise their prices due to inflation, they could lose customers.

Among the Debtors' major third party suppliers, the Debtors estimate that one (1) supplier, U.S. Foodservice, alone accounted for nearly substantially all of the aggregate food product and other supplies purchased during FY 2010 for the Debtors' company-owned restaurants.  U.S. Foodservice also supplies certain of the Debtors' franchisees.  Under the terms of the Debtors' contract with U.S. Foodservice, U.S. Foodservice may unilaterally establish and revise credit terms based on the Debtors' perceived creditworthiness, including reducing the amount of time permitted between invoice and payment for new orders.  If U.S. Foodservice, or other significant suppliers or distributors, are unable to perform their agreements with the Debtors, or if the agreements with such parties are suddenly and unexpectedly terminated, or if the terms by which the Reorganized Debtors' purchase products are significantly amended in a manner adverse to the Reorganized Debtors, supply costs could increase and disruptions in distribution could occur during the transition to other food suppliers.  Any such events could have a material and adverse affect on the Reorganized Debtors' business, liquidity and results of operations.

### 4.      Seasonality and Major World Events.

The Debtors' restaurant sales volume fluctuates seasonally.  Seasonality varies by geographic region but, overall, restaurant sales are generally higher in the summer months and lower in the winter months.  As is the case with all restaurant companies, weather conditions can have a strong influence on the Debtors' business.  This effect is heightened because many of the Debtors' restaurants are in geographic areas that experience extremes in weather, including severe winter conditions and tropical storm patterns.  Increases in gasoline prices also have had, and will continue to have, a negative impact on the Debtors' business, decreasing customers' discretionary spending and their dining out expenditures.  Major world developments, and other significant events, also could distract consumers from traditional spending patterns, to the detriment of the Reorganized Debtors' business.

The price and availability of the food that the Debtors purchase, which is influenced in large part by demand, capacity and energy costs (especially gasoline prices), significantly affect the Debtors' business.  Fluctuating oil and other energy costs, like those experienced in the last few years, could continue to adversely affect the Reorganized Debtors' costs.  The Reorganized Debtors may not be able to offset food price increases, in whole or in part, through menu price increases and operating efficiencies; and the Reorganized Debtors' inability to do so may affect their business materially and adversely.

### 5.      Consumer Preferences and Consumer Discretionary Spending.

The restaurant industry is affected by consumer preferences and perceptions.  If consumers seek out other dining alternatives rather than visit the Reorganized Debtors' restaurants, whether due to shifts in dietary trends, nutrition, health emphasis or otherwise, the Reorganized Debtors' business could be materially impacted.  Changes in the dining concept and/or menu by the Reorganized Debtors in response to changes in economic conditions and

consumer tastes or dining patterns could result in the loss, rather than gain, of customers. In addition, negative publicity about the Reorganized Debtors' products or dining experience could materially harm their business, results of operations and financial condition.

The Debtors' success depends, to a significant extent, on the discretionary income of their customers. Discretionary spending can be influenced by many factors, such as general economic conditions and consumer confidence. Significant declines in consumer confidence, or in the amount potential customers have available for discretionary spending, could materially and adversely affect the Reorganized Debtors' business, results of operations and financial condition. Economic downturns, high energy prices (especially gasoline prices), mortgage and credit card rates, inflation, and concerns about terrorism, and other factors, could impact potential customers' decisions as to their dining out patterns.

Historically, the Debtors had expended a material amount time and resources in updating and innovating on their menu items and dining experience. However, those efforts were curtailed substantially in the period leading up to the filing of the Petitions, and during the pendency of the Chapter 11 Cases. There can be no assurance that the full return to these initiatives will be successful in retaining existing customers or in attracting new ones.

### 6.    Restaurant Locations.

The location of a restaurant is a critical element in the ultimate success or failure of that restaurant. In connection with the Chapter 11 Cases, the Debtors have undertaken a store reduction program, in order to avoid any continuing burdens associated with restaurant locations that the Debtors have determined will not meaningfully contribute to the overall success of their business. The Reorganized Debtors will continue to evaluate the suitability and cost of the location of their existing company-owned restaurants, and of potential alternate or additional locations. There can be no assurance that current locations will continue to be attractive, as demographic patterns change. Neighborhood or economic conditions where restaurants are located could decline in the future, thus resulting in potentially reduced sales in those locations.

Ultimately, the Reorganized Debtors' success will depend in part on the ability to retain and obtain leases in desirable locations and at rental rates believed to be reasonable. The Debtors currently lease the land and/or building for all of their company-owned restaurants. The lease agreements for those locations typically provide the lessor with rights of termination for a number of reasons, including the Debtors' default in any payment of rent or taxes or breach of any covenant or agreement in the particular lease. Given that, as part of the Chapter 11 Cases, the Debtors have rejected, or will reject, pre-existing leases that no longer are desirable for the business going forward of the Reorganized Debtors, the leases that will be in effect on the Confirmation Date largely constitute locations that the Debtors believe are important or useful to their future operations. Accordingly, termination of any such lease by the landlord, or termination of any new lease the Reorganized Debtors may enter into, could materially and adversely affect the Reorganized Debtors' business and, as with a default under any of their indebtedness, the Reorganized Debtors' liquidity. There is no assurance that the Reorganized Debtors will succeed in obtaining lease extensions in the future at all, or at rental rates believed to be reasonable. Moreover, if some locations should prove to be unprofitable, the Reorganized

-104-

Debtors could remain obligated for lease payments even were they to close those locations. Moreover, the Reorganized Debtors will incur special charges relating to the closing of such restaurants, including lease termination costs.  Impairment charges and other special charges will reduce the Reorganized Debtors' profits.

The ability of the Reorganized Debtors to expand, or for their franchisees to expand, to additional sites involves substantial risk.  After a new restaurant is opened, there is a "ramp-up" period of time before targeted level of profitability could be expected to be achieved. This is due to higher operating costs caused by start-up and other temporary inefficiencies associated with opening new restaurants, such as a lack of market familiarity, consumer acceptance within the new market and training of staff.  Furthermore, the Reorganized Debtors' ability, and their franchisees' ability, to open new restaurants is dependent upon a number of factors, many of which are beyond the Reorganized Debtors' and their franchisees' control, including, but not limited to, the ability to: (i) find quality locations; (ii) reach acceptable agreements regarding the lease or purchase of locations; (iii) comply with applicable zoning, land use and environmental regulations; (iv) raise or have available an adequate amount of money for construction and opening costs; (v) timely hire, train and retain the skilled management and other employees necessary to meet staffing needs; (vi) obtain, for an acceptable cost, required permits and approvals; (vii) efficiently manage the amount of time and money used to build and open each new restaurant; and (viii) general economic conditions.

The Reorganized Debtors or their franchisees may enter new markets in which they have limited or no operating experience.  These new markets may have different demographic and competitive conditions, consumer tastes and discretionary spending patterns than existing markets and may not be able to attract enough customers because potential customers may be unfamiliar with the Perkins and Marie Callender's brands, or the atmosphere or menu of their restaurants might not appeal to them.  As a result, the revenue and profit generated at new restaurants may not equal the revenue and profit generated at existing restaurants.  New restaurants may even operate at a loss, which would have an adverse effect on overall profits.  In addition, opening a new restaurant in an existing market could reduce the revenue of the Reorganized Debtors' or franchisees' existing restaurants in that market.

Because a significant portion of the Debtors' bakery products are produced at facilities in the same city, the Debtors are vulnerable to natural disasters and other disruptions.  In particular, the Debtors depend on Foxtail's ability to reliably produce bakery products, which include pies, cookies, muffins, mixes and syrups, and deliver them to restaurants and foodservice distributors on a regular schedule. A significant portion of the Debtors' bakery products are prepared in two manufacturing facilities in Cincinnati, Ohio. As a result, Foxtail is vulnerable to damage or interruption from fire, severe drought, flood, power loss and energy shortages, telecommunications failure, break-ins, snow and ice storms and similar events.  Any such damage or failure could disrupt some or all of the Foxtail operations and result in the loss of sales and current and potential customers if the Debtors are unable to quickly recover from such events.  The Debtors' business interruption insurance (if any) may not be adequate to compensate for all actual losses if any of these events occur.  In addition, business interruption insurance, even if presently available, may not be available in the future to the Debtors, on

-105-

acceptable terms or at all. Accordingly, even if the Debtors carry adequate insurance, such events could have a material adverse impact on them.

Many Marie Callender's restaurants are equipped with pie production facilities, while the remaining Marie Callender's restaurants rely on a pie production facility in Corona, California. Although Marie Callender's is less vulnerable than Perkins with respect to the impact of a disruption at its production plant, significant incremental costs would be incurred to supply bakery products to those restaurants without production equipment in the event they are unable to obtain pies from the Corona facility on a timely basis.

In addition, the Debtors' operations are concentrated in a limited number of states. Given that geographic concentration, particularly in California and Florida, regional occurrences such as earthquakes, hurricanes, snow and ice storms or other natural disasters, unfavorable economic conditions, government regulations, reduced tourism, negative publicity, terrorist attacks or other events, conditions and occurrences specific to these states may materially adversely affect the Debtors' revenues.

### 7.    **Franchisees.**

Nearly two-thirds of the Debtors' restaurants are owned and operated by independent franchisees over whom the Debtors have far less control than they do over restaurants that are company-owned and operated. The financial performance of those franchisees, and the dining experience in their restaurants, can have a significant effect on the Debtors and their business. Franchisees of the Reorganized Debtors may not operate their locations in accordance with, or may object to, the Reorganized Debtors' policies, and there may be disputes or other conflicts resulting from that. In addition, although the Debtors have developed criteria to evaluate and screen prospective franchisees, there can be no assurance that franchisees will have the business acumen or financial resources necessary to operate successful franchises in their franchise areas.

A material portion of the revenue of the Reorganized Debtors during the Projection Period is anticipated to come from payments made by franchisees; and a material portion of the Reorganized Debtor's franchised restaurants are concentrated in a limited number of franchisees. To the extent that one or more franchisees of the Reorganized Debtors with several franchised restaurant locations, or a large number of franchisees of the Reorganized Debtors with only a few franchised restaurant locations each, were to cease paying all or a significant portion of its or their respective royalty or other monetary or non-monetary obligations owed to the Reorganized Debtors, the Reorganized Debtors may be required to incur significant collection and litigation costs and expenses in enforcing their respective rights against such franchisee(s); and that occurrence could materially and adversely impact the financial performance of the Reorganized Debtors. In addition, were there to be any delays in collecting on a timely basis, and in any significant amount, any of the amounts due and payable by such franchisees to the Reorganized Debtors, the liquidity and future success of the Reorganized Debtors could be impacted materially and adversely.

### 8.    Government Regulations.

In addition to wage and benefit regulatory risks, the Debtors are subject to other extensive government regulation at federal, state and local levels.  These include, but are not limited to, regulations relating to the sale of food and alcoholic beverages in the Debtors' company-owned and operated restaurants.  The Debtors are required to obtain and maintain governmental licenses, permits and approvals in order to operate their restaurants.  Difficulty or failure in obtaining or maintaining them in the future could result in delaying or canceling the opening of new restaurants or the closing of current ones.  Local authorities may suspend or deny renewal of the Reorganized Debtors' governmental licenses if they determine that the Reorganized Debtors' operations do not meet the standards for initial grant or renewal.  This risk would be even higher if there were a major change in the licensing requirements affecting the Reorganized Debtors' types of restaurants.

The Federal Americans with Disabilities Act prohibits discrimination on the basis of disability in public accommodations and employment.  Mandated modifications to the Reorganized Debtors' facilities in the future to make different accommodations for disabled persons could result in material, unanticipated expense.

The Reorganized Debtors' company-owned and operated restaurants, and their franchised restaurants, are subject to extensive federal, state and local governmental regulations in other areas as well.  For example, on January 1, 2010, legislation took effect in California that prohibits the use of trans fats in food establishments, including casual dining restaurants.  The trans fat ban covers oil, shortening and margarine used in spreads or for frying.  Public interest groups have also focused attention on the marketing of high-fat and high-sodium foods to children in a stated effort to combat childhood obesity.  In addition, chain restaurants increasingly are required to include calorie information on their menu boards and make other nutritional information available on printed menus which must be plainly visible to consumers at the point of ordering.  There may also be increased regulation of and opposition to the industrialized production of food products, which could force the use of alternative food supplies. The cost of complying with these regulations could increase expenses and may cause applicable food items to be less popular, and the negative publicity arising from such legislative initiatives can impact sales negatively.

A number of the Reorganized Debtors' company-owned and operated Perkins and Marie Callender's restaurants serve alcoholic beverages.  These restaurants may be subject to state "dram shop" statutes, which generally allow a person injured by an intoxicated patron the right to recover damages from an establishment that wrongfully served alcoholic beverages to the intoxicated person. Application of these statutes to the Reorganized Debtors' operations, or liabilities otherwise associated with liquor service in the Reorganized Debtors' restaurants, could negatively affect the Reorganized Debtors' financial condition if not otherwise insured (or if it were to exceed the amount of insurance coverage in effect).

Buffet-style restaurants have a service format that is depends upon self-service by customers.  Food tampering by customers, or other events affecting the self-service format, could cause regulatory changes or changes in the Reorganized Debtors' business pattern or customer

perception.    Any development that would materially impede or prohibit the Reorganized Debtors' continued use of this approach, or reduce the appeal to guests, would have a material adverse impact on the Reorganized Debtors and their business.

The Reorganized Debtors also will be subject to Federal Trade Commission regulations and various state and foreign laws which govern the offer and sale of franchises.  Some states require that certain materials be registered before franchises can be offered or sold in that state.  The Reorganized Debtors also must comply with a number of state and foreign laws that regulate some substantive aspects of the franchisor-franchisee relationship.   These laws may limit a franchisor's ability to: terminate or not renew a franchise without good cause; interfere with the right of free association among franchisees; enforce noncompetition provisions in its franchise agreements; disapprove the transfer of a franchise; discriminate among franchisees with regard to charges, royalties and other fees; or place new restaurants near existing restaurants.  The failure to obtain or retain licenses or approvals to sell franchises could adversely affect the Reorganized Debtors' financial condition.

It is not anticipated that the Reorganized Debtors will, at any time during the Projection Period, be obligated to comply with the requirements of the Sarbanes-Oxley Act of 2002 ("**Sarbanes-Oxley**").   Compliance with Sarbanes-Oxley would place significant additional obligations on the Reorganized Debtors' systems and resources and requires them to incur additional costs.  In order to maintain the effectiveness of disclosure controls and procedures and internal control over financial reporting, significant resources and management oversight would be required, as the Reorganized Debtors would need to devote additional time and personnel to legal, financial and accounting activities to ensure ongoing compliance with the public company reporting requirements.

### 9.    Environmental Laws.

The Debtors are subject to federal, state and local laws, regulations and ordinances relating to the protection of the environment, including those that govern the cleanup of contaminated sites and activities or operations that may have adverse environmental effects, such as discharges to air and water, as well as handling and disposal practices for solid and hazardous wastes.   These laws and regulations may impose liability for the costs of cleaning up, and damage resulting from, sites contaminated by past spills, disposals or other releases of hazardous materials.   The Reorganized Debtors could incur such liabilities, including resulting cleanup costs, regardless of whether the Reorganized Debtors lease or own the restaurants or land in question and regardless of whether such environmental conditions were created by the Reorganized Debtors or resulted from historical operations of a prior owner or tenant or other third parties.   Significant expense could also arise in relation to governmental regulations involving the handling and storage of hazardous materials, response planning for environmental contingencies and the reporting of environmentally related occurrences.  It cannot be guaranteed that obligations relating to prior, existing or future restaurants or restaurant sites will not have a material adverse effect on the Reorganized Debtors.

### 10.    Risk of Negative Publicity.

Like other restaurant companies, the Debtors are, from time to time, faced with negative publicity relating to food quality, restaurant facilities, restaurant closures, health inspection scores, employee relationships or other matters at one of their restaurants or those of their franchisees.  Adverse publicity may negatively affect the Reorganized Debtors, regardless of whether the allegations are valid or whether the Reorganized Debtors are liable.  In addition, the negative impact of adverse publicity relating to one restaurant may extend beyond the restaurant involved to affect some or all of the Reorganized Debtors' other restaurants. If a franchised restaurant fails to meet the Reorganized Debtors' franchise operating standards, the Reorganized Debtors' own restaurants could be adversely affected due to customer confusion or negative publicity. A similar risk exists with respect to totally unrelated food service businesses, if customers mistakenly associate such unrelated businesses with the Reorganized Debtors' own operations.

### 11.    Risk of Food-Borne Illness Incidents.

Claims of illness or injury relating to food quality or food handling are common in the food service industry, and a number of these claims may exist at any given time.  While the Debtors maintain internal controls and training to prevent all food-borne illnesses, it cannot be guaranteed that such efforts will be fully effective.  Furthermore, reliance on third-party food processors makes it difficult to monitor food safety compliance and increases the risk that food-borne illness would affect multiple locations rather than single restaurants.  Some food-borne illness incidents could be caused by third-party food suppliers and transporters outside of the Reorganized Debtors' control.  New illnesses resistant to current precautions may develop in the future, or diseases with long incubation periods could arise that could give rise to claims or allegations on a retroactive basis.  In addition, the levels of chemicals or other contaminants that are currently considered safe in certain foods may be regulated more restrictively in the future or become the subject of public concern.

The reach of food-related public health concerns can be considerable due to the level of attention given to these matters by the media.  Local public health developments and concerns over diseases such as avian flu, swine flu, and E. coli (including the recent E. coli outbreak in Europe) could have a national adverse impact on the Reorganized Debtors' sales.  Similarly, concerns related to particular food constituents or the byproducts of cooking processes could also have an adverse effect.  This could occur whether or not the developments are specifically attributable to the Reorganized Debtors' restaurants or those of the Reorganized Debtors' franchisees or competitors.

Food-borne illnesses spread at restaurants have generated significant negative publicity at other restaurant chains in the past, which has had a negative impact on their results of operations. One or more instances of food-borne illness in one Perkins or Marie Callender's restaurant (whether or not a company-operated location) could negatively affect all of the Reorganized Debtors' and their franchisees' restaurants' image and sales.  These risks exist even if it is later determined that an illness was wrongly attributed to one of the Perkins or Marie Callender's

restaurants.  In addition, the impact of adverse publicity relating to one restaurant may extend beyond that restaurant to affect some or all of the other restaurants of that brand.

## 12.    Protection of Trademarks and Other Proprietary Rights.

The Debtors believe that their trademarks and other proprietary rights are important to their success and competitive position.  Accordingly, the Debtors devote substantial resources to the establishment and protection of their trademarks and proprietary rights.  However, actions taken may be inadequate to prevent imitation of brands, proprietary rights and concepts by others, which may thereby dilute the Reorganized Debtors' brands in the marketplace or diminish the value of such proprietary rights, or to prevent others from claiming violations of their trademarks and proprietary rights by the Reorganized Debtors.  In addition, others may assert rights in the Reorganized Debtors' trademarks and other proprietary rights.  The Reorganized Debtors' exclusive rights to trademarks, or to the use of trademarks, are subject to the common law rights of any other person who began using the trademark (or a confusingly similar mark) prior to both the date of registration and first use of such trademarks in the relevant territory.  The Reorganized Debtors cannot guarantee that third parties will not assert claims against the Reorganized Debtors' intellectual property or that the Reorganized Debtors will be able to successfully resolve such claims.  Future actions by third parties may diminish the strength of the Reorganized Debtors' restaurant concepts' trademarks or other proprietary rights and decrease the Reorganized Debtors' competitive strength and performance.  The Reorganized Debtors could also incur substantial costs to defend or pursue legal actions relating to the use of intellectual property, which could have a material adverse affect on their business, results of operation or financial condition.

In addition, in the case of Marie Callender's, certain important rights previously held by the Debtors to defend and assure the integrity of the Marie Callender trademarks reside with ConAgra by virtue of the Marie Callender's IP Sale.  Actions by ConAgra, or their other licensees, could adversely and materially affect the value of the Marie Callender trademarks that the Reorganized Debtors (directly and through their franchisees) are continuing to use.

The Reorganized Debtors' business will be partially dependent upon their advertising and promotional programs; and advertising and promotional activities of their competitors may reduce the effectiveness of those initiatives.  The Reorganized Debtors' sales are heavily influenced by marketing and advertising.  If they do not advertise or run promotions for their products, or if their marketing and advertising programs are not successful, they may experience a loss or reduction in sales, fail to attract new guests or be unable to retain existing guests.  In addition, their competitors' advertising and promotions, including any increase in the amount and/or frequency thereof, may reduce the effectiveness of the Reorganized Debtors' own initiatives.  As a result of current economic events, some competitors of the Debtors have significantly increased their use of promotions. Furthermore, the Reorganized Debtors' initiative may be adversely affected by an increase in the cost of television, radio, print or other forms of media advertising.

### 13.    Complaints or Litigation.

From time to time, the Debtors are subject to employee claims alleging injuries, wage and hour violations, discrimination, harassment or wrongful termination, as well as customer and third party claims.  In recent years, a number of restaurant companies have been subject to lawsuits, including class action lawsuits, alleging violations of federal and state law regarding workplace, employment and similar matters.  A number of these lawsuits have resulted in the payment of substantial damages by the defendants.  Class action lawsuits could also be filed alleging, among other things, that restaurants have failed to disclose the health risks associated with high-fat foods and that marketing practices have targeted children and encouraged obesity. Regardless of whether any claims against the Reorganized Debtors are valid or whether they are ultimately determined to be liable, claims may be expensive to defend and may divert time and money away from the Reorganized Debtors' operations and hurt the Reorganized Debtors' financial performance. A significant judgment for any claim(s) could materially adversely affect the Reorganized Debtors' financial condition or results of operations.

### 14.    Goodwill and Intangible Assets.

The Debtors are required to evaluate goodwill and other intangibles for impairment whenever changes in circumstances indicate that the carrying amount may not be recoverable from estimated future cash flows or at least annually.  This evaluation requires the use of projections of future cash flows from the reporting segment. These projections are based on growth rates, anticipated future economic conditions, the appropriate discount rates relative to risk and estimates of residual values.  If changes in growth rates, future economic conditions, discount rates or estimates of residual values were to occur, goodwill and other intangibles may become impaired.  This could result in material charges that could be adverse to the Reorganized Debtors' operating results and financial position.

### D.    Financial Risks.

The Reorganized Debtors' working capital needs and letter of credit requirements are anticipated to be funded by the First Lien Exit Facility.  The credit agreement establishing the First Lien Exit Facility will be in substantially the form attached as an exhibit to the Plan Supplement.  It is likely that credit agreement will include, among other things, restrictions on the Reorganized Debtors' ability to incur additional indebtedness, consummate certain asset sales, create liens on assets, make investments, loans or advances, consolidate or merge with or into any other Person or convey, transfer or lease all or substantially all of their assets or change the business to be conducted by them.  The First Lien Exit Facility also will contain specific financial covenants, as well as customary events of default. A breach of any of those covenants could result in a default under the First Lien Exit Facility; and, in certain cases, such default could result in a cross-default under the New Secured Term Loan Agreement discussed below.  It also is anticipated that substantially all of the assets of the Reorganized Debtors will be pledged as security under the First Lien Exit Facility.

In addition, upon the Effective Date the Reorganized Debtors will be subject to the terms of the New Secured Term Loan Agreement, substantially in the form attached as an exhibit to the

Plan Supplement. A term sheet relating to the New Secured Term Loans is attached as an exhibit to the Plan; and that term sheet indicates there will be, among other things, certain affirmative, negative and financial covenants, and events of default, that are comparable to those to be contained in the First Lien Exit Facility (and in any event no less favorable to the lenders than the corresponding provisions that had been contained in the Senior Secured Notes Indenture). A breach of any of those covenants could result in a default thereunder; and, any default thereunder may result in a cross-default under the First Lien Exit Facility.

Based on the Reorganized Debtors' level of secured funded indebtedness, the treatment accorded general unsecured creditors under the Plan, and other factors affecting the Reorganized Debtors or their business, one or more suppliers, including suppliers material to the business of the Reorganized Debtors, could decline to continue shipping products to the Reorganized Debtors or, as a condition to such shipments, could require more restrictive payment terms than had existed previously. The occurrence of the foregoing could affect the Reorganized Debtors in a material and adverse manner.

There can be no assurance that the Reorganized Debtors will be able to generate sufficient cash flow from operations to enable them, along with the availability under the First Lien Exit Facility, to maintain operations at a sufficient level, or to repay their indebtedness as such indebtedness becomes due and payable; and the Reorganized Debtors may not be able to extend the maturity of or refinance such indebtedness on commercially reasonable terms or at all.

### E.    Certain Bankruptcy Law Considerations.

#### 1.    Risk of Non-Confirmation of the Plan.

Although the Debtors believe that the Plan satisfies all of the requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation, or that any such modifications would not necessitate the resolicitation of votes to accept the modified Plan.

#### 2.    Risk of Non-Occurrence of the Effective Date.

Although the Debtors believe that the Effective Date will occur prior to the close of the Debtors' fiscal year ending December 25, 2011, there can be no assurance as to such timing or that the conditions to the Effective Date, as contained in the Plan, will occur on a timely basis or at all. Moreover, both the Restructuring Support Agreement and the DIP Credit Facility contain milestones relating to, among other things, the timely occurrence of the Effective Date; and there can be no assurance that the timely occurrence of the Effective Date will occur within the respective time frames set forth in the Restructuring Support Agreement and the DIP Credit Facility, if at all.

# ARTICLE X

# CONFIRMATION PROCEDURE

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

## A.      Solicitation of Votes.

In accordance with sections 1126 and 1129 of the Bankruptcy Code, the Claims and Equity Interests in five of the Classes of the Plan are Impaired.  Those Classes are Class 3 (Senior Secured Notes Claims), Class 4 (Senior Notes Claims), Class 5 (General Unsecured Claims), Class 8 (Subordinated Claims), and Class 9A (Equity Interests in PMC Holding and PMCI).  However, only the holders of Allowed Claims in three of those Classes (Classes 3, 4 and 5) are entitled to vote to accept or reject the Plan.  Holders of Claims and Equity Interests in Classes 8 and 9A are Impaired and are deemed to have rejected the Plan; and, therefore, are not entitled to vote to accept or reject the Plan.  Further, the Claims in Class 1 (Other Priority Claims), 2 (Other Secured Claims), 6 (Convenience Claims), 7 (Intercompany Claims), and 9B (Equity Interests in the Other Subsidiary Debtors) are Unimpaired and are conclusively presumed to have accepted the Plan; and, therefore, they are not entitled to vote to accept or reject the Plan.

As to Classes of Claims entitled to vote on the Plan, section 1126(c) of the Bankruptcy Code defines "acceptance" of a reorganization plan by a class of creditors as acceptance by holders of at least two-thirds in dollar amount (commonly referred to as the "aggregate claim amount" requirement) and more than one-half in number (commonly referred to as the "numerosity" requirement) of the Claims of that class that have timely voted to accept or reject a plan.

A vote on acceptance or rejection of a reorganization plan may be disregarded if the bankruptcy court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Any Claim to which an objection or request for estimation is pending, or which is on the Schedules is reflected as unliquidated, disputed or contingent and for which no proof of claim has been filed, is not entitled to vote on whether to accept or reject the Plan unless the holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing such Claim for the purpose of voting on the Plan.  In addition, the Debtors propose that Ballots cast by alleged creditors of the Debtors whose Claims (x) are not listed on the Debtors' Schedules of assets and liabilities or (y) are listed on those Schedules as disputed, contingent and/or unliquidated, but who in either case have timely filed proofs of claim in unliquidated or unknown amounts that are not the subject of an objection filed by the Debtors, will have their Ballots counted towards satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code, but will not have their Ballots counted toward satisfying the aggregate claim amount requirements of that section.

**B.      The Confirmation Hearing.**

The Bankruptcy Code requires that a bankruptcy court, after notice, hold a confirmation hearing prior to determining whether to confirm the proposed plan of reorganization.  In the case of the Chapter 11 Cases, the Confirmation Hearing in respect of the Plan presently is scheduled for October 31, 2011, at 10:00 a.m., prevailing Eastern Time, before the Honorable Kevin Gross, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Courtroom #3, Wilmington, Delaware 19801.   The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing.   Any objection to confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for such objection, and the amount of the Claim(s) or Equity Interests held by the objector.   Any such objection must be filed with the Bankruptcy Court and served so that it is received by the Bankruptcy Court and the following parties (and the other parties requesting notice in these Chapter 11 Cases) on or before October 14, 2011 at 4:00 p.m., prevailing Eastern Time:

> To the Debtors:
> Perkins & Marie Callender's Inc., in care of Troutman Sanders LLP, The Chrysler Building, 405 Lexington Avenue, New York, NY 10174, attention:  Mitchel H. Perkiel, Esq., Tel. (212) 704-6000, Fax: (212) 704-6288.
>
> To the Creditors' Committee:
> Official Committee of Unsecured Creditors of Perkins & Marie Callender's Inc., in care of Ropes & Gray, LLP, 1211 Avenue of the Americas, New York, NY 10036, attention: Mark Somerstein, Esq., Tel (212) 841-8814, Fax: (646) 728-1663.
>
> To the Pre-Petition Administrative Agent and the DIP Administrative Agent:
> In care of Paul Hastings LLP, 600 Peachtree Street, N.E., Suite 2400, Atlanta, GA 30308, attention: Jesse H. Austin, III, Esq., Tel: (404) 815-2400, Fax: (404) 685-5167.
>
> To the Restructuring Support Parties:
> In care of Akin Gump Strauss Hauer & Feld LLP, 1333 New Hampshire Avenue, N.W., Washington, D.C. 20036, attention: Scott Alberino, Esq., Tel: (202) 887-4000, Fax: (202) 887-4288.
>
> To the Office of the United States Trustee:
> Office of the United States Trustee for the District of Delaware, 844 North King Street, Room 2207, Wilmington, DE 19801, attention: Richard L. Schepacarter, Esq., Tel.: (302) 573-6491, Fax: (302) 573-6497.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014 and orders of the Bankruptcy Court.

### C. Confirmation.

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among those requirements are that the Plan is (i) accepted by all Impaired Classes of Claims and Equity Interests (or, if rejected by an Impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such Class), (ii) feasible, and (iii) in the "best interests" of creditors and equity interest holders that are Impaired under the Plan. These three concepts are described below.

#### 1. Acceptance.

Under the Bankruptcy Code, certain Classes are not entitled to vote to accept or reject a proposed plan because those Classes are conclusively presumed to have voted to accept that plan or are deemed to have rejected that plan. In the case of Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), Class 6 (Convenience Claims), Class 7 (Intercompany Claims) and Class 9B (Equity Interests in the Other Subsidiary Debtors) of the Plan, those Classes are Unimpaired under the Plan and, therefore, are conclusively presumed to have accepted the Plan. In the case of Class 8 (Subordinated Claims) and Class 9A (Equity Interests in PMC Holding and PMCI) of the Plan, those Classes are deemed to reject the Plan because, under the Plan, those Classes are Impaired and the members of those Classes will receive no Distribution or be entitled to retain any property on account of those Claims or Equity Interests. Consequently, only holders of Allowed Claims in Class 3 (Senior Secured Notes Claims), Class 4 (Senior Notes Claims) and Class 5 (General Unsecured Claims) are entitled to vote to accept or reject the Plan.

Because Classes 8 and 9A are Impaired and also are deemed to reject the Plan, the Debtors will seek nonconsensual confirmation of the Plan under section 1129(b) of the Bankruptcy Code, with respect to such Classes. In addition, the Debtors intend to seek the nonconsensual confirmation of the Plan under section 1129(b) of the Bankruptcy Code, so long as at least one (1) Class of Claims Impaired under the Plan has accepted the Plan (and which Class's acceptance is determined without inclusion of Claims of Insiders).

#### 2. Confirmation Without Acceptance of All Impaired Classes.

Section 1129(b) of the Bankruptcy Code establishes a procedure to obtain the nonconsensual confirmation of a proposed plan. This procedure is known as a "cram down". To obtain nonconsensual confirmation, it must be demonstrated to the bankruptcy court that the proposed plan (x) "does not discriminate unfairly" and (y) is "fair and equitable" with respect to each nonaccepting class that is impaired under the proposed plan. The Debtors believe that the Plan does not discriminate unfairly, and they also believe (subject to review of materials to be filed as exhibits to the Plan Supplement) it is fair and equitable.

(a) <u>No Unfair Discrimination</u>.

This test applies to classes of Claim or Equity Interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be fair. In general, bankruptcy courts consider

whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

(b)      Fair and Equitable Test.

This test applies to classes of different priority and status (e.g., secured vs. unsecured) and includes the general requirement that no Class of Claims receive more than 100% of the amount of the Allowed Claims in such Class.  As to the dissenting Class, the test sets different standards depending on the type of Claims or Equity Interests in such Class:

(a)      Secured Creditors.  In the case of a class of secured creditors, either: (i) each Impaired creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its Allowed secured claim; or (ii) each Impaired secured creditor realizes the "indubitable equivalent" of its Allowed secured claim; or (iii) the property securing the claim is sold free and clear of Liens (with such Liens instead attaching to the proceeds of the sale and the treatment of such Liens on proceeds satisfying clause (i) or (ii) above.  The Plan establishes one Class of Impaired secured Claims: Class 3 (Senior Secured Notes Claims).  All of the Claims in that Class are held by the Restructuring Support Parties, who will vote in favor of the Plan in accordance with the Restructuring Support Agreement.

(b)      Unsecured Creditors.  In the case of a Class of unsecured creditors, either: (i) each Impaired unsecured creditor receives or retains under the proposed plan property of a value equal to the amount of its Allowed Claim; or (ii) the holders of Claims and Equity Interests that are junior to the Claims or Equity Interests of the particular nonaccepting Class will not receive any property under the Plan.  The Plan establishes two Classes of Impaired unsecured Claims: Class 4 (Senior Notes Claims), and Class 5 (General Unsecured Claims).

(c)      Equity Interests.  In the case of a class of equity holders, either: (i) each holder of an Equity Interest will receive or retain under the Plan property of a value equal to the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of its interest (whichever is highest); or (ii) the holder of an Equity Interest that is junior to the particular nonaccepting class will not receive or retain any property under the Plan.

### 3.      Feasibility.

For a reorganization plan to be confirmed, section 1129(a)(11) of the Bankruptcy Code requires that confirmation of that plan is not likely to be followed by the liquidation of the debtor, or by the need for further financial reorganization of that debtor.  The Debtors believe the Plan satisfies this confirmation requirement.  The Debtors have analyzed their ability to meet their obligations under the Plan and, based upon the Financial Projections attached as **Exhibit C** to this Disclosure Statement and the assumptions to be set forth therein, including (among other things) the anticipated liquidity to be provided under the First Lien Exit Facility, the Debtors

believe they will be able to make all Distributions required by the Plan and also will be able to fund their corporate and working capital needs going forward.

#### 4.    Best Interests Test.

For a reorganization plan to be confirmed, section 1129(a)(7) of the Bankruptcy Code requires, in general, with respect to each Impaired Class of Claims and Equity Interests, that each holder of an Allowed Claim or Equity Interest either (i) accept the Plan or (ii) receive or retain under the Plan, on account of such Claim or Equity Interest, property of a value, as of the Effective Date, that is not less than the value such holder would so receive or retain if the Debtors instead were liquidated under chapter 7 of the Bankruptcy Code.

To determine what each holder of an Allowed Claim or Equity Interest would receive if the Debtors were to be liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets in the context of a chapter 7 liquidation case. The Cash amount that would be available for satisfaction of Claims and Equity Interests would consist of the proceeds resulting from the disposition of the unencumbered assets of the Debtors (if any), plus the unencumbered Cash (if any) held by the Debtors at the time of the commencement of the liquidation case and litigation recoveries not available under the Plan. That aggregate amount then would be reduced by the amount of the costs and expenses of liquidation, plus any additional administrative and priority Claims that might result from the termination of the Debtors' business and the use of chapter 7 for the purposes of liquidation.

The costs and expenses of any liquidation under chapter 7 would include, among other things, the fees payable to a chapter 7 trustee, as well as the fees and expenses that might be payable to attorneys and other professionals that such a chapter 7 trustee might engage. In addition, claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of the Chapter 11 Cases. All of these claims, as well as other claims that might arise in a liquidation case or result from the pending Chapter 11 Cases, including any unpaid expenses incurred by the Debtors and the Creditors' Committee during the Chapter 11 Cases (such as compensation for legal and financial advisors and accountants), would need to be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition Allowed General Unsecured Claims.

The value of those net distribution proceeds from the Debtors' unencumbered assets are then compared to the value of the property offered to such Classes of Claims and Equity Interests under the Plan, to determine if the Plan is in the best interests of each such Impaired Class.

The Debtors have considered the impact that a chapter 7 liquidation would have on the ultimate proceeds available for Distribution to holders of Claims and Equity Interests in the Debtors' Chapter 11 Cases, as detailed in the Liquidation Analysis being prepared by the Debtors (with the assistance of their financial advisor). A copy of that Liquidation Analysis is attached as **Exhibit D** to this Disclosure Statement. As a result of the Liquidation Analysis, the Debtors believe that confirmation of the Plan will provide each holder of an Allowed Claim with

a recovery that is not less than such holder would receive were the Debtors instead to be liquidated under chapter 7.

It is important to emphasize that a liquidation analysis, like any other type of financial projection, must be based on a series of estimates and assumptions that, although developed and considered reasonable at the time that analysis is undertaken, are inherently subject to significant economic and competitive uncertainties and contingencies, mostly beyond the control of the Debtors.  Moreover, liquidation involves a sequence of steps, with each step involving potentially multiple alternate decisions.  The sequence of steps, and decision made at each applicable step, as assumed for purposes of the analysis may or may not be the sequence and decisions that ultimately would have been taken and made, or even available, had an actual liquidation been undertaken.  For these reasons, there can be no assurance that an aggregate value at least equal to the valuation to be reflected in the Liquidation Analysis in fact would be achieved in any such actual liquidation.

# ARTICLE XI

# ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors would have two principal alternatives if the Plan is not to be confirmed and consummated. First, the Debtors could seek the confirmation and consummation of an alternative plan of reorganization under chapter 11 of the Bankruptcy Code. Second, the Debtors could seek liquidation under chapter 7, or chapter 11, of the Bankruptcy Code. These two alternatives are discussed below.

## A.      Alternative Plan of Reorganization Under Chapter 11.

If the Plan is not confirmed, the Debtors (or, after the expiration of the Debtors' exclusive period in which to propose and solicit a plan of reorganization, any other party in interest in the Chapter 11 Cases) could propose a different plan or plans of reorganization under chapter 11 of the Bankruptcy Code. Such plans might involve a reorganization and continuation of the Debtors' business, an orderly liquidation of the Debtors' assets, a transaction or a combination of such alternatives. As of the date of this Disclosure Statement, there is no feasible alternative plan of reorganization that has been developed by the Debtors. Moreover, the Debtors believe that the Plan, as described in this Disclosure Statement, enables creditors to realize the highest and best value available under the circumstances, and that any liquidation of the Debtors' assets, or alternative form of chapter 11 plan, would result in substantially more delay, risk and uncertainty to the Debtors and their creditors.

## B.      Liquidation Under Chapter 7 or Chapter 11.

If no plan of reorganization is confirmed, the Debtors' Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code. In a chapter 7 case, a trustee or trustees would be appointed to liquidate the assets of the Debtors. It is impossible to predict precisely how the proceeds of the liquidation, if any, would be distributed to the respective holders of Claims against the Debtors.

However, the Debtors believe that creditors would lose the substantially higher going concern value if the Debtors were forced to liquidate. In addition, the Debtors believe that in a liquidation under chapter 7, before creditors would receive any distribution, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees would cause a substantial diminution in the value of the Estates. The assets available for distribution to creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtors' assets.

The Debtors may also be liquidated pursuant to a liquidation plan under chapter 11 of the Bankruptcy Code.  In a liquidation under chapter 11, the Debtors' assets could be sold in an orderly fashion, a process that may be conducted over a more extended period of time than a liquidation under chapter 7.  Thus, a chapter 11 liquidation might result in larger recoveries than a chapter 7 liquidation, but still would be subject to the potential delay in distributions that could result in lower present values received and higher administrative costs.  Because a trustee is not required in a chapter 11 case, expenses for professional fees could be lower than in a chapter 7 case, in which a trustee must be appointed.  Any distribution to holders of Claims or Equity Interests under a chapter 11 liquidation plan may be delayed substantially.

The Debtors' liquidation analysis, being prepared with its financial advisor, is premised upon a hypothetical liquidation in a chapter 7 case and is attached as **Exhibit D** to this Disclosure Statement.  As described in Article X above, the Debtors believe that a liquidation under chapter 7 is a substantially less attractive alternative to the Debtors and their creditors.

# ARTICLE XII

# SECURITIES LAWS MATTERS

The Debtors have identified three categories of actual or potential "securities" within the meaning of the Securities Act of 1933, as amended (the "**Securities Act**").   Those three categories are discussed below.

### A.        Reorganized PMC Holding Membership Interests.

The Plan provides that Reorganized PMC Holding Membership Interests will be issued to holders of Allowed Claims in Class 4 (Senior Notes Claims) and Class 5 (General Unsecured Claims),[39] except for a portion (comprising in the aggregate up to ten percent (10%) of the aggregate Reorganized PMC Holding Membership Interests to be outstanding on a fully diluted basis) to be reserved for issuance under the Management Incentive Plan.

The Debtors do not intend to file a registration statement under the Securities Act, or any corresponding state securities laws, in connection with the offer and Distribution of the Reorganized PMC Holding Membership Interests under the Plan.  The Debtors believe that the provisions of section 1145(a)(1) of the Bankruptcy Code exempt the Debtors' offer and Distribution of the Reorganized PMC Holding Membership Interests from federal and state securities registration requirements (including, but not limited to, Section 5 of the Securities Act or any corresponding state law requiring the registration for offer or sale of a security).

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from the registration requirements the Securities Act and corresponding state laws if certain criteria are satisfied, principally that: (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor or of a successor to the debtor under the plan; (ii) the recipients of the securities must each hold a prepetition claim against (or equity interest in), or a claim for administrative expense in the reorganization case concerning, the debtor or such affiliate; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or equity interest in the debtor or such affiliate, or principally in such exchange and partly for cash or property.  As indicated above, the Debtors believe that the offer and sale of the Reorganized PMC Holding Membership Interests under the Plan satisfies the requirements of section 1145(a)(1) and thus are entitled to the exemption from registration afforded by that section.  However, section 1145(a)(1), by its terms, would not be available to any Person deemed a statutory underwriter under section 1145.

---

[39]        Except for holders of Allowed Claim in Class 5 who are to receive Cash as their Distribution under the Plan.

Section 1145 stipulates that the offer and sale of securities in accordance with section 1145(a)(1) is deemed to be a public offering. To the extent a creditor of the Debtors receives any Reorganized PMC Holding Membership Interests in accordance with section 1145, the subsequent transfer of such Reorganized PMC Holding Membership Interests typically would be exempt from registration under the Securities Act, pursuant to section 4(1) of the Securities Act, unless such holder were deemed to be an "issuer", "underwriter" or "dealer" with respect to such securities.

In light of the complexities of the foregoing provisions, the Debtors are unable to offer any assurance concerning the right of any Person to trade in Reorganized PMC Holding Membership Interests; nor will the Debtors seek any no-action advice from the SEC or any applicable state securities commissioner. Creditors are urged to consult with their own counsel regarding the securities laws implications of obtaining, holding and trading in Reorganized PMC Holding Membership Interests.

## B. Management Incentive Plan.

The Plan contemplates that up to ten percent (10%) of the aggregate Reorganized PMC Holding Membership Interests will be reserved for issuance in accordance with the Management Incentive Plan. The Debtors anticipate that any grants and issuances made under the Management Incentive Plan will be made pursuant to exemptions from registration common to such types of plans.

## C. New Secured Term Loans.

The Senior Secured Notes (including the related guarantees) constituted "securities" under the Securities Act. In the case of Class 3 (Senior Secured Notes Claims), the Plan provides for the holders of the Senior Secured Notes to receive, in full and final satisfaction of their Claims in respect of the Senior Secured Notes, rights and obligations as lenders under the New Secured Term Loan Agreement (under which the New Secured Term Loans are deemed to be outstanding).

In the event those interests in the New Secured Term Loan Agreement were determined to be a security, then it is anticipated that the issuance of those interests to the holders of Claims in Class 3 pursuant to the Plan would be exempt pursuant to section 1145. However, it is unlikely that those holders would be eligible to transfer those interests in reliance on Section 1145.

To the extent that the aggregate $7,500,000 in principal amount of additional New Secured Term Loans to be funded in Cash on the Effective Date are determined to be securities under applicable securities law, it is anticipated that such issuances would be exempt from registration under those laws by virtue of one or more available exemptions thereunder. However, those holders would be required to comply with applicable securities laws in connection with any transfers of those interests.

# ARTICLE XIII

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

A summary description of certain U.S. federal income tax consequences of the Plan is provided below.  This summary is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service ("**IRS**") as in effect and available on the date hereof.  Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.  The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan.  No rulings or determinations of the IRS or any other tax authorities have been sought or obtained with respect to any tax consequences of the Plan, and the discussion below is not binding upon the IRS or such other authorities.  Thus, no assurance can be given as to the interpretation that the IRS will adopt.  In addition, this summary does not address foreign, state, or local tax consequences of the Plan; nor, except as otherwise noted, does this summary purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, and investors in pass-through entities).

EACH HOLDER IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE AND LOCAL AND ANY FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.

TREASURY DEPARTMENT CIRCULAR 230 NOTICE: YOU ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE TAX CODE; (B) SUCH DISCUSSION IS INCLUDED HEREIN BY THE DEBTORS IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

### A.      Summary of Potential Transactions Pursuant to the Plan.

Pursuant to the Plan, holders of Allowed Other Priority Claims will be paid in full in cash; holders of Allowed Senior Secured Note Claims will receive New Secured Term Loan

Notes in exchange for their Allowed Senior Secured Note Claims; holders of the Senior Notes Claims will receive (i) Reorganized PMC Holding Membership Interests (hereinafter, such interests in Reorganized PMC Holding shall be referred to as "**New Equity Interests**") or (ii) Cash, as applicable, in exchange for their Claims; and holders of General Unsecured Claims will receive in exchange for their Claims either (i) New Equity Interests or (ii) Cash, as applicable. P&MC, the sole equity holder of PMC Holding, will not receive any consideration for its existing equity interests in the Debtors.

**1.      Conversion of PMC Holding and Subsidiary Debtors to Disregarded Entities.**

In anticipation of consummating the Plan, PMC Holding and each of the Subsidiary Debtors which are presently corporations or treated as corporations for U.S. federal, state and local income tax purposes (other than MCID and Wilshire Beverage) (collectively, excluding MCID and Wilshire Beverage, the "**Debtor Corporate Taxpayers**") initially will become disregarded entities for U.S. federal income tax purposes, resulting in a constructive distribution of the assets of each Debtor Corporate Taxpayer to its parent for U.S. federal income tax purposes. This will be accomplished either by direct conversion to a limited liability company, if so permitted under the laws of the jurisdiction in which such Debtor Corporate Taxpayer is organized, or by merging such Debtor Corporate Taxpayer into a newly formed limited liability company (each, a "**Conversion Transaction**"). The Conversion Transactions will be arranged sequentially, so that, beginning with the lowest-tier Debtor Corporate Taxpayer, each lower-tier Debtor Corporate Taxpayer will undergo a Conversion Transaction immediately prior to its direct equity owner.

a.      Tax Consequences of Conversion Transactions to Each Debtor Corporate Taxpayer.

For U.S. federal income tax purposes, the Debtors are either members of an affiliated group of corporations (the "**Debtor Consolidated Group**") or limited liability companies owned by such members and treated as disregarded entities. The members of the Debtor Consolidated Group join in the filing of a consolidated U.S. federal income tax return. As to each Debtor Corporate Taxpayer, the Conversion Transaction will be treated as a complete liquidation of such entity into its direct equity owner for U.S. federal income tax purposes. The U.S. federal income tax consequences of a deemed liquidation of a subsidiary within a consolidated group will depend, in part, on whether or not the subsidiary is considered to be solvent or insolvent for U.S. federal income tax purposes. For this purpose, insolvency is determined under U.S. federal income tax concepts pursuant to which liabilities for which a subsidiary is jointly and severally liable together with other subsidiaries will be allocated among the various corporate debtors under complex rules.

If the Debtor Corporate Taxpayer is solvent, the Conversion Transaction should, with respect to such entity, be treated as a tax-free liquidation of the lower-tier Subsidiary Debtor into its equity owner pursuant to Sections 332 and 337 of the Tax Code. Pursuant to Section 332 of the Tax Code, no gain or loss is recognized on the receipt by a corporation of the property distributed in complete liquidation of another corporation if the distributee corporation owns

80% or more of the stock of the liquidating corporation in terms of voting power and value. Since each equity owner of a Debtor Corporate Taxpayer owns 100% of the outstanding stock of such entity (in terms of voting power and value), the ownership prerequisite of Tax Code Section 332 will be satisfied.  Pursuant to Section 337 of the Tax Code, no gain or loss is recognized to the liquidating corporation on the distribution to any "80% distributee" (which, in the case of any Debtor Corporate Taxpayer, will include such entity's sole corporate parent) of any property in complete liquidation.  Following each successive Conversion Transaction with respect to a Debtor Corporate Taxpayer, the Debtor Corporate Taxpayer, as a result of being wholly-owned, will become disregarded as a separate entity for U.S. federal income tax purposes.  The basis of the direct equity owner in the deemed liquidated assets of the Debtor Corporate Subsidiary should be the same as that of the Debtor Corporate Subsidiary's basis in those assets.

However, if a Debtor Corporate Taxpayer is insolvent, the Conversion Transaction may be treated as a taxable liquidation.  In such case, there may be recognition of gain or loss as a result of the deemed liquidation of the Debtor Corporate Taxpayer.  In addition, any unused tax attributes of the insolvent Debtor Corporate Taxpayer will not carry over to the Debtor Consolidated Group.  It is not believed that there will be any insolvent Debtor Corporate Taxpayers with unused tax attributes following a Conversion Transaction.

> b.    <u>Tax Consequences of Conversion Transaction to each Parent of a Debtor Corporate Taxpayer</u>.

As noted above, if the Debtor Corporate Taxpayer is solvent, the Conversion Transaction should be treated as a tax-free liquidation of the lower-tier Debtor Corporate Taxpayer into its parent pursuant to Sections 332 and 337 of the Tax Code.  Thus, if the Debtor Corporate Taxpayer undergoing the Conversion Transaction is solvent, no gain or loss will be recognized by its parent on account of such Conversion Transaction.

If the Debtor Corporate Taxpayer is insolvent, the Conversion Transaction with respect to such entity should be treated as a taxable liquidation with respect to such Debtor Corporate Taxpayer, and Tax Code Sections 332 and 337 will not apply to such Conversion Transaction. As a result, the parent of the Debtor Corporate Taxpayer undergoing the Conversion Transaction may have an ordinary loss deduction upon the Conversion Transaction under Section 165(g)(3) of the Tax Code in an amount equal to its basis in the stock of its liquidated subsidiary.  If the Debtor Corporate Taxpayer is insolvent, there may be income or gain to its parent as a result of the Conversion Transaction in the event that there is an excess loss account with respect to such Debtor Corporate Taxpayer.  (Generally, within a consolidated group the basis in the stock of a subsidiary is increased by the income of and contributions to the subsidiary and is decreased by any losses of and distributions by the subsidiary which is used by the group.  If the subsidiary's tax losses and distributions exceed the basis in its stock, such "negative basis" amount essentially will be the amount of the excess loss account.)

Immediately after the Conversion Transactions, the successor limited liability companies will have a single member and will not make the election under Treasury Regulation section 301.7701-3 to be treated as a corporation for U.S. federal income tax purposes.  Accordingly, each successor limited liability company will be treated as a disregarded entity for U.S. federal

income tax purposes. Following the completion of all of the Conversion Transactions, P&MC will be treated for U.S. federal income tax purposes as (x) owning all of the assets held by its disregarded entity subsidiaries and (y) the obligor of the debts of all of such subsidiaries.

c.      Tax Consequences of Conversion transaction to MC Partnerships.

Certain of the Subsidiary Debtors (the "**Subsidiary Partners**") own interests in one or more of 12 partnerships, which in turn, own Marie Callender's restaurants (the "**MC Partnerships**"). The Subsidiary Partners collectively own less than 50% of the ownership interests of two of the MC Partnerships (the "**Non-Controlled MC Partnerships**") and collectively own between 57% and 100% of the ownership interests of the other 10 partnerships (the "**Controlled MC Partnerships**"). Following the completion of the Conversion Transactions, P&MC will be treated for U.S. federal income tax purposes as directly owning the MC Partnership interests. If a Subsidiary Partner is insolvent, P&MC's resulting basis in the deemed liquidated MC Partnership interest (referred to as "**outside basis**") will be stepped-up or stepped-down, as the case maybe, to fair market value following the completion of the Conversion Transactions. However, even if P&MC's outside basis in an MC Partnership is adjusted to fair market value, P&MC's proportionate share of such MC Partnership's asset basis (referred to as "**inside basis**") following the Conversion Transaction generally will not be increased or decreased to reflect P&MC's allocable share of the fair market value of the MC Partnership's assets . P&MC may receive a basis adjustment with respect to its inside basis in an MC Partnership, though, if the MC Partnership makes an optional election under Section 754 of the Tax Code (a "**Section 754 Election**") for the taxable year of the MC Partnership in which P&MC is treated for U.S. federal income tax purposes as acquiring such MC Partnership interest. Regardless of whether a Section 754 Election is made or is in effect, P&MC will receive an inside basis adjustment with respect to its interest in an MC Partnership which has a "**substantial built-in loss**" immediately following the Conversion Transaction of the applicable Subsidiary Partner. Generally, a built-in loss with respect to partnership assets will be "substantial" if the basis of the partnership assets exceeds the fair market value of such assets by more than $250,000.

In any case, whether or not a Subsidiary Partner is insolvent, the Controlled MC Partnerships will be considered to be constructively terminated for U.S. federal income tax purposes as a result of the Conversion Transactions. A partnership generally will be considered to be terminated for U.S. federal income tax purposes if there is a sale or exchange of 50% or more of the total interests in partnership capital and profits within a 12-month period. A constructive termination results in the closing of a partnership's taxable year for all partners and the "old partnership" (before termination) is deemed to have contributed its assets to a "new partnership" followed by a distribution of the "new partnership" interests in liquidation of the new partnership. Generally, there is no recognition of gain or loss as a result of a constructive termination of a partnership, and capital accounts are not revalued. However, following the Conversion Transactions, the Controlled MC Partnerships will be required to make new tax elections if such elections are so desired, including a new Section 754 Election, for any partnership wishing for such new election to be in effect for the taxable year in which the holders of the Claims acquire the New Equity Interests.

-126-

          d.       <u>Possible Treatment of PMC Holding as a Publicly Traded Partnership</u>.

Very generally, under the "publicly traded partnership"("**PTP**") provisions of the Tax Code, an entity that would otherwise be treated as a partnership whose interests are considered to be publicly traded (or traded on a secondary market or the substantial equivalent thereof) and does not meet a qualifying income test will be taxable as a corporation. Treasury Regulations concerning the classification of partnerships as PTPs provide certain safe harbors under which interests in a partnership will not be considered readily tradable on a secondary market (or the substantial equivalent thereof), including safe harbor applicable to partnerships with 100 members or less. Although the Debtors anticipate that there will be 100 members or less of Reorganized PMC Holding, it is possible that Reorganized PMC Holding might be characterized as a PTP under these rules. It is anticipated that the New Equity Interests in Reorganized PMC Holding may be tradable and that the Reorganized PMC Holding will recognize transfers that may occur – whether or not it facilitates the establishment of such a market. Depending on the number of partners, Reorganized PMC Holding may qualify for a safe harbor exemption for partnerships that are offered to investors in a private placement. If Reorganized PMC Holding has more than 100 partners, this safe harbor exemption would not apply (though other safe harbors may apply). If Reorganized PMC Holding were to be immediately treated as a PTP upon issuance of New Equity Interests to holders of claims, then, under the liquidation-reincorporation doctrine, the IRS may not give effect to the deemed liquidation of PMC Holding in the Conversion Transaction. In such case the issuance of New Equity Interests to holders of Senior Note Claims and General Unsecured Claims would not be treated for U.S. federal income tax purposes as a sale of assets, and any tax attributes in the hands of the Debtor Consolidated Group would carry over to Reorganized PMC Holding, including any basis reduction required on account of CODI (defined below) recognized by the Debtor Consolidated Group. See below, *Cancellation of Debt and Reduction of Tax Attributes*. It is not anticipated, however, that Reorganized PMC Holding will be treated as a PTP. See below, *U.S. Federal Income Tax Consequences to Holders of Claims and Interests - 4. Consequences if Reorganized PMC Holding is Treated as a PTP*, regarding the impact of potential PTP classification on holders of New Equity Interests.

## 2.      Cancellation of Debt and Reduction of Tax Attributes.

As a result of the Plan, the aggregate outstanding indebtedness of P&MC and its consolidated subsidiaries will be substantially reduced. In general, absent an exception, a debtor will recognize cancellation of debt income ("**CODI**") upon discharge of its outstanding indebtedness for an amount less than its adjusted issue price. The Tax Code provides that a debtor in a bankruptcy case generally may exclude from income, but must reduce certain of its tax attributes by, the amount of any CODI realized upon consummation of a plan of reorganization. The amount of CODI is generally the excess of (a) the adjusted issue price of any indebtedness discharged (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments), over (b) any consideration given in exchange therefore, subject to certain statutory or judicial exceptions that can apply to limit the amount of CODI (such as where the payment of the cancelled debt would have given rise to a tax deduction).

P&MC expects to realize substantial CODI. The amount of such CODI realized by P&MC (and the resulting tax attribute reduction) will depend significantly on the value of the New Equity Interests distributed pursuant to the Plan. This value cannot be known with certainty until after the Effective Date. Thus, the exact amount of such tax attribute reduction cannot be predicted with certainty. As a general rule, tax attributes must be reduced in the following order: (a) net operating losses ("**NOLs**"), (b) most tax credits, (c) capital loss carryovers, (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject), and (e) foreign tax credits. A debtor with CODI may elect first to reduce the basis of its depreciable assets under Section 108(b)(5) of the Tax Code, with any remaining balance applied to the other tax attributes in the order stated above. It has not been determined whether P&MC will make the election under Section 108(b)(5). In the context of a consolidated group of corporations, the IRC provides for a complex ordering mechanism to determine how the tax attributes of one member can be reduced in respect of the CODI of another member.

The Debtor Consolidated Group anticipates that all of its existing NOL carryovers will be utilized in the current year on account of sales of its assets, including the issuance of New Equity Interests in Reorganized PMC Holding to holders of Senior Note Claims and General Unsecured Claims and that its taxable income will exceed the amount which can be sheltered by such losses.

### 3. Alternative Minimum Tax.

In general, an alternative minimum tax ("**AMT**") is imposed on a corporation's alternative minimum taxable income ("**AMTI**") at a 20% rate to the extent such tax exceeds the corporation's regular U.S. federal income tax for the year. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carry-forwards, only 90% of a corporation's taxable income from AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular U.S. federal income tax liability in future taxable years when the corporation is no longer subject to the AMT.

### B. U.S. Federal Income Tax Consequences to Holders of Claims and Interests.

No gain or loss will be recognized by creditors of the Debtors merely as a result of the conversion of the Debtor Corporate Taxpayers to limited liability companies. Treas. Reg. section 1.1001-3(e)(4)(i)(C).

### 1. Holders of Senior Notes Claims and General Unsecured Claims.

Pursuant to the Plan, holders of the Senior Notes Claims will receive (i) New Equity Interests or (ii) Cash, as applicable, in exchange for their Claims. In addition, holders of General Unsecured Claims will receive in exchange for their Claims either (i) New Equity Interests or (ii) Cash, as applicable. The receipt of the New Equity Interests and/or Cash by the Holders of the

-128-

Senior Notes Claims and the General Unsecured Claims, respectively, will be treated as a fully taxable exchange.

Each such holder generally will recognize gain or loss in connection with its receipt for U.S. federal income tax purposes of an undivided interest in the underlying assets of PMC Holding in an amount equal to the difference between (1) the fair market value of such underlying assets (or of the New Equity Interests and the amount Cash) received, or deemed received, in satisfaction of its Claims (other than any Claim for accrued but unpaid interest), and (2) the holder's adjusted tax basis in the Claim (other than any basis attributable to accrued but unpaid interest that is paid or treated as paid as part of the Plan). Each such holder should be deemed to make a tax-free contribution of its undivided interests in PMC Holding's underlying assets to Reorganized PMC Holding immediately thereafter.

The character of any gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature of the Claim in such holder's hands, whether the Claim constitutes a capital asset in the hands of the holder, whether the Claim was purchased at a discount, and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Claim. A holder recognizing a loss as a result of the Plan may be entitled to a bad debt deduction, either in the taxable year of the Effective Date or a prior taxable year. Any capital gain or loss would be long-term gain or loss if such holder's holding period for its Claims was more than one year on the Effective Date. A holder's adjusted tax basis in property received in exchange for its Claim will generally be equal to the fair market value of such property on the Effective Date. The holding period for any such property will begin on the day after the Effective Date. Each holder of Senior Notes Claims and each holder of General Unsecured Claims should consult their own tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequences to them of the transactions contemplated by the Plan.

a.      Accrued But Unpaid Interest.

A portion of the consideration received by holders of Claims may be attributable to accrued but unpaid interest on such Claims. Such amount should be taxable to that holder as interest income if such accrued interest has not been previously included in the holder's gross income for U.S. federal income tax purposes. Conversely, it is possible that a holder of Claims may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the Claims was previously included in the U.S. holder's gross income but is not paid in full by Debtors. The character of such loss may be ordinary rather than capital, but the tax law is unclear on this issue.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued but unpaid interest is unclear. Under the Plan, the aggregate consideration to be distributed to holders of Allowed Claims will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax

purposes.   The IRS could take the position, however, that the consideration received by the holder should be allocated in some way other than as provided in the Plan.   Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

#### b.        Market Discount.

The market discount provisions of the Tax Code may apply to holders of certain Claims. In general, a debt obligation other than a debt obligation with a fixed maturity of one year or less that is acquired by a holder in the secondary market (or, in certain circumstances, upon original issuance) is a "**market discount bond**" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, the revised issue price) exceeds the adjusted tax basis of the bond in the holder's hands immediately after its acquisition. However, a debt obligation will not be a market discount bond if such excess is less than a statutory de minimis amount.   Gain recognized by a creditor with respect to a market discount bond will generally be treated as ordinary interest income to the extent of the market discount accrued on such bond during the creditor's period of ownership, unless the creditor elected to include accrued market discount in taxable income currently.   A holder of a market discount bond may be required under the market discount rules of the Tax Code to defer deduction of all or a portion of the interest on indebtedness incurred or maintained to acquire or carry the bond. In such circumstances, such holder may be allowed to deduct such interest, in whole or in part, on the disposition of such bond.

Because the exchange of the Senior Notes Claims for the New Equity Interests should be treated as a taxable disposition of the Senior Notes Claims (as mentioned under the heading "*U.S. Federal Income Tax Consequences to Holders of Claims and Interests*", above), any gain recognized by an exchanging holder of such claims with accrued market discount should be treated as ordinary income to the extent of the market discount accrued thereon while the Claims were considered to be held by the holder (unless the holder elected to include market discount in income as it accrued, as described above).

### 2.        Holders of Other Priority Claims and Senior Secured Note Claims.

Pursuant to the Plan, holders of Allowed Other Priority Claims will be paid in full in cash, and holders of Allowed Senior Secured Note Claims will receive New Secured Term Loans.   If a holder of Allowed Other Priority Claims receives Cash in satisfaction of its Claims, the satisfaction should be treated as a taxable exchange under the Tax Code, as described above under the "*U.S. Federal Income Tax Consequences to Holders of Claims and Interests*". Because the terms of the New Secured Term Loan Notes will be sufficiently different from the terms of the Senior Secured Term Loan, the holders of Allowed Senior Secured Note Claims should be treated as receiving the New Secured Term Loan Notes in a taxable transaction.   Accordingly, holders of Allowed Senior Secured Notes Claims generally will recognize gain or loss in the same manner as described above under the "*U.S. Federal Income Tax Consequences to Holders of Claims and Interests*".

-130-

### 3. Ownership and Disposition of New Equity Interests.

Following the acquisition of New Equity Interests by holders of Allowed Senior Notes Claims and Allowed General Unsecured Claims (other than those receiving Cash as their Distribution), Reorganized PMC Holding should be treated as a partnership for U.S. federal income tax purposes. Under current Treasury regulations, a domestic entity that has two or more members and that is not organized as a corporation under U.S. federal or state law will generally be classified as a partnership for U.S. federal income tax purposes, unless it elects to be treated as a corporation.

As a partnership, Reorganized PMC Holding itself will not be subject to U.S. federal income tax (other than withholding taxes). Instead, Reorganized PMC Holding will file an annual partnership information return with the IRS which will report the results of Reorganized PMC Holding's operations. Each Reorganized PMC Holding member will be required to report on its U.S. federal income tax return, and will be subject to tax in respect of, its distributive share of each item of Reorganized PMC Holding's income, gain, loss, deduction and credit for each taxable year of Reorganized PMC Holding ending with or within the member's taxable year. Members will be required to report these items regardless of the extent to which, or whether, they receive cash distributions from Reorganized PMC Holding for such taxable year; and, thus, members may incur income tax liabilities in excess of any distributions from Reorganized PMC Holding. As described in Article IX(A)(3) of this Disclosure Statement, there can be no assurance that Reorganized PMC Holding will distribute to its members (annually or otherwise) cash in an amount sufficient for such members to satisfy their tax obligations in respect of their distributive share of the income and gain of Reorganized PMC Holding.

For purposes of calculating Reorganized PMC Holding's items of income, gain, loss and deduction, upon the implementation of the Plan, Reorganized PMC Holding should have a new tax cost basis and holding period in its underlying assets. However, whether Reorganized PMC Holding's inside basis with respect to an MC Partnership interest will be stepped-up to reflect fair market value will depend on whether such MC Partnership has a Section 754 Election in effect, and whether a new Section 754 Election is made following all of the Conversion Transactions in the case of a Controlled MC Partnership interest. (See the discussion above under "*Tax Consequences of Conversion Transactions to Each Parent of a Debtor Corporate Taxpayer.*") The transfer of the New Equity Interests to Claim holders generally will result in a second constructive termination of the Controlled MC Partnerships for U.S. federal income tax purposes. Accordingly, if it is desirable to have a Section 754 Election in effect with respect to a Controlled MC Partnership immediately following all of the Conversion Transactions, it likely will be necessary for such Controlled MC Partnership to make a new Section 754 Election.

A member is allowed to deduct its allocable share of Reorganized PMC Holding losses (if any) only to the extent of such member's adjusted tax basis (discussed below) in its membership interest at the end of the taxable year in which the losses occur. In addition, various other limitations in the Tax Code may significantly limit a member's ability to deduct its allocable share of deductions and losses of Reorganized PMC Holding against other income.

A member generally will not recognize gain or loss on the receipt of a distribution of cash or property from Reorganized PMC Holding (provided that the member is not treated as exchanging such member's share of Reorganized PMC Holding's "**unrealized receivables**" and/or certain "**inventory items**" (as those terms are defined in the Tax Code, and together "**ordinary income items**") for other partnership property). A member, however, will recognize gain on the receipt of a distribution of money and, in some cases, marketable securities, from Reorganized PMC Holding (including any constructive distribution of money resulting from a reduction of the member's share of the indebtedness of Reorganized PMC Holding) to the extent such cash distribution or the fair market value of such marketable securities distributed exceeds such member's adjusted tax basis in its membership interest. Such distribution would be treated as gain from the sale or exchange of a membership interest.

A member will recognize gain on the complete liquidation of its New Equity Interest only to the extent the amount of money received exceeds its adjusted tax basis in its New Equity Interest. Distributions of certain marketable securities from Reorganized PMC Holding are expected to be treated as distributions of money for purposes of determining gain. Any gain recognized by a member on the receipt of a distribution from Reorganized PMC Holding generally will be capital gain, but may be taxable as ordinary income, either in whole or in part, under certain circumstances. No loss can be recognized on a distribution in liquidation of a New Equity Interest, unless the member receives no property other than money and ordinary income items.

A member's adjusted tax basis in its membership interest in Reorganized PMC Holding (whether acquired on the exchange or at a later date) generally will be equal to such member's initial tax basis, increased by the sum of (i) any additional capital contribution such member makes to Reorganized PMC Holding, (ii) the member's allocable share of the income of Reorganized PMC Holding, and (iii) increases in the member's allocable share of the indebtedness of Reorganized PMC Holding, and reduced, but not below zero, by the sum of (iv) the member's allocable share of the losses of Reorganized PMC Holding, and (v) the amount of money or the adjusted tax basis of property distributed to such member, including constructive distributions of money resulting from reductions in such member's allocable share of the indebtedness of Reorganized PMC Holding.

Reorganized PMC Holding may make a Section 754 Election. That election is irrevocable without the consent of the IRS. The election generally permits a limited liability company taxable as a partnership for U.S. federal income tax purposes to adjust the tax basis of a purchasing member in the limited liability company's assets ("**inside basis**") pursuant to Section 743(b) of the Tax Code to reflect such member's purchase price. The Section 743(b) adjustment belongs to the purchaser and not to other members. (A member's inside basis in the assets of Reorganized PMC Holding generally will be considered to consist of the member's share of the limited liability company's tax basis in its assets as increased or decreased by the Tax Code Section 743(b) adjustment to that basis.) Such a basis adjustment will be advantageous if the purchasing member's basis in their membership interest is higher than the member's share of the aggregate tax basis of the limited liability company's assets immediately prior to the transfer of the membership interest.

A sale of all or part of a member's interest will result in the recognition of gain or loss in an amount equal to the difference between the amount of the sales proceeds (including any deemed proceeds resulting from a reduction of the member's share of the indebtedness of Reorganized PMC Holding) and such member's adjusted tax basis for the portion of the interest disposed of. Any gain or loss recognized with respect to such a sale generally will be treated as capital gain or loss, and will be long-term capital gain or loss if the interest has been held for more than one year (subject to certain rules regarding "split holding periods" when additional capital contributions are made), except to the extent that the proceeds of the sale are attributable to a member's allocable share of certain ordinary income items of Reorganized PMC Holding and such proceeds exceed the member's adjusted tax basis attributable to such ordinary income items.  A member's ability to deduct any loss recognized on the sale of its membership interest will depend on the member's own circumstances and may be restricted under the Tax Code.

Each holder of Senior Notes Claims and General Unsecured Claims is urged to consult its tax advisor regarding the tax consequences of owning and disposing of membership interests in Reorganized PMC Holding.

### 4.    Consequences if Reorganized PMC Holding is Treated as a PTP.

If it were to be determined that Reorganized PMC Holding should be characterized as a PTP, taxable as a corporation for U.S. federal income tax purposes, the taxable income of the Reorganized PMC Holding would be subject to corporate income tax when recognized by Reorganized PMC Holding.  Further, distributions of such income, other than in certain redemptions of Equity Interests, would be treated as dividend income when received by the member to the extent of the current or accumulated earnings and profits of Reorganized PMC Holding, and members would not be entitled to report profits or losses realized by Reorganized PMC Holding.  Moreover, gain or loss recognized on the sale of such interests generally would constitute capital gain or loss (long-term if held for more than one year).  If Reorganized PMC Holding is likely to be a PTP and taxed as a corporation for U.S. federal income tax purposes, the Reorganized PMC Holding may elect to classify Reorganized PMC Holding as a corporation for such purposes or, possibly, either to convert it to a corporation or form a new corporate parent.

If the IRS were to successfully invoke the liquidation-reincorporation doctrine to deny recognition of the deemed liquidation of PMC Holding in its Conversion Transaction, the assets of Reorganized PMC Holding would not be stepped up to the fair market value of such assets on the Effective Date.  Moreover, the issuance of New Equity Interests to holders of Secured Note Claims may be treated as a tax-free exchange pursuant to Section 368(a)(1)(G) of the Tax Code if such Secured Note Claims are characterized as securities for U.S. federal income tax purposes, and no gain or loss would be recognized in such exchange.

### 5.    Information Reporting and Backup Withholding.

Certain payments, including payments in respect of accrued interest or market discount, are generally subject to information reporting by the payor to the IRS.  Moreover, such reportable payments are subject to backup withholding under certain circumstances.  Under the

Tax Code's backup withholding rules, a U.S. holder may be subject to backup withholding at the applicable rate with respect to certain distributions or payments pursuant to the Plan, unless such holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact, or (b) provides a correct U.S. taxpayer identification number and certifies under penalties of perjury that the holder is a U.S. person, the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

### 6.    State and Local Tax Considerations.

In addition to U.S. federal income taxes, holders of New Equity Interests, as members of Reorganized PMC Holding, may be subject to state and local income taxes, unincorporated business taxes and tax-filing obligations that may be imposed by the jurisdictions in which Reorganized PMC Holding does business or owns property or in which members are resident. Members may be required to file state income tax returns and to pay state income taxes in the states in which Reorganized PMC Holding may do business or own property depending on whether such member's allocable share of Reorganized PMC Holding's income from that state equals or exceeds a filing and payment threshold requirement.   In some states, tax losses may not produce a tax benefit in the year incurred and also may not be available to offset income in subsequent taxable years.   Some of the states may require, or provided an election for, Reorganized PMC Holding to withhold a percentage of income from amounts to be distributed to its members who are not residents of the state (regardless of whether such income is distributed). Withholding, the amount of which may be greater or less than a particular member's income tax liability to the state, generally does not relieve a nonresident member from the obligation to file an income tax return.  Amounts withheld may be treated as if distributed to members for purposes of determining the amounts distributed by Reorganized PMC Holding.  Reorganized PMC Holding may (but is not obligated to) offer to its members the right to participate in the filing of composite returns in those state that permit such filing in order to obviate the need for such members to file returns in states in which they do not reside.  No analysis is provided here of the state and local withholding tax consequences of holding an membership interest in Reorganized PMC Holding.  Accordingly, each holder of New Equity Interests should consult with its  tax advisor with regard to those matters.

### 7.    Consequences to U.S. Tax-Exempt Holders of New Equity Interests.

Any U.S. holder that is generally exempt from U.S. federal income taxation under section 501 of the Tax Code (a "**tax-exempt entity**") is subject to tax on any "unrelated business taxable income" ("**UBTI**") it realizes.  In general, UBTI includes income from a trade or business regularly carried on by a tax-exempt entity that is not substantially related to the entity's tax-exempt purposes, including income from a trade or business not substantially related to the tax-

exempt entity's purposes that is regularly carried on by a partnership (such as Reorganized PMC Holding, provided it is not treated as a PTP) of which the tax-exempt entity is a partner. UBTI is reduced by deductions for certain expenses attributable to such unrelated business. UBTI also generally includes income from so-called "debt-financed property." Otherwise UBTI normally does not include dividends, interest, royalties, certain rents, capital gains and certain other items. Thus, for example, if a tax-exempt entity is a partner in a partnership that borrows as a result of or in connection with an investment, or if the tax-exempt entity borrows as a result of or in connection with its investment in the partnership, the tax-exempt entity's distributive share of partnership income (including dividends, interest, royalties, rents and capital gains) attributable to such property may be UBTI. Income allocated to an investor through one or more tiers of pass-through entities may also be UBTI if any such entity is engaged in an unrelated trade or business or borrows as a result of or in connection with an investment. A tax-exempt entity that is a holder of New Equity Interests is likely to realize UBTI because it is expected that Reorganized PMC Holding will be engaged in a trade or business and invest in operating partnerships and limited liability companies, and Reorganized PMC Holding may (and its investee operating partnerships and limited liability companies may) incur debt. Further, in the case of a tax-exempt entity investor holding its New Equity Interests through a U.S. "blocker" corporation for U.S. federal income tax purposes, the "drag-along" and "tag-along" provisions of the PMC Holding LLC Agreement will not permit such tax-exempt entity investor to dispose of the stock of such blocker corporation (rather than the New Equity Interests held by such blocker corporation) at the time other holders intend to sell their New Equity Interests, which may reduce returns to such tax-exempt entity investor. Tax-exempt entity holders of New Equity Interests should consult with their respective tax advisors with regard to the U.S., as well as foreign, tax consequences arising from the exchange of claims for Cash or New Equity Interests and from the holding or subsequent disposition of New Equity Interests.

### 8.    Consequences to Non – U.S. Holders of New Equity Interests.

Provided Reorganized PMC Holding is not treated as a PTP, holders of New Equity Interests who are not U.S. taxpayers will be subject to U.S. federal income taxes, as well as any applicable state and local income taxes (see *State and Local Tax Considerations*) on a net income basis at rates generally applicable to U.S. taxpayers on income allocated each year to such persons which constitutes or is treated as income effectively connected to Reorganized PMC Holding's trades or businesses conducted in the United States, and Reorganized PMC Holding may be required to withhold U.S. federal income taxes with respect to such non-U.S. holders (even on income that might not be effectively connected with a trade or business). Moreover, the income subject to U.S. federal income taxes may exceed the annual distributions made by Reorganized PMC Holding to such non-U.S. holders. Non-U.S. holders who are corporations may also be subject to the branch profits tax, imposed at a 30% rate (or lower treaty rate, if applicable). It generally is expected that each non-U.S. holder will be required to file a U.S. federal income tax return for each taxable year (or portion thereof) that such holder owns New Equity Interests. Further, in the case of any non-U.S. investor holding its New Equity Interests through a U.S. "blocker" corporation for U.S. federal income tax purposes, the "drag-along" and "tag-along" provisions of the PMC Holding LLC Agreement will not permit such non-U.S. investor to dispose of the stock of such blocker corporation (rather than the New Equity Interests held by such blocker corporation) at the time other holders intend to sell their New

Equity Interests, which may reduce returns to such non-U.S. investor. If Reorganized PMC Holding is treated as a PTP, holders of New Equity interests who are not U.S. taxpayers will be subject to withholding taxes on any dividends paid out of Reorganized PMC Holdings current or accumulated earnings and profits, subject to reduction or elimination under an applicable income tax treaty. Non-U.S. holders of New Equity Interests should consult with their respective tax advisors with regard to the U.S., as well as foreign, tax consequences arising from the exchange of claims for Cash or New Equity Interests and from the holding or subsequent disposition of New Equity Interests.

Non-U.S. holders with effectively connected income generally are subject to the rules discussed above in *Information Reporting and Backup Withholding.*

> **9.      Certain Withholding and Reporting Requirements of the Hiring Incentives to Restore Employment Act.**

Pursuant to recent legislation, Reorganized PMC Holding will be required to withhold at a 30% rate on certain payments made to a holder of New Equity Interests if that holder fails to satisfy timely various U.S. information reporting and due diligence requirements. Payments subject to such requirements include distributions on and the gross proceeds of dispositions of New Equity Interests, as well as interest on the New Secured Term Loans. These requirements are different from, and in addition to, the withholding tax requirements described above. This withholding requirement is being phased in, beginning with payments made on or after January 1, 2014. All holders should consult their tax advisor concerning the application of this legislation to their particular circumstances.

## ARTICLE XIV

## CONCLUSION

The Debtors believe the Plan is in the best interest of all holders of Claims against the Debtors, and all holders of Equity Interests in the Debtors, and, accordingly, urge those who are entitled to vote on whether to accept or reject the Plan to vote to accept the Plan.  As discussed in Article I(F) of this Disclosure Statement, the Creditors' Committee recommends voting in favor of the Plan.

(Remainder of Page Intentionally Left Blank)
(Signature Pages Follow)

IN WITNESS WHEREOF, each Debtor has executed this Disclosure Statement this _9th_ day of September, 2011.

PERKINS & MARIE CALLENDER'S INC.

By:_____
Name:        Joseph F. Trungale
Title:        President & CEO


PERKINS & MARIE CALLENDER'S HOLDING INC.

By:_____
Name:        Joseph F. Trungale
Title:        President & CEO


PERKINS & MARIE CALLENDER'S REALTY LLC

By:_____
Name:        Joseph F. Trungale
Title:        President & CEO


PERKINS FINANCE CORP.

By:_____
Name:        Joseph F. Trungale
Title:        President


Signatures -1

WILSHIRE RESTAURANT GROUP LLC

By:_____
Name:       Joseph F. Trungale
Title:        President & CEO


PMCI PROMOTIONS LLC

By:_____
Name:       Joseph F. Trungale
Title:        President & CEO


MARIE CALLENDER PIE SHOPS, INC.

By:_____
Name:       Joseph F. Trungale
Title:        President


MARIE CALLENDER WHOLESALERS, INC.

By:_____
Name:       Joseph F. Trungale
Title:        President


MACAL INVESTORS, INC.

By:_____
Name:       Joseph F. Trungale
Title:        President


Signatures -2

MCID, INC.

By:_____
Name:        Joseph F. Trungale
Title:        President


WILSHIRE BEVERAGE, INC.

By:_____
Name:        Joseph D. Trungale
Title:        Vice President


FIV CORP.

By:_____
Name:        Joseph F. Trungale
Title:        President


Signatures -3

## EXHIBITS

EXHIBIT A   --   Debtors' Second Amended Joint Plan of Reorganization

EXHIBIT B   --   Disclosure Statement Order (including Confirmation Hearing Notice)

EXHIBIT C   --   Financial Projections

EXHIBIT D   --   Liquidation Analysis

EXHIBIT A

TO DISCLOSURE STATEMENT

DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| PERKINS & MARIE CALLENDER'S INC.,[1] et al., | Case No. 11-11795 (KG) |
| | Jointly Administered |
| Debtors. | |

**DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

| | |
|---|---|
| TROUTMAN SANDERS LLP | YOUNG CONAWAY STARGATT & |
| Mitchel H. Perkiel (admitted *pro hac vice*) | TAYLOR, LLP |
| Hollace T. Cohen (admitted *pro hac vice*) | Robert S. Brady (DE Bar No. 2847) |
| Brett D. Goodman (admitted *pro hac vice*) | Robert F. Poppiti, Jr. (DE Bar No. 5052) |
| The Chrysler Building | The Brandywine Building |
| 405 Lexington Avenue, 7th Floor | 1000 West Street, 17th Floor |
| New York, NY 10174 | Wilmington, DE 19801 |
| Telephone:   (212) 704-6000 | Telephone:   (302) 571-6600 |
| Facsimile:   (212) 704-6288 | Facsimile:   (302) 571-1253 |

Dated:   September 9, 2011
        Wilmington, Delaware

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Perkins & Marie Callender's Inc. (4388); Perkins & Marie Callender's Holding Inc. (3999); Perkins & Marie Callender's Realty LLC (N/A); Perkins Finance Corp. (0081); Wilshire Restaurant Group LLC (0938); PMCI Promotions LLC (7308); Marie Callender Pie Shops, Inc. (7414); Marie Callender Wholesalers, Inc. (1978); MACAL Investors, Inc. (4225); MCID, Inc. (2015); Wilshire Beverage, Inc. (5887); and FIV Corp. (3448). The mailing address for the Debtors is 6075 Poplar Avenue, Suite 800, Memphis, TN 38119.

**TABLE OF CONTENTS**

**Page**

I. DEFINITIONS AND CONSTRUCTION OF TERMS ........................................................... 3

    A.     Definitions.................................................................................................. 3

    B.     Interpretation, Application of Definitions and Rules of Construction................. 22

II. CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS....................................... 22

    A.     General Rules of Classification. ................................................................... 22

    B.     Classification of Claims and Interests............................................................ 23

III. TREATMENT OF ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE
       CLAIMS, PRIORITY TAX CLAIMS AND DIP FINANCING CLAIMS .............. 24

    A.     Administrative Claims. ............................................................................... 24

    B.     Bar Date for Administrative Claims. ............................................................. 24

    C.     Professional Fee Claims.............................................................................. 25

    D.     Priority Tax Claims.................................................................................... 25

    E.     DIP Financing Claims................................................................................. 25

IV. TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS.................... 26

    A.     Class 1 — Other Priority Claims. ................................................................. 26

    B.     Class 2 — Other Secured Claims.................................................................. 26

    C.     Class 3 — Senior Secured Notes Claims. ...................................................... 27

    D.     Class 4 — Senior Notes Claims.................................................................... 27

    E.     Class 5 — General Unsecured Claims.......................................................... 28

    F.     Class 6 — Convenience Claims. ................................................................... 29

    G.     Class 7 — Intercompany Claims. ................................................................. 29

    H.     Class 8 — Subordinated Claims. .................................................................. 29

    I.     Class 9A — Equity Interests in PMC Holding and PMCI.................................. 30

    J.     Class 9B — Equity Interests in the Other Subsidiary Debtors. .......................... 30

V. PROVISIONS REGARDING CORPORATE GOVERNANCE OF THE
       REORGANIZED DEBTORS ....................................................................... 30

    A.     Amendments to Corporate Formation and Governance Documents. .................. 30

    B.     New Charter Documents.............................................................................. 31

    C.     Appointment of Officers and Managers. ........................................................ 31

    D.     Powers of Officers. ................................................................................... 32

    E.     Management of Reorganized Debtors. ........................................................... 32

    F.     Management Incentive Plan.......................................................................... 33

    G.     PMC Holding LLC Agreement...................................................................... 33

VI. LIMITED CONSOLIDATION FOR VOTING, CONFIRMATION, AND
       DISTRIBUTION PURPOSES ..................................................................... 34

VII. PROVISIONS REGARDING MEANS OF IMPLEMENTATION, VOTING,
       DISTRIBUTIONS, AND RESOLUTION OF DISPUTED CLAIMS....................... 35

## TABLE OF CONTENTS
(continued)

**Page**

A.    Exit Financing. ............................................................................... 35
B.    Issuance of Reorganized PMC Holding Membership Interests. .......................... 35
C.    New Intercreditor Agreement. .......................................................... 36
D.    Avoidance Actions. ........................................................................ 36
E.    Restructuring Transactions. ............................................................. 37
F.    Corporate Action. ......................................................................... 38
G.    Effectuating Documents; Further Transactions. ................................... 38
H.    Cancellation of Securities and Agreements. ........................................ 38
I.    Voting of Claims. .......................................................................... 39
J.    Nonconsensual Confirmation. .......................................................... 39
K.    Distributions in Respect of Allowed Claims. ..................................... 39
L.    Resolution of Disputed Claims. ....................................................... 43

**VIII. EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..................................... 45**

A.    Assumption and Rejection of Executory Contracts and Unexpired Leases. ....... 45
B.    Limited Extension of Time to Reject. ................................................. 46
C.    Cure. ......................................................................................... 46
D.    Rejection Damage Claims. ............................................................. 46
E.    Benefit Plans. ............................................................................. 46
F.    Assumption of ACE Insurance Program. ........................................... 47
G.    Assumption of Indemnification Obligations. ...................................... 48

**IX. EFFECT OF CONFIRMATION OF THIS PLAN ................................................ 48**

A.    Continued Corporate Existence. ...................................................... 48
B.    Vesting of Assets. ........................................................................ 48
C.    Preservation of Causes of Action. ................................................... 49
D.    Discharge of the Debtors. ............................................................. 49
E.    Releases by the Debtors of Certain Parties. ...................................... 50
F.    Releases by Non-Debtors. ............................................................. 50
G.    Exculpation. ............................................................................... 51
H.    Injunction. ................................................................................. 52
I.    Term of Bankruptcy Injunction or Stays. .......................................... 52
J.    Preservation of Insurance. ............................................................. 52

**X. EFFECTIVENESS OF THIS PLAN ................................................................ 52**

A.    Conditions Precedent to Confirmation. ............................................. 52
B.    Conditions Precedent to the Effective Date. ...................................... 53
C.    Waiver of Conditions. ................................................................... 54
D.    Notice of Confirmation and Effective Date. ....................................... 54
E.    Effect of Failure of Conditions. ...................................................... 54
F.    Vacatur of Confirmation Order. ...................................................... 54
G.    Revocation, Withdrawal, Modification or Non-Consummation. ................ 54

**XI. RETENTION OF JURISDICTION ................................................................ 55**

## TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|
| **XII. MISCELLANEOUS PROVISIONS** | | **56** |
| A. | Payment of Statutory Fees. | 56 |
| B. | Payment of Fees and Expenses of Restructuring Support Parties. | 56 |
| C. | Payment of Fees and Expenses of the Senior Secured Notes Trustee, Senior Secured Notes Collateral Agent and the Senior Notes Trustee. | 56 |
| D. | Modification of this Plan. | 57 |
| E. | Dissolution of Creditors' Committee. | 57 |
| F. | Votes Solicited in Good Faith. | 57 |
| G. | Administrative Claims Incurred After the Effective Date. | 58 |
| H. | Request for Expedited Determination of Taxes. | 58 |
| I. | Governing Law. | 58 |
| J. | Filing or Execution of Additional Documents. | 58 |
| K. | Exemption From Transfer Taxes. | 58 |
| L. | Exemption for Issuance of PMC Holding Membership Interests and New Secured Term Loans. | 59 |
| M. | Waiver of Federal Rule of Civil Procedure 62(a). | 59 |
| N. | Exhibits/Schedules. | 59 |
| O. | Notices. | 59 |
| P. | Plan Supplement. | 60 |
| Q. | Further Actions; Implementations. | 60 |
| R. | Severability. | 60 |
| S. | Entire Agreement. | 60 |
| T. | Binding Effect. | 61 |
| U. | Substantial Consummation. | 61 |
| V. | Conflict. | 61 |

EXHIBIT A    New Secured Term Loan Agreement Term Sheet
EXHIBIT B    PMC Holding LLC Agreement Term Sheet

## INTRODUCTION

Perkins & Marie Callender's Inc., Perkins & Marie Callender's Holding Inc., Perkins & Marie Callender's Realty LLC, Perkins Finance Corp., Wilshire Restaurant Group LLC, PMCI Promotions LLC, Marie Callender Pie Shops, Inc., Marie Callender Wholesalers, Inc., MACAL Investors, Inc., MCID, Inc., Wilshire Beverage, Inc. and FIV Corp., the above-captioned debtors and debtors in possession, propose the following second amended joint plan of reorganization under section 1121(a) of the Bankruptcy Code.[2]

The Debtors' Chapter 11 Cases are being jointly administered pursuant to an order of the Court, and this Plan is being presented as a joint plan of reorganization of the Debtors.  Claims against, and Interests in, the Debtors (other than Administrative Claims, Professional Fee Clams, Priority Tax Claims, and DIP Financing Claims) are classified in Article II hereof and treated in Article IV hereof.

Reference is made to the Disclosure Statement accompanying this Plan, including the exhibits thereto, for a discussion of the Debtors' history, business, properties, financial projections of future operations, and risk factors, together with a summary and analysis of this Plan.  All Claim and Interest holders entitled to vote on this Plan are encouraged to review the Disclosure Statement and to read this Plan carefully before voting to accept or reject this Plan.

NO SOLICITATION MATERIALS, OTHER THAN THE DISCLOSURE STATEMENT AND RELATED MATERIALS TRANSMITTED THEREWITH AND APPROVED BY THE COURT, HAVE BEEN AUTHORIZED BY THE COURT FOR USE IN SOLICITING ACCEPTANCES OR REJECTIONS OF THIS PLAN.

---

[2]    Capitalized terms used in this Introduction shall have the meanings ascribed to them below.

## I.

### DEFINITIONS AND CONSTRUCTION OF TERMS

**A.** **Definitions.**

Unless otherwise defined herein, or the context otherwise requires, the following terms shall have the respective meanings set forth below:

| | |
|---|---|
| ***ACE Companies*** | means, collectively, ACE American Insurance Company, Pacific Employers Insurance Company, Indemnity Insurance Company of North America, ACE Fire Underwriters Insurance Company, ACE Property and Casualty Insurance Company, Century Indemnity Company, Illinois Union Insurance Company, ACE Bermuda Insurance Ltd. and ESIS, Inc., and each of their respective affiliates. |
| ***ACE Insurance Program*** | means all insurance policies and all agreements, documents or instruments relating thereto including, without limitation, claims servicing agreements, that have been issued or entered into by the ACE Companies (or any of them) to or with one or more of the Debtors and their respective predecessors and/or affiliates. |
| ***Administrative Claim*** | means a Claim for costs and expenses of administration of the Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving and operating the Estates; (b) any indebtedness or obligations incurred or assumed by the Debtors in Possession in connection with the conduct of their businesses, including for wages, salaries, or commissions for services, and payments for goods and other services and leased premises; and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code. |
| ***Administrative Claims Bar Date*** | means the first Business Day that is thirty (30) days after the Effective Date. |
| ***Allowed*** | means, with reference to any Claim, (a) any Claim against any of the Debtors that has been listed by the Debtors in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or |

3

contingent, and with respect to which no contrary Proof of Claim has been filed, (b) any Claim specifically allowed under this Plan, (c) any Claim that is not Disputed by the Claims Objection Deadline, or (d) any Claim the amount or existence of which, if Disputed, (i) has been determined by a Final Order of a court of competent jurisdiction other than the Court, or (ii) has been allowed by Final Order of the Court; provided, however, that any Claims allowed solely for the purpose of voting to accept or reject this Plan pursuant to an order of the Court shall not be considered "Allowed Claims" hereunder.

*Assigned Avoidance Actions*       means the Causes of Action pursuant to chapter 5 of the Bankruptcy Code that the Claims Administrator shall be granted standing to investigate and prosecute (co-extensive with the right of the Reorganized Debtors to investigate and prosecute such Causes of Action), and that are identified on the schedule of Assigned Avoidance Actions filed in connection with the Plan Supplement, which schedule shall be acceptable to the Debtors, the Restructuring Support Parties and the Creditors' Committee.

*Avoidance Action Recovery Pool*       means 20% of the net Cash proceeds of any Avoidance Actions recovered by the Reorganized Debtors or the Claims Administrator, which net Cash proceeds shall be held in an account to be established by the Reorganized Debtors.

*Avoidance Actions*       means any Causes of Action pursuant to chapter 5 of the Bankruptcy Code, including the Assigned Avoidance Actions.

*Ballots*       means each of the ballot forms distributed with the Disclosure Statement to each holder of an Impaired Claim (other than to holders not entitled to vote on this Plan) for, among other things, voting on the acceptance or rejection of this Plan.

*Bankruptcy Code*       means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as in effect on the date hereof.

*Bankruptcy Rules*       means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, and the local rules of the Court, as the context may require.

4

| | |
|---|---|
| ***Bar Date*** | means, in the case of an Administrative Claim, the Administrative Claims Bar Date; and, in any other case, the applicable "bar date" as may have been established therefor by the Court by a Final Order. |
| ***Business Day*** | means any day on which commercial banks are open for business, and not authorized to close, in the City of New York, New York, except any day designated as a legal holiday by Bankruptcy Rule 9006(a). |
| ***Cash*** | means legal tender of the United States of America. |
| ***Cash Election*** | means the election as provided on the Ballot by a Cash Eligible Claimant who holds a Senior Note Claim to receive Cash in an amount equal to (a) the lesser of (i) 14% of such holder's Allowed Senior Notes Claim or (ii) such holder's Pro Rata share of the Cash Cap Amount; plus (b) such holder's Pro Rata share of the Avoidance Action Recovery Pool. |
| ***Cash Cap Amount*** | means $7.0 million; provided, however, that the Cash Cap Amount will be increased by an amount equal to 14% of the total aggregate amount of Allowed Specified General Unsecured Claims that do not make the Class 5 Equity Election, to the extent applicable.  Upon completion of distributions made to holders of Allowed Class 5 General Unsecured Claims and Allowed Class 4 Senior Notes Claims that make the Cash Election, any unnecessary reserve established by the Reorganized Debtors to fund such payments shall revert to the Reorganized Debtors. |
| ***Cash Eligible Claimant*** | means a holder of (i) a General Unsecured Claim in an amount $5 million or less or (ii) a Senior Notes Claim in an amount of $5 million or less; provided, however, that, the holder of an Allowed General Unsecured Claim or Senior Notes Claim in the amount of more than $5 million may irrevocably elect to reduce that Claim to an amount of $5 million or less and thereby be considered a Cash Eligible Claimant; provided, further, however, that, without the prior written consent of the Debtors (with the consent of the Restructuring Support Parties and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld)), any Claim that is Allowed in the amount of more than $5 million may not be subdivided into multiple General Unsecured Claims or Allowed Senior Notes Claims for the purpose of determining whether the holder of such Claim is a Cash |

5

|  | Eligible Claimant; *provided*, *further*, *however*, that in the event a holder of an Allowed General Unsecured Claim or an Allowed Senior Notes Claim holds multiple Allowed General Unsecured Claims or Allowed Senior Notes Claims against the Debtors, such Allowed General Unsecured Claims or Allowed Senior Notes Claims shall not be aggregated for purposes of determining whether such holder of an Allowed General Unsecured Claim or Allowed Senior Notes Claim is a Cash Eligible Claimant. |
|---|---|
| *Causes of Action* | means any and all actions, proceedings, causes of action, suits, accounts, demands, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment, and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, non-contingent, matured, unmatured, now-owned, hereafter acquired, disputed, undisputed, secured, or unsecured, and whether asserted or assertable directly or derivatively in law, equity, or otherwise, including any causes of action arising under sections 510, 544, 547, 548, 549, 550, 551 or any other section of the Bankruptcy Code, unless otherwise waived or released by the Debtor(s), with the consent of the Restructuring Support Parties (and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld), but only to the extent related to Avoidance Actions), or by the Reorganized Debtor(s) to the extent such Cause of Action is a Cause of Action held by one or more Debtors or Reorganized Debtors. |
| *Chapter 11 Cases* | means the chapter 11 cases commenced by the Debtors. |
| *CHI* | means Castle Harlan, Inc. |
| *CHI Management Agreements* | means (i) the Agreement dated September 21, 2005 among CHI, The Restaurant Holding Corporation, PMCI (f/k/a The Restaurant Company), TRC Holding Corp. and TRC Holding LLC, and (ii) the Agreement dated November 12, 1999 among CHI, Wilshire Restaurant Group LLC and Marie Callender Pie Shops, Inc. |
| *Claim* | means any claim, as such term is defined in section 101(5) of the Bankruptcy Code. |
| *Claims Agent* | means Omni Management Group, LLC or any successor |

6

thereto.

***Claims Administrator***       means the Person appointed by the Debtors on the Effective Date at the direction of the Creditors' Committee, which Person shall be acceptable to the Restructuring Support Parties.

***Claims Objection Deadline***       means, as applicable (except for Administrative Claims and Professional Fee Claims): (a) the day that is the later of (i) the first business day that is sixty (60) days after the Effective Date, or (ii) as to Proofs of Claim filed after the applicable Bar Date, the first Business Day that is at least thirty (30) days after a Final Order is entered deeming the late filed claims to be treated as timely filed; or (b) such later date as may be established by the Court upon a motion by the Reorganized Debtors, without any further notice to other parties-in-interest.

***Class***       means a group of Claims or Equity Interests as classified under this Plan.

***Class 5 Equity Election***       means the election as provided on the Ballot by a holder of an Allowed General Unsecured Claim that is a Cash Eligible Claimant to receive its Pro Rata share of Reorganized PMC Holding Membership Interests.

***Collateral***       means any property or interest in property of the Debtors' Estates subject to a Lien to secure the payment or performance of a Claim, which Lien has not been avoided or is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law.

***Confirmation Date***       means the date on which the Confirmation Order is entered by the Court, but in no event later than November 8, 2011; provided, however, that such date may be extended by the Debtors with the consent of the Restructuring Support Parties and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld).

***Confirmation Hearing***       means the hearing conducted by the Court to consider confirmation of this Plan pursuant to section 1128 of the Bankruptcy Code, as it may be adjourned or continued from time to time.

***Confirmation Order***       means the order entered by the Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

7

| | |
|---|---|
| ***Convenience Claim Amount*** | means $2,500. |
| ***Convenience Claims*** | means any Claim that would otherwise be a General Unsecured Claim that is Allowed in the Convenience Claim Amount or less, including a Claim that would otherwise be a General Unsecured Claim that would be Allowed in an amount greater than the Convenience Claim Amount but which is reduced to the Convenience Claim Amount or less by an irrevocable written election of the holder of such Claim delivered to the Debtors, provided, however, that, without the prior written consent of the Debtors (with the consent of the Restructuring Support Parties and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld)), any Claim that was originally Allowed in excess of the Convenience Claim Amount may not be subdivided into multiple Convenience Claims in the Convenience Claim Amount or less for purposes of receiving the treatment provided under this Plan to holders of Allowed Convenience Claims; provided further, however, that, in the event a holder of an Allowed General Unsecured Claim holds multiple Allowed General Unsecured Claims against the Debtors, such Allowed General Unsecured Claims shall not be aggregated for purposes of determining whether each such Allowed General Unsecured Claim is a Convenience Claim. |
| ***Court*** | means, (a) the United States Bankruptcy Court for the District of Delaware, having jurisdiction over the Chapter 11 Cases; (b) to the extent there is no reference pursuant to section 157 of title 28 of the United States Code, the United States District Court for the District of Delaware; and (c) any other court having jurisdiction over the Chapter 11 Cases or proceedings arising therein. |
| ***Creditors' Committee*** | means the Official Committee of Unsecured Creditors appointed by the United States Trustee in the Debtors' Chapter 11 Cases, as constituted from time to time. |
| ***Debtors*** | means Perkins & Marie Callender's Inc.; Perkins & Marie Callender's Holding Inc.; Perkins & Marie Callender's Realty LLC; Perkins Finance Corp.; Wilshire Restaurant Group LLC; PMCI Promotions LLC; Marie Callender Pie Shops, Inc.; Marie Callender Wholesalers, Inc.; MACAL Investors, Inc.; MCID, Inc.; Wilshire Beverage, Inc.; and FIV Corp. |

8

| | |
|---|---|
| ***Debtors in Possession*** | means the Debtors in their capacity as debtors in possession in the Chapter 11 Cases pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. |
| ***DIP Administrative Agent*** | means Wells Fargo Capital Finance, LLC, in its capacity as administrative agent under the DIP Credit Facility. |
| ***DIP Credit Agreement*** | means that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, dated as of June 14, 2011, by and among PMC Holding, PMCI, the DIP Lenders and the DIP Administrative Agent, as amended from time to time. |
| ***DIP Credit Documents*** | means the "Loan Documents" under (and as defined in) the DIP Credit Agreement, including any and all guaranties and collateral documents executed and delivered in connection therewith. |
| ***DIP Credit Facility*** | means the credit facility established in favor of PMCI, as borrower, and as guaranteed by each of the other Debtors, pursuant to the DIP Credit Agreement and the other DIP Credit Documents. |
| ***DIP Financing Claims*** | means all Claims arising under or relating to the DIP Credit Facility, whether pursuant to the DIP Credit Agreement, any other DIP Credit Document, the Final DIP Order, or otherwise. |
| ***DIP Lenders*** | means the lenders, banks, other financial institutions or other non-Debtor entities that are or may become parties to the DIP Credit Agreement from time-to-time. |
| ***Disbursing Agent*** | means the Debtors or the Reorganized Debtors, or any Person designated by the Debtors (with the consent of the Restructuring Support Parties and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld)) or the Reorganized Debtors to serve as a disbursing agent, or to assist the Debtors or the Reorganized Debtors in the making of Distributions, under this Plan. |
| ***Disclosure Statement*** | means the written disclosure statement that relates to this Plan, as approved by the Court pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, as such disclosure statement may be amended, modified or supplemented from time to time. |

9

| | |
|---|---|
| ***Disputed*** | means, with reference to any Claim: (a) any Claim, (i) proof of which was not timely or properly filed and that has been or hereafter is listed on the Schedules as unliquidated, disputed or contingent, or (ii) for which a proof of claim was required, but as to which a proof of claim was not timely or properly filed; or (b) any Claim as to which the Debtors, the Reorganized Debtors, or any other party in interest has filed an objection or request for estimation on or before such limitation period fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules or the Court, except to the extent that such objection or request for estimation is withdrawn or determined by a Final Order in favor of the holder of such Claim. |
| ***Distributions*** | means the distribution in accordance with this Plan of (a) Cash, (b) Reorganized PMC Holding Membership Interests, (c) rights and obligations with respect to the New Secured Term Loans, or (d) other form of consideration, as the case may be. |
| ***Effective Date*** | means the first Business Day on which (i) all of the conditions specified in Article X.A. and Article X.B. of this Plan have been satisfied or waived in accordance with Article X.C. of this Plan, and (ii) the stay of the Confirmation Order, if any, is no longer in effect and such date shall be set forth in a notice filed with the Court by the Reorganized Debtors within five (5) Business Days of the occurrence of the Effective Date; provided, however, that if (i) and (ii) do not occur by November 29, 2011, then the Effective Date may not occur, unless such dates are extended by the Debtors with the consent of the Restructuring Support Parties and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld). |
| ***Equity Interest or Interest*** | means any equity security within the meaning of section 101(16) of the Bankruptcy Code or any other instrument evidencing an ownership interest in any of the Debtors (or Reorganized Debtors, as applicable), whether or not transferable, any option, warrant, or right, contractual or otherwise, to acquire, sell or subscribe for any such interest, and any and all Claims that are otherwise determined by the Court to be an equity interest, including any Claim or debt that is recharacterized as an equity interest. |

10

| | |
|---|---|
| *Estates* | means the Chapter 11 estates of the Debtors, individually or collectively, as is appropriate in the context created by the commencement of and in the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code. |
| *Exit Financing* | means (i) the First Lien Exit Facility and (ii) the New Secured Term Loans to be made under the New Secured Term Loan Agreement. |
| *Final DIP Order* | means the order entered by the Court on July 12, 2011 and appearing at Docket No. 211 in the Chapter 11 Cases, as it may be further amended from time to time, approving on a final basis the DIP Credit Facility. |
| *Final Order* | means an order or judgment of the Court, or other court of competent jurisdiction, as entered on the docket of such court, the operation or effect of which has not been stayed, reversed, vacated or amended, and as to which order or judgment (or any revision, modification, or amendment thereof) the time to appeal, petition for certiorari, or seek review or rehearing has expired and as to which no appeal, petition for certiorari, or petition for review or rehearing was filed or, if filed, remains pending. |
| *Finance* | means Perkins Finance Corp. |
| *First Lien Exit Facility* | means that certain exit facility, in an aggregate principal amount (including letters of credit) not to exceed $35 million, to be entered into by the Reorganized Debtors effective as of the Effective Date pursuant to a credit agreement substantially in the form set forth in the Plan Supplement and as shall be acceptable to the Debtors and the Restructuring Support Parties in consultation with the Creditors' Committee; with the obligations under such exit facility to be secured by a first priority lien on and security interest in substantially all of the assets of the Reorganized Debtors. |
| *FIV* | means FIV Corp. |
| *General Unsecured Claim* | means a Claim against any of the Debtors that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, Professional Fee Claim, DIP Financing Claim, Other Secured Claim, Senior Secured Notes Claim, Senior Notes Claim, Convenience Claim, Intercompany Claim, or Subordinated Claim, and shall include (a) pre-Petition Date Claims of vendors or customers of the Debtors that are not |

11

priority claims under section 503(b)(9) of the Bankruptcy Code, (b) Claims of employees of the Debtors that are not priority claims under section 507(a) of the Bankruptcy Code, (c) Claims arising as a result of the rejection by any of the Debtors of executory contracts or unexpired leases pursuant to section 365 of the Bankruptcy Code, and (d) Claims arising as a result of pre-Petition Date litigation against any of the Debtors.

| | |
|---|---|
| ***General Unsecured Claim Reserve*** | has the meaning ascribed to it in Article VII.K.4 of this Plan. |
| ***Governmental Unit*** | has the meaning ascribed to such term in section 101(27) of the Bankruptcy Code. |
| ***Impaired*** | means, when used with reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code. |
| ***Indemnification Obligation*** | means any obligation of any of the Debtors to indemnify, reimburse, or provide contribution pursuant to charter, by-laws, contract, or otherwise. |
| ***Insider*** | has the meaning set forth in section 101(31) of the Bankruptcy Code. |
| ***Intercompany Claims*** | means any Claim held by one of the Debtors against any other Debtor, including (a) any account reflecting intercompany book entries by a Debtor with respect to any other Debtor, (b) any Claim not reflected in book entries that is held by such Debtor against any other Debtor or Debtors, and (c) any derivative Claim asserted or assertable by or on behalf of a Debtor against any other Debtor or Debtors. |
| ***Lien*** | has the meaning set forth in section 101(37) of the Bankruptcy Code. |
| ***Litigation Rights*** | means the Causes of Action, claims, suits, or proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their Estates may hold against any Person (except to the extent such claims are expressly released under this Plan), which are to be retained by the Reorganized Debtors and the Claims Administrator, as applicable, and identified in the Plan Supplement (which document shall be in form and substance acceptable to the Restructuring Support Parties and the Creditors' Committee (which consent of the Creditors' Committee |

12

shall not be unreasonably withheld)).

| | |
|---|---|
| ***MCID*** | means MCID, Inc. |
| ***MCPSI*** | means Marie Callender Pie Shops, Inc. |
| ***MACAL*** | means MACAL Investors, Inc. |
| ***Management Incentive Plan*** | means a certain post-Effective Date Management Incentive Plan to be adopted and implemented by the board of managers of Reorganized PMC Holding on or as soon as reasonably practicable after the Effective Date, and on such terms as such board of managers may determine, all in accordance with Article V.F. of this Plan. |
| ***Marie Callender's IP Sale*** | means the sale to ConAgra Foods RDM, Inc. which became effective June 9, 2011, of MCPSI's trademarks and domain names that were previously licensed to an affiliate of ConAgra Foods RDM, Inc. |
| ***New Charter Documents*** | means: (a) in the case of any Debtor that was a corporation prior to the Effective Date (other than MCID and Wilshire Beverage), a new certificate of formation (or certificate or articles of organization, as applicable) to be filed in such Debtor's state of incorporation in connection with the conversion of such Debtor into a limited liability company in accordance with this Plan, which shall be included (in substantially final form) in the Plan Supplement and shall be in form and substance acceptable to the Restructuring Support Parties and the Creditors' Committee (in the exercise of the Creditors' Committee's reasonable discretion); (b) in the case of any Debtor that was a limited liability company prior to the Effective Date, and unless clause (c) below applies, an amended, or amended and restated, certificate of formation (or certificate or articles of organization, as applicable) of such Debtor, which shall be included (in substantially final form) in the Plan Supplement and shall be in form and substance acceptable to the Restructuring Support Parties in consultation with the Creditors' Committee; (c) in the case of any Debtor that was a limited liability company prior to the Effective Date and as to which the Restructuring Support Parties determine no amendment, or amendment and restatement, is necessary or desirable in respect of its existing certificate of formation (or certificate or articles of organization, as applicable), such existing certificate of articles; and (d) in the case of MCID and Wilshire Beverage, an amendment |

|  |  |
|---|---|
|  | to their certificates of incorporation to be dated as of the Effective Date, and which shall be included (in substantially final form) in the Plan Supplement and shall be in form and substance acceptable to the Creditors' Committee in consultation with the Creditors' Committee. |
| *New Intercreditor Agreement* | means a certain intercreditor agreement to be entered into between the administrative agent (or collateral agent) under the First Lien Exit Facility and the New Secured Term Loan Agent in substantially the form set forth in the Plan Supplement, and otherwise to be in form and substance acceptable to the Debtors and the Restructuring Support Parties in consultation with the Creditors' Committee. |
| *New Secured Term Loan Agent* | means the administrative and collateral agent under the New Secured Term Loan Agreement, as is acceptable to the Restructuring Support Parties in consultation with the Creditors' Committee. |
| *New Secured Term Loan Agreement* | means that certain new secured term loan agreement, to be dated as of the Effective Date, and to be substantially in the form set forth in the Plan Supplement, and to be consistent in all material respects with the terms and conditions contained in the term sheet attached to this Plan as Exhibit A hereto (and otherwise to be in form and substance acceptable to the Debtors and the Restructuring Support Parties in consultation with the Creditors' Committee). |
| *New Secured Term Loans* | means the new secured term loans to be made or deemed to be made, on the Effective Date and under the New Secured Term Loan Agreement, to Reorganized PMCI, as borrower, and to be guaranteed by all of the other Reorganized Debtors, in an aggregate principal amount equal to $110,563,000, which amount may be increased by up to an additional principal amount of $10 million at any time or from time to time after the Effective Date with the consent of the Reorganized Debtors and the New Secured Term Loan Lenders holding a majority of the New Secured Term Loans.  The obligations under the New Secured Term Loan Agreement shall be secured by a second priority lien on and security interest in substantially all of the assets of the Reorganized Debtors. |
| *New Secured Term Loan Lenders* | means the lenders under the New Secured Term Loan Agreement. |

14

| | |
|---|---|
| ***Ordinary Course Administrative Claims*** | means Administrative Claims against the Debtors that represent liabilities (a) to sellers of goods or services for and on account of such seller's provision of goods and/or services subsequent to the Petition Date through the Effective Date and (b) that were incurred in the ordinary course of business by the Debtors subsequent to the Petition Date through the Effective Date. |
| ***Other Priority Claim*** | means any Claim against any of the Debtors other than an Administrative Claim, a Professional Fee Claim, a Priority Tax Claim or a DIP Financing Claim that is entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7), or (9) of Bankruptcy Code. |
| ***Other Secured Claims*** | means any Claim (other than the DIP Financing Claims, and the Senior Secured Notes Claims) to the extent reflected in the Schedules or a Proof of Claim filed as a secured Claim, which is (i) secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or, (ii) in the event that such Claim is subject to setoff under section 553 of the Bankruptcy Code, to the extent of such setoff. |
| ***Other Subsidiary Debtors*** | means the Subsidiary Debtors, excluding PMCI. |
| ***Person*** | means any individual, corporation, partnership, limited liability company, association, indenture trustee, organization, joint stock company, joint venture, estate, trust, Governmental Unit or any political subdivision thereof, or any other entity. |
| ***Petition Date*** | means June 13, 2011. |
| ***Plan*** | means this "Debtors' Second Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code", as it may be amended or modified from time to time, together with all addenda, exhibits, schedules or other attachments, if any. |
| ***Plan Supplement*** | means the compilation of documents and forms of documents, schedules, attachments and exhibits to this Plan, to be filed by the Debtors following the filing of this Plan as set forth herein, each of which documents and other materials shall be acceptable in form and substance to (a) the Debtors or the Creditors' Committee, to the |

15

extent this Plan otherwise provides that such documents and other materials must be acceptable to the Debtors or the Creditors' Committee, and (b) the Restructuring Support Parties, by no later than (A) ten (10) calendar days prior to the Confirmation Hearing or (B) such later date as may be approved by the Court on notice to parties in interest, as such Plan Supplement documents may be amended, modified, or supplemented from time to time with the consent of (x) the Debtors or the Creditors' Committee, to the extent this Plan otherwise provides that such documents and other materials must be acceptable to the Debtors or the Creditors' Committee, and (y) the Restructuring Support Parties and which shall include the following: (i) the credit agreement relating to the First Lien Exit Facility in substantially final form; (ii) the New Secured Term Loan Agreement in substantially final form; (iii) the New Intercreditor Agreement in substantially final form; (iv) the New Certificates of Formation in substantially final form; (v) the PMC Holding LLC Agreement in substantially final form; (vi) the Subsidiary LLC Agreements in substantially final form; (vii) a list of the initial post-Effective Date managers and officers of the Reorganized Debtors and information regarding the terms of their employment and compensation; (viii) a list of the Litigation Rights retained by the Reorganized Debtors; (ix) the Schedule of Rejected Contracts and Leases; (x) the schedule of Assigned Avoidance Actions; and (xi) the schedule of Specified General Unsecured Claims.

| | |
|---|---|
| ***PMC Holding*** | means Perkins & Marie Callender's Holding Inc. |
| ***PMC Holding LLC Agreement*** | means the limited liability company agreement of Reorganized PMC Holding (upon its conversion from a corporation into a limited liability company), dated as of the Effective Date, a substantially final form of which will be contained in the Plan Supplement, and the terms of which shall be acceptable to the Restructuring Support Parties and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld) and consistent in all material respects with the PMC Holding LLC Agreement Term Sheet attached to the Plan as Exhibit B. |
| ***PMCI*** | means Perkins & Marie Callender's Inc. |
| ***PMC Realty*** | means Perkins & Marie Callender's Realty LLC. |

16

| | |
|---|---|
| ***Prepayment Premium*** | means the prepayment premium due pursuant to section 3.07 of the Senior Secured Notes Indenture with respect to $28,937,000 in aggregate principal amount of Senior Secured Notes redeemed from the net proceeds of the Marie Callender's IP Sale. |
| ***Prepayment Premium Waiver*** | means the waiver of the right of holders of Senior Secured Notes whose Senior Secured Notes were redeemed from proceeds of the Marie Callender's IP Sale to receive the Prepayment Premium, which waiver becomes effective on the Effective Date. |
| ***Pre-Petition Administrative Agent*** | means Wells Fargo Capital Finance LLC, in its capacity as administrative agent under the Pre-Petition Secured Credit Facility. |
| ***Pre-Petition Secured Credit Facility*** | means that certain Credit Agreement dated as of September 24, 2008, as amended from time to time, among PMCI, PMC Holding, the Pre-Petition Secured Credit Facility Lenders and the Pre-Petition Administrative Agent. |
| ***Pre-Petition Secured Credit Facility Lenders*** | means the lender parties under the Pre-Petition Secured Credit Facility. |
| ***Priority Tax Claim*** | means any unsecured Claim that is entitled to a priority in right of payment under section 507(a)(8) of the Bankruptcy Code. |
| ***Professional*** | means (i) any professional employed in the Chapter 11 Cases pursuant to sections 327 and 328 of the Bankruptcy Code or otherwise and (ii) any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b) of the Bankruptcy Code but excluding professionals for (a) the Pre-Petition Administrative Agent, (b) the DIP Administrative Agent, (c) the Restructuring Support Parties, (d) the Senior Secured Notes Trustee, (e) the Senior Secured Notes Collateral Agent, and (f) the Senior Notes Trustee. |
| ***Professional Fee Claims*** | means an Administrative Claim Allowed under section 328, 330(a), 331 or 503 of the Bankruptcy Code for reasonable compensation of a Professional or other Person for services rendered or expenses incurred in the Chapter 11 Cases on or prior to the Effective Date (including the reasonable, actual and necessary expenses of the members of the Creditors' Committee incurred as members of the |

17

Creditors' Committee in discharge of their duties as such), but specifically excluding the fees and expenses of professionals of (a) the Pre-Petition Administrative Agent, (b) the DIP Administrative Agent, (c) the Restructuring Support Parties, (d) the Senior Secured Notes Trustee, (e) the Senior Secured Notes Collateral Agent, and (f) the Senior Notes Trustee.

**Promotions**                    means PMCI Promotions LLC.

**Pro Rata**                      means the proportion that an allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class and in any other Class entitled to share in the same recovery as such Allowed Claim under this Plan.

**Proof of Claim**               means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

**Record Date**                  means, (i) for purposes of making distributions under this Plan on account of Allowed Claims, the Effective Date, and (ii) for purposes of casting Ballots, the date set forth in the order approving the Disclosure Statement that accompanies this Plan.

**Released Parties**             means (i) the officers, directors, employees, legal, financial and tax advisors, and other representatives of the Debtors as of the Petition Date, in their capacity as such; (ii) all direct and indirect holders of Equity Interests in PMC Holding as of the Petition Date, in their capacity as such; (iii) the Restructuring Support Parties and their legal, financial and tax advisors, in their capacity as such; (iv) the Pre-Petition Administrative Agent, the arranger under the Pre-Petition Secured Credit Facility, the issuer of letters of credit under the Pre-Petition Secured Credit Facility, and the Pre-Petition Secured Credit Facility Lenders (and each of the foregoing parties' respective legal and financial advisors), in their respective capacities as such; (v) the Senior Secured Notes Trustee and the Senior Secured Notes Collateral Agent and their respective legal advisors, in their capacity as such; (vi) the Senior Notes Trustee and its legal advisors, in its capacity as such; (vii) the DIP Administrative Agent, the arranger under the DIP Credit Facility, the issuer of letters of credit under the DIP Credit Facility, and the DIP Lenders (including each of the

18

|  | foregoing parties' respective legal and financial advisors), in their respective capacities as such; and (viii) the Creditors' Committee and the members thereof in their capacity as such (and each of the foregoing parties' respective legal and financial advisors). |
|---|---|
| ***Reorganized Debtor*** | means each of the Debtors, or any successors thereto by merger, consolidation, or otherwise, on and after the Effective Date; and includes any corporate Debtor converting into a limited liability company in accordance with this Plan. |
| ***Reorganized PMC Holding Membership Interests*** | means the Class A Membership Interests of Reorganized PMC Holding issued under this Plan and governed by the PMC Holding LLC Agreement (and including both economic and membership rights). |
| ***Reorganized PMC Holding*** | means PMC Holding or any successor thereto by merger, consolidation or otherwise, on or after the Effective Date, including by its conversion into a limited liability company in accordance with this Plan. |
| ***Reorganized PMCI Membership Interests*** | means the limited liability company membership interests (including both economic and membership rights) in Reorganized PMCI, which shall be governed by its respective Subsidiary LLC Agreement. |
| ***Reorganized PMCI*** | means PMCI or any successor thereto by merger, consolidation or otherwise, on or after the Effective Date, including by its conversion into a limited liability company in accordance with this Plan. |
| ***Reorganized Subsidiary Debtor*** | means any Subsidiary Debtor, or any successor thereto by merger, consolidation or otherwise, on or after the Effective Date, including in the case of any corporate Subsidiary Debtor, by its conversion into a limited liability company in accordance with this Plan. |
| ***Restructuring Support Agreement*** | means that certain Restructuring Support Agreement dated as of June 6, 2011, between PMC Holding, on behalf of itself and the other Debtors parties thereto, and the Restructuring Support Parties. |
| ***Restructuring Support Parties*** | means the holders of one hundred percent (100%) in aggregate principal amount of the Senior Secured Notes and the holders of more than eighty percent (80%) in aggregate principal amount of Senior Notes on the Petition |

19

|  | Date parties to the Restructuring Support Agreement. |
|---|---|
| *Schedule of Rejected Contracts and Leases* | means the schedule of executory contracts and unexpired leases to be rejected pursuant to this Plan to be filed in connection with the Plan Supplement, which schedule shall be in form and substance acceptable to the Debtors, the Restructuring Support Parties and the Creditors' Committee (in the exercise of the Creditors' Committee's reasonable discretion). |
| *Schedules* | means the schedules of assets and liabilities, statements of financial affairs, lists of holders of Claims and Equity Interests and related exhibits filed with the Court by each of the Debtors, including any amendments or supplements thereto. |
| *Securities Act* | means the Securities Act of 1933, as amended. |
| *Senior Notes* | means the $190,000,000 in aggregate principal amount outstanding of 10% Senior Notes due October 1, 2013 issued by PMCI (f/k/a The Restaurant Company) pursuant to the Senior Notes Indenture. |
| *Senior Notes Claims* | means any Claim of a holder of Senior Notes based on the Senior Notes. |
| *Senior Notes Indenture* | means the Indenture dated as of September 21, 2005 among PMCI (f/k/a The Restaurant Company), the other Subsidiary Debtors parties thereto, and the Senior Notes Trustee, as amended, restated, supplemented or otherwise modified from time to time. |
| *Senior Notes Trustee* | means Wilmington Trust Company, as successor indenture trustee, for the Senior Notes. |
| *Senior Secured Notes* | means the $103,063,000 in aggregate principal amount outstanding of 14% Senior Secured Notes due May 31, 2013, issued by PMCI pursuant to the Senior Secured Notes Indenture. |
| *Senior Secured Notes Claims* | means any Claim of a holder of Senior Secured Notes based on the Senior Secured Notes. |
| *Senior Secured Notes Collateral Agent* | means The Bank of New York Mellon, as Collateral Agent for the Senior Secured Notes. |
| *Senior Secured Notes Indenture* | means the Indenture dated as of September 24, 2008 among PMCI, PMC Holding, the other Subsidiary Debtors |

20

|  | party thereto, the Senior Secured Notes Trustee, and the Senior Secured Notes Collateral Agent, as amended, restated, supplemented or otherwise modified from time to time. |
|---|---|
| ***Senior Secured Notes Trustee*** | means The Bank of New York Mellon Trust Company, N.A., as indenture trustee for the Senior Secured Notes. |
| ***Specified General Unsecured Claims*** | means the Claims asserted in the Proofs of Claim listed on the schedule of Specified General Unsecured Claims, which schedule shall be filed as part of the Plan Supplement and acceptable to the Debtors, the Restructuring Support Parties and the Creditors' Committee. |
| ***Subordinated Claims*** | means any Claim that is subordinated by Final Order of the Court pursuant to section 510(b) or 510(c) of the Bankruptcy Code. |
| ***Subsidiary Debtors*** | means PMCI and each of the other Debtors, excluding PMC Holding. |
| ***Subsidiary LLC Agreements*** | means: (a) in the case of any Subsidiary Debtor that was a corporation prior to the Effective Date (other than MCID and Wilshire Beverage), a new limited liability company agreement (or operating agreement or company agreement, as applicable), to be dated as of the Effective Date, and which shall be included (in substantially final form) in the Plan Supplement and shall be in form and substance acceptable to the Restructuring Support Parties and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld); (b) in the case of any Subsidiary Debtor that was a limited liability company prior to the Effective Date, an amended and restated limited liability company agreement (or operating agreement or company agreement, as applicable), to be dated as of the Effective Date, and which shall be included (in substantially final form) in the Plan Supplement and shall be in form and substance acceptable to the Restructuring Support Parties in consultation with the Creditors' Committee; and (c) in the case of MCID and Wilshire Beverage, an amendment to their certificates of incorporation to be dated as of the Effective Date, and which shall be included (in substantially final form) in the Plan Supplement and shall be in form and substance acceptable to the Creditors' Committee in consultation |

21

with the Creditors' Committee.

| | |
|---|---|
| *Subsidiary Membership Interests* | means the limited liability company membership interests (including both economic and membership rights) in each of the Reorganized Subsidiary Debtors, other than MCID and Wilshire Beverage but including Reorganized PMCI, which shall be governed by their respective Subsidiary LLC Agreements. |
| *Unimpaired* | means, when used with reference to a Claim or Interest, a Claim or Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code. |
| *Wilshire* | means Wilshire Restaurant Group LLC. |
| *Wilshire Beverage* | means Wilshire Beverage, Inc. |

## B.    Interpretation, Application of Definitions and Rules of Construction.

Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter, such meanings to be applicable to both the singular and plural forms of the terms defined. Capitalized terms in this Plan that are not defined herein shall have the same meanings assigned to such terms by the Bankruptcy Code or Bankruptcy Rules, as the case may be. The words "herein," "hereof," and "hereunder" and other words of similar import refer to this Plan as a whole and not to any particular section or subsection in this Plan unless expressly provided otherwise. The words "includes" and "including" are not limiting and mean that the things specifically identified are set forth for purposes of illustration, clarity or specificity and do not in any respect qualify, characterize or limit the generality of the class within which such things are included. Captions and headings to Articles, Sections and exhibits to this Plan are inserted for convenience of reference only, are not a part of this Plan, and shall not be used to interpret this Plan. The rules of construction set forth in section 102 of the Bankruptcy Code shall apply to this Plan. In computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## II.

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

## A.    General Rules of Classification.

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of the Classes of Claims and Interests.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Priority Tax Claims, and DIP Financing Claims, as described below, have not been classified.  These Claims will be Unimpaired and,

22

therefore, will not be entitled to vote to accept or reject this Plan.  A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

As discussed in greater detail in Article VI hereof, this Plan is premised upon the limited consolidation of the Debtors for purposes of this Plan only and shall not affect the legal and corporate structures of the Debtors, subject to the rights of the Debtors to effectuate the restructuring transactions contemplated herein. Accordingly, for purposes of this Plan, the assets and liabilities of each of the Debtors are deemed assets and liabilities of a single, consolidated entity; provided, however, that if any Class of Impaired Claims votes to reject this Plan, the Debtors' ability to confirm this Plan with respect to such rejecting Class pursuant to the "cramdown" standards of section 1129(b) of the Bankruptcy Code will be determined by reference to the treatment to which the holders of Claims in such Class would be entitled were (i) their Claims limited to the specific Debtor(s) that are liable for such Claims, and (ii) the Debtors not treated as consolidated for distribution and confirmation purposes.  This limited consolidation treatment is designed to consensually pool the assets and liabilities of the Debtors solely to implement the settlements and compromises reached by the primary constituencies in the Chapter 11 Cases.

### B.   Classification of Claims and Interests.

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which of those Classes are (i) Impaired or Unimpaired under this Plan, (ii) entitled to vote to accept or reject this Plan, and (iii) deemed to either accept or reject this Plan. A Claim or Interest is designated in a particular Class only to the extent it falls within the description of that Class, and is classified in any other Class to the extent (if any) that a portion of such Claim or Interest falls within the description of such other Class.

| Class | Designation | Status | Entitled to Vote |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| 3 | Senior Secured Notes Claims | Impaired | Yes |
| 4 | Senior Notes Claims | Impaired | Yes |
| 5 | General Unsecured Claims | Impaired | Yes |
| 6 | Convenience Claims | Unimpaired | No (deemed to accept) |
| 7 | Intercompany Claims | Unimpaired | No (deemed to accept) |
| 8 | Subordinated Claims | Impaired | No (deemed to reject) |
| 9A | Equity Interests in PMC Holding and PMCI | Impaired | No (deemed to reject) |
| 9B | Equity Interests in the Other Subsidiary Debtors | Unimpaired | No (deemed to accept) |

23

**III.**

**TREATMENT OF ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, PRIORITY TAX CLAIMS AND DIP FINANCING CLAIMS**

A.    **Administrative Claims.**

Each holder of an Allowed Administrative Claim (other than Professional Fee Claims and DIP Financing Claims) shall receive from the Debtors (a) Cash in an amount equal to the amount of such Allowed Administrative Claim on the later of the (i) Effective Date and (ii) the date such Administrative Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable, or (b) such other treatment as the Debtors and such holder shall have agreed upon in writing; provided, however, that Allowed Ordinary Course Administrative Claims shall be paid in full in the ordinary course of business of the Reorganized Debtors consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions; provided, further, that in no event shall a post-Petition Date obligation that is contingent or disputed and subject to liquidation through pending or prospective litigation, including alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law, secondary payor liability, or any other disputed legal or equitable claim based on tort, statute, contract, equity, or common law, be considered to be an obligation which is payable in the ordinary course of business.

B.    **Bar Date for Administrative Claims.**

Unless a prior date has been established pursuant to the Bankruptcy Code, the Bankruptcy Rules or a prior order of the Court, the Confirmation Order will establish a bar date for filing notices, requests, Proofs of Claim, applications or motions for allowance of Administrative Claims (other than Professional Fee Claims, Ordinary Course Administrative Claims, DIP Financing Claims of the DIP Administrative Agent and the DIP Lenders, the post-Petition Date fees and expenses of the Restructuring Support Parties, the Senior Secured Notes Trustee, the Senior Secured Notes Collateral Agent and the Senior Notes Trustee), which date shall be the Administrative Claims Bar Date.  Holders of Administrative Claims not paid prior to the Confirmation Date shall file with the Court and serve upon the Debtors or Reorganized Debtors, as applicable, a motion requesting payment of such Administrative Claim on or before the Administrative Claims Bar Date or forever be barred from doing so. The notice of entry of the Confirmation Order to be delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) will set forth the Administrative Claims Bar Date and constitute good and sufficient notice of the Administrative Claims Bar Date. The Reorganized Debtors shall have thirty (30) days (or such longer period as may be allowed by Final Order of the Court, which may be entered without notice or a hearing) following the Administrative Claims Bar Date to review and object to all Administrative Claims (other than those listed in the parenthetical above).

24

**C.      Professional Fee Claims.**

All requests for compensation or reimbursement of Professional Fee Claims pursuant to sections 327, 328, 330, 331, 503 or 1103 of the Bankruptcy Code for services rendered prior to the Effective Date shall be filed and served on the Reorganized Debtors, counsel to the Reorganized Debtors, the United States Trustee, counsel to the Restructuring Support Parties and counsel to the Creditors' Committee and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Court, no later than thirty (30) days after the Effective Date. Holders of Professional Fee Claims that are required to file and serve applications for final allowance of their Professional Fee Claims and that do not file and serve such applications by the required deadline shall be forever barred from asserting such Claims against the Debtors, the Reorganized Debtors or their respective properties, and such Professional Fee Claims shall be deemed discharged as of the Effective Date. Objections to any Professional Fee Claims must be filed and served no later than twenty (20) days following the filing with the Court of any request for compensation or reimbursement of Professional Fee Claims. Objections must be served on the Reorganized Debtors, counsel for the Reorganized Debtors, counsel to the Restructuring Support Parties, counsel to the Creditors' Committee and the holders of Professional Fee Claims requesting payment no later than fifty (50) days after the Effective Date.

**D.      Priority Tax Claims.**

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Debtors (with the consent of the Restructuring Support Parties and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld)) or the Reorganized Debtors, (a) Cash in an amount equal to such Allowed Priority Tax Claim on the later of (i) the Effective Date and (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or (b) treatment in any other manner such that its Allowed Priority Tax Claim shall not be Impaired, including equal annual installment payments in Cash of an aggregate value, as of the Effective Date, equal to the Allowed amount of such Claim, over a period ending not later than five (5) years after the Petition Date.

**E.      DIP Financing Claims.**

The DIP Financing Claims shall be allowed in an amount equal to the sum of all amounts outstanding under the DIP Credit Agreement as of the Effective Date.  On or as soon as reasonably practicable after the Effective Date, each holder of an Allowed DIP Financing Claim shall receive payment in full in Cash of all debts, Claims, liabilities and obligations calculated in accordance with the DIP Credit Agreement, except to the extent that the holders of DIP Financing Claims agree to a different treatment.

25

## IV.

## TREATMENT OF CLASSIFIED CLAIMS AND
## EQUITY INTERESTS

A.      **Class 1 — Other Priority Claims.**

1.      **Classification.**  Class 1 consists of all Other Priority Claims.

2.      **Treatment.**  Except to the extent that a holder of an Allowed Other Priority Claim (i) has been paid in full by the Debtors, prior to the Effective Date or (ii) agrees to a less favorable treatment with the Debtors (with the consent of the Restructuring Support Parties and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld)), if the Claim is greater than $25,000) or the Reorganized Debtors, each holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of and in exchange for such Other Priority Claim, Cash in the full amount of such Allowed Other Priority Claim, on or as soon as practicable after the later of (a) the Effective Date and (b) the date when such Other Priority Claim becomes Allowed.

3.      **Impairment and Voting.**  Class 1 is Unimpaired under this Plan.  Holders of Allowed Other Priority Claims in Class 1 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject this Plan.

B.      **Class 2 — Other Secured Claims.**

1.      **Classification.**  Class 2 consists of all Other Secured Claims.

2.      **Treatment.**

Except to the extent that a holder of an Allowed Other Secured Claim shall have agreed in writing to a less favorable treatment, at the option of the Debtors (with the consent of the Restructuring Support Parties and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld)) or the Reorganized Debtors, in full and final satisfaction of such Claim, (i) such holder's Allowed Other Secured Claim shall be reinstated and Unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, (ii) such holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code or (iii) such holder of an Allowed Other Secured Claim shall receive the Collateral securing its Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on or as soon as practicable after the later of (a) the Effective Date and (b) the date when such Other Secured Claim becomes Allowed.

26

Notwithstanding the foregoing, to the extent any Allowed Other Secured Claim arises on account of property taxes, such Allowed Other Secured Claim shall be treated as a Priority Tax Claim, and any applicable Liens shall remain Unimpaired until such Allowed Other Secured Claim is paid in full. Any applicable interest in respect of such Allowed Other Secured Claim shall be calculated in a manner consistent with section 511 of the Bankruptcy Code.

3.    **Impairment and Voting.**  Class 2 is Unimpaired under this Plan.  Holders of Allowed Other Secured Claims in Class 2 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject this Plan.

C.    **Class 3 — Senior Secured Notes Claims.**

1.    **Classification.**  Class 3 consists of all Senior Secured Notes Claims.

2.    **Allowance.**  The Senior Secured Notes Claims shall be Allowed and deemed to be Allowed in the amount of (i) $103,063,000 on account of the aggregate outstanding principal amount of the Senior Secured Notes plus (ii) accrued and unpaid interest thereon at the applicable contract rate, if any, as of the Effective Date.

3.    **Treatment.**  On or as soon as reasonably practicable after the Effective Date, the Senior Secured Notes shall be cancelled and, in full and final satisfaction of and in exchange for all Allowed Senior Secured Notes Claims, each holder of Senior Secured Notes shall receive (a) rights and obligations in respect of the New Secured Term Loans in a principal amount equal to the principal amount of such holder's Senior Secured Notes Claim and (b) Cash equal to the amount of any accrued and unpaid interest owed on account of its Senior Secured Notes Claim, if any, due as of the Effective Date.  The vote by the holders of the Senior Secured Notes to accept this Plan shall constitute such holders' consent to the Prepayment Premium Waiver; provided, however, that the Prepayment Premium Waiver shall be deemed null and void if the Effective Date of this Plan does not occur.

4.    **Impairment and Voting.**  Class 3 is Impaired under this Plan.  Holders of Allowed Senior Secured Notes Claims in Class 3 are entitled to vote to accept or reject this Plan.

D.    **Class 4 — Senior Notes Claims.**

1.    **Classification.**  Class 4 consists of all Senior Notes Claims.

2.    **Allowance.**  The Senior Notes Claims shall be Allowed and deemed to be Allowed in the amount of (i) $190,000,000 on account of the aggregate outstanding principal amount of the Senior Notes plus (ii) accrued and unpaid interest thereon at the applicable contract rate from October 1, 2010 to the Petition Date.

3.    **Treatment.**  On or as soon as reasonably practicable after the Effective Date, the Senior Notes shall be cancelled, and, in full and final satisfaction of and in exchange for all Allowed Senior Notes Claims, each holder of an Allowed Senior Notes Claim shall receive its Pro Rata percentage of the Reorganized PMC Holding Membership Interests (subject to dilution on account of Reorganized PMC Holding Membership Interests or other similar

27

Interests, if any, that may be issued from time to time pursuant to the Management Incentive Plan), with such Pro Rata percentage determined by dividing the Allowed amount of such holder's Senior Notes Claim by the total aggregate amount of all Allowed Senior Notes Claims and Allowed General Unsecured Claims that receive Reorganized PMC Holding Membership Interests under this Plan; provided, however, that any Cash Eligible Claimant holding an Allowed Senior Notes Claims may, in lieu of such Pro Rata percentage of Reorganized PMC Holding Membership Interests, make the Cash Election and receive Cash in an amount equal to (a) the lesser of (i) 14% of such holder's Allowed Senior Notes Claim or (ii) such holder's Pro Rata share of the Cash Cap Amount; plus (b) such holder's Pro Rata share of the Avoidance Action Recovery Pool.

4.      **Impairment and Voting.**  Class 4 is Impaired under this Plan.  Holders of Allowed Senior Notes Claims in Class 4 are entitled to vote to accept or reject this Plan.

### E.      <u>Class 5 — General Unsecured Claims</u>.

1.      **Classification.**  Class 5 consists of all General Unsecured Claims.

2.      **Treatment.**  On or as soon as reasonably practicable after the Effective Date, in full and final satisfaction of and in exchange for all Allowed General Unsecured Claims:

(a)      each holder of an Allowed General Unsecured Claim that is a Cash Eligible Claimant shall receive Cash in an amount equal to (a) the lesser of (i) 14% of the holder's Allowed General Unsecured Claim or (ii) such holder's Pro Rata share of the Cash Cap Amount; plus (b) such holder's Pro Rata share of the Avoidance Action Recovery Pool; provided, however, that such Cash Eligible Claimant may, in lieu of receiving Cash, make the Class 5 Equity Election and receive its Pro Rata share of Reorganized PMC Holding Membership Interests (subject to dilution on account of Reorganized PMC Holding Membership Interests or other similar Interests, if any, that may be issued from time to time pursuant to the Management Incentive Plan), with such Pro Rata percentage determined by dividing the Allowed amount of such holder's General Unsecured Claim by the total aggregate amount of all Allowed Senior Notes Claims and Allowed General Unsecured Claims that receive Reorganized PMC Holding Membership Interests under this Plan; and

(b)      each holder of an Allowed General Unsecured Claim that is not a Cash Eligible Claimant shall receive its Pro Rata percentage of the Reorganized PMC Holding Membership Interests (subject to dilution on account of Reorganized PMC Holding Membership Interests or other similar Interests, if any, that may be issued from time to time pursuant to the Management Incentive Plan), with such Pro Rata percentage determined by dividing the Allowed amount of such holder's General Unsecured Claim by the total aggregate amount of all Allowed Senior Notes Claims and Allowed General Unsecured Claims that receive Reorganized PMC Holding Membership Interests under this Plan.

3.      **Impairment and Voting.**  Class 5 is Impaired under this Plan.  Holders of Allowed General Unsecured Claims in Class 5 are entitled to vote to accept or reject this Plan.

**F.    Class 6 — Convenience Claims.**

1.    **Classification.**  Class 6 consists of all Convenience Claims.

2.    **Treatment.**  Each holder of an Allowed Convenience Claim shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such holder's Allowed Convenience Claim as soon as practicable after the later of (a) the Effective Date and (b) the date such Convenience Claim becomes Allowed.

3.    **Impairment and Voting.**  Class 6 Claims are Unimpaired under this Plan. Holders of Allowed Convenience Claims in Class 6 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject this Plan.

**G.    Class 7 — Intercompany Claims.**

1.    **Classification.**  Class 7 consists of all Intercompany Claims.

2.    **Treatment.**  On or as soon as reasonably practicable after the Effective Date, at the option of the Debtors (with the consent of the Restructuring Support Parties and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld)) or the Reorganized Debtors, each Allowed Intercompany Claim shall be either (i) reinstated and continued in full or in part, or (ii) eliminated in full or in part by offset, distribution, cancellation, assumption or contribution of such Intercompany Claim or otherwise to the extent determined by the applicable Debtor(s), subject to the consent of the Restructuring Support Parties and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld), or by the Reorganized Debtor(s).

3.    **Impairment and Voting.**  Class 7 is Unimpaired under this Plan.  Holders of Allowed Intercompany Claims in Class 7 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject this Plan.

**H.    Class 8 — Subordinated Claims.**

1.    **Classification.**  Class 8 consists of all Subordinated Claims.

2.    **Treatment.**  The holders of Subordinated Claims shall neither receive Distributions nor retain any property under this Plan for or on account of such Subordinated Claims.

3.    **Impairment and Voting.**  Class 8 is Impaired under this Plan.  Holders of Subordinated Claims are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject this Plan.

29

I.    **Class 9A — Equity Interests in PMC Holding and PMCI.**

1.    **Classification.**  Class 9A consists of all Equity Interests in PMC Holding and PMCI.

2.    **Treatment.**  The Equity Interests of PMC Holding and PMCI shall be discharged, cancelled, released, and extinguished as of the Effective Date and holders of Equity Interests in PMC Holding and PMCI shall neither receive any Distributions nor retain any property under this Plan for or on account of such Equity Interests.

3.    **Impairment and Voting.**  Class 9A is Impaired under this Plan. Holders of Equity Interests of PMC Holding and PMCI are presumed and deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject this Plan.

J.    **Class 9B — Equity Interests in the Other Subsidiary Debtors.**

1.    **Classification.**  Class 9B consists of all Equity Interests in the Other Subsidiary Debtors.

2.    **Distributions.**  On the Effective Date, the Equity Interests in the Other Subsidiary Debtors (as Reorganized Subsidiary Debtors, as applicable) shall remain effective and outstanding (in the form of corporate stock or Subsidiary Membership Interests, as applicable), and shall be owned and held by the same applicable Debtor (as a Reorganized Debtor) that had held and/or owned such Equity Interests prior to the Effective Date; provided, that, to the extent that a Reorganized Debtor (other than MCID and Wilshire Beverage) had been a corporation prior to its conversion into a limited liability company on the Effective Date in accordance with this Plan, the corporate stock held in such Debtor automatically upon such conversion is converted into a Subsidiary Membership Interest in such Reorganized Debtor.

3.    **Impairment and Voting.**  Class 9B is Unimpaired under this Plan. Holders of Equity Interests in the Other Subsidiary Debtors are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject this Plan.

V.

**PROVISIONS REGARDING CORPORATE GOVERNANCE OF
THE REORGANIZED DEBTORS**

A.    **Amendments to Corporate Formation and Governance Documents.**

1.    **Reorganized PMC Holding.**

On the Effective Date, PMC Holding shall convert to a Delaware limited liability company which shall be governed by the New Charter Document of Reorganized PMC Holding, and by the PMC Holding LLC Agreement, which PMC Holding LLC Agreement shall, among other things, (i) authorize the issuance of Reorganized PMC Holding Membership Interests and

30

(ii) prohibit the issuance of nonvoting equity interests, only so long as, and to the extent that, the issuance of nonvoting securities is prohibited.  The New Charter Document of Reorganized PMC Holding, and the PMC Holding LLC Agreement, shall be substantially in the form set forth in the Plan Supplement and which shall be on terms in all material respects consistent with the PMC Holding LLC Agreement Term Sheet attached hereto as Exhibit B.

2.      **Reorganized Subsidiary Debtors.**

On the Effective Date, each of the Reorganized Subsidiary Debtors that was not a limited liability company prior thereto (other than MCID and Wilshire Beverage) shall convert to a limited liability company in its respective state of incorporation, and thereupon shall be governed by its respective New Charter Documents and by its respective Subsidiary LLC Agreement.  On the Effective Date, each other Reorganized Subsidiary Debtor shall be governed by its respective New Charter Document and by its respective Subsidiary LLC Agreement.  Each of such Subsidiary LLC Agreements shall, among other things, (i) authorize the issuance of corporate stock or Subsidiary Membership Interests, as applicable, and (ii) prohibit the issuance of nonvoting equity interests, only so long as, and to the extent that, the issuance of nonvoting securities is prohibited.  The New Charter Documents of the Reorganized Subsidiary Debtors, and their respective Subsidiary LLC Agreements (as applicable), shall be substantially in the form set forth in the Plan Supplement.

3.      **Membership Interests to Be Issued Pursuant to this Plan**.

On the Effective Date, (i) Reorganized PMCI shall issue the Reorganized PMCI Membership Interests to Reorganized PMC Holding, and (ii) Reorganized PMC Holding shall issue the Reorganized PMC Holding Membership Interests to holders of Allowed Senior Notes Claims and Allowed General Unsecured Claims (to the extent that the holders of such Allowed Senior Notes Claims and Allowed General Unsecured Claims are receiving Reorganized PMC Holding Membership Interests pursuant to the Plan), the principal terms of which are described in the PMC Holding LLC Agreement.

B.      **New Charter Documents.**

On or immediately before the Effective Date, the Debtors, on behalf of the Reorganized Debtors, or the Reorganized Debtors will file their respective New Charter Documents (including, in the case of any Debtor being converted into a limited liability company, all other related conversion filings) with the applicable Secretaries of State and/or other applicable authorities in their respective states of formation in accordance with the limited liability company and corporate laws of the respective states of formation.  After the Effective Date, the Reorganized Debtors may amend, or amend and restate, their New Certificates of Formation and other constituent documents as permitted by the laws of their respective states of formation and their respective New Charter Documents and Subsidiary LLC Agreements (the PMC Holding LLC Agreement, in the case of Reorganized PMC Holding).

C.      **Appointment of Officers and Managers.**

Reorganized PMC Holding shall be a manager-managed limited liability company.  The initial board of managers of Reorganized PMC Holding shall be a seven-member

31

board comprised of seven (7) managers designated by the Restructuring Support Parties, (i) one of whom shall be the Chief Executive Officer of Reorganized PMC Holding and (ii) one of whom shall be selected by the Restructuring Support Parties and acceptable to the Creditors' Committee in the exercise of its reasonable discretion.  The initial officers of Reorganized PMC Holding shall be designated by the Restructuring Support Parties.

Reorganized PMCI and each other Reorganized Subsidiary Debtor that is a limited liability company shall be a manager-managed limited liability company.  The initial boards of managers or directors of each of the Reorganized Subsidiary Debtors shall have the same membership and composition as the board of managers for Reorganized PMC Holding or such other membership or composition as determined by the board of managers of Reorganized PMC Holding, provided that the board of managers or directors of any material Reorganized Subsidiary Debtor shall have the same membership and composition as the board of managers of Reorganized PMC Holding.  The initial officers of each of the Reorganized Subsidiary Debtors shall be determined in accordance with Article V.E. of this Plan.

The identities, affiliations and other information relating to the initial board members will be disclosed in the Plan Supplement and shall be acceptable to the Restructuring Support Parties.  The identity of the initial officers of each Reorganized Debtor will also be disclosed in the Plan Supplement and shall be acceptable to the Debtors, the Restructuring Support Parties and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld).  No individual shall be designated as a manager, director or officer who has not consented to serve in such respective capacity.  Any successors to the Reorganized Debtors' initial boards of managers or directors, and officers, will be appointed in compliance with the applicable Reorganized Debtor's governance documents. Each member of the boards of directors or boards of managers of the Debtors shall be deemed to have resigned on and as of the Effective Date, in each case without further notice to or order of the Court, act, or action under applicable law, resolution, order or rule of the vote, consent, or authority of any Debtor.

### D.    Powers of Officers.

The officers of the Debtors (with the consent of the Restructuring Support Parties) or the Reorganized Debtors, as applicable, shall have the power to (i) enter into, execute or deliver any documents or agreements that may be necessary and appropriate to implement and effectuate the terms of this Plan, and (ii) take any and all other actions that may be necessary and appropriate to effectuate the terms of this Plan, including the making of appropriate filings, applications or recordings, provided that such documents and agreements are in form and substance acceptable to the Restructuring Support Parties.

### E.    Management of Reorganized Debtors.

Subject to the consent of the Restructuring Support Parties in consultation with the Creditors' Committee, (i) the initial officers of the Reorganized Debtors shall be substantially the same as the officers of the Debtors on the Effective Date (except as provided in Article V.C. of this Plan, in the case of officers of Reorganized PMC Holding), and (ii) such officers shall serve in accordance with any employment agreement previously in effect with the Debtor or to

32

be entered into with the Reorganized Debtors as well as in accordance with applicable nonbankruptcy law. The Debtors will disclose the terms of such employment agreements in the Plan Supplement.

### F.       **Management Incentive Plan.**

As soon as reasonably practicable after the Effective Date, the board of managers of Reorganized PMC Holding will adopt and implement the Management Incentive Plan, which may provide for the issuance of Cash and equity incentive awards.  Specific awards shall be as determined by the board of managers of Reorganized PMC Holding (or, if applicable, a compensation committee established by such board of managers) from time to time.  Issuances of Reorganized PMC Holding Membership Interests (or other types of equity interests, if any) made under the Management Incentive Plan will dilute the interests of the holders of Reorganized PMC Holding Membership Interests issued by Reorganized PMC Holding; provided, however, that no more than ten percent (10%) of Reorganized PMC Holding Membership Interests or similar equity interests will be issued in the aggregate pursuant to the Management Incentive Plan.  In connection with any such issuances (or exercises, in the case of options and warrants), the Reorganized Debtors may take whatever actions they may determine to be necessary or appropriate to comply with applicable federal, state, local and international tax withholding obligations (including withholding from distributions a portion of the Reorganized PMC Holding Membership Interests and selling such securities to satisfy tax withholding obligations including income, social security and Medicare taxes).

### G.       **PMC Holding LLC Agreement.**

On the Effective Date, the PMC Holding LLC Agreement, which shall be on terms in all material respects consistent with the PMC Holding LLC Agreement Term Sheet attached hereto as Exhibit B, will be adopted by Reorganized PMC Holding and will be binding upon all holders of Reorganized PMC Holding Membership Interests, and their respective successors and assigns, in each case, whether or not any such holder (or successor or assign) shall have executed and delivered a counterpart to the PMC Holding LLC Agreement agreeing to be bound thereby, and also whether or not any certificate evidencing the Reorganized PMC Holding Membership Interests (or, if interests are uncertificated, any ledger or book entry) shall have been legended to reflect the existence of the PMC Holding LLC Agreement. The PMC Holding LLC Agreement will, among other things, (i) govern the access that each holder of Reorganized PMC Holding Membership Interests will have to information with respect to Reorganized PMC Holding, (ii) govern the ability to transfer such holder's Reorganized PMC Holding Membership Interests, (iii) provide for a right of first refusal for the majority holders of the Reorganized PMC Holding Membership Interests, (iv) provide for customary drag-along and tag-along rights, and (v) unless and until the board of managers of Reorganized PMC Holding shall determine otherwise in accordance with the PMC Holding LLC Agreement, Reorganized PMC Holding Membership Interests will be uncertificated.  The PMC Holding LLC Agreement will take effect on the Effective Date.  Notwithstanding the foregoing, all holders of Senior Notes Claims and General Unsecured Claims that are to receive Reorganized PMC Holding Membership Interests pursuant to this Plan shall be required to execute a counterpart signature page (or comparable joinder), in the discretion of the board of managers of Reorganized PMC Holding, as a condition precedent to receiving their respective allocation of Reorganized PMC

Holding Membership Interests; and the failure of any such holder to deliver such executed counterpart (or joinder) within the time frame specified in Article VII.B. of this Plan shall have the effects set forth in that Article VII.B.

## VI.

## LIMITED CONSOLIDATION FOR VOTING, CONFIRMATION, AND DISTRIBUTION PURPOSES

Solely for purposes of voting on, confirmation of, and Distributions to be made to holders of Allowed Claims under this Plan, this Plan is predicated upon, and it is a condition precedent to confirmation of this Plan, that the Court provide in the Confirmation Order for the limited consolidation of the Estates of the Debtors into a single Estate for purposes of this Plan, the confirmation hereof and Distributions hereunder.

Pursuant to the Confirmation Order (i) all assets and liabilities of the consolidated Debtors will be deemed to be merged solely for purposes of this Plan, the confirmation hereof and Distributions to be made hereunder, (ii) the obligations of each Debtor will be deemed to be the obligation of the consolidated Debtors solely for purposes of this Plan, the confirmation hereof and Distributions hereunder, (iii) any Claims filed or to be filed in connection with any such obligations will be deemed Claims against the consolidated Debtors, (iv) each Claim filed in the Chapter 11 Case of any Debtor will be deemed filed against the Debtors in the consolidated Chapter 11 Cases in accordance with the limited consolidation of the assets and liabilities of the Debtors, (v) all transfers, disbursements and Distributions made by any Debtor hereunder will be deemed to be made by the consolidated Debtors, and (vi) all guarantees of the Debtors of the obligations of any other Debtors shall be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors. Holders of Allowed Claims in each Class shall be entitled to their share of assets available for Distribution to such Class without regard to which Debtor was originally liable for such Claim. Intercompany Claims shall be treated as provided in Class 7 of this Plan and Equity Interests in the Other Subsidiary Debtors shall be treated as provided in Class 9B of this Plan.

Notwithstanding the foregoing, such limited consolidation shall not affect (a) the legal and corporate structure of the Reorganized Debtors, (b) any obligations under any contracts or leases that were entered into during the Chapter 11 Cases or executory contracts or unexpired leases that have been or will be assumed pursuant to this Plan, (c) distributions from any insurance policies or proceeds of such policies, (d) the revesting of assets in the separate Reorganized Debtors pursuant to Article IX.B of this Plan, or (e) guarantees that are required to be maintained post-Effective Date (i) in connection with executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been, or will hereunder be, assumed, (ii) pursuant to the express terms of this Plan, (iii) in connection with the First Lien Exit Facility, or (iv) in connection with the New Secured Term Loans. The limited consolidation proposed herein shall not affect each Debtor's obligation to file the necessary operating reports and pay any required fees pursuant to 28 U.S.C. § 1930(a)(6). Such obligations shall continue until a Final Order is entered closing, dismissing or converting each such Debtor's Chapter 11 Case.

34

## VII.

## PROVISIONS REGARDING MEANS OF IMPLEMENTATION, VOTING, DISTRIBUTIONS, AND RESOLUTION OF DISPUTED CLAIMS

A.      **Exit Financing.**

The Exit Financing shall consist of the First Lien Exit Facility and the New Secured Term Loans to be made or deemed to be made under the New Secured Term Loan Agreement.  The Cash advanced under the First Lien Exit Facility and the Cash advanced under the New Secured Term Loan Agreement shall be used to make required Distributions under this Plan, satisfy certain Plan-related expenses and fund the Reorganized Debtors' working capital needs.

1.      **First Lien Exit Facility**

On the Effective Date, the Reorganized Debtors shall enter into the First Lien Exit Facility.  The terms and conditions of the First Lien Exit Facility shall be substantially in the form set forth in the Plan Supplement.

2.      **New Secured Term Loans**

The incurrence of obligations under the New Secured Term Loans by the Reorganized Debtors is authorized without need for any further corporate action or without any further action.  On the Effective Date, the Reorganized Debtors, the New Secured Term Loan Agent and the New Secured Term Loan Lenders shall be deemed to have executed the New Secured Term Loan Agreement and shall be bound by the terms thereof.

B.      **Issuance of Reorganized PMC Holding Membership Interests.**

The issuance of Reorganized PMC Holding Membership Interests (including any Reorganized PMC Holding Membership Interests, options or other equity awards reserved for the Management Incentive Plan) by Reorganized PMC Holding is authorized without the need for any further corporate action (except in the case of the Management Incentive Plan, which must be adopted by the board of managers of Reorganized PMC Holding; and issuances under which shall be as determined from time to time by the board of managers of Reorganized PMC Holding or by any compensation committee thereof) or without any further action by a holder of Claims or Interests. On the Effective Date (or as soon as reasonably practicable thereafter), the Reorganized PMC Holding Membership Interests shall be issued, subject to the provisions of this Plan, to (i) the Senior Notes Trustee, for the benefit of holders of Allowed Senior Notes Claims who are receiving Reorganized PMC Holding Membership Interests pursuant to the Plan and (ii) the holders of Allowed General Unsecured Claims who are receiving Reorganized PMC Holding Membership Interests pursuant to the Plan. The amount of the Reorganized PMC Holding Membership Interests to be issued pursuant to this Plan shall be disclosed in the Plan Supplement.

All of the Reorganized PMC Holding Membership Interests issued pursuant to this Plan shall be duly authorized and validly issued.  Each Distribution and issuance referred to

35

in this Article VII shall be governed by the terms and conditions set forth herein applicable to such Distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such Distribution or issuance, including the PMC Holding LLC Agreement, which terms and conditions shall bind each Person receiving such Distribution or issuance.  Unless and until changed by the board of managers of Reorganized PMC Holding in accordance with the PMC Holding LLC Agreement, Reorganized PMC Holding Membership Interests shall be uncertificated.

Upon the Effective Date, the PMC Holding LLC Agreement shall be deemed to become valid, binding and enforceable in accordance with its terms, and each holder of Reorganized PMC Holding Membership Interests shall be bound thereby, in each case, without need for execution by any party thereto other than Reorganized PMC Holding; provided, however, any holder of Senior Notes Claims or Allowed General Unsecured Claims who has received Reorganized PMC Holding Membership Interests pursuant to the Plan that fails to register its Reorganized PMC Holding Membership Interests with the Reorganized Debtors or such transfer agent as may be designated by the Debtors (with the consent of the Restructuring Support Parties), and execute a counterpart signature page (or other joinder, approved by the board of managers of Reorganized PMC Holding) to the PMC Holding LLC Agreement, and to provide applicable information required to be collected by the Internal Revenue Service in respect of pass-through entities, by the later of (i) the one year anniversary of the Effective Date or (ii) 60 days after the allowance by Final Order of such holder's Senior Notes Claim or General Unsecured Claim, shall be deemed to have forever forfeited its right to receive Reorganized PMC Holding Membership Interests on account of its Claim.

The Reorganized Debtors will provide written notification, on not less than a quarterly basis, of the requirement to execute a counterpart signature page to the PMC Holding LLC Agreement to (i) the Senior Notes Trustee for distribution to holders of Allowed Senior Notes Claims who are receiving Reorganized PMC Holding Membership Interests pursuant to the Plan and (ii) holders of Allowed General Unsecured Claims who are receiving the Reorganized PMC Holding Membership Interests pursuant to the Plan, and in the event that the Reorganized Debtors fail to provide such notice in a particular quarter, the one year time period shall be extended for an additional quarter year for each quarter for which such failure to provide such notice occurs.

C.    **New Intercreditor Agreement.**

Upon the Effective Date, the New Intercreditor Agreement shall be deemed to become valid, binding and enforceable in accordance with its terms, and each lender and agent under the New Secured Term Loan Agreement and the First Lien Exit Facility shall be bound thereby.

D.    **Avoidance Actions.**

On the Effective Date, the Claims Administrator shall be granted standing to investigate and prosecute the Assigned Avoidance Actions, co-extensive with the Reorganized Debtors' standing to investigate and prosecute such actions.  The Claims Administrator shall cooperate, and coordinate, with the Reorganized Debtors regarding the pursuit of such Assigned

36

Avoidance Actions and strategy related thereto, and the Assigned Avoidance Actions may be settled or otherwise resolved only with the consent of the Reorganized Debtors and the Claims Administrator, which consent shall not be unreasonably withheld.  Any proceeds recovered on account of the Assigned Avoidance Actions shall be retained by the Reorganized Debtors other than the Avoidance Action Recovery Pool.

Nothing contained in this Article VII.D shall affect the Reorganized Debtors' rights to pursue the Assigned Avoidance Actions to the extent not otherwise being pursued by the Claims Administrator.  All other Avoidance Actions shall be retained by the Reorganized Debtors; provided, however, that the Claims Administrator shall have consent rights (not to be unreasonably withheld) over the settlement or other resolution of any such Avoidance Actions.

E.      **Restructuring Transactions.**

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan, including: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion (including related formation), disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of this Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of this Plan and having other terms to which the applicable parties may agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion (including related formation) or dissolution pursuant to applicable state law; and (iv) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law. Among other things, the restructuring transactions shall include, without limitation: (a) on the Effective Date (i) the discharge cancellation, release, and extinguishment of the Equity Interests of PMC Holding and PMCI and (ii) the issuance of the Reorganized PMCI Membership Interests from Reorganized PMCI to Reorganized PMC Holding; and (b) from and after the Effective Date, Reorganized PMCI shall pay when due (and shall indemnify and hold harmless P&MC (and the other members of any consolidated group or affiliated group of which it is a member (collectively, "*P&MC Group*")) from and against any and all Applicable Tax Liabilities of P&MC Group, and neither Reorganized PMCI nor any of the other Reorganized Debtors will assert any actual or potential claims they may have against P&MC Group (for reimbursement, restitution or contribution, or by way of subrogation, or otherwise) with respect to the payment of such Applicable Tax Liabilities. For purposes of the foregoing "*Applicable Tax Liabilities*" shall include: (x) corporate income and income-based franchise tax liabilities of the Debtors (or, if applicable, Reorganized Debtors) attributable to their operations on or prior to the Effective Date (including operations on or prior to the Petition Date); plus (y) tax liabilities of P&MC Group attributable to the restructuring transactions provided for pursuant to the Plan, in each case (net of any losses or credits available to P&MC Group), less (z) any tax refunds subsequently received by P&MC Group with respect to the tax liabilities described in clause (x) and (y) which are paid by Reorganized PMCI. Any such tax refunds received by P&MC Group shall be held by P&MC Group in trust for Reorganized

37

PMCI. Nothing herein shall affect the right of Reorganized PMCI (or any other Reorganized Debtor) to the refund of any amounts previously paid by PMCI or any other Debtor and the Reorganized Debtors reserve all rights with respect to any and all such refunds.

### F.  **Corporate Action.**

Upon the Effective Date, all corporate actions contemplated by this Plan shall be deemed authorized and approved in all respects, including (i) the transactions contemplated by Article VII.D. hereof, (ii) the adoption of the PMC Holding LLC Agreement and the Subsidiary LLC Agreements, (iii) the conversion of each of the Reorganized Debtors that is not a limited liability company  (other than MCID and Wilshire Beverage) to a limited liability company, (iv) the filing of New Charter Documents, (v) the initial selection of managers, directors and officers for the Reorganized Debtors, (vi) the Distribution of Reorganized PMC Holding Membership Interests, New Secured Term Loans, and Cash pursuant to this Plan, (vii) the execution and entry into the New Secured Term Loan Agreement, (viii) the execution and entry into the First Lien Exit Facility, and (ix) all other actions contemplated by this Plan (whether to occur before, on, or after the Effective Date), in each case unless otherwise provided in this Plan.  All matters provided for under this Plan involving the corporate structure of the Debtors and Reorganized Debtors or corporate action to be taken by or required of a Debtor or a Reorganized Debtor will be deemed to occur and be effective as of the Effective Date, if no such other date is specified in such documents, and shall be authorized, approved, adopted and, to the extent taken prior to the Effective Date, ratified and confirmed in all respects and for all purposes without any requirement of further action by holders of Claims or Interests, directors or managers of the Debtors or the Reorganized Debtors, as applicable, or any other Person, except for applicable filings necessary to convert corporate Debtors into limited liability companies in accordance with the Plan, and to effect the filing of the New Charter Documents respecting the Debtors.

### G.  **Effectuating Documents; Further Transactions.**

On and after the Effective Date, the Reorganized Debtors and the officers and members of the boards of managers or the board of directors thereof, are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan and the securities issued pursuant to this Plan in the name of and on behalf of the Reorganized Debtors, without need for any approvals, authorization, or consents except for those expressly required pursuant to this Plan and applicable non-bankruptcy law.

### H.  **Cancellation of Securities and Agreements.**

On the Effective Date, except as otherwise specifically provided for in this Plan: (1) the obligations of the Debtors under the Pre-Petition Secured Credit Facility, the Senior Secured Notes Indenture, the Senior Notes Indenture and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Equity Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically

reinstated pursuant to this Plan), shall be cancelled solely as to the Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the membership interests, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically reinstated pursuant to this Plan) shall be released and discharged; provided, however, notwithstanding confirmation of this Plan or the occurrence of the Effective Date, any agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of allowing holders to receive Distributions under this Plan as provided herein; provided, further, notwithstanding confirmation of this Plan or the occurrence of the Effective Date, the Senior Secured Notes Indenture and the Senior Notes Indenture shall continue in effect solely for the purposes of: (1) allowing holders of the Senior Secured Notes Claims and the Senior Notes Claims to receive Distributions under this Plan; and (2) allowing and preserving the rights of the Senior Secured Notes Trustee and the Senior Notes Trustee to (a) make Distributions in satisfaction of the applicable Senior Secured Notes Claims and Senior Notes Claims, (b) exercise its charging lien against any such Distributions, and (c) seek compensation and reimbursement for any fees and expenses incurred in making Distributions; provided, further, however, that the preceding proviso shall not affect the discharge of Claims or Equity Interests pursuant to the Bankruptcy Code, the Confirmation Order or this Plan, or result in any expense or liability to the Reorganized Debtors.

I.   **Voting of Claims.**

Each holder of an Allowed Claim in an Impaired Class of Claims shall be entitled to vote to accept or reject this Plan as provided in such Final Order as may be entered by the Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject this Plan, or any other order or orders of the Court.

J.   **Nonconsensual Confirmation.**

If less than all Impaired Classes accept this Plan, but at least one (1) Class of Claims Impaired under this Plan has accepted this Plan (and which Class's acceptance is determined without inclusion of Claims of Insiders), the Debtors may seek to have the Court confirm this Plan under section 1129(b) of the Bankruptcy Code.

K.   **Distributions in Respect of Allowed Claims.**

(a)   *Record Date for Distributions*. As of the close of business on the Record Date, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes made to reflect any new record holders of any Claims or Equity Interests occurring on or after the Record Date. The Debtors and the Reorganized Debtors shall have no obligation to recognize any transfer of any Claims or Equity Interests occurring after the Record Date.

(b)      *Date of Distributions.*  Except as otherwise provided herein, Distributions and deliveries under this Plan with respect to Allowed Claims shall be made before the close of business on or as soon as reasonably practicable after the Effective Date.  In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

(c)      *Disbursing Agent.*  Except as otherwise provided herein, all Distributions under this Plan shall be made by the Reorganized Debtors as Disbursing Agent or such other entity (as defined in section 101(15) of the Bankruptcy Code) designated by the Reorganized Debtors to assist the Disbursing Agent on the Effective Date.  If the Disbursing Agent is an independent third party designated by the Reorganized Debtors to serve in such capacity, such Disbursing Agent shall receive, without further Court approval, reasonable compensation for distribution services rendered pursuant to this Plan and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services from the Reorganized Debtors on terms acceptable to the Reorganized Debtors.  No Disbursing Agent shall be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Court.  If otherwise so ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

(d)      *Powers of Disbursing Agent.*  The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (ii) make all Distributions contemplated hereby, and (iii) exercise such other powers as may be vested in the Disbursing Agent by Final Order of the Court or pursuant to this Plan.

(e)      *Delivery of Distributions*.

Except as otherwise provided herein, the Disbursing Agent shall make Distributions to holders of Allowed Claims at the address for each holder indicated on the Debtors' records as of the date of any such Distribution unless such addresses are superseded by Proofs of Claim or transfers of Claim filed pursuant to Bankruptcy Rule 3001 by the Record Date.  If any Distribution to a holder of a Claim is returned as undeliverable, no further Distributions shall be made unless and until the Disbursing Agent is notified of the then-current address of such holder of the Claim, at which time all missed distributions shall be made to such holder of the Claim without interest.  Amounts in respect of undeliverable distributions shall be returned to the Reorganized Debtors until such Distributions are claimed.  The Reorganized Debtors shall make reasonable efforts to locate holders of undeliverable Distributions.

Except as otherwise provided herein, all Distributions to holders of DIP Financing Claims shall be governed by the DIP Credit Facility, and shall be deemed completed when made to the DIP Administrative Agent, who shall in turn make distributions in accordance with the DIP Credit Facility, for further Distribution to the holders of DIP Financing Claims.

Except as otherwise provided herein, all Distributions to holders of Senior Secured Notes Claims and Senior Notes Claims shall be governed by the Senior Secured Notes

Indenture and the Senior Notes Indenture, respectively, and shall be deemed completed when made to the Senior Secured Notes Trustee and the Senior Notes Trustee, respectively, who shall in turn make Distributions in accordance with the Senior Secured Notes Indenture and Senior Notes Indenture, as applicable, for further distribution to holders of Senior Secured Notes Claims and Senior Notes Claims.

(f)      *Distribution of Cash.*  Any payment of Cash by the Reorganized Debtors pursuant to this Plan shall be made at the option and in the sole discretion of the Reorganized Debtors by (i) a check drawn on, or (ii) wire transfer from, a U.S. domestic bank selected by the Reorganized Debtors.

(g)      *Unclaimed Distributions*.  Any Distribution under this Plan that is unclaimed six (6) months after the Disbursing Agent has delivered (or has attempted to deliver) such Distribution shall become the property of the Reorganized Debtor against which such Claim was Allowed notwithstanding any federal or state escheat, abandoned or unclaimed property laws to the contrary, and the entitlement by the holder of such unclaimed Allowed Claim to such Distribution or any subsequent Distribution on account of such Allowed Claim shall be discharged and forever barred.  In the case of any unclaimed Distributions of Reorganized PMC Holding Membership Interests that remain unclaimed for six (6) months after the Disbursing Agent has delivered (or attempted to deliver) such Distribution, such unclaimed Reorganized PMC Holding Membership Interests shall be forfeited, and the holder of the Allowed Claim otherwise entitled to receive such Reorganized PMC Holding Membership Interests shall have forever forfeited its right to receive any recovery or Distribution under the Plan on account of its Allowed Claim.

(h)      *Fractional Reorganized PMC Holding Membership Interests and De Minimis Distributions*.  Notwithstanding any other provision in this Plan to the contrary, no fractional units of Reorganized PMC Holding Membership Interests shall be issued or distributed pursuant to this Plan. Whenever any payment of a fraction of a unit of Reorganized PMC Holding Membership Interests would otherwise be required under this Plan, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole share (up or down), with half Interests or less being rounded down and fractions in excess of a half of an Interest being rounded up. Any holder whose Claim has been so rounded down shall not be entitled to receive any compensation whatsoever on account of such reduction. If two or more holders are entitled to equal fractional entitlements and the number of holders so entitled exceeds the number of whole Interests, as the case may be, which remain to be allocated, the Reorganized Debtors shall allocate the remaining whole units to such holders by random lot or such other impartial method as the Reorganized Debtors deem fair, in the their sole discretion. Upon the allocation of all of the whole Reorganized PMC Holding Membership Interests authorized under this Plan, all remaining fractional portions of the entitlements shall be canceled and shall be of no further force and effect.

The Debtors (with the consent of the Restructuring Support Parties) or the Reorganized Debtors, as the case may be, shall not be required to, but may in their discretion, make distributions to any holder of a Claim of Cash in an amount less than twenty-five dollars ($25).  In addition, the Debtors (with the consent of the Restructuring Support Parties) and the Reorganized Debtors shall not be required to, but may in their discretion, make any payment on

41

account of any Claim in the event that the costs of making such payment exceeds the amount of such payment.

(i)      *Distributions for Claims Allowed as of the Effective Date*.  Unless otherwise provided in this Plan, on the Effective Date the Reorganized Debtors shall distribute Cash, Reorganized PMC Holding Membership Interests, rights and obligations in respect of the New Secured Term Loans, or other appropriate consideration, as the case may be, to the holders of Allowed Claims as contemplated herein.

(j)      *Interest on Claims*.  Except as expressly provided for in this Plan, the Confirmation Order or any contract, instrument, release, settlement or other agreement entered into in connection with this Plan, or as required by applicable bankruptcy law, including sections 511 and 1129(a)(9)(C)-(D) of the Bankruptcy Code, post-Petition Date interest shall not be treated as accruing in respect of any Claim for purposes of determining the allowance of, and Distribution for or on account of, such Claim; provided, however, that post-Petition Date interest shall accrue on the principal amount of the Senior Secured Notes outstanding at the applicable contract rate set forth in the Senior Secured Notes and the Senior Secured Notes Indenture.

(k)      *Withholding and Reporting Requirements*.  In connection with this Plan and all instruments issued in connection therewith, the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Distributions under this Plan shall be subject to any such withholding or reporting requirements.

(l)      *Setoffs*.  The Debtors (with the consent of the Restructuring Support Parties), the Reorganized Debtors and the Claims Administrator, as applicable, may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which Distribution shall be made), any claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim the Debtors or the Reorganized Debtors may have against the holder of such Claim.  Nothing in this Plan shall be deemed to expand rights to setoff under applicable non-bankruptcy law.  Notwithstanding the foregoing, the Reorganized Debtors shall be deemed to waive and shall have no right to setoff or recoupment against the holders of Senior Secured Notes Claims or Senior Notes Claims.

(m)      *Allocation of Consideration*. To the extent that any Allowed Claim entitled to a Distribution under this Plan is comprised of indebtedness and, accrued but unpaid interest thereon, the consideration distributed to the holder of such Allowed Claim shall be treated as first satisfying the principal amount of such Claim (as determined for federal income tax purposes), and any remaining consideration shall be treated as satisfying accrued but unpaid interest.

42

### L.    **Resolution of Disputed Claims.**

#### 1.    **Objections to Claims.**

Prior to the Effective Date, the Debtors (with the consent of the Restructuring Support Parties, as to any claims in excess of $25,000) shall have the right and authority to file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan.  Unless otherwise ordered by the Court, objections to, or other proceedings concerning the allowance of Claims shall be filed and served upon the holders of such Claims as to which the objection is made, or otherwise commenced, as the case may be, as soon as practicable, but in no event later than the Claims Objection Deadline. Objections to Professional Fee Claims shall be filed and served in accordance with Article III.C.

From and after the Effective Date, the Reorganized Debtors shall have the right to object to any and all Claims and shall provide periodic updates to the Claims Administrator on the claims reconciliation process.  To the extent the Reorganized Debtors opt not to object to certain General Unsecured Claims, the Claims Administrator may, with the consent of the Reorganized Debtors not to be unreasonably withheld, object to any such General Unsecured Claims; provided, however, that the Claims Administrator must demonstrate to the Reorganized Debtors that the prosecution of the objection to any such General Unsecured Claim is reasonably likely to result in a benefit (net of costs and expenses) to the Cash recoveries of those holders of Allowed Senior Notes Claims and Allowed General Unsecured Claims that are receiving Cash pursuant to the Plan; provided, further, however, that the Reorganized Debtors (i) shall have consent rights over any settlements of objections to any such General Unsecured Claims pursued by the Claims Administrator, which consent shall not be unreasonably withheld and (ii) shall reserve the right to enter into settlements of objections to any such General Unsecured Claims.

#### 2.    **Settlement of Claims.**

Notwithstanding the requirements that may be imposed pursuant to Bankruptcy Rule 9019, from and after the Effective Date, the Reorganized Debtors shall have the authority to settle or compromise any objections or proceedings relating to the allowance of Claims as and to the extent deemed prudent and reasonable without further review or approval of the Court; provided, however, that except as otherwise provided in Article VII.L.1 of this Plan, the Claims Administrator shall have consent rights over any settlement of objections to General Unsecured Claims to the extent that such General Unsecured Claim is (i) settled for an Allowed amount equal to or greater than $150,000, and (ii) such claimant is a Cash Eligible Claimant and has not made the Class 5 Equity Election.  Nothing in this Article VII.N shall be deemed to effect or modify the applicable Bar Dates previously established in the Chapter 11 Cases.

#### 3.    **No Distributions Pending Allowance.**

Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no payment or Distribution provided hereunder shall be made on account of the disputed portion of such Claim until the disputed portion of such Claim becomes an Allowed Claim.

4.     **Establishment of General Unsecured Claims Reserve.**

On the Effective Date or as soon as practicable thereafter, the Reorganized Debtors shall reserve, Cash from the Cash Cap Amount  and the Avoidance Action Recovery Pool and Reorganized PMC Holding Membership Interests (to the extent the holder of a Disputed General Unsecured Claim is to receive Reorganized PMC Holding Membership Interests or Cash) with an aggregate value equal to 100% of the Distributions of Cash or Reorganized PMC Holding Membership Interests to which holders of Disputed General Unsecured Claims would be entitled under this Plan as of such date as if the Disputed General Unsecured Claims were Allowed General Unsecured Claims either in the amounts of the Claims as filed or in such amounts as estimated by the Court (the "General Unsecured Claims Reserve"). Accordingly, until such time as all Disputed Claims are resolved, Pro Rata Distributions will be calculated taking into account all Disputed and Allowed Claims of the Class or Classes of Claims to which the pro ration applies.

5.     **Reorganized PMC Holding Membership Interests and Cash Held in General Unsecured Claims Reserve.**

Cash and Reorganized PMC Holding Membership Interests held in the General Unsecured Claims Reserve shall be held by the Reorganized Debtors in trust for the benefit of holders of Allowed General Unsecured Claims. Cash and Reorganized PMC Holding Membership Interests held in the General Unsecured Claims Reserve shall not constitute property of the Reorganized Debtors or any of them and no Reorganized PMC Holding Membership Interests held in the General Unsecured Claims Reserve shall have any voting rights unless and until such Interests are distributed in accordance herewith. The Reorganized Debtors shall pay, or cause to be paid, out of any dividends or distributions paid on account of Reorganized PMC Holding Membership Interests held in the General Unsecured Claims Reserve, any tax imposed on the General Unsecured Claims Reserve by any Governmental Unit with respect to income generated by Reorganized PMC Holding Membership Interests held in the General Unsecured Claims Reserve and any costs associated with maintaining the General Unsecured Claims Reserve. Any Reorganized PMC Holding Membership Interests held in the General Unsecured Claims Reserve after all General Unsecured Claims have been Allowed or disallowed, including any unclaimed Distributions forfeited in accordance with Article VII.J. hereof, shall be forfeited.

6.     **Distributions after Allowance.**

In the event that a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall distribute to the holder of such Claim such holder's Pro Rata portion of the property distributable with respect to the Class in which such Claim is classified herein.  To the extent that all or a portion of a Disputed Claim is disallowed, the holder of such Claim shall not receive any distributions on account of the portion of such Claim that is disallowed and any property withheld pending the resolution of such Claim shall be reallocated Pro Rata to the holders of Allowed Claims in the same Class.  The Disbursing Agent shall make Distributions to holders of Disputed Claims that become Allowed at such time that the Reorganized Debtors determine, in their sole discretion, to make subsequent Distributions to holders of other Claims Allowed following the Initial Distribution Date; provided, however, that the Reorganized Debtors shall

44

make such Distributions at least semi-annually. Nothing set forth herein is intended to, nor shall it, prohibit the Reorganized Debtors, in their sole discretion, from making a Distribution on account of any Claim at any time after such Claim becomes an Allowed Claim.

7.    **Interest on Disputed Claims.**

Unless otherwise specifically provided for in this Plan or as otherwise required by sections 506(b), 511 or 1129(a)(9)(C)-(D) of the Bankruptcy Code, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final Distribution is made when and if such Disputed Claim becomes and Allowed Claim.

8.    **Estimation of Claims.**

The Debtors (with the consent of the Restructuring Support Parties and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld)) or the Reorganized Debtors may at any time request that the Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code or other applicable law regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim or whether the Court has ruled on any such objection. The Court will retain jurisdiction to estimate any Claim at any time during the pendency of litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Court estimates any Disputed Claim, such estimated amount shall constitute either (a) the Allowed amount of such Claim, (b) the amount on which a reserve is to be calculated for purposes of any reserve requirement to this Plan or (c) a maximum limitation on such Claim, as determined by the Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors (with the consent of the Restructuring Support Parties and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld)) or the Reorganized Debtors, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Court.

## VIII.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    **Assumption and Rejection of Executory Contracts and Unexpired Leases.**

Except as otherwise provided herein or in any contract, instrument, release, indenture or other agreement or document entered into in connection with this Plan, as of the Effective Date, all executory contracts and unexpired leases governed by section 365 of the Bankruptcy Code to which any of the Debtors are parties are hereby assumed except for any executory contract or unexpired lease that (i) previously has been assumed or rejected by the Debtors in the Chapter 11 Cases, (ii) previously expired or terminated pursuant to its own terms; (iii) is specifically identified on the Schedule of Rejected Contracts and Leases, or (iv) is the subject of a separate motion to assume or reject such executory contract or unexpired lease filed by the Debtors under section 365 of the Bankruptcy Code prior to the Effective Date.  The

Debtors reserve the right to amend the Schedule of Rejected Contracts and Leases at any time prior to the Effective Date, subject to the consent of the Restructuring Support Parties and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld).

### B.    Limited Extension of Time to Reject.

In the event the Reorganized Debtors become aware after the Effective Date of the existence of an executory contract or unexpired lease that was not included in the Schedules, the right of the Reorganized Debtors to move to reject such executory contract or lease shall be extended until the date that is thirty (30) days after the date on which the Reorganized Debtors become aware of the existence of such executory contract or lease. The deemed assumptions and rejections provided for in this Article VIII of this Plan shall not apply to any such executory contract or lease.

### C.    Cure.

Except to the extent that different treatment has been agreed to by the non-Debtor party or parties to any executory contract or unexpired lease to be assumed pursuant to Article VIII.A hereof, within ten (10) Business Days prior to the Confirmation Hearing, the Debtors shall, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code, and consistent with the requirements of section 365 of the Bankruptcy Code, file and serve a pleading with the Bankruptcy Court listing the cure amounts of all executory contracts or unexpired leases to be assumed.  The parties to such executory contracts or unexpired leases to be assumed by the Debtors shall have five (5) Business Days from service of such pleading to object to the cure amounts listed by the Debtors.  If there are any objections filed with respect thereto, the Court shall conduct a hearing to consider such cure amounts and any objections thereto.  The Debtors shall retain their right to reject any of their executory contracts or unexpired leases, including any executory contracts or leases that are subject to a dispute concerning amounts necessary to cure any defaults.

### D.    Rejection Damage Claims.

Any and all Claims for damages arising from the rejection of an executory contract or unexpired lease must be filed with the Court in accordance with the terms of the Final Order authorizing such rejection, but in no event later than thirty (30) days after the Effective Date. Any Claims for damages arising from the rejection of an executory contract or unexpired lease that is not filed within such time period will be forever barred from assertion against the Debtors, their respective estates and the Reorganized Debtors. All Allowed Claims arising from the rejection of executory contracts or unexpired leases shall be treated as General Unsecured Claims or Convenience Claims, as appropriate under the circumstances.

### E.    Benefit Plans.

As of and subject to the Effective Date, all employment and severance agreements and policies, and all employee compensation and benefit plans, policies, and programs of the Debtors applicable generally to their employees, including agreements and programs subject to section 1114 of the Bankruptcy Code, as in effect on the Effective Date, including all savings

plans, retirement plans, health care plans, disability plans, severance benefit plans, incentive plans, and life, accidental death, and dismemberment insurance plans, nonqualified deferred compensation plans, and senior executive retirement plans shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under this Plan, and the Debtors' obligations under all such agreements and programs shall survive the Effective Date of this Plan, without prejudice to the Reorganized Debtors' rights under applicable nonbankruptcy law to modify, amend, or terminate the foregoing arrangements in accordance with the terms and provisions thereof, except for (i) such executory contracts or plans specifically rejected pursuant to this Plan (to the extent such rejection does not violate section 1114 of the Bankruptcy Code), and (ii) such executory contracts or plans as have previously been terminated, or rejected, pursuant to a Final Order, or specifically waived by the beneficiaries of such plans, benefits, contracts, or programs.

### F.    Assumption of ACE Insurance Program.

Notwithstanding anything to the contrary in this Plan: (a) the ACE Insurance Program shall be deemed to be, and shall be treated as though it is, "executory", and on the Effective Date, the applicable Reorganized Debtors shall assume the ACE Insurance Program in its entirety; (b) the ACE Insurance Program and all letters of credit and other collateral and security previously provided to, and in effect as of the Confirmation Date for the benefit of, the ACE Companies (or any of them) pursuant to the ACE Insurance Program, and any and all valid debts, obligations, and liabilities of Debtors (and after the Effective Date, the Reorganized Debtors) thereunder, shall survive and shall not be amended, modified, waived or impaired in any respect by this Plan without the prior written consent of both the ACE Companies and the Debtors (with the consent of the Restructuring Support Parties) or the Reorganized Debtors, as the case may be; (c) as of the Effective Date, the Reorganized Debtors shall be liable for all of the Debtors' valid obligations and liabilities, whether now existing or hereafter arising, under the ACE Insurance Program, including, without limitation, the duty to continue to provide collateral and security as required by the ACE Insurance Program; (d) the valid claims of the ACE Companies arising under the ACE Insurance Program (i) shall be Allowed Administrative Claims; (ii) shall be due and payable in the ordinary course of business by the Debtors (or after the Effective Date, by the Reorganized Debtors) pursuant to the ACE Insurance Program without the need or requirement for the ACE Companies to file claims; and (iii) shall not be discharged or released by the Plan or the Confirmation Order; (e) nothing in this Plan in any way: (i) alters, modifies or amends the terms of the ACE Insurance Program including, but not limited to, the provisions prohibiting the assignment of the policies and agreements except to the extent assumed or succeeded to by the Reorganized Debtors (as to which assumption and succession the ACE Companies shall have been deemed to have consented); (ii) alters the rights and obligations of the ACE Companies or of the Debtors (or after the Effective Date, the Reorganized Debtors) under the ACE Insurance Program or modifies the coverage provided thereunder; (iii) discharges, releases or relieves the Debtors (or on or after the Effective Date, the Reorganized Debtors) from any valid debt or other liability under the ACE Insurance Program; and (iv) the injunction set forth in section IX.H of this Plan and the automatic stay of section 362(a) of the Bankruptcy Code, if and to the extent applicable, shall be lifted, without further order of the Bankruptcy Court, to permit (a) claimants with valid workers' compensation claims that are covered by the ACE Insurance Program to proceed with their claims and (b) the ACE Companies to administer, handle, defend, settle and/or pay all workers' compensation claims arising under

47

the ACE Insurance Program and the costs related thereto without further order of the Bankruptcy Court.

### G.    Assumption of Indemnification Obligations.

#### 1.    Indemnification Obligations of PMC Holding and PMCI.

Upon the Effective Date, Reorganized PMC Holding shall assume all existing Indemnification Obligations of PMC Holding and of PMCI in favor of those individuals serving, as of the Effective Date, as directors or officers of PMC Holding or of PMCI, or serving, as of the Effective Date, at their request, as directors, managers or officers of any of the other Subsidiary Debtors.

#### 2.    Indemnification Obligations of Other Subsidiary Debtors.

Upon the Effective Date, each other respective Reorganized Subsidiary Debtor shall assume all existing Indemnification Obligations in favor of those individuals serving, as of the Effective Date, as directors (or managers) or officers of such respective Reorganized Subsidiary Debtor, or serving, as of the Effective Date, at the request of such respective Reorganized Subsidiary Debtor as directors, managers or officers of any of the other Subsidiary Debtors.

### IX.

### EFFECT OF CONFIRMATION OF THIS PLAN

### A.    Continued Corporate Existence.

Each of the Debtors, as Reorganized Debtors (converted into limited liability companies (other than MCID and Wilshire Beverage), in the case of Debtors that were corporations prior to the Effective Date), shall continue to exist after the Effective Date with all powers of a corporation or a limited liability company under the laws of the respective states governing their formation or incorporation and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under applicable state law, except as such rights may be limited, modified and conditioned by this Plan and the documents and instruments executed and delivered in connection therewith.

### B.    Vesting of Assets.

Except as otherwise provided in this Plan or any agreement, instrument, or other document incorporated herein, on the Effective Date all property in each Estate, all Causes of Action, and any other property acquired by any of the Debtors pursuant to this Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens, if any, granted to secure the First Lien Exit Facility, the New Secured Term Loans and any liens applicable to any capitalized leases existing on the Effective Date).  On and after the Effective Date, except as otherwise provided in this Plan, each Reorganized Debtor may operate its business and conduct its affairs, and may use, acquire, or dispose of their property and assets and compromise or settle any Claims, Interests, or Causes of

Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

###### C.      Preservation of Causes of Action.

In accordance with section 1123(b)(3) of the Bankruptcy Code and except as otherwise provided in this Plan, including Articles VII.D and VII.L.1, the Debtors (with the consent of the Restructuring Support Parties) and the Reorganized Debtors shall retain all Litigation Rights, and nothing contained in this Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any such Litigation Rights. The Debtors may (but are not required to) enforce all Litigation Rights and all other similar claims arising under applicable state laws, including fraudulent transfer claims, if any, and all other Causes of Action of a trustee and debtor-in-possession under the Bankruptcy Code.  Except as otherwise set forth in Articles VII.D and VII.L.1 of this Plan, the Reorganized Debtors, as applicable, in their sole and absolute discretion, shall determine whether to bring, settle, release, compromise, or enforce any such Litigation Rights (or decline to do any of the foregoing), and shall not be required to seek further approval of the Bankruptcy Court for such action.  Except as otherwise set forth in Articles VII.D and VII.L.1 of this Plan, the Debtors (with the consent of the Restructuring Support Parties), the Reorganized Debtors, or any successors thereof may pursue such Litigation Rights in accordance with the best interests of the Reorganized Debtors or any successors holding such rights of action.

###### D.      Discharge of the Debtors.

Pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in this Plan or in the Confirmation Order, the Distributions and rights that are provided in this Plan shall be in complete satisfaction, discharge and release, effective as of the Effective Date, of any and all Claims and Causes of Action (whether known or unknown) against, liabilities of, liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property or assets shall have been distributed or retained pursuant to this Plan on account of such Claims, rights, and Interests, including Claims and Interests that arose before the Effective Date, any liability (including withdrawal liability to the extent such Claims relate to services performed by employees of the Debtors prior to the Petition Date and that arise from a termination of employment or a termination of any employee or retiree benefit program which occurred prior to the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (a) a Proof of Claim or Interest based upon such Claim, debt, right, or Interest was filed, is filed, or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim or Interests based upon such Claim, debt, right, or Interest is allowed under section 502 of the Bankruptcy Code, or (c) the holder of such a Claim, right, or Interest accepted this Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims against and Interests in the Debtors, subject to the terms thereof and the occurrence of the Effective Date.

**E.    Releases by the Debtors of Certain Parties.**

Pursuant to section 1123(b)(3) of the Bankruptcy Code, effective as of the Effective Date, each Debtor, in its individual capacity and as a debtor in possession for and on behalf of its Estate, shall release and discharge and be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Released Parties for and from any and all claims or Causes of Action existing as of the Effective Date in any manner arising from, based on, or relating to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, or any act, omission, occurrence, or event in any manner related to any such Claims, Interests, corporate or debt restructuring, or the Chapter 11 Cases, including any claim relating to or arising out of the Chapter 11 Cases, the negotiation and filing of this Plan, the filing of the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, filing, implementation, administration, confirmation, or consummation of this Plan, the Disclosure Statement, any document filed by the Debtors in respect of this Plan, the Plan Supplement, any employee benefit plan, instrument, release, or other agreement or document created, modified amended or entered into in connection with this Plan.  The Reorganized Debtors and any newly-formed entities that will be continuing the Reorganized Debtors' businesses after the Effective Date shall be bound, to the same extent that the Debtors are bound, by the releases and discharges set forth above; **provided, however,** that the Debtors shall not release any claims or Causes of Action if any, against the Debtors' directors as of the Petition Date (other than any director who continued to serve as an officer and a director subsequent to the Petition Date) or any holders of Interests in the Debtors as of the Petition Date in any way relating to (i) the CHI Management Agreements and (ii) any claims of CHI or any other Person or entity arising under or from the rejection of the CHI Management Agreements.

**F.    Releases by Non-Debtors.**

On the Effective Date, each Persons who (a) directly or indirectly, has held, holds, or may hold any Claim, (b) votes to accept this Plan in its capacity as a holder of any Claim or Interest, and (c) does not mark their Ballot to indicate their refusal to grant the releases provided in this paragraph, in consideration for the obligations of the Debtors and the Reorganized Debtors under this Plan including the New Secured Term Loans and the Cash, Reorganized PMC Holding Membership Interests, and other contracts, instruments, releases, agreements, or documents to be delivered in connection with this Plan (each, a "**Release Obligor**"), shall have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Debtors, the Reorganized Debtors, and all Released Parties for and from any Claim or Cause of Action existing as of the Effective Date in any manner arising from, based on, or relating to, in whole or in part, any or all of the Debtors, the subject matter of, or the transaction or event giving rise to, the Claim of such Release Obligor prior to or in connection with the Chapter 11 Cases, the business or contractual arrangements between or among any Debtors and Release Obligor or any Released Party, the restructuring of the claim of such Release Obligor prior to or in connection with the Chapter 11 Cases, or any act, omission, occurrence, or event in any manner related to such subject matter, transaction, obligation, restructuring or the Chapter 11 Cases, including

50

any Claim relating to, or arising out of the Chapter 11 Cases, the filing of the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, filing, implementation, administration, confirmation, or consummation of this Plan, the Disclosure Statement, any document filed by the Debtors in respect of this Plan, the Plan Supplement, any employee benefit plan, instrument, release, or other agreement or document, created, modified, amended or entered into in connection with this Plan; provided, however, that nothing in this Article IX.F shall release (i) any obligations of the Debtors or the Reorganized Debtors arising under this Plan, (ii) any of the Released Parties from any claim based on any act or omission that constitutes gross negligence or willful misconduct as determined by Final Order or (iii) any Claims or Causes of Action against the Debtors' directors as of the Petition Date (other than any director who continued to serve as an officer and a director subsequent to the Petition Date) or any holders of Interests in the Debtors as of the Petition Date in any way relating to (x) the CHI Management Agreements and (y) any claims of CHI or any other Person or entity arising under or from the rejection of the CHI Management Agreements.

G.      **Exculpation.**

Except as otherwise specifically provided in this Plan, the Plan Supplement or related documents, the Debtors, the Reorganized Debtors and the Released Parties shall neither have, nor incur any liability to any entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to, or arising out of the Chapter 11 Cases, the filing of the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, filing, implantation, administration, confirmation or consummation of this Plan, the Disclosure Statement, the exhibits to this Plan and the Disclosure Statement, the Plan Supplement documents, any employee benefit plan, instrument, release or other agreement or document created, modified, amended or entered into in connection with this Plan, except for their willful misconduct or gross negligence as determined by a Final Order and except with respect to obligations arising under confidentiality agreements, joint interest agreements, or protective orders, if any, entered during the Chapter 11 Cases; provided, however, that each Released Party shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities pursuant to, or in connection with, the above referenced documents, actions, or inactions; provided, further, that Debtors' directors as of the Petition Date (other than any director who continued to serve as an officer and a director subsequent to the Petition Date) and any holders of Equity Interests as of the Petition Date shall not be exculpated from any liability for any act or omission in connection with, related to, or arising out of (i) the CHI Management Agreements or (ii) any claims of CHI or any other Person or entity arising under or from the rejection of the CHI Management Agreements.

51

**H.**    **Injunction.**

**The satisfaction, release, and discharge pursuant to this Article IX shall act as an injunction against any Person commencing or continuing any action, employment of process, or act to collect, offset or recover any Claim, Interest, or Cause of Action satisfied, released, or discharged under this Plan to the fullest extent authorized or provided by the Bankruptcy Code, including to the extent provided for or authorized by sections 524 or 1141 of the Bankruptcy Code.**

**I.**    **Term of Bankruptcy Injunction or Stays.**

All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**J.**    **Preservation of Insurance.**

Except as otherwise provided herein, the Debtors' discharge and release from all Claims as provided herein, except as necessary to be consistent with this Plan, shall not diminish or impair the enforceability of any insurance policy that may cover Claims against the Debtors or the Reorganized Debtors, including its officers and current and former directors, or any other person or entity.

**X.**

**EFFECTIVENESS OF THIS PLAN**

**A.**    **Conditions Precedent to Confirmation.**

It shall be a condition to confirmation of this Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article X.C hereof:

(1)    the Confirmation Order, in form and substance satisfactory to the Debtors, the Restructuring Support Parties and the Creditors' Committee (in the exercise of the Creditors' Committee's reasonable discretion), shall have been entered and shall be in full force and effect and there shall not be a stay or injunction in effect with respect thereto;

(2)    This Plan, the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in form and substance acceptable to (i) the Debtors, to the extent this Plan otherwise provides that such schedule, document or exhibit must be acceptable to the Debtors, (ii) the Creditors' Committee, to the extent this Plan otherwise provides that such schedule, document or exhibit must be acceptable to the Creditors' Committee and (iii) the Restructuring Support Parties.

B.      **Conditions Precedent to the Effective Date.**

It shall be a condition to the Effective Date of this Plan that the following provisions, terms and conditions are approved or waived pursuant to the provisions of Article X.C.:

(1)      the Confirmation Order, in form and substance acceptable to the Debtors, the Restructuring Support Parties and the Creditors' Committee (in the exercise of the Creditors' Committee's reasonable discretion), shall be in full force and effect and there shall not be a stay or injunction in effect with respect thereto;

(2)      the number of holders of record of Reorganized PMC Holding Membership Interests shall be less than 400 after taking into account all Distributions of Reorganized PMC Holding Membership Interests to be made under the Plan to holders of all Allowed Senior Notes Claims and Allowed General Unsecured Claims who are receiving Reorganized PMC Holding Membership Interests pursuant to the Plan and all Disputed General Unsecured Claims who made the Class 5 Equity Election or otherwise will receive Reorganized PMC Holding Membership Interests on account of their Claims to the extent such Claims are ultimately Allowed;

(3)      all authorizations, consents and regulatory approvals required (if any) for this Plan's effectiveness shall have been obtained;

(4)      the formation and governance documents for each of the Reorganized Debtors (including the New Charter Documents, the PMC Holding LLC Agreement and the Subsidiary LLC Agreements) shall be consistent with this Plan and acceptable to the Restructuring Support Parties and the Creditors' Committee (in the exercise of the Creditors' Committee's reasonable discretion);

(5)      the Reorganized Debtors shall have entered into the First Lien Exit Facility, which shall be on terms and conditions acceptable to the Debtors and the Restructuring Support Parties in consultation with the Creditors' Committee;

(6)      the Reorganized Debtors shall have entered into the New Secured Term Loan Agreement, which shall be in form and substance acceptable to the Debtors and the Restructuring Support Parties in consultation with the Creditors' Committee;

(7)      the administrative agent (or collateral agent) under the First Lien Exit Facility and the New Secured Term Loan Agent shall have entered into the New Intercreditor Agreement, which shall be in form and substance acceptable to the Debtors and the Restructuring Support Parties in consultation with the Creditors' Committee; and

53

(8)      the $7.5 million Cash portion of the New Secured Term Loans shall be fully funded.

**C.      Waiver of Conditions.**

The conditions to confirmation of this Plan and to the Effective Date set forth in Article X.A. and X.B. hereof may be waived by the Debtors (with the consent of the Restructuring Support Parties in consultation with the Creditors' Committee) without notice, leave or order of the Court or any formal action other than proceeding to confirm or consummate this Plan.

**D.      Notice of Confirmation and Effective Date.**

On or before five (5) Business Days after the occurrence of the Effective Date, the Reorganized Debtors shall mail or cause to be mailed to all holders of Claims and Interests a notice that informs such holders of (i) the entry of the Confirmation Order, (ii) the occurrence of the Effective Date, (iii) the occurrence of the applicable Bar Date, and (iv) such other matters as the Debtors deem appropriate.

**E.      Effect of Failure of Conditions.**

In the event that the Effective Date does not occur: (a) the Confirmation Order shall be vacated; (b) no Distributions under this Plan shall be made; (c) the Debtors and all holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; and (d) the Debtors' obligations with respect to Claims and Equity Interests shall remain unchanged and nothing contained in this Plan shall (i) constitute or be deemed a waiver or release of any Claims against or any Equity Interests in  the Debtors or any other Person, (ii) prejudice in any manner any right, remedy or claim of the Debtors or any Person in any further proceedings involving the Debtors or otherwise, or (iv) be deemed an admission against interest by the Debtors or any other Person.

**F.      Vacatur of Confirmation Order.**

If a Final Order denying confirmation of this Plan is entered, or if the Confirmation Order is vacated, then this Plan shall be null and void in all respects, and nothing contained in this Plan shall (a) constitute a waiver or release of any Claims against or Equity Interests in the Debtors, (b) prejudice in any manner the rights of the holder of any Claim against, or Equity Interest in, the Debtors, (c) prejudice in any manner any right, remedy or claim of the Debtors, or (d) be deemed an admission against interest by the Debtors.

**G.      Revocation, Withdrawal, Modification or Non-Consummation.**

The Debtors reserve the right to revoke, withdraw, amend or modify this Plan at any time prior to the Confirmation Date (in each case subject to the consent of the Restructuring Support Parties, except as otherwise provided in Article XII.D. of this Plan and the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld)).  If the Debtors revoke or withdraw this Plan, the Confirmation Order is not entered, or the Effective

54

Date does not occur, (i) this Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in this Plan (including the fixing or limiting the amount of any Claim or Class of Claims), assumption or rejection of executory contracts or leases effected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void, and (iii) nothing contained in this Plan, and no acts taken in preparation for consummation of this Plan, shall (a) constitute or be deemed a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors or any other Person, (b) prejudice in any manner any right, remedy or claim of the Debtors or any other Person in any further proceeding involving the Debtors or otherwise, or (c) constitute an admission against interest by the Debtors or any other Person.

## XI.

## RETENTION OF JURISDICTION

The Court shall have exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and this Plan pursuant to, and for the purposes of, section 105(a) and section 1142 of the Bankruptcy Code and for, among other things, the following purposes: (1) to hear and determine motions for the assumption or rejection of executory contracts or unexpired leases pending on the Confirmation Date, and the allowance of Claims resulting therefrom; (2) to determine any other applications, adversary proceedings, and contested matters pending on the Effective Date; (3) to ensure that Distributions to holders of Allowed Claims are accomplished as provided herein; (4) to resolve disputes as to the ownership of any Claim or Equity Interest; (5) to hear and determine timely objections to Claims; (6) to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated; (7) to issue such orders in aid of execution of this Plan, to the extent authorized by section 1142 of the Bankruptcy Code; (8) to consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Court, including the Confirmation Order; (9) to hear and determine all applications for compensation and reimbursement of expenses of Professionals under sections 328, 330, 331 and 503(b) of the Bankruptcy Code; (10) to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan; (11) to hear and determine any issue for which this Plan requires a Final Order of the Court; (12) to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code; (13) to hear and determine disputes arising in connection with compensation and reimbursement of expenses of professionals for the Restructuring Support Parties, the Senior Secured Notes Trustee, the Senior Secured Notes Collateral Agent or the Senior Notes Trustee for services rendered and expenses incurred during the period commencing on the Petition Date through and including the Effective Date; (14) to hear and determine any Causes of Action preserved under this Plan under Bankruptcy Code sections 544, 547, 548, 549, 550, 551, 553, and 1123(b)(3); (15) to hear and determine any matter regarding the existence, nature and scope of the Debtors' discharge; (16) to hear and determine any matter regarding the existence, nature, and scope of the releases and exculpation provided in Article IX of this Plan; and (17) to enter a final decree closing the Chapter 11 Cases.

## XII.

## MISCELLANEOUS PROVISIONS

A.     **Payment of Statutory Fees.**

All fees payable on or before the Effective Date pursuant to section 1930 of title 28 of the United States Code shall be paid by the Debtors on or before the Effective Date and all such fees payable after the Effective Date shall be paid by the applicable Reorganized Debtor.

B.     **Payment of Fees and Expenses of Restructuring Support Parties.**

The Debtors or the Reorganized Debtors shall promptly pay in Cash in full (following receipt of an appropriate invoice in reasonable detail) all reasonable and documented fees and expenses incurred by the Restructuring Support Parties in connection with the restructuring described herein that have not previously been paid, including the fees and expenses of (i) Akin Gump Strauss Hauer & Feld LLP, in its capacity as legal advisor to the Restructuring Support Parties, and (ii) local Delaware counsel to the Restructuring Support Parties.  All amounts distributed and paid to the foregoing parties pursuant to this Plan shall not be subject to setoff, recoupment, reduction or allocation of any kind and shall not require the filing or approval of any fee application.

C.     **Payment of Fees and Expenses of the Senior Secured Notes Trustee, Senior Secured Notes Collateral Agent and the Senior Notes Trustee.**

The Debtors or the Reorganized Debtors shall promptly pay in Cash in full (following receipt of an appropriate invoice in reasonable detail) all reasonable and documented fees and expenses incurred by the Senior Secured Notes Trustee, the Senior Secured Notes Collateral Agent and the Senior Notes Trustee without the need of such parties to file fee applications with the Court; provided that the Senior Secured Notes Trustee, the Senior Secured Notes Collateral Agent and the Senior Notes Trustee shall provide the Debtors, the Restructuring Support Parties and the Creditors' Committee with invoices (or such other documentation as the Debtors or another of such parties may reasonably request) for which it seeks payment on or before the Effective Date, and provided that the Debtors, the Restructuring Support Parties and the Creditors' Committee shall not have objected to the payment of such fees or expenses within five (5) Business Days after the later to occur of the receipt of the applicable invoice or the date of approval of the Disclosure Statement, such fees and expenses shall be promptly paid.  To the extent that the Debtors or any of such other parties object to any of the fees and expenses of the Senior Secured Notes Trustee, the Senior Secured Notes Collateral Agent or the Senior Notes Trustee, the Debtors or the Reorganized Debtors shall not pay any disputed portion of such fees and expenses until a resolution of such objection is agreed to by the Debtors (or Reorganized Debtors) and such party and/or their counsel or a further order of the Court upon a motion filed with the Court by the party whose fees and expenses have been objected to.

56

### D.      Modification of this Plan.

Subject to the limitations contained in this Plan: (1) the Debtors (with the consent of the Restructuring Support Parties and in consultation with the Creditors' Committee) reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend, modify, revoke or withdraw this Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Debtors (with the consent of the Restructuring Support Parties) or the Reorganized Debtors, as the case may be, may, upon order of the Court, amend or modify this Plan, in accordance with Section 1127(b) of the Bankruptcy Code.

Notwithstanding anything to the contrary herein, the Debtors may revoke or withdraw the Plan upon the occurrence of a "Company Termination Event" under (and as defined in) the Restructuring Support Agreement; provided, however, that the Debtors reserve the right to fully or conditionally waive, on a prospective or retroactive basis, the effects of this paragraph in respect of any such Company Termination Event, with any such waiver effective only if in writing and signed by the Debtors.

### E.      Dissolution of Creditors' Committee.

The Creditors' Committee shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code. On the Effective Date, the Creditors' Committee shall be dissolved and its members shall be deemed released of all their duties, responsibilities and obligations in connection with the Chapter 11 Cases or this Plan and its implementation, and the retention or employment of the Creditors' Committee's attorneys, financial advisors, and other agents shall terminate as of the Effective Date; provided, with respect to any objections to Claims or other actions brought by the Creditors' Committee during the pendency of the Chapter 11 Cases (solely to the extent that the Creditors' Committee requested and obtained necessary authority from the Court to bring such actions and such actions were validly commenced), the Claims Administrator shall become successor in interest to the Creditors' Committee on the Effective Date; provided, further, the Creditors' Committee's attorneys and financial advisors shall be entitled to pursue their own Professional Fee Claims and represent the Creditors' Committee in connection with the review of and the right to be heard in connection with all Professional Fee Claims.  In the event an appeal is pending from the Confirmation Order as of the Effective Date, the Creditors' Committee shall remain in existence for all purposes related to the prosecution and defense of such appeal, and the Creditors' Committee Professionals shall be entitled to reasonable compensation and reimbursement of expenses in connection with such matters.

### F.      Votes Solicited in Good Faith.

The Debtors have, and upon confirmation of this Plan shall be deemed to have, solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. The Debtors (and each of their respective affiliates, agents, directors, managers, officers, members, employees, advisors, and attorneys) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of the securities offered and sold under this Plan and, therefore, are not, and on account

57

of such offer and issuance will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or the offer or issuance of the securities offered and distributed under this Plan.

G.      **Administrative Claims Incurred After the Effective Date.**

Except as otherwise specifically provided for in this Plan, from and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Court, pay in Cash (i) any Administrative Claims and (ii) the reasonable legal, professional, or other fees and expenses related to the implementation of this Plan incurred by the Reorganized Debtors.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation of services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order or approval of the Court.

H.      **Request for Expedited Determination of Taxes.**

The Reorganized Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns (other than federal tax returns) filed by any of them, or to be filed by any of them, for any and all taxable periods ending after the Petition Date through the Effective Date.

I.      **Governing Law.**

Unless a rule of law or procedure is supplied by Federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of Delaware shall govern the construction and implementation of this Plan, any agreements, documents, and instruments executed in connection with this Plan (except as otherwise set forth in those agreements or instruments, in which case the governing law of such agreements shall control).  Corporate governance matters shall be governed by the laws of the state of incorporation or formation of the applicable Debtor.

J.      **Filing or Execution of Additional Documents.**

On or before the Effective Date, the Debtors (with the consent of the Restructuring Support Parties) or the Reorganized Debtors, shall file with the Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

K.      **Exemption From Transfer Taxes.**

Pursuant to section 1146(c) of the Bankruptcy Code, (a) the issuance, transfer or exchange under this Plan of Reorganized PMC Holding Membership Interests, corporate stock and Subsidiary Membership Interests and the security interests in favor of the administrative agent and lenders under the First Lien Exit Facility and in favor of the New Secured Term Loan Agent and lenders under the New Secured Term Loan Agreement, (b) the making or assignment

58

of any lease or sublease, or (c) the making or delivery of any other instrument whatsoever, in furtherance of or in connection with this Plan shall not be subject to any stamp, real estate transfer, mortgage, recording sales or use or other similar tax.

### L.    Exemption for Issuance of PMC Holding Membership Interests and New Secured Term Loans.

The issuance of the Reorganized PMC Holding Membership Interests and Distribution thereof to holders of Allowed Senior Notes Claims and Allowed General Unsecured Claims and the issuance of New Secured Term Loans to holders of Allowed Senior Secured Notes Claims under this Plan, to the extent they are deemed securities (as defined in the Securities Act), shall be authorized and exempt from registration under the securities laws solely to the extent permitted under section 1145 of the Bankruptcy Code, as of the Effective Date without further act or action by any person, unless required by provision of the relevant governance documents or applicable law, regulation, order or rule; and all documents evidencing the same shall be executed and delivered as provided for in the Plan or the Plan Supplement.

### M.    Waiver of Federal Rule of Civil Procedure 62(a).

The Debtors may request that the Confirmation Order include (a) a finding that Fed. R. Civ. P. 62(a) shall not apply to the Confirmation Order, and (b) authorization for the Debtors to consummate this Plan immediately after entry of the Confirmation Order.

### N.    Exhibits/Schedules.

All Exhibits and schedules to this Plan and the Plan Supplement are incorporated into and constitute a part of this Plan as if set forth herein.

### O.    Notices.

All notices, requests, and demands hereunder to be effective shall be in writing and unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

To the Debtors:  Perkins & Marie Callender's Inc., in care of Troutman Sanders LLP, The Chrysler Building, 405 Lexington Avenue, New York, NY 10174, attention:  Mitchel H. Perkiel, Esq., Tel: (212) 704-6000, Fax: (212) 704-6288.

To the Creditors' Committee:  Official Committee of Unsecured Creditors of Perkins & Marie Callender's Inc., in care of Ropes & Gray, LLP, 1211 Avenue of the Americas, New York, New York 10036, attention:  Mark Somerstein, Esq., Tel: (212) 841-8814, Fax: (646) 728-1663.

To the Pre-Petition Administrative Agent and DIP Administrative Agent:  In care of Paul Hastings LLP, 600 Peachtree Street, N.E., Suite 2400, Atlanta, Georgia 30308, attention:  Jesse H. Austin, III, Esq., Tel: (404) 815-2400, Fax: (404) 685-5167.

To the Restructuring Support Parties:  In care of Akin Gump Strauss Hauer & Feld LLP, 1333 New Hampshire Avenue, N.W., Washington, D.C. 20036, attention: Scott Alberino, Esq., Tel: (202) 887-4000, Fax: (202) 887-4288.

P.    **Plan Supplement.**

The Plan Supplement will be filed with the Clerk of the Court no later than ten (10) calendar days prior to the Confirmation Hearing, unless such date is further extended by order of the Court on notice to parties in interest. The Plan Supplement may be inspected in the office of the Clerk of the Court during normal court hours and shall be available online at "https://ecf.deb.uscourts.gov." Holders of Claims or Equity Interests may obtain a copy of the Plan Supplement upon written request to counsel to the Debtors in accordance with Article XII.O of this Plan or by accessing the website maintained by the Debtors' claims and noticing agent at "www.PRKMCRestructuring.com".

Q.    **Further Actions; Implementations.**

The Debtors shall be authorized to execute, deliver, file or record such documents, contracts, instruments, releases and other agreements and take such other or further actions as may be necessary to effectuate or further evidence the terms and conditions of this Plan.  From and after the Confirmation Date, the Debtors shall be authorized to take any and all steps and execute all documents necessary to effectuate the provisions contained in this Plan.

R.    **Severability.**

If, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Court to be invalid, void, or unenforceable, the Court, at the request of the Debtors (with the consent of the Restructuring Support Parties and, to the extent such provision affects the rights of the Creditors' Committee, the Creditors' Committee (which consent of the Creditors' Committee shall not be unreasonably withheld)), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

S.    **Entire Agreement.**

Except as otherwise indicated, this Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

60

**T.**     **Binding Effect.**

This Plan shall be binding on and inure to the benefit of the Debtors, the holders of Claims against and Equity Interests in the Debtors, and each of their respective successors and assigns, including each of the Reorganized Debtors, and all other parties in interest in the Chapter 11 Cases.

**U.**     **Substantial Consummation.**

On the Effective Date, this Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code; provided, however, that nothing herein shall prevent the Debtors or any other party in interest from arguing that substantial consummation of this Plan has occurred prior to the Effective Date.

**V.**     **Conflict.**

The terms of this Plan shall govern in the event of any inconsistency with the summaries of this Plan set forth in the Disclosure Statement. In the event of any inconsistency or ambiguity between and among the terms of this Plan, the Disclosure Statement, and the Confirmation Order, the terms of the Confirmation Order shall govern and control.

(Remainder of Page Intentionally Left Blank)
(Signature Pages Follow)

IN WITNESS WHEREOF, each Debtor has executed this Plan this 9th day of September, 2011.

PERKINS & MARIE CALLENDER'S INC.

By:_____
Name:         Joseph F. Trungale
Title:        President & CEO


PERKINS & MARIE CALLENDER'S HOLDING INC.

By:_____
Name:         Joseph F. Trungale
Title:        President & CEO


PERKINS & MARIE CALLENDER'S REALTY LLC

By:_____
Name:         Joseph F. Trungale
Title:        President & CEO


PERKINS FINANCE CORP.

By:_____
Name:         Joseph F. Trungale
Title:        President

WILSHIRE RESTAURANT GROUP LLC

By:_____
Name:          Joseph F. Trungale
Title:          President & CEO


PMCI PROMOTIONS LLC

By:_____
Name:          Joseph F. Trungale
Title:          President & CEO


MARIE CALLENDER PIE SHOPS, INC.

By:_____
Name:          Joseph F. Trungale
Title:          President


MARIE CALLENDER WHOLESALERS, INC.

By:_____
Name:          Joseph F. Trungale
Title:          President


MACAL INVESTORS, INC.

By:_____
Name:          Joseph F. Trungale
Title:          President

MCID, INC.

By:_____

Name:      Joseph F. Trungale
Title:       President


WILSHIRE BEVERAGE, INC.

By:_____

Name:      Joseph F. Trungale
Title:       Vice President


FIV CORP.

By:_____

Name:      Joseph F. Trungale
Title:       President

**EXHIBIT A**
**TO**
**DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION**
**UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**


Term Sheet Regarding New Secured Term Loans

<u>$110,563,000 Second Lien Secured Term Loan Exit Facility</u>
<u>Summary of Principal Terms and Conditions[1]</u>

| | |
|---|---|
| <u>Borrower</u>: | Perkins & Marie Callender's LLC, a Delaware limited liability company ("***Reorganized PMCI***"). |
| <u>Guarantors</u>: | Perkins & Marie Callender's Holding LLC ("***Reorganized PMC Holding***") and each of the Reorganized Subsidiary Debtors (other than Reorganized PMCI)[2] and any subsequently acquired or organized wholly owned domestic subsidiary of the Borrower. |
| <u>Credit Facility</u>: | A second lien secured term loan facility up to the aggregate Term Loan Commitment (as defined below) (the "***Term Facility***"), to be extended for the purposes set forth under "Purposes" below. |
| <u>Principal Amount</u>: | $110,563,000 (the "***Term Loan Commitment***"), of which (i) $103,063,000 will be deemed to have been advanced by the holders of the Senior Secured Notes in exchange for 100% of the principal amount outstanding in respect of the Senior Secured Notes as of the Effective Date (as defined below), and (ii) $7,500,000 is new funding from Standard; <u>provided</u>, <u>however</u>, that the loan documentation shall include the ability for the Borrower to request an increase in the Term Loan Commitment of up to $10,000,000, subject to terms and conditions to be set forth in the loan documentation, including the consent of the Requisite Lenders. |
| <u>Agent and Lenders</u>: | [•] ("***Bank***"), will act as sole administrative agent and collateral agent (collectively, in such capacities, the "***Agent***") for a group of lenders consisting of (i) funds managed and/or advised by Wayzata Investment Partners LLC (collectively, "***Wayzata***") who are holders of the Senior Secured Notes and (ii) funds managed and/or advised by Standard General Master Fund LP (collectively, "***Standard General***" and, together with Wayzata, the "***Lenders***"), and will perform the duties customarily associated with such roles. |

---

[1] All capitalized terms not defined herein shall have the meaning ascribed to them in the Plan.

[2] Upon emergence, the Reorganized Subsidiary Debtors shall be: [Perkins & Marie Callender's Realty LLC; Perkins Finance LLC; Wilshire Restaurant Group LLC; PMCI Promotions LLC; Marie Callender Pie Shops, LLC; Marie Callender Wholesalers, LLC; MACAL Investors, LLC; MCID, LLC; Wilshire Beverage, LLC; and FIV, LLC].

| | |
|---|---|
| <u>Definitive Documentation</u>: | The definitive documentation shall, except as otherwise set forth herein, be substantially the same as the definitive documentation for the First Lien Exit Facility (as defined below). |
| <u>Conditions Precedent</u>: | • Confirmation of a plan of reorganization (the "***Plan***") supported by the Lenders holding a majority of the Term Loan Commitments ("***Requisite Lenders***"); |
| | • Conditions precedent which are usual and customary for facilities of this nature, and as appropriate, applicable to Borrower and Guarantors; and |
| | • Payment of all fees and expenses of the Agent and the Lenders. |
| <u>Interest Rates</u>: | The interest rate under the Term Facility will be 14% per annum, payable monthly. |
| <u>Final Maturity</u>: | The Term Facility will mature on November 30, 2016. |
| <u>Guarantees</u>: | All obligations of the Borrower under the Term Facility will be unconditionally guaranteed (the "***Guarantees***") by Reorganized PMC Holding, each of the Reorganized Subsidiary Debtors (other than Reorganized PMCI),[3] and any subsequently acquired or organized, wholly owned domestic subsidiary of the Borrower. |
| <u>Purpose</u>: | Make required distributions under the Plan, satisfy certain Plan-related expenses, fund the Borrower's and Guarantors' working capital needs, and pay fees and expenses associated with the transactions contemplated by this Term Sheet. |
| <u>Security</u>: | The obligations of the Borrower and the Guarantors under the Term Facility and the Guarantees, as applicable, will be secured by second-priority liens on all collateral that secures that certain first lien exit facility in an aggregate amount not to exceed $35 million entered into by the Borrower on the Effective Date ("***First Lien Exit Facility***"), the obligations of which are secured by a first priority security interest in substantially all the assets of the Borrower and its subsidiaries party thereto. |

---

[3] Upon emergence, the Reorganized Subsidiary Debtors shall be: [Perkins & Marie Callender's Realty LLC; Perkins Finance LLC; Wilshire Restaurant Group LLC; PMCI Promotions LLC; Marie Callender Pie Shops, LLC; Marie Callender Wholesalers, LLC; MACAL Investors, LLC; MCID, LLC; Wilshire Beverage, LLC; and FIV, LLC].

| | |
|---|---|
| <u>Intercreditor Agreement</u>: | The lien priority, relative rights and other creditors' rights issues in respect of the First Lien Exit Facility and the Term Facility will be set forth in a customary intercreditor agreement. |
| <u>Senior Secured Notes</u>: | The 14% Senior Secured Notes due May 31, 2013 issued by Perkins & Marie Callender's Inc. pursuant to the Indenture dated as of September 24, 2008 among Perkins & Marie Callender's Inc., Perkins & Marie Callender's Holding, Inc. and The Bank of New York Mellon Trust Company, N.A., as indenture trustee, and The Bank of New York Mellon, as collateral agent, as amended, restated or modified from time to time. |
| <u>Mandatory Prepayments</u>: | Substantially similar to the mandatory prepayment provisions in the Senior Secured Notes, but on terms no more onerous than what are in the definitive documentation for the First Lien Exit Facility; *provided* that mandatory prepayments of the Term Facility shall not be made until the First Lien Exit Facility has been paid in full. |
| <u>Voluntary Prepayments</u>: | Provided that the First Lien Exit Facility has been paid in full, may be prepaid in whole or in part at any time on or after the Effective Date at the option of the Borrower at the prepayment prices (expressed as percentages of the principal amount thereof) set forth below plus accrued and unpaid interests thereon to the applicable prepayment date, if prepaid during the twelve-month period beginning on the anniversary of the Effective Date of the years indicated below: |

| YEAR | PRICE |
|---|---|
| On or before the first anniversary of the Effective Date | 110% |
| After the first anniversary of the Effective Date but on or prior to the second anniversary of the Effective Date | 107% |
| After the second anniversary of the Effective Date but on or prior to the third anniversary of the Effective Date | 103.5% |
| Any time after the third anniversary of the Effective Date but prior to maturity | 100% |

| | |
|---|---|
| <u>Representations and</u> | Substantially similar to the representations and warranties in the Senior Secured Notes, but on terms no more onerous than |

3

| | |
|---|---|
| Warranties: | what are in the definitive documentation for the First Lien Exit Facility. |
| Conditions Precedent: | Substantially similar to the conditions precedent in the Senior Secured Notes, but on terms no more onerous than what are in the definitive documentation for the First Lien Exit Facility. |
| Affirmative Covenants: | Substantially similar to the affirmative covenants in the Senior Secured Notes, but on terms no more onerous than what are in the definitive documentation for the First Lien Exit Facility (unless otherwise agreed by the Requisite Lenders). |
| Negative Covenants: | Substantially similar to the negative covenants in the Senior Secured Notes, but on terms no more onerous than what are in the definitive documentation for the First Lien Exit Facility (unless otherwise agreed by the Requisite Lenders); *provided, however,* there shall be appropriate differences for junior debt, including, without limitation, baskets that are 10% larger. |
| Financial Covenants: | Substantially similar to the financial covenants in the definitive documentation for the First Lien Exit Facility (unless otherwise agreed by the Requisite Lenders). |
| Events of Default: | Substantially similar to the events of default in the Senior Secured Notes, but on terms no more onerous than what are in the definitive documentation for the First Lien Exit Facility (unless otherwise agreed by the Requisite Lenders). |
| Amendments: | Amendments, waivers and consents with respect to the Term Facility and related documentation shall require the approval of the Borrower and the Requisite Lenders; except that (a) the consent of each Lender directly adversely affected thereby shall be required with respect to (i) reductions in the amount or extensions of the scheduled date of maturity of any loan or reduce the amount or extend the scheduled payment date for, any payments (other than mandatory prepayments), (ii) reductions in the rate of interest or any fee or extensions of any due date thereof. |
| Assignments and Participations: | Each Lender will be permitted to make assignments and sell participations on customary terms. |
| Expenses and Indemnification: | Substantially similar to terms in the Senior Secured Notes as it relates to the indenture trustee for the Senior Secured Notes, but on terms no more onerous than what are in the definitive documentation for the First Lien Exit Facility. |

4

Governing Law and Forum:        New York.

**EXHIBIT B**
**TO**
**DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION**
**UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

PMC Holding LLC Agreement Term Sheet

**Perkins & Marie Callender's Holding LLC**
**Term Sheet**
**for**
**Limited Liability Company Operating Agreement**

**Parties:**   Perkins & Marie Callender's Holding LLC (the "*Company*") and all holders of the issued and outstanding membership interests (the "*Units*") of the Company or its affiliates (collectively referred to as the "*Members*"). All holders of Units issued pursuant to the Plan of Reorganization (the "*Plan*") shall be bound by the Operating Agreement as of the effective date of the Plan (the "*Effective Date*") by operation of the terms of the Plan; provided that any holder who fails to execute a counterpart signature page to the Operating Agreement in the form supplied by the Company for such purpose,[1] including supplying therein certain information for tax reporting purposes required to be set forth therein (collectively, the "*Admission Materials*"), within 1 year after the Effective Date shall be deemed to forfeit rights to receive Units; provided, further, that, from and after the Effective Date, the Company shall be required to provide written notification, on not less than a quarterly basis, of this requirement to each holder who has not provided the Admission Materials, and in the event the Company fails to provide such notification as to any holder in a particular quarter, the 1 year time period describe above shall be extended by 1 quarter for each quarter for which such failure to provide notice occurs.

**Information Rights:**   The Company will furnish to (a) any Member, the materials referred to in clauses (i), (ii) and (iii) below and (b) any Member who holds at least 2% of the Units, the materials referred to in clause (iv) below, in each case (x) excluding any Member who is a competitor, applicable franchisee and/or applicable franchise development party (each to be defined with more particularity in the Operating Agreement) or their respective affiliates and (y) subject to customary confidentiality provisions set forth in the Operating Agreement and/or to a confidentiality acknowledgment on an online service (which, in both instances, will include an affirmative representation that such Member is not a competitor, applicable franchisee and/or applicable franchise development party (each as defined in the Operating Agreement) and will not provide information to such parties) as contemplated below:

   (i)   within [thirty (30) days][2] after the end of each fiscal month for the Company, unaudited monthly financial statements for the monthly period then ended and the comparable period in the prior year

---

[1] The form of Admission Materials shall be negotiated, vetted by counsel and agreed upon in advance.

[2] Time periods and types of deliveries in clauses (i) – (iv) can mirror corresponding time periods and deliveries in the New Secured Term Loan Agreement (as defined in the Plan).

(excluding notes thereto), including consolidated balance sheets and consolidated statements of income and of cash flows and changes in financial condition of the Company and its consolidated subsidiaries.

(ii) within [forty-five (45) days] after the end of each of the first three fiscal quarters for the Company, unaudited quarterly financial statements for the quarterly period then ended and the comparable period in the prior year (excluding notes thereto), including consolidated balance sheets and consolidated statements of income and of cash flows and changes in financial condition of the Company and its consolidated subsidiaries.

(iii) within [one hundred and twenty (120)] days after the end of each fiscal year, audited financial statements for the Company and its consolidated subsidiaries for such year (including notes thereto), including consolidated balance sheets and consolidated statements of income and of cash flows and changes in financial condition of the Company and its consolidated subsidiaries, together with a copy of the audit report of the Company's independent public accountants.

(iv) not later than [forty-five (45)] days after the beginning of each fiscal year, a budget, prepared on an accounting period by accounting period basis, and an operating plan for such fiscal year, each approach by the Board (as defined below), and including projected consolidated balance sheets and consolidated statements of income and of cash flows and changes in financial condition of the Company and its consolidated subsidiaries for such periods.

(v) In no event shall any financial information required to be furnished pursuant to the Operating Agreement be required to include any information required by, or to be prepared or approved in accordance with, or otherwise be subject to, any provision of Section 404 of the Sarbanes-Oxley Act of 2002 or any rules, regulations, or accounting guidance adopted pursuant to that section.

The financial statements contemplated by clauses (i), (ii) and (iii) above shall be prepared in accordance with United States generally acceptable accounting principles. The financial statements contemplated by clauses (i) and (ii) above shall be certified by an authorized officer of the Company who is familiar with the financial condition of the Company as fairly presenting, in all material respects, the financial condition of the Company and its consolidated subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated,

2

subject to changes from audit and normal year-end adjustments. The Company will make such information and such reports available to the extent required by the terms hereof, which access may be provided by posting such information and reports on IntraLinks or a comparable password protected online data system, which will require a confidentiality acknowledgement (which shall include an affirmative representation that such Member is not a competitor, applicable franchisee and/or applicable franchise development party (each as defined in the Operating Agreement) and will not provide information to such parties), and will make such information and reports readily available to any prospective transferee (other than competitors (to be defined in the Operating Agreement) or affiliates of competitors) of the Units who (x) agrees to treat such information as confidential, and (y) accesses such information on IntraLinks or such comparable password protected online data system, which will require a confidentiality acknowledgement (which shall include an affirmative representation that such entity is not a competitor, applicable franchisee and/or applicable franchise development party (each as defined in the Operating Agreement) and will not provide information to such parties).

**Board of Managers:** The Board of Managers of the Company (the "***Board***") shall consist of at least seven (7) managers (each, a "***Manager***"). The Operating Agreement shall provide, among other things, that (i) the Member who directly, or in combination with affiliated Members, holds at least a majority of the outstanding Units (the "***Majority Members***") shall be entitled to designate all of the Managers, (x) one of whom, on the Effective Date, shall be the Chief Executive Officer (and who shall not be a professional or employee of any Wayzata Entity (as defined below), (y) up to three (3) of which may be professionals or employees of a Wayzata Entity, and (z) the remainder of which shall be independent Managers who are not professionals or employees of any Wayzata Entity, provided, that one of such managers shall initially be selected by the Majority Members in consultation with the Official Committee of Unsecured Creditors, (ii) each Manager shall be elected to serve a one-year term on the Board or until such time as a successor is duly elected by the Member(s) in accordance with the foregoing designation rights, (iv) the Member(s) who designated a Manager shall have the right to remove and replace such Manager with a replacement Manager in accordance with the foregoing designation rights, and (v) upon the resignation, removal, death or incapacity of a Manager, the remaining term of such Manager may be served by a successor designated by the Member(s) who have the right to designate such Manager in accordance with the foregoing designation rights. The composition of each board of each Company subsidiary shall mirror the composition of the Board or such other composition as the Board shall determine from time to time, provided that the Board of any material Company subsidiary shall mirror the composition of the Board.

3

For so long as Standard General, or its affiliates, hold at least 40% of the Units held by them on the Effective Date, Standard General shall be entitled to designate one (1) board observer, who shall have the right to attend and participate in all meetings of Managers and Board meetings and receive copies of all information provided to Managers, but who shall not be entitled to vote at such meetings.

To the maximum extent permitted by law and except as otherwise specified, Managers shall have no fiduciary duties to the Company, Managers shall not be liable to the Company or its members for an act or failure to act and the Operating Agreement shall contain all available waivers allowed by statute or otherwise in favor of the Managers and the Board of Managers.

**Corporate Opportunities:**
No Manager or Member shall have a duty to the Company or the Members to offer to the Company any business opportunity suitable for the Company that may arise from time to time which may also be suitable for the Manager, Member, or any of their Affiliates, nor shall any Manager or Member be liable to any Member or the Company for offering any such business opportunity to any other person; _provided_ that, the foregoing shall not apply to any Manager who is an employee of the Company or any of its subsidiaries.

**Voting Rights:**
The Operating Agreement shall provide that each holder of Units entitled to vote shall have one vote for each Unit thereof held.

**Preemptive Rights:**
Each Member that, together with its affiliates, holds more than 2% of the outstanding Units (collectively, the "**_Significant Members_**"), so long as such Significant Member is an accredited investor, shall have the right (a "**_Preemptive Right_**") to purchase its pro rata share of Units, or any other equity security, or securities directly or indirectly exercisable for, or convertible into, Units or any equity securities issued by the Company or any of its consolidated subsidiaries, except for the following exempted issuances: (i) the grant of Units, options or other securities convertible into Units for Managers, directors, officers, employees or consultants of the Company or its Subsidiaries to purchase Units pursuant to an employee equity incentive plan, or similar benefit program or agreement, where (A) the primary purpose is not to raise additional equity capital for the Company and (B) the total number of Units contemplated by all such plans, programs or arrangements, in the aggregate, does not exceed ten percent (10%) of the fully-diluted number of Units determined as of the Effective Date; (ii) the issuance of any Units as a pro rata dividend or distribution to existing Members, or any split, recapitalization or other subdivision or combination of Units; (iii) the issuance of any Units or

4

convertible securities as consideration in any joint venture agreement, merger, consolidation or other acquisition of any person, business, division or assets, which merger, consolidation or other acquisition has been approved by the Board; (iv) the issuance of any Units or convertible securities to a landlord of, or any insurance surety or insurance provider for, or equipment lessor or lender to, the Company, which issuance has been approved by the Board; and (v) the deemed issuance of Units by operation of the anti-dilution provisions in, or the issuance of any Units under, any convertible securities set forth above in clauses (i) – (iv); or (vi) in issuance in conjunction with a Qualified Public Offering (as defined below) of Securities of the Company.  The Operating Agreement shall contain provisions allowing the Company to comply with its preemptive right obligations on a post-issuance basis in certain circumstances. No debt instruments or debt securities of any kind shall be issued to any Wayzata Entities (as defined below) or the Majority Members unless each Significant Member that is a qualified institutional buyer is permitted to acquire its pro rata percentage of such issuance, pursuant to participation provisions substantially identical to the preemptive rights provisions contemplated above.

**Self-Dealing:**  From and after the Effective Date: (i) for so long as the Wayzata Entities hold at least fifty percent (50%) of the voting power of the Company, the Company and its subsidiaries shall not enter into or amend any significant agreement, or engage in any significant transaction (such agreement or transaction being considered "significant" if the underlying economic value of such agreement or transaction, either singly or together with a series of similar or related agreements or transactions, exceeds, $750,000), with Wayzata Investment Partners, any of its affiliated or advised investment funds or hedge funds, or any of their respective portfolio companies in which the foregoing, in the aggregate, have beneficial ownership in excess of twenty percent (20%) (a "*Wayzata Portfolio Company*," and referred to collectively, as the "*Wayzata Entities*"), other than transactions expressly contemplated by and effected in accordance with the Operating Agreement, without the prior written approval of at least a majority of the Managers who are not professionals or employees of any Wayzata Entity, provided, however, that no approval shall be required for, and the Company shall be permitted to enter into, agreements or transactions, either singly or together with a series of similar or related agreements or transactions, with any Wayzata Portfolio Company if such transaction is entered into in the ordinary course of business, does not exceed $1,500,000 in value, and is approved by an officer of the Company pursuant to authority delegated by the Board of Managers; and (ii) the Company and its subsidiaries shall not enter into or amend any significant agreement, or engage in any significant transaction (as defined in clause (i) above), with the Majority Member(s) or any of its or their affiliates, or any of their respective portfolio companies in which the foregoing, in the

5

aggregate, have beneficial ownership in excess of twenty percent (20%) (a *"Majority Member Portfolio Company,"* and referred to collectively, as the *"Majority Member Entities"*), other than transactions expressly contemplated by and effected in accordance with the Operating Agreement, without the prior written approval of at least a majority of the Managers who are not professionals or employees of any Majority Member Entity, provided, however, that no approval shall be required for, and the Company shall be permitted to enter into, agreements or transactions, either singly or together with a series of similar or related agreements or transactions, with any Majority Member Portfolio Company if such transaction is entered into in the ordinary course of business, does not exceed $1,500,000 in value, and is approved by an officer of the Company pursuant to authority delegated by the Board of Managers.

**Transfer of Units:**

Restrictions on Transferability. No Units shall be transferred, except upon the conditions set forth below, and the Company shall not register in its books the transfer of any Units unless such transfer has been effected in accordance with the terms set forth below.

Endorsement; Certain Transfer. Notwithstanding any other provision of the Operating Agreement, (i) no transfer of Units shall be effective (including to a Permitted Transferee) unless the transferee shall have executed and delivered to the Company an instrument of joinder in the form attached as an exhibit to the Operating Agreement, or in such other form as may be satisfactory to the Board acting reasonably, agreeing to be bound by the terms and conditions of the Operating Agreement, (ii) the Units may not be transferred to any person who is a competitor (to be defined in the Operating Agreement) or an affiliate of a competitor of the Company or its subsidiaries (other than transfers to any such persons who are Significant Members as a result of the restructuring and their affiliates or affiliated funds), and (iii) Units shall not be transferred, and the Company shall not be required to register any transfer of Units on its books, unless the Company shall be satisfied prior to such transfer that registration under the Securities Act and the applicable securities laws of any other jurisdiction is not required in connection with the transaction resulting in such transfer (it being acknowledged that the Company shall be satisfied as to such matters if it receives an opinion to such effect from outside counsel to the transferor) and the Right of First Refusal, Tag-Along Rights and Drag-Along Right provisions have been complied with. The Units shall also be subject to restrictions necessary to keep the number of holders under 400 and restrictions on any transfer that would result in the Company being treated as a "publicly traded partnership" within the meaning of section 7704 of the Internal Revenue Code.

**Tag Along Rights:**

Other than Permitted Transfers (as defined below), if a Member or Members (collectively referred to as the *"Transferring Member(s)"*)

6

propose(s) to sell, transfer or otherwise dispose of a number of Units representing at least forty percent (40%) of the Units then outstanding in one or a series of related transactions, other than to an affiliate of the Transferring Member(s), then the Transferring Member shall give written notice to the Company and the other Members (the "*Other Members*") at least 15 business days prior to the closing of such Transfer and the other Members will have the right (but not the obligation) to include their pro rata portion of the Units to be transferred to the proposed purchaser on the same terms and conditions as the Transferring Members(s) including without limitation in exchange for a price per Unit equal to the same price per Unit proposed to be paid to the Transferring Member for each Unit. A "*Permitted Transfer*" shall be (x) a transfer to any person who is an affiliate of the Member transferring such Units or a transfer to a limited partner, partner, member or equity holder of the Member in connection with the liquidation or wind down of the affairs of such Member, or (y) a Transfer pursuant to a Qualified Public Offering (as defined below). A "*Qualified Public Offering*" means a public offering of equity securities of the Company resulting in gross proceeds of at least $50 million.

**Drag Along Rights:**   If Transferring Member or Members propose(s) to sell Units representing at least sixty (60%) of the outstanding Units to any purchaser, other than to an affiliate of the Transferring Member(s), the other Members shall be required to include the pro rata portion of their Units and any equity securities convertible or exchangeable for Units in such sale and on the same terms and conditions applicable to the Transferring Member(s); *provided*, that in connection with such sale, such other Members shall be required to (A) pay its pro rata portion of the reasonable expenses (if any) incurred by the Company in connection with such sale and (B) join on a pro rata basis (based on respective pro rata portions of the outstanding Units subject to the sale), severally and not jointly, in any and all indemnification or other obligations as are applicable to the Transferring Member(s), other than any such obligations which relate specifically and particularly to another Member such as indemnification with respect to representations and warranties given by a Member regarding such Member's title to and ownership of Units and other fundamental customary representations and warranties regarding such Member only; *provided* that no other Member shall be obligated in connection with such sale to agree to indemnify or hold harmless the purchaser with respect to an amount in excess of the net proceeds received by the Member in respect of such Members Units in connection with such sale.

**Right of**
**First Refusal:**   Transfers of Units will not be permitted unless the Member has given written notice to the Majority Members of the number of Units the Member is proposing to Transfer, the material non-economic terms and conditions of such proposed sale and the proposed sale price. The

7

Majority Members will have the irrevocable and exclusive option to purchase that number of Units to be sold by such Member at the sale price and on the terms set forth in the notice within ten (10) business days of receipt of the notice. If the Majority Members fail to exercise such option to purchase all (and not less than all) the shares so offered, the Member may sell such number of Units during the following sixty (60) days on substantially the same terms, in the aggregate, as offered to the Majority Members and at a sale price no lower than that offered to the Majority Members.

**Capital Calls:** No Member shall be subject to any capital call requirement.

**Registration Rights:** In the event, at any time from and after the Effective Date, the Company shall grant registration rights to any person or entity, it shall be required to grant piggyback registration rights to each Significant Member of the outstanding Units that are no less favorable than the piggyback rights granted by the Company to any person or entity.

**Amendments:** The Operating Agreement may not be amended, terminated (except pursuant to the terms thereof) or otherwise modified or waived without the approval of at least a majority of the total votes of the Units then entitled to vote; *provided* that (i) the Information Rights, Board and board observer, Voting Rights, Preemptive Rights, Self-Dealing, Tag-Along Rights, Drag-Along Rights, Right of First Refusal, No Capital Calls and Registration Rights provisions, and the Amendments provisions, may not be amended without the consent of a majority of the Members who are not Majority Members, and (ii) no amendment, modification or waiver which adversely affects the rights of any Member (other than the Majority Members) in a manner that is disproportionate to its impact on the Majority Members without the consent of a majority of the Members who are not Majority Members. Notwithstanding the foregoing, provisions relating to waiver of fiduciary duties, corporate opportunity, indemnification and exculpations with respect to Managers may not be amended in a manner that adversely affects a current or former Manager without such Manager's written consent.

8

EXHIBIT B

TO DISCLOSURE STATEMENT

DISCLOSURE STATEMENT ORDER

[to be attached upon entry of Disclosure Statement Order]

EXHIBIT C

TO DISCLOSURE STATEMENT

FINANCIAL PROJECTIONS

**PERKINS & MARIE CALLENDER'S INC.**
**PRO FORMA REORGANIZED BALANCE SHEET**
**($ thousands)**

| | Effective Date 11/15/2011 (Projected) | Reorganization Adjustments | "Fresh Start" Adjustments | Effective Date 11/15/2011 Pro Forma | Notes |
|---|---|---|---|---|---|
| Cash and Cash Equivalents | $13,490 | ($6,613) | $0 | $6,877 | 1 |
| Restricted Cash | 4,576 | 0 | 0 | 4,576 | |
| Accounts Receivable | 17,119 | 0 | 0 | 17,119 | |
| Inventory | 9,093 | 0 | 0 | 9,093 | |
| Other Current Assets | 1,120 | 0 | 0 | 1,120 | |
| **TOTAL CURRENT ASSETS** | $45,397 | ($6,613) | $0 | $38,784 | |
| | | | | | |
| PP&E | 43,650 | 0 | 0 | 43,650 | |
| Goodwill | 23,100 | (23,100) | 170,738 | 170,738 | 8 |
| Other Intangible Assets | 143,366 | (143,366) | 0 | 0 | |
| Other Assets | 5,137 | 0 | 0 | 5,137 | |
| **TOTAL ASSETS** | $260,650 | ($173,079) | $170,738 | $258,309 | |
| | | | | | |
| Accounts Payable | 7,000 | 0 | 0 | 7,000 | |
| Accrued Liabilities and Other | 28,199 | 0 | 0 | 28,199 | |
| Short-Term Debt | 240 | 0 | 0 | 240 | |
| **TOTAL CURRENT LIABILITIES** | $35,439 | $0 | $0 | $35,439 | |
| | | | | | |
| DIP Credit Facility | 0 | 0 | 0 | 0 | 2 |
| First Lien Exit Facility | 0 | 8,000 | 0 | 8,000 | 3 |
| Long-Term Debt and Accrued Interest | 109,676 | (6,613) | 0 | 103,063 | 4 |
| New Secured Term Debt | 0 | 7,500 | 0 | 7,500 | 9 |
| Capital Lease Obligations | 9,856 | 0 | 0 | 9,856 | |
| Other Liabilities | 35,764 | 0 | 0 | 35,764 | 5 |
| Liabilities Subject to Compromise | 231,457 | (231,457) | 0 | 0 | 6 |
| **TOTAL LIABILITIES** | $422,192 | ($222,570) | $0 | $199,622 | |
| | | | | | |
| Shareholders' Equity | (161,542) | 49,491 | 170,738 | 58,687 | 7 |
| **TOTAL SHAREHOLDERS' EQUITY** | ($161,542) | $49,491 | $170,738 | $58,687 | |
| | | | | | |
| **TOTAL LIABILITIES & SHAREHOLDERS' EQUITY** | $260,650 | $0 | $0 | $258,309 | |

(1) Available cash reflects proceeds from issuance of $7.5 million in new secured term debt, payment of $7.5 million in general unsecured and other claims and payment of $6.6 million of accrued interest on the Senior Secured Notes.

(2) Reflects no drawn balance at effective date and issuance of new $30.0 million First Lien Exit facility.

(3) Reflects amounts drawn on First Lien Exit facility to pay priority, admin, convenience claims, cure costs and other expenses.

(4) Reflects long-term debt at emergence consisting of a $103.1 million Secured Term Loan after payment of accrued interest.

(5) Includes $8.5 million of estimated taxes due in March 2012.

(6) Does not include claims arising from rejection of leases and other executory contracts. All prepetition Liabilities Subject to Compromise (including such rejection damage claims) will be eliminated upon emergence.

(7) Reorganization adjustments include the effect of payments at emergence, elimination of liabilities subject to compromise and the exit facility financing. Adjustments to shareholders' equity were based on the estimated equity value of the Reorganized Debtors in accordance with "fresh start" accounting provisions covered under FASB Codification section 852.

(8) After accounting for all other "fresh start" accounting adjustments, the remaining offsetting adjustment for shareholder's equity was applied to goodwill.

(9) Reflects issuance of $7.5 million of additional new secured term debt to provide funding for additional payment of claims.

**PERKINS & MARIE CALLENDER'S INC.**
**Disclosure Statement Projections - Balance Sheet**
**($ thousands)**

| | 11/15/2011 Pro Forma | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 |
|---|---|---|---|---|---|---|
| Cash and Cash Equivalents | $6,877 | $7,622 | $3,985 | $3,848 | $11,042 | $23,595 |
| Restricted Cash | 4,576 | 4,576 | 4,576 | 4,576 | 4,576 | 4,576 |
| Accounts Receivable | 17,119 | **13,525** | **13,810** | **14,095** | **14,380** | **14,500** |
| Inventory | 9,093 | **11,000** | **11,000** | **12,000** | **12,000** | **12,000** |
| Other Current Assets | 1,120 | 1,120 | 1,120 | 1,120 | 1,120 | 1,120 |
| **TOTAL CURRENT ASSETS** | $38,784 | $37,843 | $34,491 | $35,639 | $43,117 | $55,791 |
| | | | | | | |
| PP&E | 43,650 | 42,050 | 38,425 | 37,700 | 37,511 | 37,511 |
| Goodwill | 170,738 | 170,738 | 170,738 | 170,738 | 170,738 | 170,738 |
| Other Intangible Assets | 0 | 0 | 0 | 0 | 0 | 0 |
| Other Assets | 5,137 | 5,137 | 5,137 | 5,137 | 5,137 | 5,137 |
| **TOTAL ASSETS** | $258,309 | $255,768 | $248,791 | $249,214 | $256,503 | $269,176 |
| | | | | | | |
| Accounts Payable | 7,000 | **8,000** | **9,100** | **9,600** | **10,300** | **11,000** |
| Accrued Liabilities and Other | 28,199 | **28,199** | **28,199** | **28,199** | **28,199** | **28,199** |
| Short-Term Debt | 240 | 240 | 240 | 240 | 240 | 240 |
| **TOTAL CURRENT LIABILITIES** | $35,439 | $36,439 | $37,539 | $38,039 | $38,739 | $39,439 |
| | | | | | | |
| DIP Credit Facility | 0 | 0 | 0 | 0 | 0 | 0 |
| First Lien Exit Facility | 8,000 | 8,000 | 6,000 | 2,000 | 0 | 0 |
| Secured Term Debt | 110,563 | 110,563 | 110,563 | 110,563 | 110,563 | 110,563 |
| Capital Lease Obligations | 9,856 | 9,800 | 9,560 | 9,320 | 9,080 | 8,840 |
| Other Liabilities | 35,764 | 35,764 | 28,264 | 29,264 | 30,264 | 31,264 |
| | | | | | | |
| **TOTAL LIABILITIES** | $199,622 | $200,566 | $191,926 | $189,186 | $188,646 | $190,106 |
| | | | | | | |
| Shareholders' Equity | 58,687 | 55,202 | 56,865 | 60,028 | 67,857 | 79,070 |
| **TOTAL SHAREHOLDERS' EQUITY** | $58,687 | $55,202 | $56,865 | $60,028 | $67,857 | $79,070 |
| | | | | | | |
| **TOTAL LIABILITIES & SHAREHOLDERS' EQUITY** | $258,309 | $255,768 | $248,791 | $249,214 | $256,503 | $269,176 |

**PERKINS & MARIE CALLENDER'S INC.**
**Disclosure Statement Projections - Income Statement**
**($ thousands)**

| | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 |
|---|---|---|---|---|---|
| Restaurant Sales | $388,096 | $342,052 | $357,683 | $377,468 | $398,513 |
| Manufacturing Revenue, Net | 31,523 | 34,199 | 37,161 | 40,266 | 41,542 |
| Franchise Royalties | 21,766 | 22,057 | 22,707 | 23,487 | 24,271 |
| Licensing and Other Revenue | 2,500 | 0 | 0 | 0 | 0 |
| **Total Revenue** | **$443,884** | **$398,307** | **$417,551** | **$441,220** | **$464,325** |
| Restaurant Food Costs | 81,963 | 70,692 | 73,435 | 76,198 | 80,419 |
| Restaurant Labor & Benefit Costs | 138,099 | 120,078 | 124,607 | 131,508 | 138,850 |
| Manufacturing Cost of Goods Sold | 39,104 | 39,600 | 42,558 | 45,753 | 47,467 |
| Operating & Occupancy Costs | 139,442 | 118,366 | 126,084 | 131,659 | 137,511 |
| **Total Cost of Goods Sold** | **$398,609** | **$348,736** | **$366,684** | **$385,119** | **$404,247** |
| **Segment Operating Profit** | **$45,275** | **$49,571** | **$50,867** | **$56,102** | **$60,078** |
| Selling, General & Adminstrative | 28,447 | 30,184 | 30,230 | 30,923 | 31,517 |
| **Operating Income** | **$16,828** | **$19,387** | **$20,637** | **$25,178** | **$28,562** |
| Non-Recurring Expense | 20,500 | 0 | 0 | 0 | 0 |
| Gain on Sale of Assets | (57,281) | 0 | 0 | 0 | 0 |
| Asset Impairments and Closed Store Expenses | (1,900) | | | | |
| Net Interest Expense | 31,402 | 17,724 | 17,474 | 17,349 | 17,349 |
| Other Expenses | 2,645 | 0 | 0 | 0 | 0 |
| **Earnings Before Tax** | **$21,462** | **$1,663** | **$3,163** | **$7,829** | **$11,213** |
| Tax Expense | 8,418 | 0 | 0 | 0 | 0 |
| **Net Income** | **$13,044** | **$1,663** | **$3,163** | **$7,829** | **$11,213** |
| Operating Income | $16,828 | $19,387 | $20,637 | $25,178 | $28,562 |
| Depreciation & Amortization | 15,300 | 12,700 | 15,275 | 14,990 | 14,879 |
| Other | 0 | 0 | 0 | 0 | 0 |
| **EBITDA** | **$32,128** | **$32,087** | **$35,912** | **$40,168** | **$43,441** |

**PERKINS & MARIE CALLENDER'S INC.**
**Disclosure Statement Projections - Cash Flow Statement**
**($ thousands)**

| | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 |
|---|---|---|---|---|---|
| **Cash Flow from Operations:** | | | | | |
| Net Income/(Loss) | $13,044 | $1,663 | $3,163 | $7,829 | $11,213 |
| Depreciation & Amortization | 15,300 | 12,700 | 15,275 | 14,990 | 14,879 |
| Non-Cash Interest | 13,936 | 0 | 0 | 0 | 0 |
| | | | | | |
| *Change in Working Capital:* | | | | | |
| Change in Receivables | | (285) | (285) | (285) | (120) |
| Change in Inventory | | 0 | (1,000) | 0 | 0 |
| Change in Payables | | 1,100 | 500 | 700 | 700 |
| Change in Accrued Liabilities | | 0 | 0 | 0 | 0 |
| | | | | | |
| Total Change in Working Capital | (14,498) | 815 | (785) | 415 | 580 |
| | | | | | |
| *Other Changes in Operations:* | | | | | |
| Change in Deferred Lease Obligations | 1,600 | 1,000 | 1,000 | 1,000 | 1,000 |
| Impairments | (1,900) | 0 | 0 | 0 | 0 |
| Other | 8,418 | (8,500) | 0 | 0 | 0 |
| **Cash Flow from Operations** | $35,900 | $7,678 | $18,653 | $24,234 | $27,672 |
| | | | | | |
| **Cash Flow from Investing:** | | | | | |
| Capital Expenditure | (5,400) | (9,075) | (14,550) | (14,801) | (14,879) |
| Asset Sales | 850 | 0 | 0 | 0 | 0 |
| Other Investing Activities | 0 | 0 | 0 | 0 | 0 |
| | | | | | |
| **Cash Flow from Investing** | ($4,550) | ($9,075) | ($14,550) | ($14,801) | ($14,879) |
| | | | | | |
| **Cash Flow from Financing:** | | | | | |
| Change in Long-Term Debt | (37,716) | 0 | 0 | 0 | 0 |
| Payments on Capitalized Leases | (240) | (240) | (240) | (240) | (240) |
| | | | | | |
| **Cash Flow-Financing Activity** | (37,956) | (240) | (240) | (240) | (240) |
| | | | | | |
| Beginning Cash | 6,228 | 7,622 | 3,985 | 3,848 | 11,042 |
| Net Period Cash Flow | (6,606) | (1,637) | 3,863 | 9,193 | 12,553 |
| | | | | | |
| Ending Cash Flow Before 1st Lien Exit Facility | (378) | 5,985 | 7,848 | 13,042 | 23,595 |
| 1st Lien Exit Facility Draw / (Paydown) | 8,000 | (2,000) | (4,000) | (2,000) | 0 |
| | | | | | |
| **ENDING CASH BALANCE** | **$7,622** | **$3,985** | **$3,848** | **$11,042** | **$23,595** |

EXHIBIT D

TO DISCLOSURE STATEMENT

<u>LIQUIDATION ANALYSIS</u>

**PERKINS & MARIE CALLENDER'S INC.**
**HYPOTHETICAL LIQUIDATION ANALYSIS - CONSOLIDATED**
**(in thousands)**

| SUMMARY OVERVIEW - CONSOLIDATED BASIS | Estimated Book Value | Estimated Liquidation Value | | | | See Attached |
|---|---|---|---|---|---|---|
| **Statement of Estimated Assets** | at 10/31/11 | High | | Low | | Notes |
| Cash | $11,962 | $11,962 | 100.0% | $11,962 | 100.0% | 1 |
| Restricted Cash | 4,576 | $4,576 | 100.0% | 4,576 | 100.0% | 2 |
| Accounts Receivable-Trade | 14,576 | 11,840 | 81.2% | 7,071 | 48.5% | 3 |
| Inventory | 8,893 | 2,685 | 30.2% | 912 | 10.3% | 4 |
| Prepaid Expenses & Other | 1,870 | 280 | 15.0% | 0 | 0.0% | 5 |
| Net Fixed Assets | 44,050 | 11,669 | 26.5% | 0 | 0.0% | 6 |
| Goodwill & Intangibles | 166,466 | 30,173 | 18.1% | 0 | 0.0% | 7 |
| Other Assets | 9,835 | 3,894 | 39.6% | 3,894 | 39.6% | 8 |
| Gross Liquidation Proceeds | $262,227 | $77,079 | 29.4% | $28,414 | 10.8% | |

| | | Recovery | | | | |
|---|---|---|---|---|---|---|
| **Recovery of Claims and Costs** | | High | | Low | | Notes |
| Estimated Accrued Sales Tax | $1,200 | $1,200 | 100.0% | $1,200 | 100.0% | 9e |
| **Super Priority Claims** | | | | | | |
| DIP Credit Facility (Super Priority) | $0 | $0 | 100.0% | $0 | 100.0% | |
| **Net Recovery to Super Priority Claims** | $1,200 | $1,200 | 100.0% | $1,200 | 100.0% | |
| Less: Wind-Down Costs | | 2,716 | | 2,716 | | 10 |
| Less: Chapter 7 Trustee Fees | | 2,312 | | 852 | | 11 |
| Less: Carve-Out for Professional Fees | | 1,800 | | 1,800 | | 9g |
| **Total Chapter 7 Costs** | | $6,828 | | $5,368 | | |
| **Total of Super Priority Claims and Chapter 7 Costs** | | $8,028 | | $6,568 | | |
| **Undistributed Net Proceeds** | | $69,051 | | $21,846 | | |
| **Pre-Petition Claims:** | | | | | | |
| Senior Secured Notes Claims | $109,075 | $69,051 | 63.3% | $21,846 | 20.0% | 12b |
| Administrative Expense Claims | $20,746 | 0 | 0.0% | 0 | 0.0% | 12c |
| Priority Tax Claims | $0 | 0 | 0.0% | 0 | 0.0% | |
| Senior Notes Claims | 203,300 | 0 | 0.0% | 0 | 0.0% | 12d |
| General Unsecured Claims | 86,132 | 0 | 0.0% | 0 | 0.0% | 12e |
| Intercompany Claims | 0 | 0 | 0.0% | 0 | 0.0% | |
| Old Equity Interests | 0 | 0 | 0.0% | 0 | 0.0% | |

As the table above shows, the estimated net proceeds from a Chapter 7 Liquidation Analysis range from approximately $28.4 million to $77.1 million before wind-down costs and payment of any claims.  The major assumptions are detailed on the following pages.

LIQUIDATION ANALYSIS

NOTES

The estimated net book values of the assets were derived from a combination of actual balances as of 8/7/11 and projected balances as of 10/31/11, the assumed date of the conversion to a Chapter 7 Liquidation.  In addition, the net estimated liquidation proceeds are expressed on a current basis rather than a net present value basis (unless otherwise noted) even though the Liquidation is expected to take place over a period of 6 - 12 months.

1) **Cash**

   The amounts shown are projected cash balances available to the Debtors as of the Conversion Date. The estimated cash balances were derived from the forecasted balance sheet based on projected cash flows through the Conversion Date.  Unless otherwise noted, the cash balances,

   a)   Are prior to any wind-down costs required for the Liquidation;

   b)   Exclude payment of any professional fees accrued and unpaid to that date;

   c)   Do not include any "restricted cash".

2) **Restricted Cash**

   The Restricted Cash relates to a marketing fund that is used for advertising and promotion of the Perkins brand.  These funds are classified as restricted cash with a corresponding liability for franchise advertising on the consolidated balance sheet.  Although these funds are essentially held on behalf of franchisees, we have assumed that they will be available for general distribution in the event of liquidation, which would result in unsecured claims by the franchisees.

3) **Accounts Receivable**

   Accounts Receivable was analyzed by the following major general ledger accounts:

   a)   *Credit Cards, net of fees* – Represents cash in transit from patrons. Estimated recovery range of 90-98%.

   b)   *Accrued Franchise Royalties* – These are franchisee royalties.  Estimated recovery range of 25-50% in wind-down.

   c)   *Other Franchise Receivables* – Represents other amounts due from franchisees, such as for equipment purchases.  Estimated recovery range of 25-50% in wind-down.

1

d) *All Other* – Includes Foxtail outside sales receivables, Marie Callender's outside commissary sales receivables, and other general corporate AR.  We have assumed that receivables at the local restaurant level would be difficult to collect in a wind-down. Estimated recovery range of 0-50% in wind-down.

4) **Inventory**

a) *Food and Supplies (Restaurants)* – Due to their perishable nature, we estimate that restaurant food and supplies would be sold to liquidators or donated with recoveries between 5% and 25%.

b) *Ingredients (Foxtail)* – Due to their perishable nature, we estimate that Foxtail ingredients would be sold to liquidators or donated with recoveries between 5% and 25%.

c) *Work in Process (Foxtail)* – In the event of liquidation, we assume that WIP inventory would have little to no value in recovery.

d) *Finished Goods (Foxtail)* – Because Foxtail's products have a longer shelf life than restaurant food, we have assumed modestly higher recoveries of between 25% and 50%.

e) *Capitalized Labor & Overhead* – In the event of liquidation, these items would have little to no value in recovery.

f) *Supplies & Other (Foxtail)* – Supplies include packaging materials and other supplies.  In an orderly liquidation, we estimate recoveries in the range of 0-20%.

g) *Supplies & Other (Restaurants)* – Supplies include training materials and other supplies.  In an orderly liquidation, we estimate recoveries in the range of 0-20%.

5) **Prepaid Expenses and Other Current Assets**

a) *Prepaid Expenses* - Includes prepaid expenses for insurance, rent, legal, and other.  Any prepaids are assumed to be applied during the wind-down period, with little to no recovery expected.

b) *Utility Deposit* – Cash held in a segregated Utility Deposit account at Regions Bank for the benefit of utilities that did not receive separate deposits.  This account is, for the most part, equal to 2 weeks of average usage for each of the respective utilities.  It is assumed that these funds will either be used during the wind-down period or that the Utilities will have them applied to their open post-petition balances.

6) **Net Fixed Assets**

Net fixed assets were analyzed in the following major groups:

a) *Land Improvements* – In liquidation, all improvements would remain with the properties, which are owned by third parties.

b)  *Buildings* – **In liquidation, all buildings would remain with the properties, which are owned by third parties.**

c)  *Equipment* – **All non-attached equipment is assumed to be sold to liquidators. We have assumed a high value equal to depreciated net book value (12.0% of cost) and low value equal to zero.**

d)  *Leasehold Improvements* – **Due to its nature, most leasehold improvements would remain with the properties.**

e)  *Construction in Process* – **Similar to leasehold improvements, we have assumed that any additional construction value would remain with the properties.**

f)  *Property Under Capital Lease* – **In liquidation, property under capital lease would revert back to its original owners.**

7)  **Goodwill & Other Intangible Assets**

a)  *Goodwill* – **We assume that goodwill has no value in liquidation.**

b)  *Franchise Agreements* – **We assume that these assets have no value in liquidation.**

c)  *Customer Relationships* – **We assume that these assets have no value in liquidation.**

d)  *Acquired Franchise Rights* – **We assume that these assets have no value in liquidation.**

e)  **Trade Names – Under the assumption that the "Perkins" and "Foxtail" trade names could be sold to third parties, a value of up to $30.2 million was assumed.**

8)  **Other Non-Current Assets**

a)  *Deposits: Utilities & Other* – **We assume these funds would be available for general distribution in the case of a Chapter 7 liquidation.**

b)  *Equity in Partnerships* – **This asset represents joint ventures between the Company and third parties for certain Marie Callender's restaurants. We assume that this asset has little to no value in liquidation.**

c)  *Liquor Licenses* – **This asset represents liquor licenses for certain Marie Callender's restaurants. Under the assumption that these assets could be sold to a third party in liquidation, we have assumed a value equal to net book value under both high and low scenarios.**

d)  *Deferred Compensation Assets* – **Represents the assets in a non-qualified deferred compensation retirement plan for certain executive-level employees. The balance sheet contains a corresponding offsetting liability. We have assumed that these assets would be available for general distribution in the case of a Chapter 7 liquidation.**

e) *SERP Assets* – Represents the assets in a supplemental executive retirement plan for certain executive-level employees. The balance sheet contains a corresponding offsetting liability. We have assumed that these assets would be available for general distribution in the case of a Chapter 7 liquidation.

f) *Other Assets (Long Term)* –Represents the deferred financing costs from the two bond issues and pre-petition credit facility. We assume that these assets have no value in liquidation.

**9) Estimated Additional Costs and Claims Due to a Chapter 7 Conversion**

The Estate would incur additional costs and claims due to the conversion of the Chapter 11 case to a Chapter 7 case. In addition, the estate could bear considerable costs to liquidate the assets with value and for the wind-down of the estate.

a) Payroll and Payroll Taxes: As most of Perkins & Marie Callender's employees are paid in arrears, there is estimated to be approximately $10.5 million of accrued payroll, vacation and payroll taxes as of the Conversion Date. These costs receive Administrative Claim status in this Liquidation Analysis.

b) Severance: Under this Liquidation Analysis, it was assumed that normal Company practice would not be followed and that severance would not be paid.

c) Accounts Payable and Accrued Expenses: As of the conversion date, it is estimated that there will be approximately $6.5 million of post-petition accrued costs and payables (primarily trade vendors). These costs receive Administrative Claim status in this Liquidation Analysis.

d) Medical Insurance: The Company's portion of medical claims post-petition is estimated at $0.8 million (Administrative Claims).

e) Sales Taxes: The Company collects sales tax on its customer sales and remits the proceeds to the respective taxing jurisdictions approximately one month after collection. These proceeds are in effect "Trust Fund" proceeds and would be remitted to the taxing jurisdictions prior to any other claim (including the Super-Priority Claims) being paid.

f) Gift Cards: Any outstanding customer gift cards would not be honored as store operations have ceased. These claims (assumed to be post-petition) would receive Administrative Claims status.

g) Professional Fees: Treatment is based on the terms of the DIP Agreement:

i) Lender's Professionals do not receive a recovery under a Chapter 7 as they are not covered by the DIP agreement carve-out.

ii) Professionals retained by the Company and the UCC will receive payment out of the proceeds paid to the Super-Priority claims under the DIP agreement carve-out.

h) Property Taxes:  Accrued property taxes receive Administrative Claim status.  Since all leases will be rejected this is assumed to be zero.

i) Taxes:  Unpaid federal, state and local taxes would receive a Priority Claim in a Liquidation.

j) Workers Compensation Claims:  Pre-petition claims are covered under existing Letters of Credit.  The portion of post-petition claims subject to the Company's self insurance limits are estimated at $0.5 million in Administrative Claims.

k)  Lease Rejection Claims:  It is assumed that no leases are assumed during the post-petition period, and therefore all landlords will receive General Unsecured Claims under Section 502(b)(6) of the Bankruptcy Code.

l) Other Contracts:  Numerous other non-real estate executory contracts would also be rejected.  Most of the parties to the contracts would be entitled to file General Unsecured Claims.  There may also be numerous contingent, disputed or unliquidated claims not included in this Liquidation Analysis due to the unknown resolution of such claims.

## 10)  Wind-Down Costs

It is estimated it could take 6 to 12 months or more to perform the activities necessary to wind-down the Estate.  Wind-down estimates include items such as corporate payroll, corporate headquarter costs and certain professional fees which would be required to liquidate assets, close and reconcile books, collect accounts receivable, review accounts payable and creditor claims and file all required tax returns.

## 11)  Chapter 7 Trustee Fees

It is assumed that the Chapter 7 Trustee fees are paid in accordance with limits established by section 326 of the Bankruptcy Code.

## 12)  Claims of the Estate (all Classes)

a)  Super Priority Secured Claims:  This is the $21.0 million facility created under the original DIP agreement.  At the assumed Liquidation date, the balance is projected to be zero plus $10.1 million in Letters of Credit.  In this Liquidation Analysis, it is assumed that these claims receive priority over all other claim categories (except for payment of Sales Taxes as previously noted).

b)  Pre-Petition Secured Claims:  This is the principal and accrued interest as of 6/12/11 on the Senior Secured Notes.

c)  Administrative Claims as of Conversion Date:

    i)  Accrued Payroll, Payroll Taxes and Vacation      $10.5 million

    ii)  Accounts Payable & Accrued Expenses      $ 6.5 million

    iii) Other Admin      $ 3.7 million

**Total Estimated Administrative Claims**                                   $20.7 million

d)   **Unsecured Senior Note Claims:  This is the principal and accrued interest as of 6/12/11 on the Senior Notes.**

e)   **General Unsecured Claims:**

    i)   **Estimated Claims as of June 12, 2011 (pre Chapter 7 conversion)**   $28.1 million

    ii)   **Lease Rejections Claims under 502(b)(6)**   $50.3 million

    iii)   **Employee Claims**   $ 3.1 million

    iv)   **Franchise & Other Executory Contracts**   $ 4.6 million

    **Total Estimated General Unsecured Claims**   $86.1 million